TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A. Oswald
Brian F. Moore

Proposed Counsel to the
 Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                           :

In re:                          :       Chapter 11
                           :

LOEHMANN'S HOLDINGS INC., *et al.*,   :       Case No. _____
                           :

               Debtors.     :       (Motion for Joint Administration
                           :       Pending)
-----------------------------------------------------------X

## DECLARATION OF JOSEPH MELVIN PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Under 28 U.S.C. § 1746, I, Joseph Melvin, declare as follows under penalty of perjury:

1.      I am the Chief Operating Officer ("COO"), Chief Financial Officer ("CFO") and Secretary of Loehmann's Holdings Inc. ("Loehmann's Holdings"), a Delaware corporation and the ultimate parent of debtors and debtors in possession (i) Loehmann's, Inc., (ii) Loehmann's Operating Co. ("Loehmann's Opco") and (iii) Loehmann's Real Estate Holdings, Inc. ("Loehmann's Real Estate Holdings"), as well as COO and CFO of Loehmann's Capital Corp. ("Capco"), an affiliated debtor and debtor in possession in the above-captioned Chapter 11 cases (Capco, together with

Loehmann's, Inc., Loehmann's Operating Co., Loehmann's Real Estate Holdings, and Loehmann's Holdings, "Loehmann's" or the "Debtors").

2.     I have been employed by Loehmann's since June, 2010, and I am familiar with the day-to-day operations, business, and financial affairs of the Debtors. My extensive retail experience spans more than thirty years in both department and specialty stores. I served for twelve years, from 1997 to 2009 as the President and COO of The Finlay Fine Jewelry Corporation, a publicly held retailer with more than 1,000 locations primarily leased in department stores and approximately $1 billion in annual sales. Prior thereto, I was employed for more than twenty years at The May Department Stores Company in several capacities, including serving as Chairman and COO for its then affiliate, Filene's Department Stores.

3.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"). The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.     Unless otherwise stated, the facts set forth in this Declaration are based upon my personal knowledge as an officer of the Debtors, my review of relevant documentation and financial information, information provided to me by employees of the Debtors, and my opinions based upon my knowledge and information concerning the Debtors' operations and financial affairs.

5.     Unless otherwise indicated, the financial information set forth in this declaration is unaudited.

2

6. Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), I submit this Declaration to explain, among other things, to the Court and other interested parties the circumstances that compelled the Debtors to seek relief under Chapter 11. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

7. Loehmann's, founded in 1921 as the "Original Designer Outlet," is a leading national specialty retailer, offering well-known designer and brand name women's fashion apparel, accessories and shoes, and men's and children's apparel and furnishings at prices that are typically 30% to 65% below department store prices.

8. Over the past several years, Loehmann's has been implementing strategic and operational initiatives that had initially yielded positive results: Loehmann's gross profit increased $7.9 million from $168.2 million in fiscal year 2008 to $176.1 million in fiscal year 2009, and gross profit percentage improved to 41.7% compared to 37.1% in the prior fiscal year. Notwithstanding these initiatives, the decline in economic conditions in several markets in which Loehmann's stores are concentrated, mainly California, the Northeast, Midwest and Florida, has had an adverse effect on Loehmann's financial condition and results of operations.

9. Accordingly, Loehmann's with the support of its key Supporting Secured Noteholders, defined herein, and Istithmar, its pre-petition equity sponsor -- have filed these consensual Chapter 11 cases to effectuate a proposed financial restructuring that will substantially reduce debt and re-capitalize the company, enhance

the company's liquidity, and solidify the company's long-term growth prospects and operating performance.

10.     To evidence their support of the Debtors' restructuring, the parties executed, as of the date hereof, a Restructuring Support Agreement and Investment Commitment Letter prior to the filing of the Chapter 11 cases, annexed hereto as Exhibit "1" and Exhibit "2," respectively.   The term sheet attached to the Restructuring Support Agreement sets forth the essential terms for the proposed joint Chapter 11 plan of reorganization (the "Plan"), which is expected to be filed shortly.  The term sheet attached to the Investment Commitment Letter sets forth the essential terms and conditions for an investment to be made by Istithmar and Whippoorwill in Reorganized Loehmann's upon emergence that will, together with the cash received from an exit financing facility, provide the funding for distributions under the Plan and for Reorganized Loehmann's working capital needs upon emergence.

11.     In addition, Loehmann's' prepetition senior secured working capital lender, Crystal Financial LLC ("Crystal") has agreed to provide the Debtors with a $45 million debtor-in-possession credit facility (the "DIP Financing Facility") to finance the Debtors' operations pending confirmation of the Plan.

12.     Loehmann's intends to emerge from bankruptcy quickly and will maintain viable and competitive business operations going forward.

13.     Upon de-leveraging its balance sheet through the comprehensive and financial restructuring under the Plan, Loehmann's will be able to "right-size" and capitalize on its strategic initiatives going forward, while preserving approximately 1,900 jobs and the Loehmann's brand that has been a fixture in the retail industry for 89 years.

# I. SDNY LBR 1007-2(A)(1)
## NATURE OF DEBTORS' BUSINESS AND
## CIRCUMSTANCES LEADING TO CHAPTER 11 FILING

**A.**     **Company Overview**

14.     Loehmann's has a strong brand name, a loyal customer base and long-standing relationships with leading designers and vendors of quality merchandise. Loehmann's' merchandise offerings include over 500 upscale and designer apparel brands such as Calvin Klein, Donna Karan, Ralph Lauren, Michael Kors and Dolce & Gabbana. The Debtors' renowned "Back Room", which showcases Loehmann's' highest end designer merchandise, provides a key point of differentiation from other off-price retailers.

15.     Loehmann's' core customer base is mostly affluent women between the ages of 30 and 55 with household incomes in excess of $100,000 who shop at Loehmann's for its wide array of in-season designer and brand name merchandise priced at a significant discount to department stores. Loehmann's has approximately 200,000 "Best Customers," many of whom have been Loehmann's customers for over ten years, who average approximately $1,000 in annual purchases, purchase goods an average of approximately twelve times a year and represent approximately 45% of the Debtors' annual net sales.

16.     Loehmann's offers a wide selection of women's sportswear, dresses, suits, outerwear, accessories, handbags, intimate apparel and shoes, and men's furnishings and sportswear. Most of the Loehmann's merchandise is in-season and, therefore, is available during the same selling season as it is available in department stores.

(i) <u>Organizational Structure</u>

17.    The Debtors are an integrated business with common management, and they share key financial and operational systems.   As reflected in the corporate organization chart annexed hereto as Exhibit "3," Loehmann's Holdings is the direct parent or owner of Loehmann's, Inc., which owns 100% of the common stock of Loehmann's Real Estate Holdings, Inc., and Loehmann's Opco.   Capco was established outside of the other Debtors' corporate structure.   Although Capco is owned by an affiliate of Global Securitization Services LLC, an independent corporate services company, under ASC 810-10-55, Capco is included in the consolidated financial statements of Loehmann's.   Capco's sole purpose was to facilitate the 2004 Transaction (defined below) so as to comply with the strictures of Shari'ah law that do not allow for the charging or payment of interest.

(ii) <u>History of the Company</u>

18.    Loehmann's is headquartered in the Bronx, New York.   As of the Petition Date, the Debtors have approximately 1900 employees and operate 48 stores in major metropolitan areas located in 13 states and the District of Columbia. Loehmann's' stores are concentrated on the East and West coasts with a major presence in the Northeast/Mid-Atlantic, California and Florida markets.

19.    In May 1999, Loehmann's filed for Chapter 11 bankruptcy protection in Delaware due to a combination of overexpansion and declining sales when it was suffering losses.   Loehmann's emerged from bankruptcy in October 2000, shedding 25 stores in the process.   Loehmann's Holdings was created upon the company's emergence from bankruptcy.

20.     In July 2006, 100% of the common stock of Loehmann's Holdings was acquired by Istithmar Retail Investments ("Istithmar") in a transaction valued at $300 million. Istithmar owns 100% of the common stock through its wholly owned subsidiary, Designer Apparel Holding Company ("DAHC"). Istithmar and its affiliates (the "Istithmar Group") comprise a Dubai, United Arab Emirates-based alternative investment firm focusing on private equity, real estate and other alternative investments.

(iii) <u>Loehmann's Niche in the Industry</u>

21.     Loehmann's offers in-season brand name designer, bridge and better merchandise, a mix similar to that found at Bloomingdale's, Saks Fifth Avenue, Neiman Marcus and Nordstrom, in an off-price environment. Loehmann's differs from more expensive department stores by offering similar merchandise at significantly lower prices and from other off-price retailers by offering a broader range of designer, bridge and better merchandise.

22.     Loehmann's does not engage in significant forward purchasing and a large portion of its purchasing requirements in any given month intentionally remains unfulfilled at the beginning of the month. This strategy enables Loehmann's to react to fashion trends and changing customer preferences while enhancing its ability to negotiate with vendors and take advantage of market inefficiencies and opportunities as they may arise.

23.     Loehmann's purchases a majority of its inventory during the manufacturer's selling season, enabling Loehmann's to offer merchandise during the same selling season as it is available in department stores. Loehmann's also purchases a portion of inventory at the end of the season, when a manufacturer's remaining items

can be bought at an even steeper discount. This merchandise is held for distribution at the beginning of the comparable season of the next year. Given the way Loehmann's operates, its vendors do not need to build into their pricing any anticipation of returns, markdown allowances or advertising allowances, all of which are typical in the department store industry.

24. Loehmann's maintains its own central buying staff of experienced, well respected off-price buyers capable of enhancing Loehmann's already strong vendor relationships. Loehmann's leases a 44,250 square foot facility in Bronx, NY, which serves as its corporate headquarters; this lease expires in 2012, subject to renewal. Loehmann's operates a 404,000 square foot centralized distribution center located in Rutherford, New Jersey; this lease expires 2011, subject to renewal. As merchandise arrives at the distribution center, it is priced, ticketed, assigned to individual stores by merchandising systems and packaged for delivery to the stores.

25. Loehmann's leases all of its retail store locations. Loehmann's average traditional store size is approximately 26,000 square feet. The terms of such leases expire from 2011 to 2024, excluding option periods. The leases for Loehmann's stores typically provide for a 10 to 15-year term with two or three five-year renewals that are automatic, unless Loehmann's elects to terminate the lease. The rental rate is typically a fixed amount rather than a percentage of a store's sales. Loehmann's retail store lease obligations are approximately $3.5 million per month. The leases often contain tax escalation clauses and require Loehmann's to pay insurance, utilities, and repair and maintenance expenses. Loehmann's was current with its monthly lease payments on its operating stores through October 31, 2010.

26.     Loehmann's stores are divided into two shopping areas: a large, open selling area with wall-to-wall merchandise and a smaller, separate, and more intimate area called The Back Room.   All stores are low maintenance, simple and functional facilities designed to maximize selling space and contain overhead costs.

**B.     Capital Structure**

(i) Equity Sponsor

27.     Loehmann's is the surviving entity of the merger of DAH Merger Corporation and Loehmann's Holdings, which was consummated on October 13, 2004 (the "2004 Transaction").   Because the prior equity sponsor of Loehmann's sought to comport with Islamic banking practices, the 2004 Transaction was structured to comply with the strictures of Shari'ah law, which, *inter alia,* does not allow for the imposition, or payment, of interest.

28.     In July 2006, Istithmar acquired 100% of the common stock of Designer Apparel Holding Company ("DAHC"), which in turn owns 100% of the common stock of Loehmann's Holdings.

29.     Since purchasing Loehmann's in July 2006, Istithmar has provided Loehmann's with operating funds through a $55 million standby letter of credit (the "SLOC").   As a result of losses incurred in fiscal years 2007 and 2008, due in part to adverse economic conditions, Loehmann's had drawn $42.0 million and $5.0 million, respectively, under the SLOC.

30.     On April 19, 2010, Loehmann's drew the remaining $8.0 million available under the SLOC, which had an expiration date of September 30, 2012.  Those drawdowns were recorded by Loehmann's as contributions of capital made by Istithmar.

9

(ii) Secured Credit Agreement

31.     The Debtors (other than Capco) are parties to a $45 million Credit Agreement (the "Prepetition Credit Agreement"), dated as of September 15, 2010, by and among Loehmann's Opco, as borrower, Loehmann's Holdings, Loehmann's Real Estate Holdings, and Loehmann's, Inc., each as a guarantor, any other persons parties thereto designated from time to time as Credit Parties (as defined in the Prepetition Credit Agreement), and Crystal, as a lender and as agent for all lenders, and any other lenders party thereto from time to time (collectively, the "Prepetition Lender"). The Prepetition Credit Agreement is scheduled to mature on January 18, 2014.

32.     Loehmann's entered into the Prepetition Credit Agreement with Crystal to replace a $35 million credit facility with General Electric Capital Corporation ("GECC") that had been otherwise scheduled to mature on December 11, 2012[1].

33.     As credit support for Loehmann's obligations under the Prepetition Credit Agreement, Istithmar posted a $7.5 million standby letter of credit. Loehmann's is entitled to borrow under the Prepetition Credit Agreement for general corporate purposes, including, without limitation, working capital requirements, letters of credit, liquidity and repayment of indebtedness, subject to certain conditions

34.     The Prepetition Credit Agreement is an asset-based facility governed by a borrowing base formula of accounts receivable, credit card receivables, and inventory. The Prepetition Credit Agreement includes a $15 million sublimit available for the issuance of letters of credit, of which up to $15 million may be used for stand-by letters of credit, and is secured by a security interest in all of the present and

---

[1]     The GECC credit facility was entered into in December 2009 to replace a credit facility provided by CIT, which had declined to extend its facility.

after acquired tangible and intangible assets of Loehmann's Holdings and its subsidiaries.

35.     As of the Petition Date, approximately $30.5 million was outstanding under the revolver and there is $750,000 in open letters of credit under the Prepetition Credit Agreement.

(iii)   <u>Secured Lease/Note Obligations</u>

36.     Capco was established outside of the other Debtors' corporate structure. Capco's sole purpose was to facilitate the 2004 Transaction so as to comply with the strictures of Shari'ah law that do not allow for the charging or payment of interest.

37.     As a result, Capco is the obligor on (a) $55 million in 12% senior secured Class A Notes due October 1, 2011 (the "Class A Notes"); (b) $20 million in senior secured Class A Floating Rate Notes due October 1, 2011 (the "Floating Rate Notes"); and (c) $35 million in 13% senior secured Class B Notes due October 1, 2011 (the "Class B Notes"). The Class A Notes, Floating Rate Notes and Class B Notes (collectively the "Notes") were issued pursuant to Capco's Note Indenture, dated October 12, 2004, with Wells Fargo Bank, N.A., as indenture trustee (the "Indenture Trustee").

38.     Capco used the proceeds raised from the Class A Notes, Floating Rate Notes and Class B Notes to fund a sale and lease-back transaction between Capco and Loehmann's Opco pursuant to a Lease and License Financing and Purchase Option Agreement, dated as of October 13, 2004 (the "Capco Lease"), whereby; (i) Capco acquired the fixed operating assets of Loehmann's Opco at that time (the "Leased Assets") and (ii) Capco leased such assets back to Loehmann's Opco. Loehmann's

Opco's obligations under the Capco Lease are guaranteed by Loehmann's Holdings, Loehmann's Real Estate Holdings, and Loehmann's, Inc. pursuant to that certain Lease Guarantee, dated as of October 13, 2004 (the "Lease Guarantee"), by each of: (i) Loehmann's Holdings, (ii) Loehmann's, Inc., (iii) Loehmann's Real Estate Holdings, (iv) Loehmann's Opco, and (v) and any other subsidiary of Loehmann's Holdings.

39.     Loehmann's Opco's obligations under the CapCo Lease and the obligations of Loehmann's Holdings, Loehmann's, Inc. and Loehmann's Real Estate Holdings under the Lease Guarantee are secured under a Lease Security Agreement, dated as of October 13, 2004 (the "Lease Security Agreement"), pursuant to which each of Loehmann's Opco, Loehmann's Holdings, Loehmann's, Inc. and Loehmann's Real Estate Holdings (each, a "Grantor") pledged to Capco substantially all of its assets to secure its obligations under, in the case of Loehmann's Opco, the Capco Lease, and, in the case of the other Grantors, the Lease Guarantee.   In addition, each of the Grantor's obligations under the Capco Lease and the Lease Guarantee are also secured under a pledge agreement, pursuant to which each Grantor pledged its owned equity interests, including equity interests owned in subsidiaries, to secure its obligations under the Lease Documents (as such term is defined in the Note Indenture).  The collateral packages securing the obligations under the Lease Agreement and the Lease Guarantee and the obligations under the Prepetition Credit Agreement are substantially identical. Such collateral is referred to herein as the "Collateral."

40.     In turn, Capco's obligations under the Class A Notes, Floating Rate Notes and Class B Notes are secured under a Security Agreement, dated as of October 12, 2004 (the "Note Security Agreement"), pursuant to which Capco pledged to the Indenture Trustee all of its assets to secure its obligations under the Note Indenture,

including its rights to the Leased Assets and its rights under the Lease Documents (which include its rights as a secured party under the Lease Security Documents (as such term is defined in the Note Indenture) and its rights to receive annual rent payments in the amount of approximately $14 million).

41.     Capco has not made the interest payment that was due on October 1, 2010 under the Notes.

(iv) Intercreditor Agreement

42.     The priority of lien rights as to the Collateral between the Prepetition Lender and Capco (with such rights of Capco pledged to the Indenture Trustee for the benefit of the holders of the Notes pursuant to the Note Security Agreement as described above) are established pursuant to an Amended and Restated Intercreditor Agreement, dated December 18, 2009, and as amended by the First Amendment to the Amended and Restated Intercreditor Agreement, dated as of October 14, 2010 (the "Intercreditor Agreement").

43.     Pursuant to the Intercreditor Agreement, (i) Capco has a first priority security interest on all the Collateral except the "Revolving Facility Collateral" (as defined in the Intercreditor Agreement), as to which it has a second priority security interest, to secure the Grantors' obligations under the Lease Documents and (ii) the Prepetition Lender has a first priority security interest on the Revolving Facility Collateral and a second priority security interest on all other Collateral to secure the Grantors' Obligations under the Prepetition Credit Agreement.   As set forth in the Intercreditor Agreement, the Revolving Facility Collateral includes, *inter alia*, all of the Grantors' interests in accounts (including receivables from credit card processors with respect to credit card sales), inventory and deposit accounts.  The Revolving Facility

13

Collateral also includes all general intangibles (including intellectual property) to the extent evidencing or governing any of the other Revolving Facility Collateral.

(v) Trade Debt

44.     As an operator of a chain of specialty stores, the Debtors purchased inventory from approximately 750 vendors.   The Debtors have historically purchased merchandise under normal purchase commitments in the ordinary course of business. Loehmann's does not enter into any long-term vendor contracts, which gives the flexibility to buy merchandise opportunistically during the selling season, typically at an attractive price.   This buying strategy also gives Loehmann's less exposure to fashion risk than full-priced retailers, which generally make their purchasing decisions several seasons in advance.  Currently, approximately $15 million in trade payables are currently past due.

C.     **Summary of Financial Information and Events Leading to Chapter 11**

(i) Strategic Initiatives and Current Management

45.     Loehmann's senior management team has an average of over 28 years experience in the retail industry and has developed the operational expertise and vendor relationships that have helped Loehmann's maintain its position as one of the nation's largest upscale off-price specialty retailers.

46.     After hiring Jerald S. Politzer as Chief Executive Officer in April, 2008, Loehmann's began to develop a strategic re-positioning in the marketplace. Shortly thereafter, Loehmann's engaged two firms:  ARC Consulting, a strategic consulting firm and SHC Direct, a marketing consulting firm.  As a result of these efforts, strategic initiatives were established to:

- establish Loehmann's as the "trend right" fashion destination;

- rebuild the Back Room as the cornerstone of the business;

- re-define core merchandising strategy;

- improve merchandise presentation and physical condition of stores;

- establish new store prototype implemented in Spring 2010;

- shift focus from operations to customer service and develop service standards;

- improve customer checkout time;

- refine and refocus direct mail strategy and invest in new customer acquisition; and

- invest in public relations to generate "buzz."

47.     In April 2009, Loehmann's introduced a redesigned Insider Club loyalty program that comprises three levels of membership: Basic, Gold and Diamond. The Insider Club is the basic, no-fee club where members receive 15% off on their birthday along with special offers, discounts and notices of sales and events. The Insider Club Gold offers all the benefits of the basic membership plus 10% off every day and is open to anyone for a low annual fee of $25. Recently, Loehmann's most exclusive level, Insider Club Diamond, which offers all the benefits of Insider Club Gold plus additional soft benefits, was expanded to include Loehmann's very best Gold Club members who had spent more than $1,000 in the prior twelve months.

48.     In addition to the initiatives discussed herein, Loehmann's negotiated rent reductions on many of its leases resulting in a cash flow savings of $3.2 million in the first 12 months of the reductions and $800,000 in the following twelve months.

49.     In all, selling, general and administrative expenses for fiscal year 2009 decreased to $166.0 million, or 39.3% of net sales in fiscal year 2009, from $178.8 million, or 39.5% of net sales in fiscal year 2008.  The decrease of $12.8 million was primarily due to a $13.5 million decrease in variable sales expenses slightly offset by an increase of $0.7 million in expenses related to the new stores opened within the past twelve months.   The decrease in expense is directly attributable to the Company's cost reduction initiatives taken at the beginning of the fiscal year which included reductions in store and corporate payroll and reductions in variable expenses (i.e. travel, advertising, etc.).

50.     The strategic initiatives and expense reductions yielded positive results:  Loehmann's gross profit increased $7.9 million from $168.2 million in fiscal year 2008 to $176.1 million in fiscal year 2009, and gross profit percentage improved to 41.7% compared to 37.1% in the prior fiscal year due to lower markdown activity and higher revenues related to gold card and magazine sales.

51.     As such, Loehmann's had begun the process of re-positioning itself in the industry for the long term.

52.     Notwithstanding these initiatives, however, Loehmann's business is still sensitive to customers' spending patterns, which in turn are subject to prevailing economic conditions.   As a result, the significant decline over the last 12 months in macroeconomic conditions in several of the markets in which Loehmann's stores are concentrated, mainly California, the Northeast, Midwest and Florida, has had an adverse effect on Loehmann's financial condition and results of operations.

53.     Moreover, on April 6, 2010, the New York Post erroneously reported that Loehmann's had missed an interest payment on its debt the week prior

thereto and that "[s]uppliers to the off-price clothing chain have begun to withhold shipments to stores as concerns mount about the retailer's shaky finance."

54.    Although this report was completely false, it served as a catalyst that resulted in certain suppliers holding back crucial merchandise shipments. As might be expected, however, the resulting inability to obtain merchandise, which customers have come to expect be available and in stock during the same selling season as it is available in department stores, only served to further adversely impact Loehmann's financial performance.

55.    As a result, Loehmann's found itself having to stretch payment terms with merchandise vendors. This has limited the company's ability to source product, a key challenge as Loehmann's has sought to build inventory for the Fall season.

(ii)  Recent Financial Performance

56.    During the past six to twelve months, Loehmann's has been faced with declining sales in a poorly performing domestic economy, as well as the financial constraints resulting from a highly leveraged capital structure.  As a result of the difficult macroeconomic climate and financial constraints, Loehmann's business has experienced certain issues that have impacted inventory and sales, including vendor concerns that limited the company's ability to source high visibility brands, missed merchandise purchasing opportunities, and lower factor credit limits resulting in reduced product flow.

57.    Loehmann's' net sales have decreased $30.4 million, or 6.7%, from $452.5 million in fiscal year 2008 to $422.2 million in fiscal year 2009. This decrease was primarily attributable to (i) a comparable store sales decrease of $23.3 million and (ii) a

decrease of $7.3 million in sales related to closed stores, partially offset by a net increase of $0.2 million in sales related to non-comparable stores.

58. As a result, the Debtors net sales for the quarter ended July 31, 2010 were $91.4 million as compared to $101.5 million for the comparable period in the prior year. The decrease of $10.1 million, or 10%, was primarily attributable to (i) a decrease in comparable store sales of $15.1 million and (ii) a decrease of $1.4 million in sales related to closed stores, partially offset by (iii) an increase related to new stores of $6.4 million. Same store sales decreased 15.1% during the quarter ended July 31, 2010 as compared to the same period in the prior year.

59. The Debtors' operating loss was $12 million, or a decrease of 13.1% as a percentage of sales, in the quarter ended July 31, 2010, as compared to an operating loss of $3.8 million, or a decrease of 3.7% as a percentage of sales, in the prior year period.

60. These issues have been reflected in weaker performance in recent financial results, including a 4.6% decrease in comparable store sales for fiscal year 2009 and 11.7% decrease for spring 2010. Gross margin was 42% for fiscal year 2009 and 40% for spring 2010. Selling, general, and administrative expenses ("SG&A") as a percent of revenue was 39% for fiscal year 2009 and 45% for spring 2010.

61. The Company is currently projecting comparable store sales to decrease by 6.9% for fall 2010, increase by 4.5% for fiscal year 2011 and increase 3.5% for each of fiscal years 2012 and 2013. Gross margin is projected to be 39% in fall 2010 and 38% in each of fiscal year 2011, 2012 and 2013. SG&A as a percent of revenue is projected to be 42% for fall 2010, 38% for fiscal year 2011, 37% for fiscal year 2012 and 36% for fiscal year 2013.

62.     Given the Company's operating results for the first three quarters of 2010 and internal forecasts for the balance of fiscal year 2010, coupled with continuing risks in the U.S. economy, Loehmann's was challenged to assure that amounts available from its operating cash flows, together with funds available under its Prepetition Credit Agreement were sufficient to meet Loehmann's expected operating needs and planned capital expenditures beyond the third quarter of 2010.

(iii) <u>Financial Restructuring</u>

63.     In June 2010, Loehmann's began exploring possible financial restructuring alternatives in addition to its ongoing strategic and operational initiatives to reduce costs and provide additional liquidity for its operations.

64.     Business consultants Clear Thinking Group, LLC ("CTG") and investment bank Perella Weinberg Partners ("PWP") were retained to consider financial restructuring alternatives, including finding new financial or strategic investor(s), a replacement working capital lender and reviewing Loehmann's business processes for cost-savings. As a result of these initiatives, $4.0 to $5.6 million in savings was identified and implemented; however, savings alone would not be enough to address the company's $12 to $15 million in liquidity needs in the next six to twelve months. Ultimately, it was determined that a restructuring of Loehmann's' balance sheet was in the best long-term interests of the Debtors and their creditors.

65.     Beginning in August 2010, Loehmann's entered negotiations with its equity sponsor Istithmar, and the two largest holders of the Notes, Whippoorwill Associates, Inc., as agent for its discretionary accounts that are legal and/or beneficial owners of the Notes ("Whippoorwill" or a "Supporting Secured Noteholder"), and Plainfield Capital Asset Management ("Plainfield") to develop a comprehensive plan to

restructure and/or recapitalize Loehmann's balance sheet prior to the October 1 interest payments becoming due under the Notes.

66.     In connection therewith, in the summer of 2010, Loehmann's requested an amendment from GECC of certain terms of its revolving credit facility in order to enhance liquidity and facilitate its operational and financial initiatives.   In pertinent part, this amendment would have provided, *inter alia,* an elimination of the borrowing base reserve and a reduction in the borrowing base for eligible in transit inventory and eligible letter of credit inventory.

67.     The amendment proposed by the Debtors was predicated on an additional capital commitment from Istithmar, of which $3 million was provided to Loehmann's contemporaneously with the amendment proposal.

68.     Notwithstanding Istithmar's additional capital contribution, the proposed amendment was refused by GECC, at which point Loehmann's sought to replace GECC with a lender more supportive of Loehmann's restructuring efforts.

69.     In September 2010, Loehmann's entered into the Prepetition Credit Agreement with Crystal to replace the GECC $35 million credit facility that had been otherwise scheduled to mature on December 11, 2012 to facilitate its financial restructuring initiatives.

70.     With the Crystal Prepetition Credit Agreement in place, on September 24, 2010, Loehmann's reached an agreement in principle with Istithmar and Whippoorwill to pursue a financial restructuring that would significantly reduce the Debtors' outstanding debt through either (i) an exchange offer (the "Exchange Offer") and consent solicitation (the "Consent Solicitation"), dated September 24, 2010, to amend the Capco Lease and the Intercreditor Agreement to allow for the incurrence of

$10 million in additional debt under the Prepetition Credit Agreement, to allow for the closing of up to 15 stores in the next 12 months, and to exchange the outstanding Notes for newly-issued notes on substantially the same terms as the current Notes, except that the newly-issued notes would have a new maturity date of October, 2014 (such notes, the "Exchanged Notes") or (ii) a Chapter 11 plan based upon a Plan Support Agreement dated September 24, 2010 between by Loehmann's, Istithmar and Whippoorwill (the "Original Support Agreement"). The proposed restructuring set forth in the Original Support Agreement, however, was not supported by Plainfield.

71. The Exchange Offer was launched pursuant to the terms of an offering memorandum issued by Capco on September 24, 2010 (the "Offering Memorandum") and provided that Noteholders could opt to exchange their Notes for Exchanged Notes at 100% of their face value through October 13, 2010 (the "Early Participation Date") or at 97% of their face value after the Early Participation Date though October 27, 2010 (the "Expiration Date"). The Offering Memorandum was supplemented (i) on October 14, 2010 to extend the period in which tendering Noteholders could exchange their Notes for Exchanged Notes at 100% of their face value through October 22, 2010; (ii) on October 25, 2010 to extend such period until the Expiration Date; and (iii) on October 28, 2010 to extend the Expiration Date until October 28, 2010.

72. The Consent Solicitation was launched contemporaneously with the Exchange Offer and was deemed successful on October 14, 2010 after Noteholders representing more than fifty percent in aggregate outstanding principal amount of the Notes tendered consents, which allowed for the incurrence of $10 million in additional

debt under the Prepetition Credit Agreement, and the closing of up to 15 stores in the next 12 months.

73.    Noteholders representing approximately 92.4% in aggregate principal amount of Notes tendered their Notes pursuant to the Exchange Offer. Because the Exchange Offer did not achieve the requisite 97% acceptance for the exchange of the Notes;  however, the Exchange Offer was not consummated.

74.    On November 4, 2010, the Board of Directors of Loehmann's Holdings convened a special committee (the "Special Committee") to consider restructuring alternatives for the Debtors.  The Special Committee is comprised of Jerald Politzer, Robert Friedman and myself, all of whom are not associated with Istithmar.

75.    Loehmann's is now commencing these Chapter 11 cases to implement its financial restructuring.  To that end, Loehmann's expects to shortly file the proposed Plan consistent with the terms and conditions contained in the Restructuring Support Agreement.

D.    **The Chapter 11 Cases**

(i) The Plan

76.    Specifically, as contemplated by the Restructuring Support Agreement, the Plan will provide for, among other things, the discharge of claims and liens against the Debtors, the cancellation of all existing common stock in Loehmann's Holdings Co., and the issuance of (i) new common stock ("New Common Stock") and (ii) new convertible preferred equity ("New Convertible Preferred Equity") in reorganized Loehmann's Holdings.

77. Under the terms of the Restructuring Support Agreement, the Supporting Secured Noteholders have agreed, among other things, to vote in favor of the Plan and exchange their Notes for New Common Stock.

78. In addition, Istithmar and Whippoorwill have agreed, subject to the satisfaction of certain conditions of the Restructuring Support Agreement and the Investment Commitment Letter, to invest an aggregate amount of $25 million (the "New Investment") in the Company upon its emergence from Chapter 11 in the form of New Convertible Preferred Equity.

79. Under the terms of the Restructuring Support Agreement (and attached plan term sheet) and Investment Commitment Letter (and attached investment term sheet), between the parties, holders of Class A Notes would receive approximately 42.4% of the reorganized equity, holders Class B Notes will receive 8.6% of the reorganized equity in reorganized Loehmann's Holdings and Istithmar and Whippoorwill will receive 49.1% of the reorganized equity, all on a fully converted basis, subject to dilution for any new equity issued as part of a management incentive plan.

80. The recovery to unsecured creditors is not estimated at this time pending the filing of claims by such creditors. The distributions to be provided to holders of allowed unsecured claims shall be funded from the proceeds of the New Investment.

81. Upon emergence from Chapter 11 and consistent with the Restructuring Support Agreement, Reorganized Loehmann's shall enter into a senior secured credit facility (the "Exit Facility") in the amount of up to $40 million to be

negotiated and to be reasonably satisfactory to Loehmann's, Istithmar, and each of the Supporting Noteholders.

82.     Loehmann's proposed new capital structure, a $40 Million Exit Facility and equity classes, will represent a reduction of the Debtors' outstanding debt by approximately $115 million.

83.     Moreover, the Debtors' re-capitalization under the Plan represents the best recovery for the holders of the Notes, and Loehmann's creditors in general, because no third-party financial or strategic investor would have made a proposal to (i) purchase the company in a transaction in a manner that would have adequately satisfied or redeemed the Notes, or (ii) alternatively, make an equity investment on a *pari passu* basis that would have yielded as a high a recovery for the converted Note claims, without diluting the value of their respective equity stake in reorganized Loehmann's.

(ii) Debtor in Possession Financing

84.     Loehmann's has negotiated and reached an agreement to enter into, subject to Court approval, a $45 million superpriority senior secured debtor-in-possession credit facility with Crystal.

85.     The DIP Financing Facility will provide the Debtors sufficient liquidity to finance the Debtors' operations until emergence from Chapter 11.  The Debtors are also seeking authorization to use cash collateral on an interim basis, which, together with the DIP Financing Facility, will be used by Loehmann's to support their working capital requirements and other general corporate purposes as well as to satisfy the costs attendant to these Chapter 11 cases.

86.     The terms and conditions of the DIP Financing Facility (including the fees and charges paid thereunder) and the use of cash collateral are fair and reasonable and were negotiated by the parties in good faith and at arm's length after the Debtors and their advisors concluded a good faith effort to obtain the most advantageous financing.  The Debtors were unable to obtain debtor in possession financing on more advantageous terms, given that any new lender would need to prime Crystal's liens securing the Prepetition Credit Agreement.  The Debtors have determined, in their reasonable business judgment, that the DIP Financing Facility is the best financing option available under the present circumstances, and will enable the Loehmann's to operate their businesses in Chapter 11 without disruption.

87.     Loehmann's ability to secure debtor-in-possession financing prior to commencing these Chapter 11 cases serves as crucial signal to its customers, employees and trade vendors that the Loehmann's will maintain viable and competitive business operations going forward.

(iii)  Right-Sizing the Company

88.     Loehmann's will focus on regaining vendor credibility and pursuing high visibility branded merchandise buying opportunities, as well as executing a marketing and merchandising plan that focuses on reconnecting with Loehmann's core customers and attracting new shoppers.

89.     The marketing plan for fiscal year 2011 and beyond includes several efforts to obtain new customers as well as retain existing customers, including online advertising and website improvements in addition to the Loehmann's historical direct mail focused marketing efforts.

90.     Loehmann's has already begun to commence closing underperforming stores in an effort to improve profitability. In the last twelve months the Company has closed underperforming stores, including seven in November, 2010. Loehmann's will also focus on other cost savings initiatives including streamlining store operations and eliminating corporate overhead costs by reducing headcount. To that end, in addition to the First Day Motions discussed below, the Debtors are filing motions at the commencement of the Chapter 11 cases to reject nine unexpired leases in order to avoid incurring administrative rent and other charges for stores that the Debtors determined were unprofitable and have been closed upon the conclusion of inventory clearance sales.

91.     In sum, the Debtors have filed the Chapter 11 cases to effectuate their financial restructuring, enhance liquidity and solidify their long-term growth prospects and operating performance while still preserving approximately 1,900 jobs. Loehmann's expects to emerge from the Chapter 11 process as a substantially deleveraged enterprise well positioned to compete successfully in the competitive retail industry.

## II.  FIRST DAY MOTIONS

92.     Contemporaneously with this Declaration, the Debtors have filed a number of so-called "First Day Motions" in the Chapter 11 cases seeking orders granting various forms of relief. I believe that, among other things, the relief requested in the First Day Motions is necessary to enable the Debtors to operate with minimal disruption during the pendency of the Chapter 11 cases.

## A.     **Administrative Motions**

(i)  Debtors' Motion Pursuant to Rule 1015(b) of he Federal Rules Of Bankruptcy Procedure for Joint Administration and Waiving Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1055 and 2002(n) (the "Joint Administration Motion")

93.     The Debtors request entry of an order directing joint administration of the Chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).   Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 Cases under the case of parent company Loehmann's Holdings.  Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 cases of the Debtors other than Loehmann's Holdings to indicate the joint administration of the Chapter 11 cases.

94.     Given the integrated nature of the Debtors' operations, joint administration of the Chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings and orders that will be filed in the Chapter 11 Cases will almost certainly affect each of the Debtors.  The entry of an order directing joint administration of the Chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor the Chapter 11 cases with greater ease and efficiency.  I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.

95.     Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

(ii) Debtors' Motion Pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure to Extend Time to File Lists of Creditors, Schedules of Assets and Liabilities, Statement Of Financial Affairs, And Schedule of Executory Contracts and Unexpired Leases (the "Schedules and Statements Motion")

96.     The Debtors request entry of an order granting additional time to file their schedules and statements of financial affairs (collectively, the "Schedules and Statements.") The breadth of the Debtors' business operations requires the Debtors to maintain voluminous books and records and complex accounting systems. Given the size, complexity, and geographic diversity of their business operations, and the number of creditors, I submit that the large amount of information that must be assembled to prepare the Schedules and Statements and the hundreds of employee and advisor hours required to complete the Schedules and Statements would be unnecessarily burdensome to the Debtors during the period of time following the Petition Date.

97.     I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and Statements Motion should be approved.

(iii) Debtors' Motion for Order Under 11 U.S.C. Sections 102(1) and 105 Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates (the "Case Management Motion")

98.     The Debtors request that the Court enter an order providing for certain notice, hearing and other case management procedures in the Chapter 11 cases. Given the number of parties in interest in the Chapter 11 cases, requiring that service be made upon each of these parties would waste the Debtors' limited resources. Thus, the Debtors believe that requiring paper service of certain pleadings only upon the main

parties in interest, as well as authorizing service on all parties by email, will be efficient and save the estates significant time and expense.

99.     Additionally, due to the likely volume of motions and other pleadings that will be filed in these cases, the Debtors have proposed that such special hearing procedures be created, including the creation of regularly scheduled omnibus hearings at which the Court, the Debtors, and other main parties in interest can address several motions at once, thereby avoiding the substantial time and expense of scheduling separate hearings on each discrete matter.  I believe that the relief requested in the Case Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.

100.     Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be approved and submit that the Schedules and Statements Motion should be approved.

> (iv) Debtors' Motion for Order Under Bankruptcy Code Section 521, Bankruptcy Rule 1007(d) and Local Rule 1007-1 Authorizing Debtors to (I) Prepare Consolidated List of Creditors in Lieu of Mailing Matrix (the "Creditors Matrix Motion")

101.     The Debtors propose to retain a notice and claims agent in connection with the Chapter 11 cases to assist the Debtors in preparing creditor lists and mailing notices.  With such assistance, the Debtors will be prepared to file a computer-readable consolidated list of creditors and a list of equity security holders upon request and will be capable of undertaking all necessary mailings.  Indeed, because the Debtors have thousands of creditors, converting the Debtors' computerized information to a format compatible with the matrix requirements likely would be a burdensome task

and may greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

102.     I believe that consolidation of the Debtors' computer records, as requested in the Creditors Matrix Motion, into a creditor database and mailing notices to all applicable parties in such database will be sufficient to permit the Debtors' notice and claims agent to promptly notice those parties.  Additionally, maintaining electronic-format lists of creditors and equity security holders rather than preparing and filing separate matrices likely will maximize efficiency and reduce costs.  Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be approved.

**B.     Operations Motions**

> (i)   Debtors' Motion for Orders Under Bankruptcy Code Sections 105, 363(b), 507(a), 541, 1107(a) and 1108, Authorizing, But Not Directing, Debtors, Inter Alia, to Pay Prepetition Wages, Compensation and Employee Benefits (the "Wages and Benefits Motion")

103.     The Debtors request the entry of interim and final orders authorizing the Debtors, in their sole discretion, to pay prepetition wage claims, to honor obligations and to continue programs, in the ordinary course of business and consistent with past practices, relating to Employee Wages and Benefits, as defined in the Wages and Benefits Motion.  As noted above, as of the Petition Date, the Debtors employ approximately 1,900 employees.  Although the Debtors have paid their wage, salary and other Employee obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition employee's obligations may nevertheless be due and owing.

104.     I believe that the majority of the Debtors' Employees rely exclusively on their compensation, benefits, employee programs and reimbursement of expenses provided by the Debtors to satisfy their daily living expenses.  Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations to the Employees for unpaid compensation, benefits and reimbursable expenses.   Moreover, I also believe that if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical.   In the absence of such payments, I believe that the Debtors will suffer irreparable harm and the Debtors' Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors, thereby hindering the Debtors' ability to meet their customer obligations, and likely diminishing customer confidence in the Debtors.  It is my opinion that the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a massive and costly distraction at a time when the Debtors must focus on restructuring their operations and balance sheets.

105.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.   Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be approved.

(ii)   Debtors' Motion for Interim and Final Orders pursuant To 11 U.S.C. §§ 105, 361, 362, 363 And 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing The Debtors To Incur Postpetition Secured Indebtedness with Priority Over All Secured Indebtedness and with Administrative Superpriority, (II) Granting Liens, (III) Authorizing the Debtors to Use Cash Collateral Pursuant to 11 U.S.C. § 363 and Providing for Adequate Protection, (IV) Modifying Automatic Stay and (V) Scheduling A Final Hearing (the "Motion to Approve the DIP Financing Facility")

106.    As discussed above the Debtors have negotiated and reached an agreement to enter into, subject to approval of the Court, a $45 million DIP Financing Facility with Crystal as the proposed DIP Lender.  The DIP Financing Facility will provide funds to protect the Debtors' liquidity throughout the Chapter 11 case

107.    I believe that the continued viability of the Debtors' businesses and the success of the Debtors' restructuring efforts hinge upon obtaining immediate access to financing under the DIP Financing Facility and the Debtors would irreparably harmed without it.

108.    In particular, the Debtors require access to the DIP Financing Facility to satisfy their ongoing obligations to trade vendors, whose continued supply of merchandise, goods and services is critical to the company's ongoing business.   Absent an eventual infusion of capital or access to financing, the Debtors would risk being unable to pay these obligations to its vendors, which may result in the vendors refusing to supply merchandise to the Debtors, thereby causing severe disruptions to the Debtors' operations to the material detriment of creditors, customers and employees. Therefore, I believe that the Debtors require authority to borrow under the proposed DIP Financing Facility, and to use such proceeds to satisfy the Debtors' liquidity needs and their ordinary course obligations.

109.     Further, approval of the DIP Financing Facility on an interim and final basis will allow the Debtors to demonstrate to their customers, suppliers, vendors and employees that they have sufficient capital to ensure ongoing operations in the ordinary course and to ultimately propose, confirm and implement a plan of reorganization.  Accordingly, I believe that obtaining access to debtor-in-possession financing is crucial to the success of the Debtors' reorganization efforts and going forward operations.

(iii)  Debtors' Motion for Interim and Final Orders Under 11 U.S.C. Sections 105(a), 345, 363, 364 and 503(b)(1) Authorizing (A) Continued Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Business Forms, (C) Continued Use of Existing Cash Management Systems and (D) Waiver of Certain Guidelines Relating to Bank Accounts  (the "Cash Management Motion")

110.     Under the Cash Management Motion, the Debtors request the entry of interim and final orders (a) authorizing the continued use of their centralized cash management system and procedures (the "Cash Management System");  (b) authorizing and directing all of the Debtors' banks (the "Banks") that process checks and fund transfers on account of any prepetition obligations which have been authorized by this Court to be paid ("Prepetition Payment Obligations") to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on account of such Prepetition Payment Obligations;  and (c) authorizing the maintenance and continued use of their existing bank accounts (the "Bank Accounts") and business forms; and a waiver of certain guidelines relating to the Bank Accounts.

111.     In the ordinary course of business, the Debtors maintain their Cash Management System, which is an integrated system that provides well-established mechanisms for the collection, concentration, management, disbursement and

investment of funds used in the Debtors' operations and maintains current and accurate accounting records of the transactions within the Cash Management System.

112.     I believe that given the complexity of the Cash Management System, if the Debtors were required to comply with the guidelines of the Unites States Trustee, the burden of opening new bank accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks and business forms with a "Debtor in Possession" legend, would severely disrupt and cause irreparable harm to the Debtors' business, and cause additional confusion, delay and cost at this critical time, including disrupting and impacting the Debtors' ability to pay wages to their employees and to continue as a going concern.  It is my opinion that the relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy.

113.     Authorizing the Debtors to maintain their Cash Management System will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial days of the Chapter 11 cases. In addition, the continued maintenance of the Cash Management System will allow the Debtors to comply with the terms of the proposed DIP Financing Facility.

114.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in Chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

(iv)  Debtors' Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a), 363(b), 364, 503(b)(9), 507(a)(2) and 1107(a) of the Bankruptcy Code Authorizing the Debtors to Pay Prepetition Claims of Certain Essential Vendors (the "Essential Vendors Motion")

115.    The Debtors request the entry of interim and final orders granting the Debtors the authority to pay prepetition claims of Essential Vendors and approving procedures related thereto.

116.    It is my understanding that the Debtors and their advisors spent a significant amount of time reviewing their prepetition vendor lists to identify the Essential Vendors.  In analyzing which vendors -- if any -- should be deemed Essential Vendors, the Debtors identified those vendors who are most essential to the Debtors' operations using the following criteria:  (a) whether the vendor in question is a "sole-source" provider, and (b) the overall impairment on the Debtors' operations that would result if the particular Essential Vendor ceased or delayed services or shipment.  The Debtors also considered the need for a particular vendor's merchandise to be in stock as of the commencement of these cases because, as its customers know, Loehmann's merchandise is in-season and it is imperative that the right merchandise be available during the imminent holiday selling season just as it is available in its competitors' stores.

117.    The Debtors have determined, in the exercise of their sound business judgment, that payment to Essential Vendor is essential to the Debtors' day-to-day operations and to ensure that the value of the businesses as a going concern is preserved through the pendency of the Chapter 11 cases.

118.    In so doing, the Debtors propose to condition payment to an Essential Vendor upon Essential Vendor's binding agreement to continue on a post-

35

petition basis to supply its merchandise to the Debtors on Customary Trade Terms, as defined in the Essential Suppliers Motion.

119.    I believe that this relief is in the best interest of the Debtors' estates because favorable Customary Trade Terms will prevent contraction of the Debtors' liquidity. The failure to make payment to the Debtors' Essential Vendors will result in considerable disruption and irreparable harm to the Debtors' business. In addition, authorizing the Debtors to pay the Essential Vendor Claims should eliminate the burden on the Court and the Debtors arising from the filing of numerous individual vendor motions requesting payment on account of their section 503(b)(9) claims.

120.    Accordingly, on behalf of the Debtors, I respectfully submit that the Essential Vendors Motion should be approved.

(v) Debtors' Motion for Interim and Final Order Under Bankruptcy Code Sections 105(a), 363(b), 506, 1107(a) and 1108 Authorizing Payment of Certain Customs Duties, Brokers Fees Prepetition Shipping, Warehousing, and Delivery Charges (the "Shippers Motion")

121.    The Debtors seek the entry of interim and final orders authorizing the Debtors to (i) satisfy certain prepetition customs duties, broker's fees, shipping, warehousing, and delivery charges and related possessory liens and certain post petition customs duties, broker's fees, shipping, warehousing, and delivery charges and related possessory liens in the ordinary course of business, and (ii) authorize the Debtors' banks and other financial institutions to receive, honor, process and pay, to the extent of funds on deposit, any and all checks or electronic transfers requested or to be requested by the Debtors relating to the payment of certain prepetition and postpetition customs duties, broker's fees, shipping, warehousing, and delivery charges and related possessory liens

122.     The Debtors rely extensively on the services of the Shippers and Warehousemen, as defined in the Shippers Motion, to ensure the timely shipping and delivery of merchandise to the Debtors in the ordinary course of the Debtors' business. The Debtors also do business with a number of Lien Claimants that could, notwithstanding the automatic stay under section 362 of the Bankruptcy Code, potentially assert mechanic's liens and materialman's liens against the Debtors and their property for amounts the Debtors owe, but do not pay, to such vendors. The assertion of any such liens could result in considerable disruption and irreparable harm to the Debtors' businesses. The Debtors estimate that the prepetition Customs Duties, Broker's Fees and Shipping and Warehousing Charges to be paid are collectively no more than $900,000 and seek authorization to pay same.

123.     Paying the prepetition obligations owed to Shippers and Warehousemen will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.

124.     I believe that the relief requested in the Shippers Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in Chapter 11 without disruption.   Accordingly, on behalf of the Debtors, I respectfully submit that the Shippers and Motion should be approved.

> (vi) Debtors' Motion For Order Under Bankruptcy Code Sections 105, 361, 362, 363, 364, 1107(a) and 1008 Authorizing Debtors to Maintain Existing Insurance Policies and Pay All Policy Premiums and Brokers' Fees Arising Hereunder or in Connection Therewith (the "Insurance Motion")

125.     The Debtors request the entry orders authorizing the Debtors to maintain their existing insurance policies and pay all policy premiums and brokers'

fees arising thereunder or in connection therewith continue their prepetition insurance coverage. In the ordinary course of the Debtors' businesses, the Debtors have maintained and continue to maintain a number of insurance policies (collectively, the "Policies") that benefit the Debtors' estates. Continuation of the Policies is essential to the preservation of the Debtors' businesses, property and assets, and, in many cases, such coverage is required by various regulations, laws and contracts that govern the Debtors' business conduct. It is my understanding that the U.S. Trustee for the Southern District of New York's operating guidelines require the Debtors to maintain certain insurance including workers' compensation, general liability, and casualty insurance.

126. As part of the effort to obtain comprehensive insurance coverage for the Debtors' operations in the most cost-effective manner, the Debtors maintain a brokerage agreement with Marsh USA, Inc. who assists in procuring and negotiating favorable Policies and premiums for the Debtors.

127. I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in Chapter 11 without disruption. I believe that the relief requested in the insurance motion is necessary to avoid immediate and irreparable harm that would result from the failure to authorize the Debtors to maintain their Policies

128. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

(vii)  Debtors' Motion for Order Under Bankruptcy Code Sections 105(a), 506(a), 507(a)(8), 541, 1107(a), 1108 and 1129 Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Taxes and Related Obligations (the "Taxes Motion")

129.    The Debtors request the entry of interim and final orders granting the Debtors the authority to pay any taxes that accrued or arose in the ordinary course of business prior to the Petition Date.  In the ordinary course of business, the Debtors incur and/or collect certain taxes and remit such taxes and fees to various authorities. The Debtors must continue to pay the taxes and fees to continue operating in certain jurisdictions and to avoid costly distractions during the Chapter 11 cases.  Specifically, it is my understanding that the Debtors' failure to pay the taxes and fees could affect adversely the Debtors' business operations because the Authorities could suspend the Debtors' operations, file liens, seek to lift the automatic stay or revoke the Debtors' tax incentives.  In addition, certain authorities may take precipitous action against the Debtors' directors and officers for unpaid taxes, which undoubtedly would distract those key employees from their duties related to the Debtors' restructuring.

130.    Finally, based on my knowledge and conversations with the Debtors' counsel, it is my understanding that certain of the Debtors' taxes are entitled to priority status under the Bankruptcy Code and, therefore, must be paid in full before any general unsecured obligations may be satisfied. Accordingly, I believe that the relief requested in the Taxes Motion is necessary to avoid immediate and irreparable harm that would result from the failure to authorize the Debtors to pay their taxes and assessments.

131.    I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in Chapter 11 without

disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

> (viii) Debtors' Motion for Order Under Bankruptcy Code Sections 105(a), 506, 507(a)(7), 5553, 1107(a) and 1108 Authorizing Continuation of Certain Customer Practices (the "Customer Satisfaction Programs Motion")

132.   The Debtors request the authority to maintain and administer the Customer Satisfaction Programs and to pay prepetition obligations related thereto in the ordinary course of business and in a manner consistent with past practice.

133.   In order to maintain the Debtors' reputation for reliability and to maintain the loyalty, goodwill and support of Customers, the Debtors must maintain their Customer Satisfaction Programs in the ordinary course of business, and honor their obligations thereunder. I believe that maintaining the Customer Programs will encourage customers to continue to purchase the Debtors' products and, ultimately, lead to increased revenue.

134.   I believe that the Debtors' ability to honor their obligations under the Customer Satisfaction Programs in the ordinary course of business is necessary to retain their customer base and reputation for quality and reliability. I also believe that the relief requested in the Customer Satisfaction Programs Motion will pay dividends with respect to the reorganization of the Debtors' businesses, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the Chapter 11 cases.

135.   I believe that the relief requested in the Customer Satisfaction Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption. Accordingly, on behalf of the Debtors, I

respectfully submit that the Customer Satisfaction Programs Motion should be approved.

**D.    Retention Related Motions**

(i)  Debtors' Application to Employ Kurtzman, Carson Consultants, LLC as Claims, Noticing and Balloting Agent (the "KCC Retention Application")

136.    The Debtors seek to retain Kurtzman Carson Consultants LLC ("KCC") as notice and claims agent.  I believe that by retaining KCC in the Chapter 11 cases, the Debtors' estates, and particularly their creditors, will benefit from KCC's service.   KCC has developed efficient and cost-effective methods in its area of expertise.  I am of the opinion that KCC is fully equipped to handle the volume of mailing involved in properly sending the required notices to creditors and other interested parties in the Chapter 11 cases and, therefore, respectfully submit that the KCC Retention Application should be approved.

137.    The Debtors will be filing additional motions seeking to, inter alia, retain Togut, Segal & Segal LLP, as their bankruptcy counsel;  Troutman Sanders, as this special corporate counsel;  PWP as their investment banker;  and CTG, as their financial advisors.  Such motions will be considered at the first omnibus hearing to be held for these cases.

**III.   Additional Disclosures Required Under Local Rule 1007-2**

SDNY LBR 1007-2(a)(2)

138.    These cases were not originally commenced as a Chapter 7, Chapter 12 or Chapter 13 case.

SDNY LBR 1007-2(a)(3)

139.     To the best of my knowledge, no unofficial creditor or other committees were formed prior to the filing of the Debtors' Chapter 11 cases.

SDNY LBR 1007-2(a)(4)

140.     A list containing the names, addresses and the amounts of the claims of the consolidated Debtors' thirty (30) largest known non-insider unsecured creditors is annexed hereto as Exhibit "A." The Debtors reserve their rights to dispute the amount or validity of such claims.

SDNY LBR 1007-2(a)(5)

141.     A list containing the names and addresses of the Debtors' two secured creditors, with amounts of each claim and a brief description and estimate of the value of the collateral securing each claim, indicating whether such claim is disputed, is annexed hereto as Exhibit "B."   The Debtors reserve their rights to dispute the amount and/or secured status of these claims.

SDNY LBR 1007-2(a)(6)

142.     A summary of the Debtors' assets and liabilities on an unaudited basis as of October 31, 2010 is annexed hereto as Exhibit "C."

SDNY LBR 1007-2(a)(7)

143.     There are no classes of shares of stock, debentures, or other securities of the Debtors that are publicly held.

SDNY LBR 1007-2(a)(8)

144.     A schedule setting forth property of the Debtors in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity is annexed hereto as Exhibit "D."

145.　A schedule setting forth the premises that the Debtors currently own, lease, or otherwise hold from which they operate their businesses is annexed hereto as Exhibit "E."

SDNY LBR 1007-2(a)(10)

146.　A schedule setting forth the location of the Debtor's assets, books and records is annexed hereto as Exhibit "F."

SDNY LR 1007-2(a)(11)

147.　A list identifying each action against the Debtors or its properties where a judgment or a seizure of their property may be imminent is annexed hereto as Exhibit "G."

SDNY LBR 1007-2(a)(12)

148.　The names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience is attached hereto as Exhibit "H."

SDNY LBR 1007-2(b)(1)

149.　The estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders, and partners) for the thirty (30) day period following the filing of the Chapter 11 cases is approximately $5,000,000.

SDNY LBR 1007-2(b)(2)

150.　The Debtors estimate that for the thirty (30) day period following the commencement of these Chapter 11 cases, the amount paid or proposed to be paid in payroll, including fees, salaries and other compensation for the Debtors' senior management set forth on Exhibit "H" is approximately $185,000.

151.    A schedule setting forth, for the thirty (30) day period following the filing of the Chapter 11 petitions, estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remaining unpaid, other than professional fees, and other information relevant to the foregoing, is attached hereto as Exhibit "I."

152.    Copies of the resolutions of the Debtors' Boards of Directors and shareholder consents authorizing the filing of the Debtors' Chapter 11 petitions are annexed thereto.

## CONCLUSION

153.    The Debtors will continue in possession of their assets and management of their properties in accordance with sections 1107(a) and 1108 of the Bankruptcy Code, and intend to propose the Plan.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on November 14, 2010 in Bronx, New York.

/s/ Joseph Melvin
JOSEPH MELVIN
Chief Operating Officer
Chief Financial Officer

EXHIBIT "1"

# RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (the "Restructuring Support Agreement") is made and entered into as of November 14, 2010 by and among (i) Loehmann's Holdings Inc. ("Loehmann's Holdco"), (ii) Loehmann's, Inc. ("Loehmann's"), (iii) Loehmann's Real Estate Holdings, Inc. ("Holdings"), (iv) Loehmann's Operating Co. ("Loehmann's Opco"), (v) Loehmann's Capital Corp. ("Capco") (collectively, the "Company" or the "Loehmann's Entities"), (vi) Istithmar Retail Investments ("Istithmar"), (vii) Whippoorwill Associates, Inc., as agent for certain of its discretionary funds and accounts that are legal and/or beneficial owners of the Senior Secured Notes (as defined below) and as signatory to the Investment Commitment Letter ("Whippoorwill"), and (viii) any other holders of the Senior Secured Notes (as defined below) identified on the signature pages hereto (together with Whippoorwill, the "Supporting Secured Noteholders"). Each of the entities comprising the Company, Istithmar and the Supporting Secured Noteholders is referred to herein individually as a "Party," and collectively, as the "Parties." As used herein, the phrases "this Agreement", "hereto", "hereunder" and phrases of like import shall mean this Restructuring Support Agreement.

## RECITALS

**WHEREAS:**

A.     Capco is the issuer of 12% Senior Secured Class A Notes due 2011 (the "12% A Notes"); Senior Secured Floating Rate Notes due 2011 (the "Floating Rate Notes," together with the 12% A Notes, the "Class A Notes"); and 13% Senior Secured Class B Notes due 2011 (the "13% B Notes") (collectively, the "Senior Secured Notes") pursuant to the terms of that certain Indenture, dated as of October 12, 2004 (the "Senior Secured Notes Indenture"), by and among Capco and Wells Fargo Bank National Association, as indenture trustee (the "Senior Secured Notes Indenture Trustee"). $110 million in aggregate principal amount of Senior Secured Notes is currently outstanding;

B.     Loehmann's Opco is a borrower (and the other Loehmann's Entities are guarantors) pursuant to that certain Credit Agreement, dated as of September 15, 2010 (the "Credit Agreement"), by and among Loehmann's Opco, as borrower, Loehmann's Holdco, Holdings, and Loehmann's, each as a guarantor, any other persons parties thereto designated from time to time as Credit Parties (as defined in the Credit Agreement), and Crystal Financial LLC (the "Senior Agent"), as a lender and as agent for all lenders, and any other lenders party thereto from time to time (such lenders, the "Revolving Facility Lenders");

C.     Whippoorwill currently beneficially owns, or has investment responsibility for, approximately 33.9% of the aggregate principal amount outstanding of Senior Secured Notes. Whippoorwill intends to purchase 100% of the Class A Notes beneficially owned by Plainfield Special Situations Master Fund Limited, Plainfield Special Situations Master Fund II Limited, and Plainfield OC Master Fund Limited (collectively, "Plainfield," and such Class A Notes purchased by Whippoorwill, the "Purchased Notes") pursuant to an LSTA Purchase and Sale Distressed Trade agreement (the "Note Purchase Agreement") that will be entered into pursuant to that certain trade confirmation, dated as of November 14, 2010 (the "Trade Confirmation", together with the Note Purchase Agreement, the "Trade Documents") between Plainfield and

1

Whippoorwill. Upon the purchase of the Purchased Notes by Whippoorwill pursuant to the transactions contemplated by the Trade Confirmation and the closing of the Note Purchase Agreement, Whippoorwill will beneficially own, or have investment responsibility for, approximately 70% of the aggregate principal amount outstanding of Senior Secured Notes;

      D.     Istithmar, through its subsidiary Designer Apparel Holdings Corp. ("DAC"), beneficially owns 100% of the issued and outstanding common stock of Loehmann's Holdco (such stock, the "Existing Common Stock"). GSS Contract Services III ("GSS") beneficially owns 100% of the issued and outstanding common stock of Capco;

      E.     Istithmar and Whippoorwill have entered into an agreement (the "Forward Purchase Agreement") providing that Istithmar will purchase from Whippoorwill at least 50% of the principal amount of the Purchased Notes subject to the terms and conditions set forth in the Forward Purchase Agreement;

      F.     The Parties have engaged in good faith negotiations with the objective of reaching an agreement to restructure the Company's debt obligations through the Financial Restructuring (as defined below) in accordance with the terms set forth in this Agreement;

      G.     Each of the Loehmann's Entities anticipates that it will, subject to all necessary internal and corporate approvals, commence cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to restructure the financial obligations of the Company (collectively, the "Chapter 11 Cases");

      H.     The Parties have negotiated and agreed upon the principal terms of a financial restructuring (the "Financial Restructuring") of the obligations of certain of the Loehmann's Entities to be implemented pursuant to a joint plan of reorganization for all or certain of the Loehmann's Entities (the "Debtors") in form and substance satisfactory to each of the Parties in their sole discretion (as it may be amended or otherwise modified in accordance with its terms, the "Restructuring Plan") through the Chapter 11 Cases. Unless each of the Parties otherwise agrees, the Restructuring Plan must be consistent in all respects with the terms and conditions expressly set forth in Exhibit A hereto (the "Plan Term Sheet"), which is incorporated by reference herein as if fully set forth herein, and that certain Investment Commitment Letter, dated November 14, 2010, among Istithmar, Whippoorwill and each of the Loehmann's Entities (the "Investment Commitment Letter"). Notwithstanding anything to the contrary in this Restructuring Support Agreement, any terms or conditions of the Restructuring Plan that are not expressly set forth in the Plan Term Sheet or the Investment Commitment Letter must be satisfactory to each of the Parties in their sole discretion;

      I.     To implement the Financial Restructuring, the Company intends to prepare (i) the Restructuring Plan consistent in all respects with the terms and conditions set forth in the Plan Term Sheet and the Investment Commitment Letter and (ii) a supporting disclosure statement consistent in all respects with the terms and conditions set forth in the Plan Term Sheet and the Investment Commitment Letter, in form and substance satisfactory to each of the Parties;

J.      Subject to the closing of the transactions contemplated by the Trade Documents and the effectiveness of the Forward Purchase Agreement, each of Istithmar and Whippoorwill has agreed to make an additional investment in Loehmann's Holdco on the effective date of the Restructuring Plan (the "Effective Date") in accordance with the terms and conditions set forth in this Restructuring Support Agreement (including the Plan Term Sheet) and in the Investment Commitment Letter;

K.      Pursuant to the terms of this Restructuring Support Agreement, subject to the satisfaction of the conditions precedent set forth below, the Parties have agreed during the period commencing with the date of execution of this Agreement and ending upon termination of this Restructuring Support Agreement, to support and, with respect to the Supporting Secured Noteholders, vote any and all of their Claims in respect of the Senior Secured Notes (the "Senior Secured Notes Claims") to accept the Restructuring Plan (subject to the terms and conditions of this Restructuring Support Agreement and Bankruptcy Court approval, and the receipt of, the Disclosure Statement); and

L.      In expressing such support and commitment, the Parties do not desire and do not intend in any way to derogate from or diminish the solicitation requirements of applicable securities and bankruptcy law, or the fiduciary duties of the Company or any other Party having such duties.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.      Defined Terms.   All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Plan Term Sheet.

2.      Termination of Prior Restructuring Support Agreement.   Each of the Loehmann's Entities, Whippoorwill and Istithmar agrees:

a.      that certain Restructuring Support Agreement (the "Prior Restructuring Support Agreement") dated as of September 24, 2010 by and among each of the Loehmann's Entities, Istithmar and Whippoorwill is hereby terminated effective as of the date hereof;

b.      notwithstanding anything to the contrary in the Prior Restructuring Support Agreement, including without limitation the Plan Term Sheet (as defined in the Prior Restructuring Support Agreement), the Parties (as defined in the Prior Restructuring Support Agreement) shall have no obligations under the Prior Restructuring Support Agreement; and

c.      no Party (as defined in the Prior Restructuring Support Agreement) shall have any liability to any other Party (as defined in the Prior Restructuring Support Agreement) on account of any rights or obligations arising under the Prior Restructuring Support Agreement.

3.      Termination of Equity Commitment Letter.  Each of the Loehmann's Entities and Istithmar agrees:

a.      that certain Equity Commitment Letter (the "Equity Commitment Letter") dated as of September 24, 2010 by and among each of the Loehmann's Entities and Istithmar is hereby terminated effective as of the date hereof;

b.      notwithstanding anything to the contrary in the Equity Commitment Letter, including without limitation the Investment Term Sheet (as defined in the Equity Commitment Letter), the parties to the Equity Commitment Letter shall have no obligations under the Equity Commitment Letter; and

c.      no party to the Equity Commitment Letter shall have any liability to any other party to the Equity Commitment Letter on account of any rights or obligations arising under the Equity Commitment Letter.

4.      Company Obligations.  The Company believes that prompt consummation of the Restructuring Plan will best facilitate the Company's business and financial restructuring, and is in the best interests of the Company's creditors, employees, stakeholders, vendors and other parties in interest.  Accordingly, each of the Loehmann's Entities hereby expresses its intention to seek to consummate the Restructuring Plan.  Without limiting the foregoing, for so long as this Restructuring Support Agreement remains in effect, and subject to each of the Supporting Secured Noteholders and Istithmar fulfilling its respective obligations as contemplated herein, each of the Loehmann's Entities agrees:

a.      to use best efforts to file its voluntary petitions to commence the Chapter 11 Cases;

b.      to take such actions as may be necessary or appropriate to obtain approval of the Restructuring Plan, including the solicitation of the requisite votes in favor of and all efforts to obtain confirmation of the Restructuring Plan;

c.      not pursue, propose, support, or encourage the pursuit, proposal or support of, any Chapter 11 plan or other restructuring or reorganization for, or the liquidation of, any of the Loehmann's Entities (directly or indirectly) that is inconsistent with the Financial Restructuring unless the Company believes in the good faith (after consultation with outside legal counsel) that the failure to do so would be inconsistent with its fiduciary duties under applicable law, including the Bankruptcy Code;

d.      to provide draft copies of the Restructuring Plan, the Disclosure Statement, the proposed order confirming the Restructuring Plan, the solicitation materials, and pleadings and exhibits related to the foregoing to counsel to the Supporting Secured Noteholders and Istithmar reasonably in advance of, and to the extent practicable, no less than two days prior to, the date when the Debtors intend to file such documents with the Bankruptcy Court and to

consult in good faith with the Supporting Secured Noteholders and Istithmar regarding the form and substance of any such proposed filings;

> e. support consummation of the Financial Restructuring as set forth in the Plan Term Sheet and in the Investment Commitment Letter; and

> f. to otherwise use its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by the Financial Restructuring, including consummation of the transactions set forth in the Investment Commitment Letter, at the earliest practicable date; and

> g. to provide prompt notice to and consult with Conway Del Genio Gries & Co., LLC, in its capacity as financial advisor to the Supporting Secured Noteholders ("CDG") prior to making any decisions relating to store closures, the establishment of new stores or relocation of existing stores, expense rationalization, capital expenditures, 2011 spring and fall merchandising and marketing plans, treatment of critical vendors, cost-cutting initiatives and any other strategic business decisions which could reasonably be expected to have a significant or material effect on the value of the Reorganized Company;

in each case expressly subject to the exercise (after consultation with outside legal counsel) by each of the Loehmann's Entities of its fiduciary duties.

> 5. <u>Supporting Secured Noteholder Obligations</u>. For so long as this Restructuring Support Agreement remains in effect, and subject to the other Parties hereto fulfilling their respective obligations as provided herein, each Supporting Secured Noteholder shall, and shall cause its affiliates to:

> a. timely vote any and all of its Claims against each of the Loehmann's Entities to accept the Restructuring Plan consistent in all respects with the Plan Term Sheet;

> b. support consummation of the Financial Restructuring as set forth in the Plan Term Sheet and in the Investment Commitment Letter;

> c. not pursue, propose, support, or encourage the pursuit, proposal or support of, any Chapter 11 plan or other restructuring or reorganization for, or the liquidation of, any of the Loehmann's Entities (directly or indirectly) that is inconsistent with the Financial Restructuring or the Investment Commitment Letter;

> d. not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Restructuring Support Agreement, the Plan Term Sheet or the Investment Commitment Letter or delay, impede, appeal or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Financial Restructuring; and

> e. not commence any proceeding or prosecute, join in, or otherwise support any objection to oppose or object to the Restructuring Plan;

provided, however, that nothing herein shall require any of the Supporting Secured Noteholders to incur any obligations to provide financial support to the Company or any other entity, except as expressly provided herein or in the Investment Commitment Letter.

6. <u>Whippoorwill Obligations</u>. In addition to the obligations set forth in Section 5 of this Restructuring Support Agreement, for so long as this Restructuring Support Agreement remains in effect, and subject to the other Parties hereto fulfilling their respective obligations as provided herein, Whippoorwill agrees that it shall, and shall cause its affiliates to perform all of its obligations set forth in the Investment Commitment Letter, subject to the terms and conditions therein; provided, however, that nothing herein shall require Whippoorwill to incur any obligations to provide financial support to the Company or any other entity, except as expressly provided herein or in the Investment Commitment Letter.

7. <u>Istithmar Obligations</u>. For so long as this Restructuring Support Agreement remains in effect, and subject to the other Parties hereto fulfilling their respective obligations as provided herein, Istithmar shall:

a. support consummation of the Financial Restructuring as set forth in the Plan Term Sheet and in the Investment Commitment Letter;

b. perform all of its obligations set forth in the Investment Commitment Letter, subject to the terms and conditions therein;

c. not pursue, propose, support, or encourage the pursuit, proposal or support of, any Chapter 11 plan or other restructuring or reorganization for, or the liquidation of, any of the Loehmann's Entities (directly or indirectly) that is inconsistent with the Financial Restructuring or the Investment Commitment Letter;

d. not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Restructuring Support Agreement, the Plan Term Sheet or the Investment Commitment Letter or delay, impede, appeal or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Financial Restructuring; and

e. not commence any proceeding or prosecute, join in, or otherwise support any objection to oppose or object to the Restructuring Plan;

provided, however, that nothing herein shall require Istithmar to incur any obligations to provide financial support to the Company or any other entity, except as expressly provided herein or in the Investment Commitment Letter.

8. <u>Acknowledgement</u>.

a. While the Parties agree herein to support approval of the Restructuring Plan, this Restructuring Support Agreement is not and shall not be deemed to be a solicitation for consent to the Restructuring Plan in contravention of section 1125(b) of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, any obligation to vote in favor of the Restructuring Plan as set forth above is expressly conditioned on the receipt

of the Restructuring Plan and a copy of the Disclosure Statement which shall have previously been approved by the Bankruptcy Court, after notice and a hearing, as containing adequate information as required by section 1125 of the Bankruptcy Code.

b.        Each Party further acknowledges that no securities of any of the Loehmann's Entities are being offered or sold hereby and that this Restructuring Support Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities of any of the Loehmann's Entities.

9.        <u>Limitations on Transfer of Senior Secured Notes</u>.  Each Supporting Secured Noteholder shall not, subject to the provisions of the documents related and necessary to close the transactions contemplated by the Trade Documents and the Forward Purchase Agreement (i) sell, transfer, assign, pledge, grant a participation interest in or otherwise dispose, directly or indirectly, of its right, title or interest in respect of the Senior Secured Notes (to the extent held by it on the date hereof), in whole or in part, or any interest therein, or (ii) grant any proxies, deposit any of its Senior Secured Notes (to the extent held by it on the date hereof) into a voting trust, or enter into a voting agreement with respect to any of such Senior Secured Notes, unless (a) the transferee agrees in writing at the time of such transfer to be bound by this Restructuring Support Agreement in its entirety without revision and to become a party to the Restructuring Support Agreement and the Forward Purchase Agreement, by executing a joinder agreement in the form attached as <u>Exhibit B</u> hereto with respect to the Senior Secured Notes being transferred to such transferee and (b) such transferee delivers the counterpart signature page in subsection (a) above to the Senior Secured Notes Indenture Trustee and Capco no later than three (3) business days following the closing of such transfer.  No transfer by Whippoorwill shall release or otherwise relieve Whippoorwill of its obligations under the Investment Commitment Letter and the Forward Purchase Agreement.  No transfer by Istithmar shall release or otherwise relieve Istithmar of its obligations under the Investment Commitment Letter and the Forward Purchase Agreement.  No transferring Supporting Secured Noteholder shall have any liability under this Agreement arising from or related to the failure of its transferee to comply with the terms of this Agreement.  No Supporting Secured Noteholder may create any subsidiary or affiliate for the sole purpose of acquiring any Senior Secured Notes or any other claims against or interests in any of the Loehmann's Entities without first causing such subsidiary or affiliate to become a party hereto.  Any transfer that fails to comply with the provisions of this paragraph shall be void *ab initio*.

10.        <u>Further Acquisition of Senior Secured Notes</u>.  This Restructuring Support Agreement shall in no way be construed to preclude any Supporting Secured Noteholder from acquiring additional Senior Secured Notes or other claims against any of the Loehmann's Entities.  Any such additional Senior Secured Notes or claims so acquired shall be automatically subject to the terms of this Restructuring Support Agreement.

11.        <u>Condition to each Party's Obligations</u>.

a.        Each Party's obligations under this Restructuring Support Agreement are subject to the prior execution of this Restructuring Support Agreement by each of the Loehmann's Entities, Whippoorwill, and Istithmar.

b.     The Supporting Secured Noteholders' obligations under this Restructuring Support Agreement are subject to execution (prior to or contemporaneously with this Agreement) of the Investment Commitment Letter by each of the Loehmann's Entities, Whippoorwill and Istithmar.

c.     Whippoorwill's and Istithmar's obligations under this Restructuring Support Agreement are subject to execution of the Forward Purchase Agreement by Whippoorwill and Istithmar.

d.     Whippoorwill's and Istithmar's obligations under this Restructuring Support Agreement are subject to (i) the closing of the transactions contemplated by the Trade Documents and (ii) the closing of the transactions contemplated by the Forward Purchase Agreement, including, without limitation, the execution of the Escrow Agreement and the funding of the Escrow Account (both as defined in the Forward Purchase Agreement) in accordance with the terms of the Forward Purchase Agreement.

In no event shall this Restructuring Support Agreement be effective with respect to any Party until the conditions set forth in this Section 11 are satisfied.

12.     <u>Termination Events</u>.  This Restructuring Support Agreement may be terminated upon the occurrence of any of the following events (each, a "<u>Termination Event</u>"):

a.     any of the Loehmann's Entities has (i) breached any of its material obligations under this Restructuring Support Agreement, including, without limitation, the requirement to pay professional fees and expenses set forth in Section 30 of this Agreement, (ii) failed to diligently prosecute the confirmation of the Restructuring Plan, or (iii) has announced its intention to pursue a Chapter 11 plan or other financial restructuring that differs in any material respect from the terms set forth herein or in the Investment Commitment Letter;

b.     any Party (other than any of the Loehmann's Entities) shall have breached any of its material obligations under this Restructuring Support Agreement or under the Investment Commitment Letter;

c.     the commitment set forth in the Investment Commitment Letter expires or terminates pursuant to any Termination Event as defined and described in the Investment Term Sheet (as defined in the Investment Commitment Letter);

d.     any of the Company, Istithmar or Whippoorwill declares that the Investment Commitment Letter is invalid or has no force or effect and the Investment Commitment Letter therefore terminates in accordance with its terms;

e.     any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or an interim or permanent trustee shall be appointed in any of the Chapter 11 Cases, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

f.      any court (including the Bankruptcy Court) shall declare this Restructuring Support Agreement to be unenforceable, which order has not been reversed or vacated within fourteen (14) days after entry;

g.      entry of an order by the Bankruptcy Court denying confirmation of the Restructuring Plan, which order has not been reversed or vacated within fourteen (14) days after entry;

h.      the order of the Bankruptcy Court confirming the Restructuring Plan shall have been stayed, reversed, vacated or otherwise modified in a manner adverse to the Supporting Secured Noteholders or Istithmar;

i.      entry of an order by the Bankruptcy Court invalidating, disallowing, equitably subordinating or limiting in any respect, as applicable, the Senior Secured Notes Claims;

j.      if the effective date of the Restructuring Plan shall not have occurred by March 15, 2011; or

k.      each of the Parties hereto agrees in writing to terminate this Restructuring Support Agreement.

13.     Termination of this Restructuring Support Agreement.

a.      Upon the occurrence of any of the Termination Events described in Sections 12(e), 12(f), 12(g), or 12(j) herein, this Restructuring Support Agreement shall terminate automatically and without further notice or action by any Party.

b.      Upon the occurrence of any other Termination Event set forth herein, this Restructuring Support Agreement shall terminate only upon written notice by any non-breaching Party to the other Parties and, if such Termination Event is based upon a breach of an obligation by a Party and such breach is capable of being cured, failure by the breaching Party to remedy the breach giving rise to such Termination Event within five (5) business days; provided, however, that the right to terminate hereunder shall not preclude any non-breaching Party from seeking specific performance or any other remedy available under applicable law for breach of this Restructuring Support Agreement.

c.      Specific Performance; Damages.  This Restructuring Support Agreement, including without limitation the Parties' agreement herein to support confirmation of the Restructuring Plan, is intended as a binding commitment enforceable in accordance with its terms.  Each Party acknowledges and agrees that the exact nature and extent of damages resulting from a breach of this Restructuring Support Agreement are uncertain at the time of entering into this Restructuring Support Agreement and that breach of this Restructuring Support Agreement would result in damages that would be difficult to determine with certainty.  It is understood and agreed that money damages would not be a sufficient remedy for any breach of this Restructuring Support Agreement and that the Parties shall each be entitled to specific performance and injunctive relief as remedies for any such breach, and further agree to waive, and to use their best efforts to cause each of their representatives to waive, any requirement for

9

the securing or posting of any bond in connection with such remedy. Such remedies shall not be deemed to be the exclusive remedies for the breach of this Restructuring Support Agreement by any Party or its representatives, but shall be in addition to all other remedies available at law or in equity. In the event of litigation relating to this Restructuring Support Agreement, if a court of competent jurisdiction determines that any Party or any of its representatives have breached this Restructuring Support Agreement, such breaching Party shall be liable and pay to the non-breaching Parties the reasonable legal fees incurred by such non-breaching Parties in connection with such litigation, including any appeal therefrom.

14. <u>Effect of Termination</u>. Upon termination of this Restructuring Support Agreement, all obligations hereunder shall terminate and shall be of no further force and effect; <u>provided</u>, <u>however</u>, that any claim for breach of this Restructuring Support Agreement shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way; but <u>provided further</u>, that the breach of this Restructuring Support Agreement by one or more Parties shall not create any rights or remedies against any non-breaching Party unless such non-breaching Party has participated in or aided and abetted the breach by the breaching Party or Parties. Except as set forth above in this Section 14, upon such termination, any obligations of the non-breaching Parties set forth in this Restructuring Support Agreement shall be null and void <u>ab initio</u> and all claims, causes of action, remedies, defenses, setoffs, rights or other benefits of such non-breaching Parties shall be fully preserved without any estoppel, evidentiary or other effect of any kind or nature whatsoever.

15. <u>Representations and Warranties</u>. Each of the Loehmann's Entities, the Supporting Secured Noteholders, and Istithmar represents and warrants to each other Party, severally but not jointly, that the following statements are true, correct and complete as of the date hereof:

a. <u>Corporate Power and Authority</u>. It is duly organized, validly existing, and in good standing under the laws of the state of its organization, and has all requisite corporate, partnership or other power and authority to enter into this Restructuring Support Agreement and to carry out the transactions contemplated by, and to perform its respective obligations under, this Restructuring Support Agreement.

b. <u>Authorization</u>. The execution and delivery of this Restructuring Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or other action on its part.

c. <u>Binding Obligation</u>. This Restructuring Support Agreement has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with the terms hereof, subject to the conditions precedent set forth herein.

d. <u>No Conflicts</u>. The execution, delivery and performance by it (when such performance is due) of this Restructuring Support Agreement does not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or

(ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

        e.        <u>Governmental Consents</u>.  The execution, delivery and performance by the Loehmann's Entities of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body.

        16.        <u>Additional Representations</u>.    Each Supporting Secured Noteholder represents that, (i) as of the date hereof, it owns or has investment management responsibility for accounts that own Senior Secured Notes in the principal amount set forth on <u>Schedule I</u> and (ii) it is not aware of any event that, due to any fiduciary or similar duty to any other person, would prevent it from taking any action required of it under this Restructuring Support Agreement. Each of the Parties acknowledges and agrees that <u>Schedule I</u> is being provided, on a confidential basis, to the Loehmann's Entities and Istithmar, including their respective advisors, agents, attorneys and representatives, and is not being provided to any other person.  Unless required by applicable law or regulation, neither the Loehmann's Entities nor Istithmar shall disclose any information contained in a Supporting Secured Noteholder's <u>Schedule I</u> without the prior written consent of such Supporting Secured Noteholder except to their advisors, agents, attorneys and representatives; and if such announcement or disclosure is so required by law or regulation, the Loehmann's Entities or Istithmar, as applicable, shall, to the extent allowed by law or regulation, afford the Supporting Secured Noteholder a reasonable opportunity to review and comment upon any such announcement or disclosure prior to making such announcement or disclosure.  The foregoing shall not prohibit the Loehmann's Entities or Istithmar from disclosing the approximate aggregate holdings of the Supporting Secured Noteholders.

        17.        <u>Amendment or Waiver</u>.  Except as otherwise specifically provided herein, this Restructuring Support Agreement may not be modified, waived, amended or supplemented unless such modification, waiver, amendment or supplement is in writing and has been signed by each Party.  No waiver of any of the provisions of this Restructuring Support Agreement shall be deemed or constitute a waiver of any other provision of this Restructuring Support Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver (unless such waiver expressly provides otherwise).

        18.        <u>Notices</u>.  Any notice required or desired to be served, given or delivered under this Restructuring Support Agreement shall be in writing, and shall be deemed to have been validly served, given or delivered if provided by personal delivery, or upon receipt of fax delivery, as follows:

        a.        if to any of the Loehmann's Entities, to Loehmann's, 2500 Halsey Street , Bronx, NY 10461, Attn: Jerry Politzer, Chief Executive Officer, with a copy to Frank Oswald, Togut, Segal & Segal, LLP, One Penn Plaza, New York, NY 10119, fax: 212 967-4258;

        b.        if to Whippoorwill, to Whippoorwill Associates, Inc., 11 Martine Avenue, 11th Floor, White Plains, NY 10606, Attn: Steven Gendal, with a copy to its General Counsel at the same address and a copy to Robert L. Cunningham and Matt J. Williams, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166, fax: 212-351-5208;

        c.      if to any Supporting Secured Noteholder other than Whippoorwill, to the address and fax number listed on its respective signature page hereto;

        d.      if to Istithmar, to Istithmar Retail Investments, The Galleries, Limitless Building No. 4, Level 6, Jebel Ali, Dubai, United Arab Emirates, fax: +971 4 390 2100, Attn: Chief Executive Officer and General Counsel, with a copy to Richard S. Lincer, Sean A. O'Neal, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, fax: 212-225-3999.

        19.     <u>Governing Law; Jurisdiction</u>.  THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  By its execution and delivery of this Restructuring Support Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under this Restructuring Support Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought (i) in the event that the Chapter 11 Cases have not been commenced, in the United States District Court for the Southern District of New York or (ii) in the event that the Chapter 11 Cases have been commenced, in the Bankruptcy Court.  By execution and delivery of this Restructuring Support Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of the United States District Court for the Southern District of New York or the Bankruptcy Court, as applicable, solely with respect to any such action, suit or proceeding, and waives any objection it may have to venue or the convenience of the forum.

        20.     <u>Headings</u>.  The headings of the sections, paragraphs and subsections of this Restructuring Support Agreement are inserted for convenience only and shall not affect the interpretation hereof.

        21.     <u>Interpretation</u>.  This Restructuring Support Agreement is the product of negotiations of the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Restructuring Support Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

        22.     <u>Successors and Assigns</u>.  This Restructuring Support Agreement is intended to bind and inure only to the benefit of the Parties and their respective successors, assigns, heirs, transferees, executors, administrators and representatives.

        23.     <u>Consideration</u>.  It is hereby acknowledged by each of the Parties that no consideration shall be due or paid to any Party for its agreement to vote to accept the Restructuring Plan in accordance with the terms and conditions of this Agreement, other than the Loehmann's Entities' agreement to use best efforts to obtain confirmation of the Restructuring Plan in accordance with the terms and conditions set forth herein.

24. <u>No Third-Party Beneficiaries</u>. Unless expressly stated herein, this Restructuring Support Agreement shall be solely for the benefit of the Parties hereto and no other person or entity shall be a third-party beneficiary hereof.

25. <u>No Waiver of Participation and Reservation of Rights</u>. Except as expressly provided in this Restructuring Support Agreement and in any amendment among each of the Parties, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in the Chapter 11 Cases. If the transactions contemplated by this Restructuring Support Agreement or the Restructuring Plan are not consummated, or if this Restructuring Support Agreement is terminated for any reason, each of the Parties fully reserves any and all of its rights.

26. <u>No Special Damages</u>. Notwithstanding anything to the contrary herein, in the event of any litigation or dispute involving this Restructuring Support Agreement, the Plan Term Sheet, the Financial Restructuring, the Investment Commitment Letter, the Restructuring Plan, the Disclosure Statement or any definitive documents related to the foregoing, neither Istithmar nor any of the Supporting Secured Noteholders shall be responsible or liable to the Company for any special, indirect, consequential, incidental or punitive damages. The obligations of the Company under this paragraph shall be effective upon execution of this Restructuring Support Agreement and shall remain effective whether or not any of the transactions contemplated by this Agreement are consummated, whether any definitive documents are executed and notwithstanding any termination of this Agreement and shall be binding upon the Reorganized Company in the event that any plan of reorganization of the Company is consummated.

27. <u>No Admissions</u>. This Restructuring Support Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert. No Party shall have, by reason of this Restructuring Support Agreement, a fiduciary relationship in respect of any other Party or any party in interest in the Chapter 11 Cases, or any of the Loehmann's Entities, and nothing in this Restructuring Support Agreement, expressed or implied, is intended to or shall be so construed as to impose upon any Party any obligations in respect of this Restructuring Support Agreement except as expressly set forth herein.

28. <u>Counterparts</u>. This Restructuring Support Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Delivery of an executed signature page of this Restructuring Support Agreement by facsimile or electronic mail in portable document format (pdf) shall be effective as delivery of a manually executed signature page of this Restructuring Support Agreement.

29. <u>Representation by Counsel</u>. Each Party acknowledges that it has been represented by counsel in connection with this Restructuring Support Agreement and the

transactions contemplated herein. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Restructuring Support Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

30. <u>Expenses</u>. The Loehmann's Entities shall pay, when due and payable, any invoice for reasonable professional fees and expenses incurred in connection with this Restructuring Support Agreement presented for payment by the Supporting Secured Noteholders, including without limitation the reasonable out of pocket fees and expenses of (i) Gibson, Dunn & Crutcher LLP, in its capacity as counsel to Whippoorwill, and (ii) CDG, in its capacity as financial advisor to the Supporting Secured Noteholders. In the event the Restructuring Plan is consummated, the Loehmann's Entities will reimburse Istithmar for the reasonable out of pocket fees and expenses of Cleary Gottlieb Steen & Hamilton LLP incurred in connection with the Financial Restructuring.

31. <u>Entire Agreement</u>. This Restructuring Support Agreement, the Plan Term Sheet and the schedules provided to counsel for the Company constitute the entire agreement between the Parties and supersede all prior and contemporaneous negotiations, agreements, representations, warranties and understandings of the Parties, whether oral, written or implied, as to the subject matter hereof.

32. <u>Automatic Stay</u>. Each of the Loehmann's Entities acknowledges that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code.

33. <u>Several not Joint</u>. The agreements, representations and obligations of the Parties under this Restructuring Support Agreement are, in all respects, several and not joint. Any breach of this Restructuring Support Agreement by any Party shall not result in liability for any other non-breaching Party.

*[Remainder of page intentionally blank; remaining pages are signature pages]*

**IN WITNESS WHEREOF**, the undersigned have each caused this Restructuring Support Agreement to be acknowledged, duly executed and delivered by their respective, duly authorized officers as of the date first above written.

**LOEHMANN'S HOLDINGS INC.**

By: /s/ Joseph Melvin
Name: Joseph Melvin
Title: Chief Operating Officer/Chief Financial Officer

**LOEHMANN'S, INC.**

By: /s/ Joseph Melvin
Name: Joseph Melvin
Title: Chief Operating Officer/Chief Financial Officer

**LOEHMANN'S REAL ESTATE HOLDINGS, INC.**

By: /s/ Joseph Melvin
Name: Joseph Melvin
Title: Chief Operating Officer/Chief Financial Officer

**LOEHMANN'S OPERATING CO.**

By: /s/ Joseph Melvin
Name: Joseph Melvin
Title: Chief Operating Officer/Chief Financial Officer

**LOEHMANN'S CAPITAL CORP.**

By: /s/ Joseph Melvin
Name: Joseph Melvin
Title: Chief Operating Officer/Chief Financial Officer

**ISTITHMAR RETAIL INVESTMENTS**

By: /s/ Kapil Zaveri
Name: Kapil Zaveri
Title:

**SUPPORTING SECURED NOTEHOLDERS**:

**WHIPPOORWILL ASSOCIATES, INC.,** as agent for certain of its discretionary funds and accounts

By: /s/ Steven Gendal
Name: Steven Gendal
Title: Principal

**<u>ADDITIONAL SECURED NOTEHOLDERS</u>:**

By: _____
Name:
Title:

Notice Information:

**EXHIBIT A**
(Plan Term Sheet)

**Exhibit A to Restructuring Support Agreement**

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.**

**SUCH OFFER OR SOLICITATION ONLY WILL BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

Loehmann's Holdings Inc

Loehmann's, Inc.

Loehmann's Real Estate Holdings, Inc.

Loehmann's Operating Co.

Loehmann's Capital Corp.

**TERM SHEET FOR PROPOSED CHAPTER 11 PLAN OF REORGANIZATION**

This term sheet (the "Plan Term Sheet"), which is part of a Restructuring Support Agreement, dated November 14, 2010 (the "Restructuring Support Agreement"), by and among (i) Loehmann's Holdings Inc. ("Loehmann's Holdco"), (ii) Loehmann's, Inc. ("Loehmann's"), (iii) Loehmann's Real Estate Holdings, Inc. ("Holdings"), (iv) Loehmann's Operating Co. ("Loehmann's Opco"), (v) Loehmann's Capital Corp. ("Capco") (collectively, the "Company" or the "Loehmann's Entities"), (vi) Istithmar Retail Investments ("Istithmar"), (vii) Whippoorwill Associates, Inc., as agent for its discretionary accounts that are legal and/or beneficial owners of the Senior Secured Notes (as defined below) ("Whippoorwill"), and (viii) any other holders of the Senior Secured Notes (as defined below) identified on the signature pages to the Restructuring Support Agreement (together with Whippoorwill, the "Supporting Secured Noteholders"), and is subject to the terms and conditions of the Restructuring Support Agreement, describes the principal terms of a proposed restructuring of the Company to be implemented pursuant to a plan of reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement.

| | |
|---|---|
| **PLAN PROPONENT:** | The Debtors |
| **PLAN OF REORGANIZATION:** | The Debtors shall file a plan of reorganization (the "Restructuring Plan") and related disclosure statement (the "Disclosure Statement") that incorporate, and are consistent with, the terms of the Restructuring Support Agreement, the Investment Commitment Letter and this Plan Term Sheet. |

The Restructuring Plan and the Disclosure Statement shall be in form and substance acceptable to each Investor in its sole discretion and may not be amended without the consent of the Supporting Secured Noteholders and Istithmar. All documents related to the Restructuring Plan and Disclosure Statement, including, without limitation, all plan supplement documents, the Investment Commitment Letter, all corporate governance documents, any shareholders' agreement, any registration rights agreement, any Management Incentive Plan and all documentation related to the Exit Facility and the DIP Financing Facility shall be in form and substance acceptable to each Investor in its sole discretion.

The Restructuring Plan shall address, among other things, the Debtors' (i) obligations under that certain Debtor-In-Possession Credit Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "DIP Credit Agreement") by and among Loehmann's Opco as borrower (the "Borrower"), Capco, Loehmann's Holdco, Loehmann's and Holdings as guarantors (collectively, the "Guarantors", and together with the Borrower, the "Loan Parties"), Crystal Financial LLC ("Crystal"), as administrative agent and collateral agent (in such capacity, and together with its successors in such capacity, the "Agent") for the lenders party to the DIP Credit Agreement from time to time (individually, a "Lender" and collectively, including the Agent, the "DIP Lenders"); (ii) obligations under the Indenture, dated as of October 12, 2004, by and among Capco and Wells Fargo, as trustee, relating to the issuance of 12% Senior Secured Class A Notes due 2011 (the "12% A Notes"); (iii) obligations under the Indenture, dated as of October 12, 2004, by and among Capco and Wells Fargo, as trustee, relating to the issuance of the Senior Secured Floating Rate Notes due 2011 (the "Floating Rate Notes," together with the 12% A Notes, the "A Notes"); (iv) obligations under the Indenture, dated as of October 12, 2004, by and among Capco and Wells Fargo, as trustee, relating to the issuance of 13% Senior Secured Class B Notes due 2011 (the "13% B Notes"); (v) other obligations; and (vi) equity securities.

The Financial Restructuring shall provide for, among other things: (i) the discharge of Claims and Liens against the Loehmann's Entities, pursuant to the Restructuring Plan, (ii) the cancellation of all existing common stock in Loehmann's Holdco, (iii) the issuance of new common stock in Reorganized Loehmann's Holdco ("New Common Stock")

2

pursuant to the Restructuring Plan and (iv) the issuance of new convertible preferred equity in Reorganized Loehmann's Holdco ("New Convertible Preferred Equity").

**PLAN FUNDING:**
The Reorganized Company shall enter into a senior secured credit facility in the amount of up to $40 million to be negotiated and to be satisfactory to each of the Company, Istithmar, and each of the Supporting Secured Noteholders in their sole discretion (the "Exit Facility").

The Restructuring Plan will be funded with cash from operations, borrowings under the Exit Facility and the proceeds received from the New Investment (as defined in the Investment Commitment Letter).

**DEFINITIVE DOCUMENTS:**
The transactions described in this Plan Term Sheet are subject in all respects to, among other things, definitive documentation, including without limitation, the Restructuring Plan, the documents to be included in the plan supplement to the Restructuring Plan, the Disclosure Statement, the Exit Facility, and the documents contemplated by the Restructuring Support Agreement and the Investment Commitment Letter, all of which shall be in form and substance satisfactory to each of the Supporting Secured Noteholders and Istithmar in their sole discretion.

**TREATMENT OF CLAIMS AND INTERESTS:**

**Administrative Expense Claims**
Unclassified; to be paid in full by the Reorganized Debtors.

**Priority Tax Claims**
Unclassified; to be paid in full by the Reorganized Debtors.

**DIP Financing Claims**
Unclassified; the allowed claims under the DIP Financing Facility shall be paid in full on the Effective Date.

**Other Priority Claims**
Unimpaired; to be paid in full by the Reorganized Debtors; deemed to accept and not entitled to vote on the Restructuring Plan.

**Other Secured Claims**
Unimpaired; to be paid in full by the Reorganized Debtors; deemed to accept and not entitled to vote on the Restructuring Plan.

**Class A Note Claims**
Impaired and entitled to vote on the Restructuring Plan. Class A Note Claims shall be allowed under the Restructuring Plan in the aggregate amount of $75,000,000 plus accrued and unpaid interest as of the Petition Date.

3

In full satisfaction of Class A Note Claims, each holder of an allowed Class A Note Claim shall receive the following treatment:

On the Effective Date, holders of Class A Note Claims shall receive their pro rata share of:

New Common Stock representing 83.2% of the total outstanding New Common Stock on the Effective Date (prior to dilution resulting from any conversion of New Convertible Preferred Equity (as such term is defined in the Investment Commitment Letter) to New Common Stock), subject to dilution for any New Common Stock issued pursuant to any Management Incentive Plan.

Assuming that 100% of the New Convertible Preferred Equity is converted to New Common Stock, holders of Class A Note Claims would receive their pro rata share of New Common Stock representing 42.4% of the total outstanding New Common Stock on the Effective Date.

Any unpaid fees and expenses owed pursuant to the terms of the Senior Secured Notes Indenture, including any fees and expenses owed to the Senior Secured Notes Indenture Trustee and the Special Trustee (as defined in the Indenture), if any, shall be paid in full and in cash on the Effective Date.

The distributions above shall also be in full satisfaction of: (i) any Claim, Lien, right or interest that a holder of an A Note may have arising under, related to, or in connection with, the Related Agreements; and (ii) any Claim, Lien, right or interest that the Senior Secured Notes Indenture Trustee or the Special Trustee may have arising under, related to, or in connection with, the Related Agreements for the benefit of any holder of an A Note.

| | |
|---|---|
| **Class B Note Claims** | Impaired and entitled to vote on the Restructuring Plan. Class B Note Claims shall be allowed under the Restructuring Plan in the aggregate amount of $35,000,000 plus accrued and unpaid interest as of the Petition Date. |

In full satisfaction of the Class B Note Claims, each holder of an allowed Class B Note Claim shall receive the following treatment:

On the Effective Date, holders of Class B Note Claims shall receive their pro rata share of:

New Common Stock representing 16.8% of the total outstanding New Common Stock on the Effective Date (prior

to dilution resulting from any conversion of New Convertible Preferred Equity (as such term is defined in the Investment Commitment Letter) to New Common Stock), subject to dilution for any New Common Stock issued pursuant to any Management Incentive Plan.

Assuming that 100% of the New Convertible Preferred Equity is converted to New Common Stock, holders of Class B Note Claims would receive their pro rata share of New Common Stock representing 8.6% of the total outstanding New Common Stock on the Effective Date.

Any unpaid fees and expenses owed pursuant to the terms of the Senior Secured Notes Indenture, including any fees and expenses owed to the Senior Secured Notes Indenture Trustee (as defined in the Indenture), if any, shall be paid in full and in cash on the Effective Date.

The distributions above shall also be in full satisfaction of: (i) any Claim, Lien, right or interest that a holder of a 13% B Note may have arising under, related to, or in connection with, the Related Agreements; and (ii) any Claim, Lien, right or interest that the Senior Secured Notes Indenture Trustee may have arising under, related to, or in connection with, the Related Agreements for the benefit of any holder of a 13% B Note.

| | |
|---|---|
| **General Unsecured Claims** | Impaired and entitled to vote on the Restructuring Plan. |

In full satisfaction of the General Unsecured Claims, each holder of an allowed General Unsecured Claim shall receive the following treatment:

On the Effective Date, holders of General Unsecured Claims shall receive their pro rata share of:

A cash distribution in an amount to be agreed upon by the Company, Istithmar and the Supporting Secured Noteholders, provided however, that subject to the satisfaction of agreed upon conditions, holders of allowed General Unsecured Claims may elect to receive, in lieu of the Cash Distribution, unsecured notes in the principal amount of amount to be agreed upon by the Company, Istithmar and the Supporting Secured Noteholders (the "New Unsecured Notes"), which New Unsecured Notes shall have terms to be mutually agreed between Istithmar and the Supporting Secured Noteholders.

The distributions provided to holders of allowed General Unsecured Claims shall be funded from the proceeds of the the New Investment (as defined in the Investment Commitment Letter).

| | |
|---|---|
| **Statutory Subordinated Claims** | Impaired and deemed to reject the Restructuring Plan. The holders of allowed Statutory Subordinated Claims shall be impaired and the holders of such Claims shall receive no distributions under the Restructuring Plan. |
| **Existing Equity of Loehmann's Holdco** | Impaired and deemed to reject the Restructuring Plan. Holders of existing common stock of Loehmann's Holdco will receive no distributions under the Restructuring Plan. Existing common stock of Loehmann's Holdco will be cancelled on the Effective Date. Any options with respect to existing common stock of Loehmann's Holdco will be cancelled on the Effective Date. |
| **Intercompany Claims** | Unimpaired and deemed to accept the Restructuring Plan. Holders of Intercompany Claims shall receive no distributions under the Restructuring Plan; provided, however, the Debtors reserve the right to reinstate any or all Intercompany Claims on the Effective Date other than any Claims related to the Lease or related transactions. |
| **Executory Contracts and Unexpired Leases** | All executory contracts and unexpired leases of the Loehmann's Entities, including the Lease, will be assumed by the Loehmann's Entity that is a party to such contract or lease, unless expressly rejected by the applicable Loehmann's Entity pursuant to the Restructuring Plan or pursuant to a separate order of the Bankruptcy Court. |
| **RELEASES & EXCULPATION** | In addition to the discharge and release granted to the Loehmann's Entities and their Related Persons under sections 105 and 1141 of the Bankruptcy Code, the Restructuring Plan shall provide for certain releases as set forth below.

The Restructuring Plan will include:

- exculpation and release of the Released Parties with respect to the formulation, solicitation and implementation of the Exchange Offer, the Restructuring Plan, in connection with or related to the Chapter 11 Cases, and transactions contemplated thereby (except for acts or omissions constituting willful misconduct, gross negligence or bad faith); and

- release of the Released Parties by all holders of Claims who vote to accept the Restructuring Plan of all causes of action in connection with or related to the Loehmann's Entities, including without limitation, the Chapter 11 Cases, the Restructuring Support Agreement, the Exchange Offer, the Investment Commitment Letter or the Restructuring Plan (including, without limitation, |

the solicitation of votes on the Restructuring Plan) (other than the rights to enforce the Restructuring Plan and the contracts, releases, indentures, and other agreements or documents delivered thereunder) that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date, which could have been asserted by the holders of Claims; provided, however, that the foregoing shall not operate as a waiver or release from any causes of action arising out of the acts or omissions constituting actual or intentional fraud, willful misconduct or criminal conduct as determined by a final order entered by a court of competent jurisdiction.

**CONDITIONS TO EFFECTIVE DATE:**

The Restructuring Plan shall contain various usual and customary conditions precedent to the Effective Date that must be satisfied (or waived by each of the Supporting Secured Noteholders and Istithmar) prior to, or concurrent with, the occurrence of the Effective Date and conditions that may only be satisfied on the Effective Date.

Such conditions to the Effective Date shall include, without limitation, the following:

(i) an order confirming the Restructuring Plan (the "Confirmation Order"), which Restructuring Plan and Confirmation Order shall be in form and substance reasonably satisfactory to each of the Loehmann's Entities, Istithmar and the Supporting Secured Noteholders in their sole discretion, shall have been entered and shall not have been stayed or modified or vacated on appeal; and

(ii) receipt by the Company of the proceeds of the New Investment (as defined in the Investment Commitment Letter) on or prior to the Effective Date; and

(iii) the Effective Date shall have occurred on or prior to March 15, 2011.

**REORGANIZED DEBTORS' SENIOR MANAGEMENT:**

The officers of the Reorganized Debtors shall constitute such individuals as are acceptable to each Investor and will be designated in the Plan Supplement.

The Reorganized Debtors' officers shall serve in accordance with any employment agreement, policies or other arrangements as is acceptable to each Investor and the Reorganized Debtors and applicable nonbankruptcy law.

**MANAGEMENT INCENTIVE PLAN:**

The Restructuring Plan may provide for a new management incentive plan in form and substance satisfactory to each of the Supporting Secured Noteholders and Istithmar in their

sole discretion (the "Management Incentive Plan").

**POST-EFFECTIVE DATE GOVERNANCE:** The Restructuring Plan shall provide that the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Restructuring Plan.

**SHAREHOLDER PROTECTIONS:** The Restructuring Plan shall provide for shareholder protections as set forth in the Investment Term Sheet (as defined in the Investment Commitment Letter) in the section thereof entitled "Shareholder Protections" in form and substance reasonably satisfactory to each of the Supporting Secured Noteholders and Istithmar in their sole discretion.

**ADDITIONAL PROVISIONS:** The Restructuring Plan shall contain other provisions customarily found in other similar plans of reorganization, as are reasonably acceptable to each of the Supporting Secured Noteholders and Istithmar in their sole discretion.

Additionally, on the Effective Date, Capco and Holdings shall be merged into Loehmann's Opco and all obligations between Capco, Holdings and the other Loehmann's Entities shall be fully extinguished.

**MEANS FOR IMPLEMENTATION:** The Restructuring Plan shall include such provisions as are reasonably necessary to implement the transactions contemplated herein.

**PROFESSIONAL FEES AND EXPENSES:** The Plan shall provide for payment in full, on the Effective Date, of the Commitment Fee as well as any unpaid reasonable fees and expenses incurred by the Supporting Secured Noteholders in connection with the Chapter 11 Cases and the transactions contemplated herein , including without limitation the reasonable fees and expenses of (i) Gibson, Dunn & Crutcher LLP, in its capacity as counsel to Whippoorwill, (ii) Conway Del Genio Gries & Co., LLC, in its capacity as financial advisor to the Supporting Secured Noteholders and (iii) Cleary Gottlieb Steen & Hamilton LLP, in its capacity as counsel to Istithmar; provided, however, that the Expenses of Istithmar shall be reimbursed only in the event that the transactions contemplated by the Restructuring Plan are consummated.

**DEFINITIONS:** "Administrative Expense Claim" means any Claim for costs and expenses of administration of the Chapter 11 Cases that is allowed under section 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) any

actual and necessary costs and expenses incurred after the Petition Date of preserving the Loehmann's Entities' estates and operating the businesses of the Loehmann's Entities; and (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses allowed by the Bankruptcy Court under section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Class A Note Claim" means any Claim, Lien, right or interest of (i) a holder of a 12% A Note arising under, related to, or in connection with, the 12% A Notes or the Senior Secured Notes Indenture or (ii) a holder of a Floating Rate Note arising under, related to, or in connection with, the Floating Rate Notes, the Senior Secured Notes Indenture or the Related Agreements.

"Class B Note Claim" means any Claim, Lien, right or interest of a holder of a 13% B Note arising under, related to, or in connection with, the 13% B Notes, the Senior Secured Notes Indenture or the Related Agreements.

"Covenant Compliance and Indemnity Agreement" means the covenant compliance and indemnity agreement dated October 13, 2004 (as amended, supplemented or otherwise modified from time to time) among Capco and each of Loehmann's Holdco, Loehmann's, Holdings, and Loehmann's Opco.

"DIP Financing Claim" means any Claim, Lien, right or interest against any of the Loehmann's Entities (or their property) with respect to the obligations arising under the DIP Financing Facility.

"DIP Financing Facility" means that certain credit facility established pursuant to the DIP Credit Agreement.

"Exchange Offer" means that certain exchange offer with respect to the Senior Secured Notes that was launched pursuant to the terms of an offering memorandum issued by Capco on September 27, 2010, which offering memorandum was supplemented on October 14, 2010, October 25, 2010, and October 28, 2010.

"General Unsecured Claim" means any Claim (including any

9

Lease Rejection Damages Claim) against any of the Loehmann's Entities that is not an Administrative Expense Claim, Priority Tax Claim, DIP Financing Claim, Other Priority Claim, Other Secured Claim, Class A Note Claim, Class B Note Claim, Secured Tax Claim, or Statutory Subordinated Claim.

"Intercompany Claims" means any Claim of one Debtor against another Debtor.

"Lease" means that certain Lease and License Financing and Purchase Option Agreement (as the same may be amended, restated, supplemented or otherwise modified from time to time), dated as of October 13, 2004, between Capco, as Lessor, and Loehmann's Opco, as Lessee.

"Lease Guarantee" means that certain Lease Guarantee (as the same may be amended, restated, supplemented or otherwise modified from time to time), dated as of October 13, 2004, by each of: (i) Loehmann's Holdco, (ii) Loehmann's, (iii) Holdings, (iv) Loehmann's Opco; (v) and any other subsidiary of Loehmann's Holdco, in favor of Capco.

"Lease Rejection Damages Claim" means any Claim arising from, or relating to, the rejection of an unexpired lease pursuant to section 365(a) of the Bankruptcy Code by any of the Loehmann's Entities.

"Lease Security Agreement" shall mean the Lease Security Agreement, dated as of October 13, 2004 (as amended, supplemented or otherwise modified from time to time), among Capco, Loehmann's Holdco, Loehmann's, Holdings and Loehmann's Opco.

"Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"Other Priority Claim" means any Claim against any Loehmann's Entity, other than an Administrative Expense Claim or Priority Tax Claim, that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

"Other Secured Claim" means any Secured Claim against any Loehmann's Entity other than a Secured Tax Claim. Other Secured Claim includes any Claim, Lien, right or interest against any of the Loehmann's Entities (or their property) with respect to the obligations arising under the Credit

Agreement (unless obligations arising under the Credit Agreement are satisfied with the proceeds of the DIP Financing Facility).

"Petition Date" means the date and time that the Loehmann's Entities file their respective voluntary petitions under chapter 11 of the Bankruptcy Code.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of October 12, 2004 (as amended, supplemented or otherwise modified from time to time), between Capco and Jefferies & Company, Inc.

"Registration Rights Assistance Agreement" means the Registration Rights Assistance Agreement dated as of October 13, 2004 (as amended, supplemented or otherwise modified from time to time) by and among Capco, Loehmann's Opco, Loehmann's Holdco, Loehmann's, and Holdings.

"Registration Rights Assistance Agreement" means the Registration Rights Assistance Agreement dated as of October 13, 2004 (as amended, supplemented or otherwise modified from time to time) by and among Capco, Loehmann's Opco, Loehmann's Holdco, Loehmann's, and Holdings.

"Related Agreements" means the Lease, the Lease Guarantee, the Security Agreement, the Security and Control Agreement, the Lease Security Agreement, the Notes Trademark Security Agreement, the Registration Rights Agreement, the Registration Rights Assistance Agreement, and the Covenant Compliance and Indemnity Agreement.

"Released Parties" means (i) each of the Loehmann's Entities and their affiliates, (ii) each of the DIP Lenders, (iii) each holder of Senior Secured Notes that votes in favor of the Restructuring Plan, (iv) the Senior Secured Notes Indenture Trustee and Special Trustee, solely in the event that such person or persons do not object to the Restructuring Plan, (v) Istithmar, (vi) Whippoorwill and (vii) each of their respective Related Persons.

"Reorganized Debtors" means, collectively, the Debtors after the Effective Date.

"Secured Claim" means any Claim against any Loehmann's Entity that is secured by a Lien on property in which a

Loehmann's Entity's estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the applicable estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

"Secured Tax Claim" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

"Security Agreement" means the Security Agreement, dated as of October 12, 2004 (as amended, supplemented or otherwise modified from time to time), between Capco and Wells Fargo, as collateral agent.

"Security and Control Agreement" means the Security and Control Agreement, dated as of October 12, 2004 (as amended, supplemented or otherwise modified from time to time), between Capco and Wells Fargo as trustee, collateral agent, and securities intermediary.

"Statutory Subordinated Claim" means any Claim that is subordinated pursuant to section 510(b) or (c) of the Bankruptcy Code.

"Wells Fargo" means Wells Fargo Bank, National Association.

**EXHIBIT B**
(Restructuring Support Joinder)

**TRANSFER AND RESTRUCTURING SUPPORT JOINDER AGREEMENT**

This Transfer and Restructuring Support Joinder Agreement (the "Joinder Agreement") is dated as of and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee") in accordance with Section 9 of the Restructuring Support Agreement attached hereto as Exhibit A (the "Restructuring Support Agreement"). Capitalized terms used but not defined herein shall have the meanings given to them in the Restructuring Support Agreement or the Forward Purchase Agreement.

**WHEREAS**, Assignor is a party to the Restructuring Support Agreement and the Forward Purchase Agreement and has assigned to Assignee by separate agreement claims held by Assignor against the Company;

**WHEREAS**, the assignment by Assignor to Assignee is not effective unless Assignee complies with Section 9 of the Restructuring Support Agreement; and

**WHEREAS**, Assignee agrees to comply with the Restructuring Support Agreement by entering into this Joinder Agreement.

**NOW, THEREFORE**, in consideration of the mutual conditions and agreements set forth in the Assignment and herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      Assignee (a) agrees to be bound by the Restructuring Support Agreement as a Supporting Secured Note Holder; (b) assumes the rights and obligations of a Supporting Secured Note Holder under the Restructuring Support Agreement, and shall be deemed for all purposes to be a Supporting Secured Note Holder; (c) agrees to be bound by the Forward Purchase Agreement as a Seller; and (d) assumes the rights and obligations of a Seller under the Forward Purchase Agreement, and shall be deemed for all purposes to be a Seller. Assignee (a) represents and warrants to each of the other Parties to the Restructuring Support Agreement that, solely with respect to itself, the statements set forth in Section 3(a) and Section 3(b) of the Forward Purchase Agreement are true, correct and complete as of the date hereof; (b) represents and warrants to each of the other Parties to the Restructuring Support Agreement that, solely with respect to itself, the statements set forth in Section 15 and Section 16 of the Restructuring Support Agreement are true, correct and complete as of the date hereof; and (c) further represents and warrants that (i) it is acquiring the claims from Assignor in the amounts set forth on Schedule I hereof (the "Assigned Claims"), and (ii) upon consummation of such acquisition under the applicable agreements to which such Assigned Claims relate, it will be the legal or beneficial owner of the Assigned Claims. With respect to the Assigned Claims, Schedule I hereof shall be deemed to constitute Schedule I of the Restructuring Support Agreement.

2.      Assignee shall deliver a copy of this Joinder Agreement to the Company no later than three (3) Business Days after the date of this Joinder Agreement.

3.      When acknowledged by the Company, this Joinder Agreement may be attached to the Restructuring Support Agreement to evidence the foregoing assumptions and agreements;

provided that any failure by the Company to acknowledge this Joinder Agreement shall not affect the validity or enforceability hereof.

4. THIS JOINDER AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. By its execution and delivery of this Joinder Agreement, Assignee hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under the Joinder Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought (i) in the event that the Chapter 11 Cases have not been commenced, in the United States District Court for the Southern District of New York or (ii) in the event that the Chapter 11 Cases have been commenced, in the Bankruptcy Court. By execution and delivery of this Joinder Agreement, Assignee irrevocably accepts and submits itself to the exclusive jurisdiction of the United States District Court for the Southern District of New York or the Bankruptcy Court, as applicable, solely with respect to any such action, suit or proceeding, and waives any objection it may have to venue or the convenience of the forum.

6. This Joinder Agreement shall be effective upon execution by the Assignor and Assignee and shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Joinder Agreement may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Joinder Agreement by telecopy or electronic mail in portable document format (pdf) shall be effective as delivery of a manually executed counterpart of this Assignment.

*[Remainder of page intentionally left blank]*

The terms set forth in this Joinder Agreement are hereby agreed to:

ASSIGNOR
**[NAME OF ASSIGNOR]**

By: _____
Title:

Address:
_____
_____
_____
Telephone:_____
Facsimile:_____
Email:_____

ASSIGNEE
**[NAME OF ASSIGNEE]**

By: _____
Title:

Address:
_____
_____
_____
Telephone:_____
Facsimile:_____
Email:_____

## ACKNOWLEDGEMENT

By its signature below, Loehmann's Holdings Inc., on behalf of itself and Loehmann's Inc., Loehmann's Real Estate Holdings Inc., Loehmann's Operating Co. and Loehmann's Capital Corp., acknowledges the transfer evidenced by the Joinder Agreement to which this Acknowledgement is attached.

**LOEHMANN'S HOLDINGS INC.**

By: _____

Title:

**SCHEDULE I**

Name of Supporting Secured Noteholder:_____

Total Outstanding Principal Amount of 12% Senior Secured Class A Notes
 Due 2011 held by Supporting Secured Noteholder:_____

Total Outstanding Principal Amount of Senior Secured Floating Rate Notes due 2011 held by
Supporting Secured Noteholder:_____

Total Outstanding Principal Amount of 13% Senior Secured Class B Notes due 2011 held by
Supporting Secured Noteholder:_____

**EXHIBIT "2"**

# INVESTMENT COMMITMENT LETTER

November 14, 2010

Loehmann's Holdings Inc.
2500 Halsey Street
Bronx, NY 10461

      Re:    <u>Investment Funding Commitment</u>

Ladies and Gentlemen:

      The Company intends to restructure certain of its obligations and certain obligations of its subsidiaries to third parties (the "<u>Financial Restructuring</u>") pursuant to the terms and conditions set forth in that certain Restructuring Support Agreement dated and effective as of November 14, 2010, among each of the Loehmann's Entities, the Supporting Secured Noteholders and Istithmar (the "<u>Restructuring Support Agreement</u>") and the term sheet annexed as <u>Exhibit A</u> (the "<u>Plan Term Sheet</u>") to the Restructuring Support Agreement.  In connection with the Financial Restructuring, each of the Investors (as defined below) will fund its respective portion of the New Equity Investment pursuant to the terms and conditions set forth herein and the term sheet annexed hereto as <u>Exhibit A</u> (the "<u>Investment Term Sheet</u>", and together with the Plan Term Sheet, the "<u>Term Sheets</u>"), which is incorporated by reference herein as if fully set forth herein.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement or the Investment Term Sheet.

      Subject to the express terms and conditions contained herein, including without limitation the terms and conditions set forth in the Term Sheets, each of Istithmar and Whippoorwill (individually, an "<u>Investor</u>" and collectively, the "<u>Investors</u>") hereby agrees, severally and not jointly, to fund its respective portion of the New Equity Investment on the Effective Date as set forth in <u>Schedule I</u> hereto, which is incorporated by reference herein as if fully set forth herein, and to otherwise satisfy its obligations set forth in this Investment Commitment Letter.

      In consideration of the foregoing, and other good and valuable consideration, the value of which is hereby acknowledged, the Company and the Investors hereby agree as follows:

      1.     <u>Representations and Warranties of Istithmar</u>.  Solely with respect to itself, Istithmar represents and warrants to, and agrees with, Whippoorwill and the Company as set forth below.  Each representation, warranty and agreement made in this Section 1 is made as of the date hereof and as of the Effective Date:

      (a)     Istithmar has been duly organized and is validly existing and in good standing under the laws of its respective jurisdiction of organization.

(b) Istithmar has the requisite power and authority to enter into, execute and deliver this Investment Commitment Letter and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Investment Commitment Letter.

(c) This Investment Commitment Letter has been duly and validly executed and delivered by it, and constitutes its valid and binding obligation, enforceable against it in accordance with its terms and subject to the conditions precedent set forth herein and in the Term Sheets.

(d) Compliance by Istithmar with its obligations hereunder, will not (i) conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration, termination, modification or cancellation of, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Istithmar is a party or by which Istithmar is bound or to which any of the property or assets of Istithmar are subject, (ii) result in any violation of the provisions of the organizational documents of Istithmar or (iii) result in any violation of any statute, license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over Istithmar or any of its respective properties.

(e) Except as provided in the Term Sheets, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over Istithmar or any of its properties is required for the compliance by Istithmar with all of the provisions hereof or the consummation of the transactions contemplated herein.

2. <u>Representations and Warranties of Whippoorwill</u>. Solely with respect to itself, Whippoorwill represents and warrants to, and agrees with, Istithmar and the Company as set forth below. Each representation, warranty and agreement made in this Section 2 is made as of the date hereof and as of the Effective Date:

(a) Whippoorwill has been duly organized and is validly existing and in good standing under the laws of its respective jurisdiction of organization.

(b) Whippoorwill has the requisite power and authority to enter into, execute and deliver this Investment Commitment Letter and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Investment Commitment Letter.

(c) This Investment Commitment Letter has been duly and validly executed and delivered by it, and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d) Compliance by Whippoorwill with its obligations hereunder, will not (i) conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration, termination, modification or cancellation of, any indenture, mortgage, deed of trust, loan

agreement or other agreement or instrument to which Whippoorwill is a party or by which Whippoorwill is bound or to which any of the property or assets of Whippoorwill are subject, (ii) result in any violation of the provisions of the organizational documents of Whippoorwill or (iii) result in any violation of any statute, license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over Whippoorwill or any of its respective properties.

(e)     Except as provided in the Term Sheets, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over Whippoorwill or any of its properties is required for the compliance by Whippoorwill with all of the provisions hereof or the consummation of the transactions contemplated herein.

3.     <u>Representations and Warranties of the Company</u>.  Each of the Loehmann's Entities represents and warrants to, and agrees with each Investor as set forth below.  Each representation, warranty and agreement made in this Section 3 is made as of the date hereof and as of the Effective Date:

(a)     Each of the Loehmann's Entities has been duly organized and is validly existing and in good standing under the laws of its respective jurisdiction of organization.

(b)     Each of the Loehmann's Entities has the requisite power and authority to enter into, execute and deliver this Investment Commitment Letter and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Investment Commitment Letter.

(c)     This Investment Commitment Letter has been duly and validly executed and delivered by it, and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)     Compliance with its obligations hereunder will not (i) conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration, termination, modification or cancellation of, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company is a party or by which the Company is bound or to which any of the property or assets of the Company are subject, (ii) result in any violation of the provisions of the organizational documents of the Company or (iii) result in any violation of any statute, license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its respective properties. Except as provided in the Term Sheets, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its properties is required for the compliance by the Company with all of the provisions hereof or the consummation of the transactions contemplated herein.

4.     <u>Agreements of the Company</u>.  The Company hereby agrees:

(a)     The Company shall provide to each Investor and its advisors, designees and representatives reasonable access during normal business hours to all books, records, documents, properties and personnel of the Company.  In addition, the Company shall promptly (but in no event later than three (3) days following notice of such claim, litigation, arbitration or administrative proceeding) provide written notification to each Investor's respective counsel of any claim or litigation, arbitration or administrative proceeding that is threatened or filed against any of the Loehmann's Entities from the date hereof until the earlier of the (i) Effective Date and (ii) termination or expiration of this Investment Commitment Letter; provided, however, that the Company's obligations under this Section 4(a) shall not apply in connection with any claim or litigation, arbitration or administrative proceeding that is threatened or filed against any of the Loehmann's Entities in the ordinary course of its business operations.

(b)     The Company shall file a motion seeking Bankruptcy Court approval of this Investment Commitment Letter (including seeking an order providing for the allowance and payment of the Commitment Fee and Expenses in accordance with the Investment Term Sheet which order shall be in a form and substance satisfactory to each Investor) promptly following the Petition Date (but in no event later than five (5) days after the Petition Date).  Any motion, pleading, proposed order, press release, public statement or other document that relates or refers to any of the Investors, this Investment Commitment Letter, the Restructuring Support Agreement, the Financial Restructuring, the Restructuring Plan or the Chapter 11 Cases shall be provided to each Investor's respective counsel in draft form for review prior to its being made public or its being filed with the Bankruptcy Court.  The Company shall consider any comments to such materials in good faith.  No such materials may be made public or be filed with the Bankruptcy Court without the consent of each Investor, which consent may not be unreasonably withheld.

(c)     The Company will not file any pleading or take any other action in the Bankruptcy Court that is inconsistent with the terms of this Investment Commitment Letter or the Restructuring Support Agreement, or the consummation of the transactions contemplated hereby or thereby unless the Company believes in the good faith (after consultation with outside legal counsel) that the failure to authorize such filing or action would be inconsistent with its fiduciary duties under applicable law, including the Bankruptcy Code.

(d)     If the Company receives, directly or indirectly, any offer from another person involving any recapitalization, restructuring, merger, consolidation, sale of assets or sale of equity of the Company (any such offer, an "Offer"), then the Company shall inform each Investor of the receipt of such Offer no later than one (1) business day after receipt of such Offer.

(e)     The Company shall pay the Commitment Fee and Expenses to the extent payable and subject to the terms and conditions set forth in the Investment Term Sheet.

(f)     The Company shall provide quarterly and annual financial statements to any transferee of New Common Stock pursuant to the transactions contemplated by the Trade Documents, provided that the transferee has executed a confidentiality agreement in form and substance reasonably acceptable to the Company, provided further that such transferee shall have an independent right to enforce the terms of this Section 4(f) notwithstanding anything set forth in section 14(d) of this Investment Commitment Letter.

5.     Acknowledgements and Agreements of the Company.  Notwithstanding anything herein to the contrary, the Company acknowledges and agrees that (a) the Investors shall not be jointly and severally liable with respect to the obligations arising under this Investment Commitment Letter, (b) the transactions contemplated hereby are arm's-length commercial transactions among the Company and each Investor, (c) in connection therewith and with the processes leading to such transactions, each Investor is acting solely as a principal and not as an agent or fiduciary of any other Investor, the Company and/or its estates, (d) the Investors have not assumed an advisory or fiduciary responsibility in favor of the Company and/or its estates with respect to such transactions or the processes leading thereto (irrespective of whether any Investor has advised or is currently advising the Company on other matters), and (e) the Company has consulted its own legal and financial advisors to the extent it has deemed appropriate.  The Company agrees that it will not claim that any Investor has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Company or its estates, in connection with such transactions or the processes leading thereto.

6.     Acknowledgements and Agreements of the Investors.  Notwithstanding anything herein to the contrary, each Investor acknowledges and agrees that (a) the transactions contemplated hereby are arm's-length commercial transactions among the Company and each Investor, (b) in connection therewith and with the processes leading to such transactions, such Investor is acting solely as a principal and not as an agent or fiduciary of any other Investor, the Company and/or its estates, and (c) such Investor has consulted its own legal and financial advisors to the extent it has deemed appropriate and has had the opportunity to conduct, and has conducted, its own diligence with respect to the Company and the New Equity Investment.  Each Investor agrees to negotiate in good faith the Definitive Documents (defined below).

7.     Conditions Precedent.  The agreements set forth herein (other than those indemnifications set forth in Section 8 hereof which are intended to be effective upon the execution hereof) are subject to (a) the terms and conditions set forth in the Term Sheets, including without limitation, the conditions precedent set forth in the Term Sheets; (b) the negotiation, execution and delivery of definitive documentation (the "Definitive Documents"), including, without limitation, the documents contemplated by the Restructuring Support Agreement and this Investment Commitment Letter, each in form and substance satisfactory to each Investor in its sole discretion; and (c) the simultaneous closing of the Financial Restructuring and the New Equity Investment pursuant to the Restructuring Plan.  The Definitive Documents shall be in form and substance consistent with this Investment Commitment Letter and the Restructuring Support Agreement, and shall contain representations, warranties and covenants customarily found in agreements for similar investments or financings and shall be satisfactory to each Investor in its sole discretion.

8.     Indemnification; Limitation on Damages.  The Company agrees to indemnify and hold harmless each Investor and its respective affiliates, and each of their respective directors, officers, partners, members, employees, agents, counsel, financial advisors and assignees (including affiliates of such assignees), in their capacities as such (each an "Indemnified Party"), from and against any and all losses, claims, damages, liabilities or other expenses to which such Indemnified Party may become subject from third party claims, insofar as such losses, claims, damages, liabilities (or actions or other proceedings commenced or threatened in respect thereof) or other expenses arise out of or in any way relate to or result from

this Investment Commitment Letter, the Restructuring Support Agreement, the Plan Term Sheet, the Financial Restructuring, the Trade Documents and any related documentation, the Forward Purchase Agreement, the Restructuring Plan or the Definitive Documents, and the Company agrees to reimburse (on an as-incurred monthly basis) each Investor for any reasonable legal or other reasonable expenses incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability or action or other proceeding (whether or not such Investor is a party to any action or proceeding out of which indemnified expenses arise), but excluding therefrom all expenses, losses, claims, damages and liabilities of such Investor that are finally judicially determined (not subject to appeal) to have resulted solely from the bad faith, gross negligence, willful misconduct or willful breach (as determined pursuant to a Final Order) of such Investor. In the event of any litigation or dispute involving this Investment Commitment Letter, the Restructuring Support Agreement, the Plan Term Sheet, the Financial Restructuring, the Restructuring Plan or the Definitive Documents, subject to the foregoing, neither of the Investors shall be responsible or liable to the Company for any special, indirect, consequential, incidental or punitive damages. The obligations of the Company under this Section 8 shall be effective upon execution of this Investment Commitment Letter and shall remain effective whether or not any of the transactions contemplated in this Investment Commitment Letter are consummated, any Definitive Documents are executed and notwithstanding any termination of this Investment Commitment Letter and shall be binding upon the Reorganized Company in the event that any plan of reorganization of the Company is consummated.

9.     Survival.  All representations, warranties and covenants and agreements made in this Investment Commitment Letter will survive the execution and delivery of this Investment Commitment Letter but will merge into the Definitive Documents and be of no continuing force or effect following the execution of the Definitive Documents by the parties thereto on the Effective Date, except to the extent that the same are incorporated into the Definitive Documents; provided, however, that (i) the Company's obligations pursuant to section 4(f) of this Investment Commitment Letter and (ii) the right of any transferee referenced in Section 4(f) hereof will (a) be incorporated into the Definitive Documents and/or (b) survive any termination of this Commitment Letter.

10.     Publicity.  Subject to Section 4(c) above, the Company and the Investors each shall consult with each other prior to issuing any press releases or other public announcements (and provide each other a reasonable opportunity to review and comment upon such releases or statements) with respect to the transactions contemplated by this Investment Commitment Letter, and prior to making any filings with any third party or any governmental entity with respect thereto, except as may be required by law or by the request of any governmental entity.  No press release or other public announcement that refers to any Investor shall be released without such Investor's prior written consent.

11.     Termination.  Subject to Sections 8 and 9 above, this Investment Commitment Letter shall terminate following the occurrence of any of the Termination Events in accordance with the terms set forth in the Investment Term Sheet.

12.     Notices.  All notices and other communications in connection with this Investment Commitment Letter will be in writing and will be deemed given if delivered personally, sent via facsimile (with telephonic confirmation) or delivered by an express courier

(with confirmation) to the parties at the following addresses (or at such other address for a party as will be specified by like notice):

    (i)    If to Istithmar:

Istithmar Retail Investments
The Galleries
Limitless Building No. 4, Level 6
PO Box 17000
Jebel Ali, Dubai, United Arab Emirates
+971 4 390 2100
Attention: Chief Executive Officer and General Counsel

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
Richard S. Lincer
Sean A. O'Neal
One Liberty Plaza
New York, NY 10006
+1 (212) 225-2000

    (ii)    If to Whippoorwill:

Whippoorwill Associates, Inc.
11 Martine Avenue, 11th Floor
White Plains, NY 10606
Attn: Steven Gendal
with a copy to its General Counsel at the same address

and a copy to:

Robert L. Cunningham
Matthew J. Williams
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
fax: +1 (212) 351-5208

    (iii)    If to the Company:

Loehmann's Holdings Inc.
2500 Halsey Street
Bronx, NY 10461
Attn: Chief Executive Officer
With a copy to its General Counsel at the same address

and a copy to:

Frank Oswald
Togut, Segal & Segal LLP
One Penn Plaza
New York, NY 10119
fax: (212) 967-4258

      (a)    <u>Governing Law; Jurisdiction</u>.  THIS INVESTMENT COMMITMENT LETTER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  By its execution and delivery of this Investment Commitment Letter, each of the Company and the Investors hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under this Investment Commitment Letter or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought (i) in the event that the Chapter 11 Cases have not been commenced, in the United States District Court for the Southern District of New York or (ii) in the event that the Chapter 11 Cases have been commenced, in the Bankruptcy Court.  By execution and delivery of this Investment Commitment Letter, each of the Company and the Investors irrevocably accepts and submits itself to the exclusive jurisdiction of the United States District Court for the Southern District of New York or the Bankruptcy Court, as applicable, solely with respect to legal action, suit or proceeding against it with respect to any matter under this Investment Commitment Letter or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, and waives any objection it may have to venue or the convenience of the forum as to such legal action, suit or proceeding or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding.

      13.    <u>Waivers and Amendments</u>.  This Investment Commitment Letter may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Investment Commitment Letter may be waived, only by a written instrument signed by all the parties hereto or, in the case of a waiver, by the party waiving compliance.  No delay on the part of any party in exercising any right, power or privilege pursuant to this Investment Commitment Letter will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Investment Commitment Letter, nor will any single or partial exercise of any right, power or privilege pursuant to this Investment Commitment Letter, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Investment Commitment Letter.

      14.    <u>Miscellaneous.</u>  This Investment Commitment Letter: (a) supersedes all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the Investors and the Company and its Subsidiaries with respect hereto and thereto; (b) shall not be assignable by the Company without the prior written consent of each Investor (and any purported assignment without such consent shall be null and void); (c) shall not be assignable by any Investor except to their designees as may be reasonably acceptable

to the Company and each Investor; (d) except as otherwise provided in Section 4(f) herein, is intended to be solely for the benefit of the Company and the Investors and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the Company and the Investors; and (e) may not be amended or waived except by an instrument in writing signed by the Company and each Investor.

15.     Counterparts.  This Investment Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Investment Commitment Letter by facsimile transmission or electronic mail in portable document format (pdf)  shall be effective as delivery of a manually executed counterpart hereof.

16.     Headings.  The headings in this Investment Commitment Letter are for reference purposes only and shall not in any way affect the meaning or interpretation of this Investment Commitment Letter.

17.     Automatic Stay.  Each of the Loehmann's Entities acknowledges that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Investment Commitment Letter shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code.

*[Remainder of Page Intentionally Left Blank]*

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms hereof and of the Term Sheets by returning to us executed counterparts hereof not later than 5:00 p.m., New York City time, on November 15, 2010.

Very truly yours,

**ISTITHMAR RETAIL INVESTMENTS**

By: /s/ Kapil Zaveri
Name: Kapil Zaveri
Title:

**WHIPPOORWILL ASSOCIATES, INC.,** as
agent for certain of its discretionary funds and
accounts


By: /s/ Steven Gendal
Name: Steven Gendal
Title:  Principal

Agreed and accepted on this
14th day of November, 2010:

**LOEHMANN'S HOLDINGS INC.**

By: _/s/ Joseph Melvin_
Name: Joseph Melvin
Title: Chief Operating Officer/Chief Financial
Officer

**LOEHMANN'S, INC.**

By: _/s/ Joseph Melvin_
Name: Joseph Melvin
Title: Chief Operating Officer/Chief Financial
Officer

**LOEHMANN'S REAL ESTATE
HOLDINGS, INC.**

By: _/s/ Joseph Melvin_
Name: Joseph Melvin
Title: Chief Operating Officer/Chief Financial
Officer

**LOEHMANN'S OPERATING CO.**

By: _/s/ Joseph Melvin_
Name: Joseph Melvin
Title: Chief Operating Officer/Chief Financial
Officer

**LOEHMANN'S CAPITAL CORP.**

By: _/s/ Joseph Melvin_
Name: Joseph Melvin
Title: Chief Operating Officer/Chief Financial
Officer

**EXHIBIT A**

**Investment Term Sheet**

<u>**Exhibit A to Investment Commitment Letter**</u>

**Summary of Terms for New Equity Investment in
Loehmann's Holdings Incorporated**

This term sheet (the "<u>Investment Term Sheet</u>") is made a part of and incorporated in its entirety by reference into that certain Investment Commitment Letter dated and effective as of November 14, 2010 (the "<u>Commitment Letter</u>") executed by Istithmar, Whippoorwill and the Company. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Commitment Letter or that certain Restructuring Support Agreement dated and effective as of November 14, 2010, among each of the Loehmann's Entities, the Supporting Secured Noteholders and Istithmar (the "<u>Restructuring Support Agreement</u>").

| | |
|---|---|
| **COMPANY:** | The Company (as debtors in possession and as reorganized debtors, as applicable). |
| **INVESTORS:** | Istithmar and Whippoorwill. |
| **RESTRUCTURING TRANSACTIONS:** | Each of the Investors will fund its respective portion of the New Equity Investment subject only to the terms and conditions set forth herein and the Restructuring Support Agreement in order to fund a portion of the Financial Restructuring in connection with a reorganization of the Company pursuant to Chapter 11 of the Bankruptcy Code, as described in the Restructuring Support Agreement. |
| | The closing of the Financial Restructuring and the funding of the New Equity Investment shall occur simultaneously. |
| **NEW EQUITY INVESTMENT:** | On the Effective Date, each Investor agrees, severally and not jointly, to subscribe for and purchase its respective portion of the New Equity Investment as set forth in Schedule I to the Commitment Letter. For the avoidance of doubt, the Investors shall have no obligation to provide (i) any additional capital, whether styled as debt or equity, to the Company on the Effective Date or thereafter except as expressly provided herein, or (ii) any credit support in connection with the Exit Facility on the Effective Date or thereafter. |
| **CONDITIONS TO FUNDING THE NEW EQUITY INVESTMENT:** | (i) The obligation of the Investors to make the New Equity Investment shall be subject to the satisfaction by the Company or waiver by each Investor of each of the following conditions precedent (collectively, the "<u>Conditions Precedent</u>") on or prior to the Effective Date: |

(a)  The Restructuring Plan shall be in form and substance satisfactory to each Investor in its sole discretion, which shall provide for, among other things, the plan treatment and other terms set forth in the Plan Term Sheet;

(b)  Definitive documentation, including without limitation the Restructuring Plan, the documents to be included in the plan supplement to the Restructuring Plan, the Disclosure Statement and documentation in connection with the New Equity Investment, including without limitation a registration rights agreement and a shareholders agreement, shall have been executed and delivered by the Company and the Investors, in form and substance reasonably satisfactory to the Company and satisfactory to each Investor in its sole discretion (including as to the matters specified below under "Shareholder Protections"), and the conditions precedent contained therein shall have been satisfied or waived in accordance therewith;

(c)  All conditions precedent for the closing of the Financial Restructuring as set forth in the Commitment Letter, the Restructuring Support Agreement and the Restructuring Plan shall have been satisfied or waived by the Investors;

(d)  Each of the Investors shall have simultaneously funded its respective portion of the New Equity Investment;

(e)  No Termination Event (as defined below) shall have occurred (excluding a Termination Event that has been waived as provided for herein);

(f)  Funding of the New Equity Investment shall not result in any violation of any statute, license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Investors or any of their respective properties;

(g) The transactions contemplated by the Trade Documents shall have been consummated;

(h)  The transactions contemplated by the Forward Purchase Agreement shall have been consummated; and

(i) The Company shall have entered into definitive documentation with respect to the Exit Facility in form

and substance satisfactory to each Investor, in its sole discretion, and the transactions contemplated by such agreement shall be consummated concurrently with the New Equity Investment; and

(j)  The Exit Facility shall not require any credit support by any of the Investors.

(ii) The obligation of Istithmar to make the New Equity Investment shall be subject to the satisfaction by the Company or waiver by Istithmar of each of the following conditions precedent on or prior to the Effective Date:

(a)  No draw shall have been made on the $7.5 million letter of credit (the "Prepetition Letter of Credit") posted by Istithmar under Section 2.1 of that certain Credit Agreement dated as of September 15, 2010, by and among Loehmann's Opco as borrower, Capco, Loehmann's Holdco, Loehmann's and Holdings as guarantors, and Crystal, as administrative agent and collateral agent for the lenders party to the Credit Agreement from time to time (the "Credit Agreement"), and the Prepetition Letter of Credit shall have been surrendered to the issuing bank for cancellation undrawn; and

(b)  No draw shall have been made on the $7.5 million letter of credit posted by Istithmar under Section 2.1 of the DIP Credit Agreement in connection with the DIP Financing Facility (the "DIP Letter of Credit"), and the DIP Letter of Credit shall have been surrendered to the issuing bank for cancellation undrawn.

**TERMINATION EVENT:**    "Termination Event," wherever used herein, means any of the following:

(i)  The Commitment Letter may be terminated if an Investor provides written notice to the other Investor and the Company due to the following (provided, however, that (x) each Investor's right to terminate the Commitment Letter shall not be available where such Investor's breach or delay is the cause of such event, and (y) Istithmar's right to terminate the Commitment Letter shall not be available if the Termination Event is the result of any action or inaction taken by Istithmar in its capacity as 100% shareholder of the Company):

(a)    the failure or impossibility of any Condition

Precedent to be performed or satisfied on the Effective Date;

(b)   the Company shall have breached any material provision of the Commitment Letter or the Restructuring Support Agreement, written notice of such breach shall have been given by an Investor and such breach shall not have been cured within two (2) business days of the Company's receipt of such notice;

(c)   each of the Investors shall not have reached agreement on or prior to December 1, 2010, on the terms of shareholder protections acceptable to each Investor in its sole discretion including at least those terms specified below under "Shareholder Protections";

(d)   any Investor shall have breached any material provision of the Forward Purchase Agreement, written notice of such breach shall have been given by an Investor and such breach shall not have been cured within three (3) business days of such Investor's receipt of such notice; and

(e)   the Company shall have breached its obligation to pay Expenses (defined below) in accordance with this Investment Term Sheet; provided, however, that each Investor's right to terminate the Commitment Letter on this basis shall only be available if such Investor's Expenses have not been paid when due and payable.


(ii)      Upon occurrence of any of the following, the Commitment Letter shall terminate automatically:

(a)  the Restructuring Support Agreement is terminated in accordance with its terms;

(b)  the Company has not filed the Approval Motion on or before five (5) days after the Petition Date;

(c)  the Company has not filed the Restructuring Plan and the accompanying Disclosure Statement on or before thirty (30) days after the Petition Date;

(d)  the Bankruptcy Court has not entered an order in form and substance acceptable to each Investor in its sole discretion granting the relief sought in the Approval Motion (the "Approval Order"), including without limitation authorization for the Investors to terminate the Commitment Letter upon the occurrence of a Termination Event and for the Company to pay

4

the Expenses and the Commitment Fee upon the occurrence of the conditions set forth herein or in the Commitment Letter, on or before thirty (30) days after the Petition Date;

(e)   the Bankruptcy Court does not enter an order approving the Disclosure Statement in form and substance acceptable to each Investor in its sole discretion on or before seventy (70) days after the Petition Date;

(f)   the Bankruptcy Court does not enter an order in form and substance acceptable to each Investor in its sole discretion confirming the Restructuring Plan on or before March 1, 2011;

(g)   the Effective Date of the Restructuring Plan does not occur on or before March 15, 2011;

(h)   a trustee, responsible officer, or an examiner with powers beyond the duty to investigate and report, as set forth in 11 U.S.C. § 1106(a)(3) and (4), shall have been appointed under 11 U.S.C. §§ 1104 or 105;

(i)   any of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code, or shall have been dismissed;

(j)   the Restructuring Plan is modified in a manner that is adverse in any material respect to any Investor or inconsistent in any material respect with the terms set forth in the Commitment Letter or the Restructuring Support Agreement;

(k)   the Company submits or supports a plan of reorganization or liquidation that is adverse in any material respect to any Investor or inconsistent in any material respect with the terms set forth in the Commitment Letter or the Restructuring Support Agreement, including without limitation any plan that contemplates a restructuring, sale or recapitalization that is inconsistent with the Commitment Letter;

(l)   the Company submits or supports a Competing Transaction; or the Bankruptcy Court shall have entered an order approving a Competing Transaction;

(m) the occurrence of a Material Adverse Change;

(n)   the Company moves to withdraw or withdraws the Restructuring Plan;

(o) the occurrence of an Event of Default (as defined in the DIP Credit Agreement);

(p) the occurrence of the Revolving Termination Date (as defined in the DIP Credit Agreement) other than in connection with a refinancing of the obligations of the Company under the DIP Credit Agreement contemporaneously with the effectiveness of the Financial Restructuring and the New Equity Investment; or

(q) the transactions contemplated by the Trade Documents are not closed on or before twenty (20) days from the date hereof for any reason, or the Trade Confirmation, the Note Purchase Agreement or the Forward Purchase Agreement is terminated for any reason including, but not limited to, the failure to execute the Escrow Agreement and fund the Escrow Account (as such terms are defined in the Forward Purchase Agreement) by November 24, 2010.

The Termination Events set forth in (i) and (ii) above can be waived or modified only upon the consent of each Investor.

(iii)     The Company may terminate the Commitment Letter if the Company provides written notice to each Investor due to the following (provided, however, that the Company's right to terminate the Commitment Letter shall not be available where a Company breach is the cause of such event):

(a) Any Investor fails to fund its respective portion of the New Equity Investment on the Effective Date; or

(b) Any Investor breaches its obligations under the Commitment Letter, written notice of such breach shall have been given by the Company to each Investor and such breach shall not have been cured within five (5) business days of the breaching Investor's receipt of such notice.

The Termination Events set forth in (iii) above are intended solely for the benefit of the Company, and can be waived or modified only upon the consent of the Company.

(iv) Istithmar may terminate the Commitment Letter if Istithmar provides written notice to Whippoorwill and the Company due to the following (provided, however, that

Istithmar's right to terminate the Commitment Letter shall not be available where an Istithmar breach is the cause of such event):

    (a) Crystal makes any draw upon the Prepetition Letter of Credit or the DIP Letter of Credit.

The Termination Event set forth in (iv) above is intended solely for the benefit of the Istithmar, and can be waived or modified only upon the consent of Istithmar.

**FEES AND EXPENSES:**

The Approval Order shall provide that the Company shall pay, when due and payable, the reasonable professional fees and expenses (the "Expenses") incurred by each Investor in connection with the chapter 11 proceedings, including, without limitation, with respect to the Financial Restructuring, the Restructuring Plan and the Commitment Letter, including, without limitation the reasonable fees and expenses of (i) Gibson, Dunn & Crutcher LLP, in its capacity as counsel to Whippoorwill, (ii) Conway Del Genio Gries & Co., LLC, in its capacity as financial advisor to the Supporting Secured Noteholders and (iii) Cleary Gottlieb Steen & Hamilton LLP, in its capacity as counsel to Istithmar; provided, however, that the Expenses of Istithmar shall be reimbursed only in the event that the transactions contemplated by the Restructuring Plan are consummated or the Commitment Letter is terminated pursuant to clause (i)(b) or (ii)(1) under the heading "Termination Events" above. The Expenses shall have administrative expense status in any chapter 11 proceedings.

**SHAREHOLDER PROTECTIONS:**

The Definitive Documents shall provide for shareholder protections customarily found in agreements for similar restructurings, including without limitation a shareholder agreement providing for the following:

(i)    the right of each Investor to have elected directors comprising at least 40% of the entire board; and

(ii)    the requirement that any of the following actions by the Company be approved by each Investor or each Investor as shareholder:

    (a)    any material change in the business of the Company;

7

(b)     approval of the annual business plan and budget or any amendments thereto or variances therefrom;

(c)     declaration of dividends;

(d)     payment of any management fees or other such payments to, or contracts with, holders of equity or their affiliates;

(e)     issuance of equity securities (other than pursuant to any Management Incentive Plan) at a price that would result in dilution of more than 10% to existing equity (with the formula for valuation of existing equity for such purposes to be specified);

(f)     any initial public offering;

(g)     capital expenditures or purchase or sale of assets in excess of specified thresholds;

(h)     incurrence of indebtedness in excess of specified thresholds;

(i)     merger, consolidation or sale of all or substantially all assets; and

(j)     replacement of the Chief Executive Officer, Chief Operating Officer or Chief Financial Officer;

(iii)     tag along rights in connection with any sale of equity securities by either Investor in a single transaction or a series of related transactions, of more than 25% of the New Common Stock (excluding shares of New Common Stock issued pursuant to any Management Incentive Plan);

each in form and substance satisfactory to each Investor in its sole discretion.

| | |
|---|---|
| **GOVERNING LAW:** | All Definitive Documents in connection with the Financial Restructuring and the Restructuring Plan shall be governed by the laws of the State of New York. |
| **COVENANTS:** | The Definitive Documents shall provide for affirmative and negative covenants customarily found in agreements for similar restructurings, as well as other covenants satisfactory to each Investor in its sole discretion. |
| **REPRESENTATIONS & WARRANTIES:** | The Definitive Documents shall contain representations and warranties customarily found in agreements for |

similar restructurings and shall be satisfactory to each Investor in its sole discretion.

**DEFINITIONS:** "Approval Motion" means a motion filed by the Company no later than five (5) days after the Petition Date, which motion shall seek approval of the Bankruptcy Court of the terms and conditions of the Commitment Letter, including without limitation the termination of the Commitment Letter upon the occurrence of any Termination Events, the Debtors' payment of the Commitment Fee and Expenses as set forth in the Commitment Letter and the scheduling of the hearing to consider confirmation of the Restructuring Plan and approval of the Disclosure Statement on an expedited basis pursuant to a schedule consistent with the terms and conditions of the Commitment Letter.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Commitment Fee" means a fee equal to 4% of the New Equity Investment payable to the Investors in the form of convertible preferred shares on the Effective Date in the allocations set forth in Schedule I to the Commitment Letter as consideration for the commitment of the Investors to fund the New Equity Investment, provided, that the Commitment Fee shall be entitled to administrative expense priority status and payable in all circumstances except if the Commitment Letter is terminated pursuant to a Termination Event set forth in (i)(c); (i)(d); (ii)(d); (ii)(r); (iii)(a) or (iii)(b) in the definition of Termination Event, provided, further, that if the Commitment Letter is terminated pursuant to a Termination Event set forth in (i)(d), (iii)(a) or (iii)(b), then the non-breaching Investor shall be entitled to its pro-rata share of the Commitment Fee (pro rata being based upon such Investor's commitment to the Investment) and such portion shall be granted administrative expense priority status.

"Competing Transaction" means an offer or agreement to implement a transaction that is inconsistent with the transactions contemplated by the Commitment Letter with respect to (i) any restructuring, reorganization, merger, consolidation, share exchange, business combination, recapitalization, refinancing or similar transaction involving any of the Loehmann's Entities or (ii) a sale of all or substantially all of the Company's

business or assets.

"Effective Date" means the date that all conditions to the effectiveness of the Restructuring Plan have been satisfied or waived and the Restructuring Plan has been consummated.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Company and the Investors may waive any appeal period.

"New Convertible Preferred Equity" means shares of convertible preferred equity issued by Loehmann's Holdco for an aggregate purchase price equal to $25 million. The New Convertible Preferred Equity shall (i) pay interest at the rate of 2% per annum and (ii) be convertible into 49.1% of the fully diluted shares of New Common Stock to be issued on the Effective Date (excluding any shares to be issued under any Management Incentive Plan).

"New Equity Investment" means the purchase by the Investors, severally and not jointly, of the New Convertible Preferred Equity. The proceeds of the New Equity Investment, together with available Company cash and the proceeds of the Exit Facility, shall be used to consummate the Financial Restructuring.

"Material Adverse Change" means (i) a decline of 20% or more in Actual Receipts (as such term is defined in the DIP Credit Agreement) from the date of the Commitment Letter through the date of calculation from those projected in the Approved Budget (as such term is defined in the DIP Credit Agreement) (ii) a decline of 20% or more in Actual Inventory Availability (as such

term is defined in the DIP Credit Agreement) from the date of the Commitment Letter through the date of calculation from those projected in the Approved Budget (as such term is defined in the DIP Credit Agreement) or (iii) a good faith determination by either of the Investors that the $25 million New Equity Investment is insufficient to fund the Financial Restructuring and the distributions contemplated by the Restructuring Plan.

"Petition Date" means the date that the Chapter 11 Cases are commenced.

**Schedule I**

**New Equity Investment and Commitment Fee Allocations**

| Investor | New Equity Investment | Commitment Fee Percentage |
|---|---|---|
| Istithmar | $16,100,000 | 64.4% |
| Whippoorwill | $8,900,000 | 35.6% |

EXHIBIT "3"

**EXHIBIT "3"**

Corporate Organization Chart



## EXHIBIT A

## 30 Largest Unsecured Claims (Excluding Insiders)[1]

As required and in addition to what is required under Local Rule 1007-2(a)(4), the following is a schedule of the Debtors' 30 largest unsecured claims.[2]

| Creditor | Contact | Mailing Address and Telephone Number | Amount of Claim | Contingent, Unliquidated, Disputed or Partially Secured |
|---|---|---|---|---|
| 1. G III LADIES DIVISION | FAX 212-403-0551 | PO BOX 24292, NEW YORK, NY 10087 201-866-4900 | $ 774,798 | |
| 2. TAHARI LTD | FAX 212-768-2049 | PO BOX 200799, PITTSBURGH PA, 90057 212-763-2000 | $ 580,939 | |
| 3. URBAN OUTFITTERS | FAX 215-454-4994 | 209 WEST 38TH STREET, NEW YORK NY, 10018 212-454-4773 | $ 569,438 | |
| 4. JUICY COUTURE | FAX 201-295-7159 | C/O LIZ CLAIBORNE, PO BOX 13866, NEWARK, NJ 07188-0866 888-908-1160 | $ 519,131 | |
| 5. REPUBLIC CLOTHING CORP | FAX 212-302-4376 | 225 WEST 39TH STREET, NEW YORK, NY 10018 212-719-3000 | $ 509,240 | |
| 6. U.S. OUTLET INC | FAX 213-745-7487 | 1717 SOUTH FIGUEROA STREET, LOS ANGELES CA, 90015 213-745-5574 | $ 452,082 | |
| 7. STEVE MADDEN/STEVEN | FAX 718-446-5747 | BUILDING 'A', 3400 MCINTOSH ROAD, PORT EVERGLADES, FL 33316 954-468-0060 | $ 422,036 | |
| 8. SCENT OF WORTH | FAX 631-254-9340 | 35 SAWGRASS DR, STE #2 BELLPORT, NY 11713 866-444-3225 | $ 383,569 | |
| 9. CALVIN KLEIN OUTERWEAR | FAX 212-403-0551 | 140 DOCKS CORNER RD, DAYTON, NJ 08810 212-403-0500 | $ 374,001 | |
| 10. VICTORINOX | FAX 203-225-2727 | PO BOX 845362, BOSTON, MA, 02284-5362 800-442-2706 | $ 317,037 | |
| 11. LUCCA | FAX 212-747-7737 | 629 EAST 30th STREET, LOS ANGELES, CA 90011 213-748-9898 | $ 310,837 | |
| 12. ALTERNATIVE | FAX 678-380-1894 | 1650 INDIAN BROOK WAY, NORCROSS GA, 30093 678-380-1890 | $ 307,560 | |
| 13. JUST CYNTHIA | FAX 212-302-1254 | CYNTHIA STEFFE 550 SEVENTH AVE, NEW YORK, NY 10018 212-403-6200 | $ 304,428 | |

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. All claims are subject to customary offsets, rebates, discounts, reconciliations, credits and adjustments, which are not reflected on this schedule.

[2] The amounts set forth on this Exhibit represent estimated amounts as of the Petition Date.

| Creditor | Contact | Mailing Address and Telephone Number | Amount of Claim | Contingent, Unliquidated, Disputed or Partially Secured |
|---|---|---|---|---|
| 14. MODERN SHOE COMPANY | FAX 617-333-7483 | PO BOX 849166, BOSTON, MA, 02284-9166<br>617-333-7476 | $ 300,210 | |
| 15. FEDERAL REALTY LP | FAX 212-708-6531 | 40 W. 57TH ST, 23RD FL<br>NEW YORK, NY 10019<br>212-708-6549 | $ 291,474 | |
| 16. LEVY GROUP | FAX 212-398-0707 | 512 SEVENTH AVENUE NEW YORK, NY, 10018<br>212-398-0707 | $ 266,776 | |
| 17. POUR LA VICTOIRE-PLV STU | FAX 212-696-5318 | C/O MADISON ADMINISTRATIVE SERVICES, INC.<br>232 MADISON AVE, STE 1307<br>NEW YORK NY 10016<br>212-696-4393 | $ 264,884 | |
| 18. PLANET GOLD | FAX 212-221-7256 | 1410 BROADWAY NEW YORK, NY, 10018<br>212-239-4657 | $ 254,772 | |
| 19. MICHAEL KORS LLC | FAX 646-354-4931 | 11 W. 42ND ST<br>NEW YORK, NY 10036<br>212-201-8100 | $ 235,752 | |
| 20. KERSH/IFL INC. | FAX 604-688-3657 | 8680 CAMBIE ST<br>VANCOUVER, BC CANADA V6P 6M9 | $ 233,554 | |
| 21. CRM PROPERTIES | FAX 323-900-8101 | C/O CARUSO AFFILIATED<br>101 THE GROVE DR<br>LOS ANGELES, CA 90036<br>323-900-8100 | $ 212,313 | |
| 22. LISTEFF FASHIONS INC | FAX 212-403-0551 | PO BOX 29242, NEW YORK, NY 10087-9242 | $ 211,332 | |
| 23. NATIONAL RETAIL CONSOLIDATORS | FAX 201-866-3137 | 2820 16TH ST<br>NORTH BERGEN, NJ 07047<br>201-330-1900 | $ 205,562 | |
| 24. ACCESSORY NETWORK GROUP | FAX 212-842-3232 | 350 FIFTH AVE<br>NEW YORK, NY 10118<br>212-842-3088 | $ 199,586 | |
| 25. SEVEN LICENSING COMPANY | FAX 323-881-0369 | 3151 EAST WASHINGTON BLVD., LOS ANGELES, CA, 90023<br>323-265-8000 | $ 197,807 | |
| 26. ADRIANNA PAPELL | FAX 212-714-1871 | 512 SEVENTH AVE, NEW YORK, NY 10018<br>212-695-5244 | $ 196,413 | |
| 27. MAX MARA | FAX 212-302-1134 | 530 SEVENTH AVE<br>21ST FLOOR NEW YORK, NY, 10018<br>212-302-1221 | $ 196,229 | |
| 28. KEYSTONE FREIGHT CORP | FAX 201-288-1195 | 611 US HWY 46<br>W. HASBROUCK HEIGHTS, NJ 07064<br>201-330-1900 | $ 194,261 | |
| 29. CALVIN KLEIN UNDERWEAR | FAX 203-301-7976 | PO BOX 9, MAULDIN, SC 29662<br>203-301-7263 | $ 191,577 | |
| 30. INTERNATIONAL ACCESSORIES | FAX 818-780-2676 | PO BOX 30508, LOS ANGELES, CA 90030<br>818-780-7800 | $ 188,788 | |

# EXHIBIT B

## Largest Secured Claims

As required under Local Rule 1007-2(a)(5), the following lists the Debtors' largest secured claims.[1]

| Creditor | Contact Mailing Address and Telephone Number | Amount of Claim | Type of Collateral | Value of Collateral | Disputed/ Not Disputed |
|---|---|---|---|---|---|
| Crystal Financial LLC | Two International Place Boston MA 02110 Attn: Rebecaa Tarby Fax: 617-428-8701<br><br>Proskauer Rose LLP One International Place Boston, MA 02110 Attn: Peter J Antoszyk Fax: 617-526-9800 | $45,000,000 | All of the present and after acquired tangible and intangible assets in the U.S. | Unknown | Not Disputed |

---

[1] The amounts set forth on this Exhibit represent estimated amounts as of the Petition Date and shall not constitute an admission of liability by, nor is it binding on, the Debtors.

| Creditor | Contact Mailing Address and Telephone Number | Amount of Claim | Type of Collateral | Value of Collateral | Disputed/ Not Disputed |
|---|---|---|---|---|---|
| Indenture, dated as of October 12, 2004, by and among Concourse Capital Corp. and Wells Fargo Bank, N.A. as Indenture Trustee | Well Fargo Bank, N.A. Corporate Trust Services Sixth & Marquette; N 9303-120 Minneapolis MN 55479 Attn: Tim Mowdy Fax: 612-667-9825<br><br>Seward & Kissel LLP Counsel to Wells Fargo Bank N.A. One Battery Park Plaza New York, NY 10004 Attn.: John Ashmead Fax: 212-480-8421" | $110,000,000 | All of the present and after acquired tangible and intangible assets in the U.S. | | Not Disputed |

|  | Actual |
| --- | --- |
|  | 10/30/10 |

*ASSETS*

Current Assets

Store Cash

| Cash - Register Transfer | ($0.00) |
| Cash - Bank of America | 51,491.44 |
| Total Store Cash | 51,491.44 |

Other Cash

| Cash - Payroll Operating Co. | (276.36) |
| Cash - Bank of America - U.S. Customs | 28,645.00 |
| Cash on Hand | 299,420.00 |
| Cash - BOA - Concentration | 399,649.54 |
| Cash - Wire Transfers | |
| Cash - BOA - Merch | 188,230.83 |
| Cash - BOA - Expense | 286,982.34 |
| Cash - BOA - Payroll | 45,764.56 |
| Cash - Chase Corporate Account | |
| Cash - BOA Corporate Account | |
| Cash - BOA - Credit | 1,712,106.29 |
| Total Cash | 3,012,013.64 |

Inventory

| Merchandise Inventory | 48,696,082.92 |
| L.C. Inventory - Intransit | |
| 500 Reserve Inventory | 4,274,067.11 |
| Total Inventory | 52,970,150.03 |

Accounts Receivable

| Other Receivables | 672,072.89 |
| Magazine Sales Receivable | 317,965.06 |
| Claims Receivable | 69,689.75 |
| Receivable from Telecheck | 2,126.20 |
| SVS Receivable | 5,640.00 |
| Charge Sales Receivable | 2,997,251.21 |
| Charge Back Receivable | 214.90 |
| Loans and Exchanges | 5,242.08 |
| Payroll Loans and Exchanges | 6,416.45 |
| Cobra Premiums Receivable | (155.52) |
| Total Accounts Receivable | 4,076,463.02 |

Prepaid Expenses

| Prepaid Expense - Other | 728,369.43 |
| A/P - Variance | (259.67) |
| Prepaid Rent | 3,056,773.85 |
| Prepaid Protection - Alarm | 70,690.73 |
| Prepaid Real Estate Taxes | 404,847.83 |
| Prepaid CAM | 119,820.77 |
| Prepaid Gross Receipts Tax | 18,344.99 |
| Prepaid Personal Property Tax | 82,623.38 |
| Prepaid Insurance | 624,044.22 |
| Prepaid Professional Services | 25,396.15 |
| Prepaid Advertising | 212,133.71 |
| Prepaid - Direct Mail | 30,579.78 |
| Prepaid Payroll | |
| Travel Advance | 0.03 |
| Total Prepaid Expenses | 5,373,365.20 |

| Deferred Tax Asset - Current | 91,368,039.00 |
| Valuation Allowance | (91,368,039.00) |

| | |
|---|---:|
| | ------------------------ |
| Total Current Assets | 65,431,991.89 |
| | |
| **Property, Equipment, & Leasehold Improvements** | |
| | |
| Construction in Progress | 681,185.94 |
| Leasehold Improvements | 30,258,371.60 |
| Furniture | 248,396.59 |
| Furniture & Fixtures - 3YR | 1,514,858.92 |
| Furniture & Fixtures - 5YR | 3,563,445.01 |
| Furniture & Fixtures - 7YR | 20,064,901.93 |
| Computer Equipment | 7,905,945.19 |
| Computer Software | 3,525,774.41 |
| | ------------------------ |
| Total Cost | 67,762,879.59 |
| | |
| **Accumulated Depreciation** | |
| | |
| Accumulated Depreciation - Leasehold Improvements | (12,417,072.03) |
| Accumulated Depreciation - Furniture & Fixtures | (2,963.79) |
| Accumulated Depr. - Furniture & Fixtures - 3YR | (774,347.46) |
| Accumulated Depr. - Furniture & Fixtures - 5YR | (2,223,728.51) |
| Accumulated Depr. - Furniture & Fixtures - 7YR | (11,165,758.36) |
| Accumulated Depreciation - Computer Equipment | (6,271,661.85) |
| Accumulated Depreciation - Computer Software | (3,024,655.51) |
| | ------------------------ |
| Total Accumulated Depreciation | (35,880,187.51) |
| | |
| Total Property, Equipment, & Leasehold Improvements, net | 31,882,692.08 |
| | |
| **Deferred Debt Issuance Costs & Other Assets** | |
| | |
| Deferred Debt Issuance Costs - Notes | 4,552,419.52 |
| Deferred Financing Costs - Credit Facility | 3,640,087.11 |
| Accumulated Amortization - DDIC - Notes | (3,957,447.88) |
| Accumulated Amortization - DFF - Credit Facility | (23,845.89) |
| Deposits | 232,407.14 |
| Deposits - Utility | 253,489.66 |
| Deposits - Other | 9,098,050.31 |
| Deposits - Professional Services | |
| Due from Istithmar | 416,388.17 |
| | ------------------------ |
| Total Other Assets | 14,211,548.14 |
| | ------------------------ |
| | |
| **Goodwill** | |
| | |
| Goodwill | 41,628,000.00 |
| Trade Name | 34,900,000.00 |
| Customer Lists | 14,200,000.00 |
| Accumulated Amortization - Customer Lists | (4,705,087.29) |
| | ------------------------ |
| Total Goodwill | 86,022,912.71 |
| | ------------------------ |
| | |
| **Favorable Leases** | |
| | |
| Favorable Leases | 27,015,853.00 |
| Accumulated Amortization - Favorable Leases | (20,112,839.40) |
| | ------------------------ |
| Total Favorable Leases | 6,903,013.60 |
| | ------------------------ |
| | |
| **Suspense** | |
| | |
| | ------------------------ |
| | ------------------------ |
| | |
| TOTAL ASSETS | 204,452,158.42 |
| | ================ |

*LIABILITIES & EQUITY*

Current Liabilities

Accounts Payable Trade

| | |
|---|---:|
| Accounts Payable - Merchandise | $27,729,347.54 |
| A/P - Merchandise Hold Back | |
| Cash O/S - Wachovia - Merchandise | 12,709.79 |
| Cash - Bank of America - Merchandise | 5,582,407.33 |
| Total Accounts Payable Trade | 33,324,464.66 |

Accrued Expenses

| | |
|---|---:|
| Accounts Payable - Expense | 3,605,954.62 |
| Accrued Expenses Other | |
| Accrued Expenses Payable | 2,097,622.02 |
| Accrued Freight | 231,570.09 |
| Accrued Sales Returns | 712,405.00 |
| Accrued Advertising | 116,917.12 |
| Accrued Database Marketing | |
| Accrued Direct Mail | (0.00) |
| Short Term Capital Lease | 36,061.10 |
| Accrued Light Heat and Power | 435,118.11 |
| Accrued Real Estate Taxes | 1,265,086.43 |
| Accrued CAM | 569,979.44 |
| Accrued Hospitalization - Medical | 5,665,710.73 |
| Accrued Hospitalization - Dental | (5,067,617.90) |
| Accrued Garnishments | (255.52) |
| Accrued Travel | 24,801.37 |
| Accrued Vacation Payable | 813,754.62 |
| Accrued Bonus | 95,000.00 |
| Accrued Payroll | 1,692,181.50 |
| Accrued Bank Charges | 91,234.75 |
| Accrued Accounting | 345,056.84 |
| Accrued Legal | 204,183.03 |
| Accrued RGIS for Inventory | 5,071.35 |
| Accrued Commercial Rent Tax | 41,310.48 |
| Accrued Personal Property Tax | 79,371.54 |
| Accrued Gross Receipts Tax | 35,411.38 |
| Cash O/S - Wachovia Expense | 30,146.42 |
| Cash O/S - Bank of America Expense | 1,813,813.61 |
| Cash O/S - Operating Co. - ADP | 138,090.71 |
| Cash O/S - Wachovia - Payroll | 22,924.28 |
| Cash O/S - Operating Co. - Ceridian | 10,972.09 |
| Total Accruals | 15,111,875.21 |

Customer Merchandise Credits

| | |
|---|---:|
| Gift Card Payable | 1,286,941.45 |
| Gift Certificates Pay New | 60,335.24 |
| Gift Certificates Payable | (300.00) |
| Customer Credit Pay - Old | (1,646.46) |
| Customer Credit Pay - New | 2,923,056.28 |
| Total Customer Merchandise Credits | 4,268,386.51 |

Other Payables

| | |
|---|---:|
| Sales Tax Payable | 1,713,780.77 |
| Reserve for Store Closings | 486,321.40 |
| Deferred Revenue | 4,083,086.30 |
| Total Other Payables | 6,283,188.47 |

Payroll Withholdings

| | |
|---|---:|
| Federal - Withholding | 2,664.29 |
| New York - State Withholding | (287.92) |
| New Jersey - State Withholding | (124.97) |
| DC - Withholding | (1,123.71) |
| Colorado - State Withholding | (107.00) |
| Connecticut - State Withholding | 0.57 |
| Massachusetts - State Withholding | (12.76) |
| California - State Withholding | (138.95) |
| North Carolina - State Withholding | (391.93) |
| Horsham PA - Earned Income Tax | 8,620.29 |
| Denver - City Tax Withholding | 198.12 |

| | |
|---|---:|
| New York City - Tax Withholding | (2,696.27) |
| FICA Tax Payable | (2,396.02) |
| 401K Loan Payable | (261.68) |
| 401K Withholding | (2,614.38) |
| 401K Match Liability | (177.18) |
| Federal Unemployment Payable | (12,018.31) |
| State Unemployment Payable | (26,689.27) |
| State Disability Payable | 24,689.29 |
| Flexible Spending Liability | 43,285.49 |
| Transit and Parking Payable | 52,155.72 |
| | |
| Total Payroll Withholdings | 82,573.42 |
| | |
| Total Accrued Expenses | 25,746,023.61 |

**Accrued Interest**

| | |
|---|---:|
| Accrued Interest Expense | |
| Accrued Note Interest Expense | 7,724,391.36 |
| | |
| Total Accrued Interest | 7,724,391.36 |

**Income Taxes Payable**

| | |
|---|---:|
| Federal Income Tax Payable | (5,226,820.00) |
| State Income Tax Payable | (1,112,986.00) |
| | |
| Total Income Taxes Payable | (6,339,806.00) |
| | |
| Total Current Liabilities | 60,455,073.63 |

**Long Term Debt**

| | |
|---|---:|
| GE- Line of Credit | 28,751,247.16 |
| 12% Sr. Secured Notes Due 10/1/2011 | 55,000,000.00 |
| Floating Rate Notes Due 10/2/2011 | 20,000,000.00 |
| 13% Sr. Secured Notes Due 10/1/2011 | 35,000,000.00 |
| Deferred Debt Issuance Costs - Discount | (1,530,900.00) |
| Accumulated Amortization - Def'd Debt - Discounts | 1,314,475.15 |
| | |
| Total Long Term Debt | 138,534,822.31 |

**Other Long Term Liabilities**

| | |
|---|---:|
| Long Term Capital Lease | |
| Deferred Rent (FAS13) | 11,010,183.91 |
| Deferred Comp. Expense Payable - P. Kaplin | 103,944.95 |
| Deferred Comp. Expense Payable - R. Friedman | 152,519.21 |
| Deferred Comp. Expense Payable - R. Glass | 99,790.72 |
| Deferred Tax Liability - Non-current | 13,761,147.00 |
| Shareholders Payable | 5,358,448.00 |
| Due from Istithmar | 3,255,655.23 |
| | |
| Total Other Long-Term Liabilites | 33,741,689.02 |
| | |
| TOTAL LIABILITIES | 232,731,584.96 |

**STOCKHOLDERS' EQUITY**

| | |
|---|---:|
| Common Stock | 34,711.70 |
| Additional Paid in Capital | 229,866,477.08 |
| Additional Paid in Capital - FAS 123R | 3,150,957.22 |
| Retained Earnings | (225,283,542.35) |
| Current Year Earnings/Loss | (36,048,030.19) |
| | |
| TOTAL STOCKHOLDERS' EQUITY | (28,279,426.54) |
| | |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | 204,452,158.42 |

## EXHIBIT D

### Debtors' Property Not in the Debtors' Possession

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or agent for any such entity.

| THIRD PARTY | PROPERTY DESCRIPTION |
|---|---|
| Various of the Debtors' landlords for leases properties. | Cash security deposits. |
| Various of the Debtors' utility companies. | Cash security deposits. |
| Various domestic commercial carriers, movers, shippers, delivery services and distributors used in the ordinary course of business. In light of the size and movement of this property through the Debtors' supply chain, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers and the location of any court proceeding affecting such property would be impractical. | Certain business property generally consisting of inventory. |

## EXHIBIT E

### Debtors' Property

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses:

| LEASE ADDRESS | DESCRIPTION |
|---|---|
| 5740-5746 Broadway, Riverdale, New York 10463 | Riverdale Store |
| 467 West Avenue, Norwalk, Connecticut 06850 | Norwalk Store |
| 1296 Broadway, Hewlett, New York 11557 | Hewlett Store |
| 7271 Arlington Road, Falls Church, Virginia 30346 | Falls Church Store |
| 1053 Pontiac Road, Drexel Hill, Pennsylvania 19026 | Drexel Hill Store |
| 233 Highway 18, East Brunswick, New Jersey 08816 | East Brunswick Store |
| 19373 Victory Boulevard, Reseda, California 91335 | Reseda Store |
| 5230 Randolph Road, Rockville, Maryland 20852 | Rockville Store |
| 2480 Briarcliff Road, Atlanta, Georgia 30329 | Atlanta Store |
| 333 So. La Cienega Boulevard, Los Angeles, California 90048 | Beverly Hills Store |
| 29 Tarrytown Road, White Plains, New York 10607 | White Plains Store |
| 7455 Southwest Freeway, Houston, Texas 77074 | Houston Store |
| 1651 Hollenbeck Avenue, Sunnyvale, California 94087 | Sunnyvale Store |
| 1550 Union Turnpike, New Hyde Park, New York 11040 | New Hyde Park Store |
| 3135 East Lincoln Drive, Phoenix, Arizona 85016 | Phoenix Store |
| 31085 Orchard Lake Road, Farmington Hills, Michigan 48334 | Detroit Store |
| 18701 Biscayne Boulevard, Aventura, Florida 33180 | North Miami Store |
| 3161 Crow Canyon Place, San Ramon, California 94583 | San Ramon Store |
| 7135 SW 117 Avenue, Miami, Florida 33183 | Kendall Store |

| LEASE ADDRESS | DESCRIPTION |
|---|---|
| 18595 Main Street, Huntington Beach, California 92648 | Huntington Beach Store |
| 2555 Fairoaks Boulevard, Sacramento, California 95825 | Sacramento Store |
| 160 West Ridgely Road, Timonium, Maryland 21093 | Timonium Store |
| 7234 West Dempster Street, Morton Grove, Illinois 60053 | Morton Grove Store |
| 8903 North Glades Road, Boca Raton, Florida 33434 | Boca Raton Store |
| 27991 Greenfield Drive, Laguna Niguel, California 92677 | Laguna Niguel Store |
| 211 Sutter Street, San Francisco, California 94108 | San Francisco Shoe Store |
| 222 Sutter Street, San Francisco, California 94108 | San Francisco Store |
| 9347 Katy Freeway, Hedwig Village, Texas 77024 | Memorial Houston Store |
| 1646 Camino Del Rio North, San Diego California 92108 | San Diego Store |
| 101 Seventh Avenue, New York, New York 10011 | Chelsea Store |
| 2807 East 21st Street, Brooklyn, New York 11235 | Brooklyn Store |
| 180 West Route 4, Paramus, New Jersey 07652 | Paramus Store |
| 13682 Jamboree Road, Irvine, California 90803 | Tustin Store |
| 19800 Hawthorne Boulevard, Torrance, California 90503 | Torrance Store |
| 1349 Nixon Drive, Moorestown, New Jersey 08057 | Moorestown Store |
| 6274 East Pacific Coast Highway, Long Beach, California 90803 | Long Beach Store |
| 9555 East County Line Road, 6A Unit, Englewood, Colorado 80112 | Centennial Store |
| 1500 East 16th Street, Suite B, Oak Brook, Illinois 60523 | Oak Brook Store |
| 805 East Big Beaver Road, Troy, Michigan 48083 | Troy Store |
| 200 Route 10 West, East Hanover, New Jersey 07936 | East Hanover Store |
| 5333 Wisconsin Avenue, Washington, DC 20015 | Chevy Chase Store |
| 1290 Worcester Street, Natick, Massachusetts 01760 | Natick Store |
| 181 Skokie Boulvald, Northbrook, Illinois 60062 | Northbrook Store |
| 248 East Colorado Boulevard, Pasadena, California | Pasadena Store |

| LEASE ADDRESS | DESCRIPTION |
|---|---|
| 128 Ranch Drive, Milpitas, California 95035 | Milpitas Store |
| 17615 Haggerty Road, Northville, Michigan 48167 | Northville Store |
| 120 Perimeter Center Place, Atlanta, Georgia 30346 | Perimeter Store |
| 11201 Legacy Avenue, Palm Beach Gardens, Florida 33410 | Legacy Store |
| 2891 El Camino Real, Tustin, California 92782 | Tustin YC Nexxt Store |
| 3201 North Miami Avenue, Miami Florida 33127 | Mid-Town Miami Store |
| 34 East Ridgewood Avenue, Paramus, New Jersey 07652 | Paramus North Store |
| 13033 Fair Lakes Shopping Center, Fairfax, Virginia 22033 | Fairfax |
| 851 North San Fernando Road, Burbank, California 91502 | Burbank Store |
| 8271 Gateway Overlook Drive, Elkridge, Maryland 21075 | Columbia Store |
| 627 SW 145th Terrace, Pembrooke Pines, Florida 33027 | Pembroke Pines Store |
| 151 North State Street, Chicago, Illinois 60601 | State Street Store |
| 2101 Broadway, New York, New York 10023 | Upper West Side Store |
| 2665 West Hillcrest Drive, Thousand Oaks, California 91320 | Thousand Oaks Store |
| 97-77 Queens Boulevard, Lefrank Building, Rego Park, New York 11374 | Rego Park Store |
| 100 North LaCienega, Building C - Suite 240, Los Angeles, California 90048 | Beverly Connection |
| 299 Thomas E. Dunn Memorial Highway, Rutherford, New Jersey 07070 | Distribution Center |
| 2500 Halsey Street, Bronx, New York 10461 | Corporate Office |
| 901 M South Coast Drive Costa Mesa, CA 92626 | Costa Mesa |

| LEASE ADDRESS | DESCRIPTION |
|---|---|
| 8525 Mills Drive, Miami, FL 33183 | The Palms at Town & Country |
| 1317 Broadway, Hewlett, NY 11557 | Hewlett Shoe |
| 1528 Chestnut Street, Philadelphia, PA 19102 | Philadelphia |
| 395 Route 202/206, Bridgewater, NJ 08807 | Bridgewater |
| 800 Morris Turnpike, Short Hills, NJ 07702 | Short Hills |
| 7777 Edinger Ave., Huntington Beach, CA 92647 | Huntington Beach, YC |
| 15752-15854 South LaGrange Road, Orland Park, IL | Orland Park |

4

## EXHIBIT F

**Location of Debtors' Substantial Assets and Books and Records, and Nature and Location of Debtors' Assets Outside the United States**

| DEBTOR'S ASSETS | LOCATION |
|---|---|
| Debtors' Substantial Assets | See **Exhibit E** – Owned and Leased Property |
| Debtors' Books and Records | 2500 Halsey Street, Bronx, New York 10461. |
| Debtors' Assets Outside the United States | N/A. Debtors have no assets outside the United States. |

## EXHIBIT G

## Summary of Actions or Proceedings Against the Debtors[1]

| PLAINTIFF | CASE NO. | COURT/GOVERNMENT AGENCY | ATTORNEY CONTACT | LITIGATION TYPE |
|---|---|---|---|---|
| Jeffrey Alford | 520-2009-03723 | US Equal Employment Opportunity Commission | Ossai Miazad Outten & Golden LLP 3 Park Avenue, 29th Floor New York, NY 10016 212 -245-1000 | Employment discrimination |
| Audrey Baroody | 510-2010-04810 | US Equal Employment Opportunity Commission | No attorney information | Employment discrimination |
| Tiana Daniels et al | CV10-3291-JST (PLAX) | US District Court Central District of California | Monica Balderrama Initiative Legal Group 1800 Century Park East Los Angeles, CA 90067 310 556-5637 | Wage and hour and other claims |
| Galbraith & Paul, Inc. | 10CV6333 | US District Court Southern District of New York | George Gottlieb Gottlieb Rackman & Reisman PC 270 Madison Avenue New York, NY 10016 212 684-3900 | Copyright infringement and related claims |

---

[1] The Debtor has included all information reasonably available to them to date. To the extent additional information becomes available, the Debtors will provide such information in the Debtor's Statement of Financial Affairs and / or Schedules of Liabilities, as applicable.

| PLAINTIFF | CASE NO. | COURT/GOVERNMENT AGENCY | ATTORNEY CONTACT | LITIGATION TYPE |
|---|---|---|---|---|
| Center for Environmental Health | RG 09-459448 | Superior Court of the State of California County of Alameda | Eric Somers Lexington Law Group 1627 Irving Street San Francisco, CA 94122 415 759-4111 | Proposition 65 |
| Phyllis Pergola | P415-007369 309244/08 | Supreme Court Bronx County, NY | Tonino Sacco, Esq. Sacco & Fillas, LLP 141-07 20th Ave Suite 506 Whitestone, NY 11357 718-746-3440 | General liability |
| Marissa Tait | P102-060824 ESX-L-004440-08 | Supreme Court Essex County, NJ | John James, Esq. Friedman, James & Buchsbaum, LLP 200 Craig Road Manalapan, NJ 07726 732-431-1978 | General liability |
| Nancy Schneier | P415-009074 301127/08 | Supreme Court Bronx County, NY | Sarah J. Eagen, Esq. Clark, Gagliardi & Miller, P.C. 99 Court Street White Plains, NY 10601 914-946-8900 | General liability |

| PLAINTIFF | CASE NO. | COURT/GOVERNMENT AGENCY | ATTORNEY CONTACT | LITIGATION TYPE |
|---|---|---|---|---|
| Elva Rodriguez | P103-060783 114393/00 | Supreme Court County of NY | Melvin C. Hartman, Esq. The Jacob D. Fuschsber Law Firm, LLP 500 Fifth Ave 45th Floor New York, NY 10010 212-869-3500 | General liability |
| Paula Jellinek | 9450062268 24113/08 | Supreme Court Kings County, NY | Anthony G. Gross, P.C. 30 Vesey Street New York, NY 10007 212-227-8140 | General liability |
| Susan & Howard Landress | 9450067034 300806-10 | Supreme Court Bronx County, NY | Jeffery J. Belovin, Esq. Belovin & Franzblau, LLP 231 White Plains Rd Bronx, NY 10467 718-655-2900 | General liability |
| Justin Walker, Helen Walker & Arianna Webb | 9530046229 03C108486 | Circuit Court for Baltimore City, MD | Jason T. Wasserman, Esq. Silverman Thompson Slutkin & White 201 North Charles Street Suite 2600 Baltimore, MD 21201 410-385-2225 | General liability |

| PLAINTIFF | CASE NO. | COURT/GOVERNMENT AGENCY | ATTORNEY CONTACT | LITIGATION TYPE |
|---|---|---|---|---|
| Helen Livingston | 9840054613<br>10-22675CA05 | Circuit Court of the 11th Judicial Circuit for Miami Dade County, FL | Philip A. Gold, Esq.<br>Gold Chavez & Gold, P.A.<br>2121 Ponce De Leon Blvd<br>Suite 200<br>Fresh Meadows, NY 11366<br>718-380-1010 | General liability |

| NAME | TENURE | POSITION | EXPERIENCE/RESPONSIBILITIES |
|---|---|---|---|
| Jerald S. Politzer | April 2008 | Chief Executive Officer | Mr. Politzer the Chief Executive Officer of Loehmann's Holdings Inc. a director since April 2008. From 2003 until 2008, Mr. Politzer served as President of Value City Department Stores and Executive Vice President of Filene's Basement, both divisions of Retail Ventures. He was previously Executive Vice President of Melville Corp., now CVS Corp., where he oversaw retail divisions, including Marshalls and Linens 'n Things. |
| Joseph Melvin | June 2010 | Chief Operating Officer, Chief Financial Officer | Mr. Melvin was appointed Chief Operating Officer/Chief Financial Officer of Loehmann's in June 2010. Mr. Melvin is responsible for Finance, IT, Logistics, Stores, Loss Prevention, Legal and Real Estate. Mr. Melvin's experience spans more than thirty years in both department and specialty stores. Most recently, he served for twelve years as the President and COO of The Finlay Fine Jewelry Corporation. Previously, he spent more than twenty years at The May Department Stores Company, including serving as Chairman and COO for Filene's Department Stores. |
| Anthony D'Annibale | June 2010 | Executive Vice President | Anthony D'Annibale became an Executive Vice President of Loehmann's in June 2010. Tony has been Senior Vice President of Merchandising for the Company since 1996. Tony joined Loehmann's in 1989 with ten years of retail experience. Prior to 1989, Tony held various buying positions at Steinbach Department Stores. |

| NAME | TENURE | POSITION | EXPERIENCE/RESPONSIBILITIES |
|------|--------|----------|------------------------------|
| Karen Lapidus | March 2005 | Vice President, General Counsel | Previously, Karen was Vice President and General Counsel for Forbes.com and Unitel Video as well as a Corporate Attorney at the firm Mudge Rose Guthrie Alexander & Ferdon. |
| Richard Morretta | April 1998 | Vice President & Controller | Richard Morretta had twenty years of experience including a position as Chief Financial Officer for Revillon, Inc. Richard is a C.P. |

# EXHIBIT I

## Debtors' Estimated Cash Receipts and Disbursements for the Thirty (30) Day Period Following the Filing of the Chapter 11 Petition

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the 30 day period following the filing of the Debtors' Chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---:|
| **Cash Receipts** | $29,602,000 |
| **Cash Disbursements** | $23,802,000 |
| **Net Cash Gain/Loss** | $5,800,000 |
| **Unpaid Obligations**[1] | $10,225,000 |
| **Unpaid Receivables** | $4,076,463 |

---

[1]   The Debtors anticipate paying all liabilities when incurred except for rent and tax which are paid monthly.