TOGUT, SEGAL & SEGAL LLP
One Penn Plaza – Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A. Oswald
Howard P. Magaliff

Proposed Counsel to the
 Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                 :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LOEHMANN'S HOLDINGS, INC., *et al.*, | : | Case No. 10-16077 through |
| | : | 10-16081 |
| Debtors. | : | Joint Administration Requested |
| | : | |

------------------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 AND RULES 2002,
4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
(I) AUTHORIZING THE DEBTORS TO INCUR POSTPETITION SECURED
INDEBTEDNESS WITH PRIORITY OVER ALL SECURED INDEBTEDNESS
AND WITH ADMINISTRATIVE SUPERPRIORITY, (II) GRANTING LIENS,
(III) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL PURSUANT
TO 11 U.S.C. § 363 AND PROVIDING FOR ADEQUATE PROTECTION, (IV)
MODIFYING AUTOMATIC STAY AND (V) SCHEDULING A FINAL HEARING**

        Loehmann's Holdings, Inc. ("Loehmann's Holdings") and its debtor affili-

ates, Loehmann's, Inc., Loehmann's Operating Co. ("Loehmann's Opco") and Loeh-

mann's Real Estate Holdings, Inc. ("Loehmann's Real Estate Holdings"), as debtors and

debtors in possession in the above-captioned cases (collectively, "Loehmann's or the

"Debtors")[1], by their proposed attorneys, Togut, Segal & Segal LLP, make this motion

(the "Motion") and respectfully represent:

---

[1]   Loehmann's Capital Corp. ("Capco") is also a debtor, but is not a Credit Party under the DIP Facility
(as defined below) or a movant. Capco supports the relief requested in the Motion.

## PRELIMINARY STATEMENT

Time is of the essence. The Debtors must have sufficient liquidity to keep their stores stocked with inventory during this holiday season. Typically, Loehmann's stores do not maintain a large back room inventory; most of the goods are displayed on the selling floor. To keep the stores stocked and the inventory fresh, Loehmann's receives shipments of goods on a weekly basis. Without the ability to obtain postpetition financing and the use of cash collateral, the Debtors will be unable to fund their operations during these Chapter 11 cases and will almost certainly be forced to liquidate. The Debtors therefore have an urgent and immediate need for postpetition financing and the use of cash collateral to preserve the going concern value of their businesses and assets. The Debtors believe that the DIP Facility (defined below) will afford them access to postpetition financing on the most favorable terms possible, given the Debtors' existing capital structure and available collateral pool.

## BACKGROUND

1.      On November 15, 2010 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter of title 11 of the United States Code (the "Bankruptcy Code"). The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in detail in the *Declaration of Joseph Melvin Pursuant To Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions* (the "Melvin Declaration") filed concurrently herewith and fully incorporated herein by reference.

2.      The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. By motion filed today, the Debtors have requested that

their chapter 11 cases be consolidated for procedural purposes only and administered jointly, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## JURISDICTION

3. This Court has subject matter jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

4. By this Motion, the Debtors request entry of an interim order (the "Interim Borrowing Order") substantially in the form attached as <u>Exhibit 1</u> and final order (the "Final Borrowing Order", and together with the Interim Borrowing Order, the "DIP Orders"):

> (a) authorizing the Debtors to obtain credit and incur debt, pursuant to sections 363, 364(c) and 364(d) of the Bankruptcy Code, (i) on an interim basis for a period from the commencement of the case through and including the date of the Final Hearing (as defined below) up to the aggregate committed amount of $6,000,000, secured by first priority, valid, priming, perfected and enforceable liens on property of the Debtors' estates pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, and (ii) on a final basis after entry of the Final Borrowing Order, up to the aggregate committed amount of $45,000,000 including the Roll Up;

> (b) (i) establishing that financing arrangement (the "DIP Facility") pursuant to (x) that certain Debtor in Possession Credit Agreement (the "DIP Credit Agreement")[2], substantially in the form attached as <u>Exhibit 2</u>, by and among Loehmann's Operating Co. (the "Borrower"), Loehmann's Holdings, Inc., Loehmann's Inc. and Loehmann's Real Estate Holdings, Inc. (collectively, the "Guarantors"), Crystal Financial LLC, as agent (the "DIP Agent"), and the Lenders thereto (the "DIP

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the DIP Credit Agreement.

Lenders," collectively with the DIP Agent, the "DIP Secured Parties"), and (y) all other agreements, documents, and instruments executed and/or delivered with, to, or in favor of the DIP Secured Parties pursuant to authority granted by this Court, including, without limitation, the guaranty and security agreement(s), any mortgages, the credit card acknowledgments, each control agreement, and all other security agreements, pledge agreements, patent and trademark security agreements, lease assignments, guarantees and other similar agreements, and all amendments, restatements, modifications or supplements thereto, by or between any one or more of any of the Guarantors or Borrower, and any DIP Secured Parties and all other related agreements, documents, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as may be amended, modified or supplemented and in effect from time to time, the "DIP Financing Agreements"); and (ii) incur the Obligations under and as defined in the DIP Credit Agreement (collectively, the "DIP Obligations");

(c)     authorizing the use of the proceeds of the DIP Facility (net of any amounts used to pay fees under the DIP Financing Agreements) in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Budget (as defined below) solely for (i) working capital and other general corporate purposes including, without limitation, payment for essential vendors, warehouseman and freight handlers, and (ii) payment of costs of administration of the Chapter 11 cases, to the extent set forth in the Budget;

(d)     providing that all prepetition letters of credit issued under the Prepetition Credit Agreement (as defined below) shall be deemed issued under the DIP Credit Agreement;

(e)     approving the terms of the DIP Sponsor Credit Support (as defined and described below);

(f)     authorizing the Prepetition Agent (for the benefit of the Prepetition Lenders) to apply any and all Collections (as defined in the Prepetition Credit Agreement and as such term is defined below) received in the ordinary course of business from and after the Petition Date and prior to the occurrence and entry of the Final Order (as defined below): (i) first, to reduce the Prepetition Debt, and (ii) second, to reduce the DIP Obligations pursuant and subject to the provisions of the DIP Orders;

(g)     granting a secured, first-priority senior perfected Lien on all present and after-acquired assets and property of the Debt-

ors not subject to a valid, properly perfected, unavoidable Lien on the Petition Date, pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out (as defined below), other than the Lease Priority Collateral, Avoidance Actions and proceeds of Avoidance Actions;

(h)     granting a secured, first-priority, senior priming perfected Lien on all property of the Debtors that is subject to a valid, properly perfected, unavoidable and senior lien on the Petition Date, including, without limitation, the Liens of the Prepetition Agent (as defined below) on behalf of the Prepetition Lenders (as defined below), pursuant to section 364(d)(1) of the Bankruptcy Code, subject to the Carve-Out, other than Lease Priority Collateral and Avoidance Actions and proceeds of Avoidance Actions;

(i)     granting a Lien on the Lease Priority Collateral, subject to the Liens of Loehmann's Capital Corp., existing as of the Petition Date pursuant to section 364(c)(3) of the Bankruptcy;

(j)     granting to the DIP Agent (for the benefit of the DIP Secured Parties) superpriority administrative claim status in respect of all DIP Obligations, pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out;

(k)     authorizing the use of cash collateral as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral") in which the Prepetition Secured Parties have an interest;

(l)     granting the Prepetition Agent (for the benefit of the Prepetition Lenders) Prepetition Replacement Liens and Prepetition Superpriority Claims (each as defined below) to the extent of any diminution in the value of the Prepetition Agent's interest in the Prepetition Collateral and requiring the Debtors to make Adequate Protection Payments (as defined below) to the Prepetition Secured Parties as adequate protection for the granting of the DIP Liens (as defined below) to the DIP Agent, subordination to the Carve-Out, the use of Cash Collateral, and for the imposition of the automatic stay;

(m)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and the DIP Orders;

(n)     scheduling a final hearing (the "Final Hearing"), pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), to consider entry of the Final Borrowing Order granting the relief requested in

this Motion on a final basis and approve the form of notice with respect to the Final Hearing;  and

(o)    waiving any applicable stay as provided in the Bankruptcy Rules and providing for immediate effectiveness of the Interim Borrowing Order.

## BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2 SUMMARY

5.      In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, the Debtors request that the Court approve the DIP Facility and the Debtors' use of Cash Collateral on the terms set forth in the Interim Order and as described below.  The Interim Order imposes certain conditions and restrictions on the Debtors' use of Cash Collateral and grants certain relief and adequate protection for the benefit of the Prepetition Lenders.  Material provisions of the DIP Credit Agreement are set out at the following sections of the DIP Credit Agreement and/or the Interim Order, pursuant to Bankruptcy Rules 4001(c)(1)(B) (relating to obtaining credit) and 4001(b)(1)(B) (relating to the use of cash collateral), and Local Rule 4001-2 (relating to the use of cash collateral and obtaining credit):[3]

| TERM | DESCRIPTION | LOCATION IN DIP CREDIT AGREEMENT (CA) OR INTERIM ORDER (IO) |
| --- | --- | --- |
| **Borrower** | Loehmann's Operating Co. and its subsidiaries. | CA Preamble (p. 1) |
| **Guarantors** | Loehmann's Holdings Inc., Loehmann's, Inc. and Loehmann's Real Estate Holdings, Inc. | CA Preamble (p. 1) |
| **Agent** | Crystal Financial LLC | CA Preamble (p. 1) |
| **Lender** | Crystal Financial LLC | CA Preamble (p. 1) |

---

[3]    The descriptions of the terms of the DIP Credit Agreement, the DIP Financing Agreements and the Interim Borrowing Order set forth in this Motion are summaries only.  If there is any inconsistency between the summaries set forth in this Motion and the terms of the DIP Credit Agreement, the DIP Financing Agreements Interim Borrowing Order, the terms of the DIP Credit Agreement, the DIP Financing Agreements Interim Borrowing Order, as applicable, shall govern.

| | | |
|---|---|---|
| **Closing Date** | November __, 2010 | CA Definitions (p. 90) |
| **Borrowing Limits** | Interim:  Up to maximum committed amount of $6,000,000 upon entry of the Interim Borrowing Order, exclusive of amounts outstanding under the Prepetition Credit Agreement | CA § 1.1(a)(i) (p. 3) |
| | Final:  $45,000,000 upon entry of the Final Borrowing Order, inclusive of amounts outstanding under the Prepetition Credit Agreement. | CA Definition of "Aggregate Revolving Loan Commitment" (p. 86) |
| **Prepayment Fee** | 3% of the aggregate loan commitments, payable if the revolving loan commitments are terminated prior to one year from the Petition Date pursuant to the same formula as provided for in the Prepetition Credit Agreement.  Upon entry of the Final Order (as defined below), any prepayment fee that is due under the Prepetition Credit Agreement will be waived. | CA § 1.9(d) (p. 12) |
| **Borrowing Base** | An amount equal to the sum of: | CA Definitions (p. 89) |
| | a.  90% of the book value of Eligible Credit Card Receivables at such time; | CA Definitions (p. 94) |
| | b.  90% of the book value of Eligible Magazine Subscription Receivables at such time (but the book value of each Eligible Magazine Subscription Receivable shall be reduced by the maximum discount for early payment that the Borrower may elect to accept under the applicable Magazine Subscription Agreement); | CA Definitions (p. 99) |
| | c.  90% of the book value of Eligible Inventory multiplied by the NOLV Factor; and | CA Definitions (p. 96) |
| | d.  90% of the book value of Eligible In-Transit Inventory and Eligible LC Inventory, multiplied by the NOLV Factor. | CA Definitions (pp. 95, 98) |
| | In the case of clauses (a), (b), (c) and (d), less any and all Reserves (including the Credit Support Reserve, if applicable) established by Agent at such time in its Permitted Discretion. | |
| **Purpose; Use of DIP Loan; Rollup** | To repay amounts outstanding under the Prepetition Credit Agreement (the "Roll Up") and to fund disbursements incurred in connection with the chapter 11 case in accordance with the DIP Budget, including without limitation, payment to essential vendors, warehousemen and freight handlers as approved by the Bankruptcy Court. | CA § 4.10 (p. 38) |

| | | |
|---|---|---|
| **Interest Rate** | <u>Non-Default Rate</u>: LIBOR + 8.5% | CA Definition of "Interest Rate" (p. 105) |
| | <u>Default Rate</u>: Non-Default Rate + 3% | CA § 1.3(c) (p. 7) |
| **Fees and Expenses** | <u>Commitment and Arrangement Fee</u>: $500,000, payable $250,000 on the Closing Date and $250,000 upon entry of the Final Borrowing Order, in consideration of the DIP Facility and a commitment to provide exit financing in accordance with the Exit Financing Term Sheet attached as <u>Exhibit 4</u>. | CA § 1.9(a) (p. 11) |
| | <u>Unused Commitment Fee</u>: 0.5% annually of the amount of the unused portion of the DIP Facility. | CA § 1.9(b) (p.11) |
| | <u>Letter of Credit Fees</u>: LIBOR + 8.5% | CA § 1.9(c) (p. 12) |
| | <u>Monitoring Fee</u>: $65,000. | CA § 1.9(e) (p. 12) |
| **Use of Cash Collateral** | Subject to the limitations set forth in the DIP Orders, the Debtors are authorized to use all of their funds, including the contents of all of the deposit accounts and securities accounts, all proceeds, products, rents, issues or profits of any collateral and any other Cash Collateral in accordance with the DIP Budget. | IO ¶ 3 |
| **Events of Default** | a. <u>Final Order</u>. Failure to entry of a Final Order within 30 days after the Petition Date. | CA § 7.1(c)(i) (p. 53) CA § 4.17(a) (p. 41) |
| | b. <u>Failure to Pay</u>. Nonpayment of principal, interest, fees or other amounts under the DIP Facility when due. | CA § 7.1(a) (p. 52) |
| | c. <u>Representations and Warranties</u>. Material inaccuracy or breach of representations and warranties arising from facts first occurring on or after the Petition Date. | CA § 7.1(b) (p. 52) |
| | d. <u>Material Covenants</u>. Violation of material covenants, arising from facts first occurring on or after the Petition Date. | CA § 7.1(c)(i) (p. 53) |
| | e. <u>ERISA Events</u>. Occurrence of certain ERISA events resulting in liabilities in excess of $250,000 in the aggregate. | CA § 7.1(c)(i) (p. 53) CA § 5.10 (p. 48) |
| | f. <u>Monetary Judgments</u>. One or more judgments, non-interlocutory orders, decrees or arbitration awards, not subject to the automatic stay, shall be entered against any one or more of the Credit Parties or any of their respective Subsidiaries involving in the aggregate a liability of $100,000 or more (excluding | CA § 7.1(f) (p. 53) |

$100,000 or more (excluding amounts covered by insurance to the extent the relevant independent third party insurer has not denied coverage therefor), and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of 30 days after the entry thereof.

g. <u>Non Monetary Judgments</u>. One or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Credit Parties or any of their respective Subsidiaries which has or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

CA § 7.1(g) (p. 53)

h. <u>Material Adverse Effect</u>. The occurrence of a Material Adverse Effect. None of the following shall be deemed, in itself or in any combination, to constitute a Material Adverse Effect: (i) the filing of the Chapter 11 cases (and any defaults under agreements arising solely as a result of the filing of the Chapter 11 cases, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code), (ii) the conditions, events and changes that ordinarily occur in connection with a filing under Chapter 11 of the Bankruptcy Code, and (iii) any other event which preceded the Petition Date and which was known to the Agent or Lenders prior to the Closing Date.

CA 7.1(h) (p. 53)
CA Definition of "Material Adverse Effect" (p. 108)

i. <u>Collateral</u>. Any material provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against any Credit Party or any Subsidiary of any Credit Party thereto or any Credit Party or any Subsidiary of any Credit Party shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any Collateral Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in the Collateral purported to be covered thereby or such security interest shall for any reason cease to be a perfected and first priority security interest subject only to Permitted Liens.

CA § 7.1(i) p. 54)

j. <u>Ownership</u>. (i) Loehmann's Holdings ceases to own 100% of the issued and outstanding Stock and Stock Equivalents of Loehmann's Inc. ("Parent"), (ii) Parent ceases to own 100% of the issued and outstanding Stock and Stock Equivalents of Borrower, in each instance in

CA § 7.1(j) (p. 54)

clauses (i), and (ii), free and clear of all Liens, rights, options, warrants or other similar agreements or understandings, other than Liens in favor of Agent, for the benefit of the Secured Parties; or (iii) the sale of all or substantially all of the assets of the Credit Parties pursuant to Section 363 of the Bankruptcy Code (other than in connection with a Permitted Sale).

k. <u>DIP Sponsor Credit Support</u>. (i) If the Existing L/C (defined below) or New L/C (defined below) is in the form of a standby letter of credit, such standby letter of credit shall for any reason cease to be in full force and effect other than in accordance with its express terms or in accordance with the terms of the DIP Credit Agreement, or the issuer of such standby letter of credit shall seek to terminate the standby letter of credit or is unwilling or unable to honor a draw request by the Agent, (ii) the ability of the Agent to draw upon the Existing L/C or New L/C following the occurrence of the Draw Conditions is stayed or enjoined or otherwise impaired or delayed, (iii) the Equity Sponsor shall seek to terminate or repudiate the Existing L/C or New L/C (other than in accordance with the terms of the DIP Credit Agreement) or deny that its obligations in respect thereof are valid, binding and enforceable, or (iv) the Existing L/C or New L/C is otherwise limited or terminated other than in accordance with the express terms of the Existing L/C or New L/C (or the terms of the DIP Credit Agreement).    CA § 7.1(k) (p. 54)

l. <u>Dismissal or Conversion</u>.  The entry of an order dismissing any Chapter 11 Case or converting any Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;    CA § 7.1(l) (p. 54)

m. <u>Enlarged Powers</u>.  The entry of an order appointing a trustee in any Chapter 11 Case or an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4));    CA § 7.1(m) (p. 54)

n. <u>Superior Claims</u>.  The entry of an order granting any other super-priority claim or lien equal or superior in priority to that granted to Agent or Lender, other than the Carve-Out, without the Agent's prior written consent;    CA § 7.1(n) (p. 54)

o. <u>Relief from Automatic Stay</u>.  The entry of one or more orders granting relief from the auto-    CA § 7.1(o) (p. 54)

matic stay so as to allow third parties to proceed against any asset of any Credit Party having a fair market value in excess of $100,000 in the aggregate;

| | | |
|---|---|---|
| p. | Material Contracts and Leases. The termination or rejection, or the filing by the Credit Parties of a motion terminating or rejecting material leases, material contracts or any other material agreement, document or instrument following the Petition Date to which any Credit Party is a party, except those approved by the Agent; or | CA § 7.1(p) (p. 55) |
| q. | DIP Borrowing Orders. The entry of an order staying, reversing, vacating or otherwise modifying the Loans, Liens securing the Obligations or the DIP Borrowing Orders. | CA § 7.1(q) (p. 55) |
| r. | Borrower's failure to meet the Milestones. | CA § 7.1(c)(i) (p. 52) CA § 4.17 (p. 41) |

**Termination**  The DIP Facility can be terminated upon the occurrence of an Event of Default, with seven days' notice to the Borrower, the United States Trustee and any committee appointed in the chapter 11 cases.  CA § 7.2(a) (p. 55)

**Liens**  The DIP Secured Parties will receive perfected liens and security interests pursuant to Bankruptcy Code §§ 361, 362, 364(c)(2), 364(c)(3) and 364(d) on the Credit Parties' respective existing and after-acquired property and assets, but excluding any claims or causes action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof (the DIP Collateral). The liens on the DIP Collateral will prime the liens currently securing the Prepetition Obligations except for the collateral securing the Borrower's obligations under the Lease Agreement, but will be subject to all other valid and enforceable senior liens of record, and to the Carve-Out (as defined below).  CA § 1.12(b)-(d) (p. 18) IO ¶ 2(e)

**Superpriority Claims**  All of the DIP Obligations shall constitute first-priority administrative expense claims against each of the Debtors, with priority over any and all administrative expenses, adequate protection superpriority claims and all other claims against the Debtors or their estates now existing or hereafter arising, which shall be payable from and have recourse to all prepetition and postpetition real and personal property of the Debtors and all proceeds therefrom, excluding any proceeds or property recovered in connection with the pursuit of chapter 5 avoidance actions, subject only to the Carve-Out.  CA § 1.12(a) (p. 18) IO ¶ 2(i)

| | | |
|---|---|---|
| **Waiver of Automatic Stay** | Waived upon seven day's notice of the occurrence of an Event of Default to permit DIP Secured Parties to exercise their rights under the DIP Financing Agreements. | CA § 7.2 (p. 55) |
| **Milestones** | a. Within 30 days from the Petition Date, the Bankruptcy Court shall have entered the Final Borrowing Order. | CA § 4.17(a) (p. 41) |
| | b. Within 45 days from the Petition Date, the Bankruptcy Court shall have entered a final order extending the Borrower's time to assume or reject each of its real property leases until 210 days after the Petition Date. | CA § 4.17(b) (p. 42) |
| | c. On or before December 1, 2010, the Credit Parties shall have filed with the Bankruptcy Court a Plan of Reorganization and Disclosure Statement, each in form and substance satisfactory to the Agent. | CA § 4.17(c) (p. 42) |
| | d. On or before January 7, 2011, the Bankruptcy Court shall have entered an order approving the Disclosure Statement respecting the Plan of Reorganization; | CA § 4.17(d) (p. 42) |
| | e. On or before January 14, 2011, the Credit Parties shall have filed a motion pursuant to section 363 of the Bankruptcy Code seeking authorization from the Bankruptcy Court to conduct a Permitted Sale of all or substantially all of Credit Parties' assets, which motion shall be in form and substance satisfactory to the Agent. | CA § 4.17(e) (p. 42) |
| | f. On or before February 7, 2011, the Bankruptcy Court shall have entered an order confirming the Credit Parties' Plan of Reorganization. | CA § 4.17(f) (p. 42) |
| | g. On or before February 18, 2011, the effective date of the Plan of Reorganization shall have occurred. | CA § 4.17(g) (p. 42) |
| | h. On or before February 23, 2011, the Bankruptcy Court shall have entered a final order, in form and substance satisfactory to Agent, authorizing the Credit Parties to engage in a Permitted Sale of all or substantially all of its assets, which sale shall be completed within 60 days from the date of such order. | CA § 4.17(h) (p. 42) |
| | If (i) a capital infusion of $10,000,000 is made on or before January 14, 2011, on terms and conditions | CA § 4.17 (p. 42) |

acceptable to the Agent in its discretion and (ii) the payment date of April 1, 2011 on account of the Lease Obligations set forth in the Senior Secured Note Indenture is extended to May 1, 2001 (exclusive of any cure periods), then the dates set forth in clauses (e) and (h) above shall each be extended, at Borrower's election, by not more than 45 calendar days

**Indemnification**

The DIP Secured Parties (and each of their affiliates, officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the DIP Facility or the use or the proposed use of the proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party).

CA § 9.6 (p. 67)

**Releases**

The Credit Parties will release the DIP Secured Parties and their past and present officers, directors, servants, agents, attorneys, assigns, parents, subsidiaries, and each Person acting for or on behalf of any of them from all claims directly or indirectly arising out of, connected with or relating to the DIP Financing Agreements, the DIP Borrowing Orders and the transactions contemplated thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

CA § 1.15 (p. 19)

**Waiver of § 506(c)**

The Debtors will waive the provisions of section 506(c) of the Bankruptcy Code as part of the DIP Facility, the consideration of which will be delayed until the Final Hearing.

IO ¶¶ G, 9

**Limitation on Use of DIP Loan and Collateral**

No Credit Party shall use any proceeds of the DIP Facility or Cash Collateral to challenge any of the Prepetition Secured Parties' liens, and the Committee will be authorized to use up to $50,000 of the Carve-Out to investigate the validity of the Prepetition Secured Parties' liens.

IO ¶¶ E, 7

**Adequate Protection**

As adequate protection to the Prepetition Secured Parties for any diminution in the value of their respective Prepetition Collateral resulting from the priming of their liens by the liens in favor of the DIP Secured Parties granted under the DIP Facility pursuant to Bankruptcy Code § 364(d)(1), the Pre-Petition Agent, on behalf of the Prepetition Secured Parties, shall be granted replacement liens on, and security interests in the Prepetition Collateral, Prepetition Superpriority Claims and Adequate Protection Payments, subject only to (1) the

IO ¶ 4

liens on, and security interests in, the DIP Collateral granted to the DIP Secured Parties under the DIP Facility, the Interim Order and the Final Order, as the case may be, and (2) the Carve-Out.

**Conditions Precedent**

Initial Conditions:

CA § 2.1 (p. 20)

a. Loan Documents.  Agent shall have received on or before the Closing Date all of the DIP Financing Agreements in form and substance reasonably satisfactory to Agent.

CA § 2.1(a) (p. 20)

b. Sponsor Credit Support.  The Sponsor Credit Support shall be in full force and effect.

CA § 2.1(b) (p. 20)

c. Cash Management.  The Borrower shall have established or shall maintain its cash management systems and the Cash Management Order shall have been entered, shall be in full force and effect, and shall not have been reversed, vacated or stayed, or modified without the prior written consent of the Agent.

CA § 2.1(c) (p. 20)

d. Sponsor Participation Agreement.  On or before the Closing Date, the Agent shall have received from the Equity Sponsor the Sponsor Participation Agreement fully executed.

CA § 2.1(d) (p. 20)

e. Approvals.  Agent shall have received satisfactory evidence that the Credit Parties have obtained all required consents and approvals of all Persons including all requisite Governmental Authorities, to the execution, delivery, performance and consummation of the DIP Financing Agreements.

CA § 2.1(e) p. 20)

f. Payment of Fees.  Borrower shall have paid the fees required to be paid on the Closing Date under the Fee Letter, and shall have reimbursed Agent for all fees, costs and expenses (including Attorney Costs) of closing the DIP Facility incurred by Agent and presented as of the Closing Date.

CA § 2.1(f) (p. 21)

g. Representations and Warranties.  The representations and warranties of the Credit Parties and their Subsidiaries contained in the DIP Financing Agreements shall be true and correct in all respects.

CA § 2.1(g) (p. 21)

h. Approved Budget.  The Agent shall have received the Approved Budget, which shall be in form and substance satisfactory to the Agent.

CA § 2.1(h) (p. 21)

|   |   |   |
|---|---|---|
| | i. <u>Bankruptcy Pleadings</u>.  All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility shall be in form and substance reasonably satisfactory to the Agent and the Interim Borrowing Order, in form and substance acceptable to the Agent, shall have been entered and shall not be subject to any stay. | CA § 2.1(i) (p. 21) |
| | j. <u>No Default</u>.  After giving effect to the consummation of the transactions contemplated under the DIP Facility on the Closing Date (including any Loans made or Letters of Credit issued under the Credit Agreement), all representations and warranties by any Credit Party contained in any DIP Financing Agreement are true and correct and no Default or Event of Default shall exist. | CA § 2.1(j) (p. 21) |
| | k. <u>No contravention</u>.  The terms and provisions of this Agreement shall not be prohibited by the Amended and Restated Intercreditor Agreement. | CA § 2.1(k) (p. 21) |
| | <u>On-Going Conditions</u>: | |
| | The making of each advance under the DIP Facility shall be conditioned upon: | CA § 2.2 (p. 21) |
| | a. The continuing accuracy of all representations and warranties. | CA § 2.2(a) (p. 21) |
| | b. There is no default or Event of Default in existence at the time of, or after giving effect to the making of loans under the DIP Facility. | CA § 2.2(b) (p. 21) |
| | c. After giving effect to any Loan (or the incurrence of any Letter of Credit Obligations), the aggregate outstanding amount of the Revolving Loans would not exceed the Maximum Revolving Loan Balance unless otherwise permitted. | CA § 2.2(c) (p. 22) |
| | d. After giving effect to any Loan, the terms and provisions of this Agreement shall not be prohibited by the Amended and Restated Intercreditor Agreement. | CA § 2.2(e) (p. 22) |
| **Budget** | Borrower shall deliver a rolling 26-week DIP Budget, which must be satisfactory to the Agent and DIP Lender. | CA Definition of "Approved Budget" (p. 87) |
| **Carve-Out** | <u>Pre-Default</u>:  All professional fees and disbursements incurred by the professionals retained pur- | CA § 1.12(a) (p. 18) IO ¶ 7 |

suant to Bankruptcy Code §§ 327 or 1103(a) by Borrower and any statutory committees appointed in the chapter 11 cases from the Petition Date set forth in the DIP Budget until the occurrence and continuation of an Event of Default, and all fees payable to the United States Trustee, up to the amount of $950,000.

Post-Default: (a) $350,000 for professional fees and disbursements incurred by the professionals retained pursuant to Bankruptcy Code §§ 327 or 1103(a) by Borrower and any statutory committees appointed in the Cases for services rendered after receipt by Borrower, its counsel, counsel to any statutory committee and United States Trustee fees of a notice of Event of Default, including "burial expenses" for a Chapter 7 trustee if the cases are converted.

CA § 1.12(a) (p. 18)
IO ¶ 7

**DIP Sponsor Credit Support**

Reasonably contemporaneously with entry of the Final Borrowing Order, the Agent shall have received from the Equity Sponsor, against delivery of the letter of credit posted in connection with the Prepetition Credit Agreement (the "Existing L/C") to the issuing bank for cancellation in accordance with its terms, a new standby letter of credit (the "New L/C"), naming the Agent as sole beneficiary, in the face amount, or cash collateral in the initial amount, of $7,500,000, less any amounts drawn on under the Existing L/C , to secure the Equity Sponsor's obligations pursuant to the DIP Credit Agreement. The New L/C shall be in effect on the date of the entry of a Final Borrowing Order and shall remain in effect until 30 days after the Revolving Termination Date (the "DIP Sponsor Credit Support Termination Date"). Each draw on the New L/C will result in the reclassification of Revolving Loans (as defined in the DIP Credit Agreement) to Term Loans (as defined in the DIP Credit Agreement) in the amount of the letter of credit draw (with the aggregate principal balance of the Term Loans increasing by such amount), and, upon each letter of credit draw, the Equity Sponsor will be deemed to have purchased a 100% junior participation in the Term Loans under the DIP Credit Agreement on the terms set forth in the Sponsor Participation Agreement, whereby the Equity Sponsor is entitled to receive payment to the extent of the Term Loans after all other obligations under the DIP Credit Agreement are paid in full. . For the avoidance of doubt, in the event that the Existing L/C is fully drawn prior to the entry of the Final Borrowing Order, the Borrower shall not be required to deliver the New L/C. Upon

CA § 4.15(a) – (d) (p. 41)

|  |  |  |
|---|---|---|
|  | entry of the Final Borrowing Order, any Term Loans then extant under the Prepetition Credit Agreement shall be deemed Term Loans under the terms of the DIP Credit Agreement. For purposes of this Motion, the foregoing is referred to as the "DIP Sponsor Credit Support." |  |
| **Prepayments** | Mandatory prepayment of all Obligations upon termination of the DIP Facility, and upon asset dispositions. | CA § 1.8 (p. 10) |

## PREPETITION CAPITAL STRUCTURE

### A. Equity Sponsor

8.      Loehmann's is the surviving entity of the merger of DAH Merger Corporation and Loehmann's Holdings, which was consummated on October 13, 2004 (the "2004 Transaction"). Because the prior equity sponsors of Loehmann's sought to comport with Islamic banking practices, the 2004 Transaction was structured to comply with the strictures of Shari'ah law, which, *inter alia,* does not allow for the imposition, or payment, of interest.

9.      In July 2006, Istithmar Retail Investments ("Istithmar") acquired 100% of the common stock of DAHC, which in turn owns 100% of the common stock of Loehmann's Holdings.

10.      Since purchasing Loehmann's in July 2006, Istithmar has provided Loehmann's with operating funds through a $55 million standby letter of credit (the "SLOC"). As a result of losses incurred in fiscal years 2007 and 2008, due in part to economic conditions, Loehmann's had drawn $42.0 million and $5.0 million, respectively, under the SLOC.

11.      On April 19, 2010, Loehmann's drew the remaining $8.0 million available under the SLOC, which had an expiration date of September 30, 2012. Those

drawdowns were recorded by Loehmann's as contributions of capital made by Istith-mar.

**B.    Secured Credit Agreement**

12.     The Debtors (other than Capco) are parties to a $45 million Prepeti-tion Credit Agreement, dated as of September 15, 2010, by and among Loehmann's Opco, as borrower, Loehmann's Holdings, Loehmann's Real Estate Holdings, and Loehmann's, Inc., each as a guarantor, and Crystal, as a lender and as agent for all lend-ers, and any other lenders party thereto from time to time (collectively, the "Prepetition Lenders").  The Prepetition Credit Agreement is scheduled to mature on January 18, 2014.

13.     Loehmann's entered into the Prepetition Credit Agreement with Crystal to replace a $35 million credit facility with General Electric Capital Corporation ("GECC") that had been otherwise scheduled to mature on December 11, 2012.[4]  Loeh-mann's is entitled to borrow under the Prepetition Credit Agreement for general corpo-rate purposes, including, without limitation, working capital requirements, letters of credit, liquidity and repayment of indebtedness, subject to certain conditions.

14.     As credit support for Loehmann's' obligations under the Prepeti-tion Credit Agreement, Istithmar posted the Existing L/C.  In connection with Istith-mar's posting of the Existing L/C, the Prepetition Credit Agreement provides that each draw on the Existing L/C will result in the reclassification of Revolving Loans (as de-fined in the Prepetition Credit Agreement) to Term Loans (as defined in the Prepetition Credit Agreement) in the amount of the letter of credit draw (with the aggregate princi-pal balance of the Term Loans increasing by such amount), and, upon each letter of

---

[4]    The GECC credit facility was entered into in December 2009 to replace a credit facility provided by CIT, which had declined to extend its facility.

credit draw, Istithmar will be deemed to have purchased a 100% junior participation (the "Junior Participation") in the Term Loans under the Prepetition Credit Agreement, whereby Istithmar is entitled to receive payment to the extent of the Term Loans after all other obligations under the Prepetition Credit Agreement are paid in full. *See* Prepetition Credit Agreement, § 4.15. The terms of the Junior Participation are set forth in the Sponsor Participation Agreement applicable to the Prepetition Credit Agreement.

15.     The Prepetition Credit Agreement is an asset-based facility governed by a borrowing base formula of accounts receivable, credit card receivables, and inventory. The Prepetition Credit Agreement includes a $15 million sublimit available for the issuance of letters of credit (of which up to $15 million may be used for stand-by letters of credit) and is secured by a security interest in all of the present and after acquired tangible and intangible assets in the U.S. of Loehmann's Holdings and its domestic subsidiaries.

16.     As of Petition Date, approximately $30 million in principal was outstanding under the Prepetition Credit Agreement.

**C.     Secured Lease/Note Obligations**

17.     Capco was established outside of the other Debtors' corporate structure. Capco's sole purpose was to facilitate the 2004 Transaction so as to comply with the strictures of Shari'ah law that do not allow for the charging or payment of interest.

18.     As a result, Capco is the obligor on (a) $55 million in 12% senior secured Class A Notes due October 1, 2011 (the "Class A Notes"); (b) $20 million in senior secured Class A Floating Rate Notes due October 1, 2011 (the "Floating Rate Notes"); and (c) $35 million in 13% senior secured Class B Notes due October 1, 2011 (the "Class B Notes"). The Class A Notes, Floating Rate Notes and Class B Notes (collectively the

"Notes") were issued pursuant to Capco's Note Indenture, dated October 12, 2004, with Wells Fargo Bank, N.A., as indenture trustee (the "Indenture Trustee").

19.     Capco used the proceeds raised from the Class A Notes, Floating Rate Notes and Class B Notes to fund a sale and lease-back transaction between Capco and Loehmann's Opco pursuant to a Lease and License Financing and Purchase Option Agreement, dated as of October 13, 2004 (the "Lease Agreement"), whereby (i) Capco acquired the fixed operating assets of Loehmann's Opco at that time (the "Leased Assets") and (ii) Capco leased the Leased Assets back to Loehmann's Opco. Loehmann's Opco's obligations under the Lease Agreement are guaranteed by Loehmann's Holdings, Loehmann's Real Estate Holdings, and Loehmann's, Inc. pursuant to that certain Lease Guarantee, dated as of October 13, 2004 (the "Lease Guarantee"), by each of (i) Loehmann's Holdings, (ii) Loehmann's, Inc., (iii) Loehmann's Real Estate Holdings, (iv) Loehmann's Opco, and (v) and any other subsidiary of Loehmann's Holdings.

20.     Loehmann's Opco's obligations under the Lease Agreement and the obligations of Loehmann's Holdings, Loehmann's, Inc. and Loehmann's Real Estate Holdings under the Lease Guarantee are secured under a Lease Security Agreement, dated as of October 13, 2004 (the "Lease Security Agreement"), pursuant to which each of Loehmann's Opco, Loehmann's Holdings, Loehmann's, Inc. and Loehmann's Real Estate Holdings (each, a "Grantor") pledged to Capco substantially all of its assets to secure its obligations under, in the case of Loehmann's Opco, the Lease Agreement, and, in the case of the other Grantors, the Lease Guarantee. In addition, each of the Grantor's obligations under the Lease Agreement and the Lease Guarantee are also secured under a pledge agreement, pursuant to which each Grantor pledged its owned equity interests, including equity interests owned in subsidiaries, to secure its obligations under the Lease Documents (as such term is defined in the Note Indenture). The

collateral packages securing the obligations under the Lease Agreement and the Lease Guarantee and the obligations under the Prepetition Credit Agreement are substantially identical (such collateral, the "Prepetition Collateral").

21.     In turn, Capco's obligations under the Class A Notes, Floating Rate Notes and Class B Notes are secured under a Security Agreement, dated as of October 12, 2004 (the "Note Security Agreement"), pursuant to which Capco pledged to the Indenture Trustee all of its assets to secure its obligations under the Note Indenture, including its rights to the Leased Assets and its rights under the Lease Documents (which include its rights as a secured party under the Lease Security Documents (as such term is defined in the Note Indenture) and its rights to receive annual rent payments in the amount of approximately $14 million).

22.     Capco has not made the October 1, 2010 interest payment that was due under the Notes.

### D.     Intercreditor Agreement

23.     The priority of lien rights in and to the Prepetition Collateral between the Prepetition Lender and Capco (with such rights of Capco pledged to the Indenture Trustee for the benefit of the holders of the Notes pursuant to the Note Security Agreement as described above) are established pursuant to an Amended and Restated Intercreditor Agreement, dated December 18, 2009, and as amended by the First Amendment to the Amended and Restated Intercreditor Agreement, dated as of October 14, 2010 (the "Intercreditor Agreement").

24.     Pursuant to the Intercreditor Agreement, (i) Capco has a first priority security interest on all the Prepetition Collateral except the "Revolving Facility Collateral" (as defined in the Intercreditor Agreement), and a second priority security interest in the Revolving Facility Collateral, to secure the Grantors' obligations under the

Lease Documents, and (ii) the Prepetition Lender has a first priority security interest on the Revolving Facility Collateral and a second priority security interest on all other collateral to secure the Grantors' Obligations under the Prepetition Credit Agreement. As set forth in the Intercreditor Agreement, the Revolving Facility Collateral includes, i*nter alia*, all of the Grantors' interests in accounts (including receivables from credit card processors with respect to credit card sales), inventory and deposit accounts. The Revolving Facility Collateral also includes all general intangibles (including intellectual property) to the extent evidencing or governing any of the other Revolving Facility Collateral.

**DEBTORS' PROPOSED DIP FACILITY**

A.      **Necessity of DIP Facility**

25.      As described more fully in the Melvin Declaration, during the past six to twelve months, Loehmann's has been faced with declining sales in a poorly performing domestic economy, as well as the financial constraints resulting from a highly leveraged capital structure. As a result, Loehmann's business has experienced certain issues that have impacted inventory and sales, including vendor concerns that limited the company's ability to source high visibility brands, missed merchandise purchasing opportunities, and lower factor credit limits resulting in reduced product flow.

26.      Despite various efforts to address these concerns, which are detailed at length in the Melvin Declaration, it became clear to the Debtors that these efforts by themselves were not enough to reduce costs and provide sufficient additional liquidity for their operations. Working with their business consultants, Clear Thinking Group, LLC and their investment banker, Perella Weinberg Partners, the Debtors began to consider financial restructuring alternatives, including finding new financial or strategic investor(s), a replacement working capital lender and identifying additional cost-

savings. The Debtors and their advisors concluded that savings alone would not be enough to address the company's $12 to $15 million in liquidity needs in the next six to twelve months. Ultimately they determined that a restructuring of Loehmann's' balance sheet was in the best long-term interests of the Debtors and their creditors.

27. After negotiating a new credit facility with Crystal to replace the GECC facility, Loehmann's reached an agreement in principle with Istithmar and Whippoorwill Associates Inc., as agent for its discretionary accounts that are legal and/or beneficial owners of the Notes, to pursue a financial restructuring that would have significantly reduced the Debtors' outstanding debt through the Exchange Offer and Consent Solicitation (as such term is defined and described in the Melvin Declaration), or a pre-arranged, consensual chapter 11 plan embodied in the Original Support Agreement (as such term is defined and described in the Melvin Declaration). The Exchange Offer did not garner the support of the requisite percentage of noteholders.

28. After further negotiations, Loehmann's, with the support of its key Supporting Secured Noteholders and Istithmar, determined to file a consensual Chapter 11 case to effectuate a proposed financial restructuring that will substantially reduce debt and recapitalize the company, enhance the company's liquidity, and solidify the company's long-term growth prospects and operating performance. To evidence their support of the Debtors' restructuring, the parties executed a Restructuring Support Agreement and Investment Commitment Letter (as defined in the Melvin Declaration) prior to the Petition Date. The term sheet attached to the Restructuring Support Agreement sets forth the essential terms for the proposed joint Chapter 11 plan of reorganization. The term sheet attached to the Investment Commitment Letter sets forth the essential terms and conditions for an investment to be made by Istithmar and Whippoorwill in the reorganized Debtors upon emergence that will, together with the cash

received from an exit financing facility, provide the funding for distributions under a plan and for working capital needs.

**B.    Negotiation of DIP Facility**

29.    To continue to operate their business in the ordinary course while in chapter 11, the Debtors determined, with the assistance of Clear Thinking Group and Perella Weinberg, that additional liquidity in the form of debtor in possession financing was essential.  Loehmann's has negotiated and reached an agreement to enter into, subject to Court approval, a $45 million superpriority senior secured debtor in possession credit facility with Crystal.  The DIP Facility will provide the Debtors with sufficient liquidity to finance their operations until emergence from chapter 11.  The Debtors are also seeking authorization to use cash collateral, which, together with the DIP Facility, will allow the Debtors to support their working capital requirements, use funds for other general corporate purposes as well as satisfy the costs attendant to the chapter 11 cases.

30.    Prior to the Petition Date, Perella Weinberg attempted to identify other sources of postpetition financing to determine whether the Debtors could obtain debtor in possession financing on better terms.  Perella Weinberg canvassed 10 potential sources of postpetition financing to fund the Debtors' operations, on terms similar to those offered by Crystal.  Notwithstanding these efforts, the Debtors were unable to obtain debtor in possession financing on more advantageous terms.  The obligations owed to the Prepetition Lenders are secured by the Prepetition Collateral, which constitute substantially all of the Debtors' assets, such that either (i) the liens of the Prepetition Lenders would have to be primed without consent to obtain postpetition financing, or (ii) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of the Prepetition Lenders.

31.     The Debtors determined that neither of these options was feasible. Borrowing from an unrelated third-party postpetition lender or lending group that required security interests senior to the Prepetition Lenders likely could only be accomplished through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code would be satisfied.  Moreover, given the general economic conditions and poor retail climate, the Debtors determined after diligence that sources of new capital on a junior lien basis, if available at all, were more expensive than obtaining postpetition financing from Crystal. The Debtors found that none of the lenders contacted were able to submit a proposal or commitment to provide debtor in possession financing on terms comparable to the principal amount, pricing, fee structure and certainty of closing of any alternative proposal would be, in the aggregate, less favorable than that offered by Crystal.  Indeed, no other lender was even willing to provide adequate financing junior to the Prepetition Lenders and the Debtors determined, based on advice from their retained professionals, that obtaining approval of a debtor in possession financing that primes the Prepetition Lenders would be highly contested with absolutely no certainty of success.

32.     To provide the DIP Facility, Crystal required that a substantial portion of the DIP Facility be used to pay off obligations outstanding under the Prepetition Credit Agreement.  The Debtors in their business judgment have determined that agreeing to the Roll-Up was necessary to be able to access additional capital under the DIP Facility, which is necessary to fund the Debtors' working capital obligations during these Chapter 11 cases.  The Roll-Up will not occur unless and until the Final Borrowing Order is entered.

33.     Additionally, Crystal required the provision by Istithmar of the DIP Sponsor Credit Support as a condition to providing the DIP Facility.  Absent receipt of

the DIP Sponsor Credit Support, the Debtors would not be able to obtain DIP Facility. The DIP Sponsor Credit Support is being provided on the same terms and conditions as the Existing L/C. Such terms and conditions are set forth above and in Section 4.15 of the Prepetition Credit Agreement and Section 4.15 of the DIP Credit Agreement. The Debtors submit that the terms of the DIP Sponsor Credit Support are necessary, reasonable and should be approved.

34. The Debtors therefore determined, in their reasonable business judgment, that the DIP Facility is the best financing option available under the present circumstances, and will enable them to operate their businesses in chapter 11 without disruption. The terms and conditions of the DIP Facility (including the fees and charges paid thereunder) and the use of cash collateral are fair and reasonable and were negotiated by the parties in good faith and at arm's length. Loehmann's' ability to obtain a commitment for debtor in possession financing prior to commencing these chapter 11 cases serves as crucial signal to its customers, employees and trade vendors that Loehmann's will maintain viable and competitive business operations going forward.

**C.    Implementation of the DIP Credit Agreement**

35. The Debtors and Crystal engaged in extensive, good faith, arm's-length negotiations about the terms and provisions of the proposed DIP Facility and the use of cash collateral. These negotiations culminated in the DIP Credit Agreement, the other DIP Financing Documents, and all of the Debtors' other obligations and indebtedness arising under, in respect of, or in connection with the DIP Obligations. The DIP Facility and the use of cash collateral should provide the Debtors with the necessary liquidity to properly administer these cases, implement the contemplated restructuring and emerge from chapter 11 as a viable business enterprise. Pursuant to this Motion, the Debtors seek the authority to borrow, on an interim basis up to $6 million, and on a

final basis up to $45 million, subject to the Budget and a Borrowing Base. Annexed as Exhibit 3 is a proposed interim Budget for the first 30 days of the case.

**D.    Use of Cash Collateral and Proposed Adequate Protection**

36.    To address their working capital needs and fund their reorganization efforts, the Debtors also require the immediate use of Cash Collateral. This will provide the Debtors with the additional necessary capital to operate their business, pay their employees, maximize value, and successfully reorganize under chapter 11.

37.    The Prepetition Lenders have consented or are deemed to consent to the Debtors' use of Cash Collateral subject to following: (a) the limitations on the use of Cash Collateral in accordance with the DIP Budget and the DIP Orders, (b) the grant of adequate protection as described herein, (c) the potential termination of the authority to use Cash Collateral upon the occurrence of certain events, and (d) the provision for the Carve-Out. "Cash Collateral" is defined as all (i) funds of the Debtors, including the contents of all of the deposit accounts and securities accounts of the Debtors, and (ii) proceeds, products, rents, issues or profits of the Prepetition Collateral and the DIP Collateral and all other cash collateral (as defined in the Bankruptcy Code) of Crystal and the parties entitled to adequate protection.

**E.    Adequate Protection of the Prepetition Lenders**

38.    Pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, the Prepetition Lenders are entitled to adequate protection of their interests in their respective Prepetition Collateral, including the Cash Collateral, for and equal in amount to the aggregate diminution in the value of their security interests in the Prepetition Collateral as a result of, among other things, the Debtors' sale, lease or use of Cash Collateral and any other Prepetition Collateral, the priming of their security interests and liens in the Prepetition Collateral by the Agent and the DIP Lender pursuant to the

Loan Documents, and the DIP Orders, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code or otherwise. As adequate protection, the Prepetition Lenders are granted those protections set forth in the Rule 4001 summary above.

39. The provisions of the DIP Orders also provide for the relative priorities of the liens and superpriority claims of the DIP Facility and adequate protection claims. The DIP Facility holds the most senior liens and is entitled to a superpriority administrative expense claim, followed in priority by the adequate protection claims. The security granted and the superpriority administrative claim status are subject to the Carve-Out.

## BASIS FOR RELIEF REQUESTED

40. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, the court may authorize the debtor to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a lien on unencumbered property, a junior lien on encumbered property, or a combination of these protections. 11 U.S.C. § 364(c). A debtor in possession may also obtain postpetition credit secured by liens senior to prior existing liens pursuant to section 364(d) of the Bankruptcy Code. Section 363(c)(2) of the Bankruptcy Code also contemplates that the Bankruptcy Court may authorize the use of cash collateral without the consent of secured parties if adequate protection is provided pursuant to section 363(e).

A.    **The DIP Facility Should be Approved**
      <u>**Under Section 364 of the Bankruptcy Code**</u>

41.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and a hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c). *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *see e.g., In re Photo Promotion Assocs.*, 89 B.R. 328, 333 (Bankr. S.D.N.Y. 1988) (Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.). Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

(i)    The debtor is unable to obtain unsecure credit under section 364(b) (*i.e.*, by granting a lender administrative expense priority);

(ii)    The credit transaction is necessary to preserve the assets of the estate; and

(iii)    The terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See In re Acqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and finding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"). In these circumstances, "[t]he statute imposes no duty to seek credit from every possible

lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Sav. & Loan Assn. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992). A debtor need only demonstrate "a good faith effort that credit was not available without" the protections of section 364(c). *See e.g. In re Snowshoe*, 789 F.2d. at 1088. When there are few lenders likely, able, or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom, Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117,120 n.4 (N.D. Ga. 1989).

**B.      The Priming Lien Under the Postpetition Financing Should<br>Be Approved Under Section 364(d) of the Bankruptcy Code**

42.      The Debtors also seek approval of the DIP Facility under section 364(d)(1) of the Bankruptcy Code to permit the Debtors to grant priming liens on the Prepetition Collateral. The statutory requirement for obtaining postpetition credit under section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise." In addition, the secured creditors whose liens are being "primed" by a new postpetition lender under section 364(d) of the Bankruptcy Code must be provided with adequate protection of their interests in collateral. *See In re Swedeland Dev. Group, Inc.*, 16 F. 3d 552, 564 (3d Cir. 1994) (*en banc*) (adequate protection is required under section 364(d)(1)(B) of the Bankruptcy Code to ensure that the creditor receives the value for which it bargained pre-bankruptcy); *Dunes Casino*, 69 B.R. 784, 793 (Bankr. D.N.J. 1986) (noting that "[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy"). The proposed liens to be granted to Crystal would "prime" certain of the existing liens of the Prepetition Lenders, who have consented to have their liens primed upon the terms and conditions described herein.

43.    There is also no issue about the ability or propriety of the Lender's liens priming Capco's junior liens in the Revolver Facility Collateral.  DIP financing and priming liens were contemplated by, and are incorporated into, the Intercreditor Agreement, which permits the DIP financing and adequate protection contemplated by this Motion.  Specifically, the Intercreditor Agreement provides:

> Finance and Sale Issues.  Until the Discharge of Revolving Facility Priority has occurred, if Loehmann's OpCo or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the Revolving Facility Agent shall desire to permit the use of cash collateral constituting Revolving Facility Collateral on which the Revolving Facility Agent or any other creditor has a Lien or to permit Loehmann's OpCo or any other Grantor to obtain a DIP Financing, then the Issuer agrees that (i) it will raise no objection to, and will be deemed to have consented to, such use of cash collateral constituting Revolving Facility Collateral or to the fact that such DIP Financing may be granted Liens on the Revolving Facility Collateral, (ii) it will not request adequate protection or any other relief in connection therewith (except, as expressly agreed by the Revolving Facility Agent or to the extent permitted by Section 3.5(c) (Adequate Protection)) and, to the extent the Liens on the Revolving Facility Collateral securing the Revolving Facility Obligations are subordinated or *pari passu* with the Liens on the Revolving Facility Collateral securing such DIP Financing, the Issuer will subordinate its Liens on the Revolving Facility Collateral to the Liens securing such DIP Financing (and all obligations relating thereto). … [Section 3.5(a)].

> Adequate Protection.  The Issuer agrees that, until the Discharge of Revolving Facility Priority, it shall not contest (or support any other person contesting) (i) any request by the Revolving Facility Agent for adequate protection with respect to any Revolving Facility Collateral or (ii) any objection by the Revolving Facility Agent to any motion, relief, action or proceeding based on the Revolving Facility Agent claiming a lack of adequate protection with respect to the Revolving Facility Collateral.  Notwithstanding the foregoing provisions in this Section 3.5(c), in any Insolvency or Liquidation Proceeding, (A) if the Revolving Facility Agent is granted adequate protection in the form of additional collateral in the nature of assets constituting Collateral in connection with any DIP Financing, then the Issuer may seek or request adequate protection in the form of a Lien on such additional collateral, which Lien will be subordinated to the

Liens securing the Revolving Facility Obligations and such DIP Financing (and all obligations relating thereto) on the same basis as the Liens on Collateral securing the Lease Obligations are so subordinated to the Revolving Facility Obligations under this Agreement, and (B) in the event the Issuer seeks or requests adequate protection in respect of Collateral securing Lease Obligations and such adequate protection is granted in the form of additional collateral in the nature of assets constituting Collateral, then the Issuer agrees that the Revolving Facility Agent shall also be granted a senior Lien on such additional collateral as security for the Revolving Facility Obligations and that any Lien on such additional collateral securing the Lease Obligations shall be subordinated to the Liens on such collateral securing the Revolving Facility Obligations and any such DIP Financing provided by the Revolving Facility Agent (and all obligations relating thereto) and to any other Liens granted to the Revolving Facility Agent as adequate protection on the same basis as the Liens on Collateral securing the Lease Obligations are so subordinated to such Revolving Facility Obligations under this Agreement.  [Section 3.5(c)].

44. Under section 364(d)(1) of the Bankruptcy Code, if interests in collateral are to be "primed," then such "primed" parties must be adequately protected.  11 U.S.C. § 364(d)(1).  The principal purpose of adequate protection is to safeguard the interests of the secured creditor in the collateral against diminution in the value of that interest postpetition.  *See In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (stating that the goal of adequate protection is to safeguard the secured creditor from diminution in value of its interest during the chapter 11 case); *In re Continental Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993); *accord In re Beker Indus Corp.*, 58 B.R. 725, 738 (Bankr. S.D.N.Y. 1986).

45. Courts determine the means for providing adequate protection on a case-by-case basis.  *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*; *see also In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985).  Section 361 of the Bankruptcy Code identifies three non-exclusive forms of ade-

quate protection:  (a) lump sum cash payments to the extent the use of property results in a diminution in value of an entity's interest in property;  (b) provision of additional or replacement liens to the extent the use of property results in a diminution in value of an entity's interest in property;  and (c) such other relief as will result in an entity realizing the indubitable equivalent of its interest in property.  11 U.S.C. § 361.

46.     In this case, the Prepetition Lenders' interests in the Prepetition Collateral will be adequately protected by replacement liens to the extent of any diminution in the value of its interests in their Prepetition Collateral and will be entitled to an administrative expense claim under section 507(b) of the Bankruptcy Code to protect the Prepetition Lenders to the extent the other adequate protection to be provided proves inadequate to secure against any diminution in the value of the Prepetition Collateral.  To the extent that inventory is sold and replaced, the Debtors will give the Prepetition Lenders replacement liens in the new inventory, to the same extent as their prepetition liens existed.  The Prepetition Lenders will also maintain their junior liens on the Lease Collateral, subject and subordinate only to the valid liens of Capco in such collateral.  Finally, the Debtors will give to the Prepetition Lenders superpriority claims under section 507(b) of the Bankruptcy Code, *provided that* the claims and liens identified herein shall be granted only to the extent of any diminution in the value of any Cash Collateral or other Collateral arising as a result of the use of Cash Collateral or other Collateral or as a result of the imposition of the automatic stay.

47.     In addition, the DIP Budget, which was prepared by the Debtors and reviewed by Crystal and its advisors, provides an additional layer of adequate protection because it ensures that the Debtors' expenditures will be limited to items that are necessary and essential to fund the Debtors' operations and the costs of this case while preserving the value of the Prepetition Collateral.  Accordingly, there is no harm done

to the Prepetition Lenders' interests by the Debtors' proposed use of the funds from the DIP Facility since such use and the corresponding maintenance and preservation of the business and assets protects and enhances the value of the Prepetition Collateral. The Debtors submit that the foregoing suffices as adequate protection in a case that is anticipated to be expeditiously conducted.

> **C. The DIP Facility is Necessary to**
> **Preserve the Assets of the Debtors' Estate**

48. The Debtors' need for prompt access to a postpetition credit facility is apparent and urgent. As described above and in the Melvin Declaration, access to credit is critical to meet the day-to-day operating needs associated with this signature retail business – inventory purchases, rent, salaries, insurance and the like. It is vital to the success of Loehmann's business that it has ample liquidity to purchase inventory on a seasonal and timely basis, which is the key to its success and longevity. In the absence of postpetition financing, vendors, utilities and employees, among others, will almost certainly refuse to provide inventory and services to the Debtors' retail stores. The result will be the immediate cessation of retail operations and the commencement of "going out of business" sales. This would represent a tremendous loss of value to all parties in interest.

> **D. The Terms of the DIP Facility are Fair,**
> **Reasonable and Appropriate and Represent the**
> **Sound Exercise of the Debtors' Business Judgment**

49. As described above, the Debtors have concluded after appropriate investigation and analysis that the DIP Facility being offered by Crystal is the best alternative available for post-petition financing. No other post-petition lender offered terms more favorable than Crystal under the circumstances required by the Debtors and credit cannot be obtained on an unsecured basis. As such, the DIP Facility was the best financing option available in the circumstances of this case. As mentioned above, both

the Roll-Up and the DIP Sponsor Credit Support are necessary for the Debtors to obtain financing under the DIP Facility.

50.     The proposed terms of the DIP Facility were negotiated in good faith and at arms' length among the parties, with the Debtors, Crystal and Istithmar represented by separate experienced counsel.  The terms of the DIP Facility are fair, reasonable, and adequate in that the terms do not prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, and they do not abridge the rights of other parties in interest.  As contemplated by the policies underlying the Bankruptcy Code, the purpose of the DIP Facility is to enable the Debtors to maintain the value of their estate while formulating a confirmable plan of reorganization.  *See generally, In re First S. Sav. Assn.*, 820 F.2d 700, 710-15 (5th Cir. 1987).

51.     Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (Business judgments should be left to the boardroom and not to this Court.).  *See also, In re Curlew Valley Assocs.*, 14 B.R. 506, 511-14 (Bankr. D. Utah 1981) (In general, a bankruptcy court should defer to a debtor in possession's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious).  Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code."  *Curlew Valley*, 14 B.R. at 513-14 (footnotes omitted).

52.     The Debtors submit that they have exercised sound and prudent business judgment in determining the merits and necessity of the DIP Facility and satisfied the legal prerequisites for incurring debt.  The Debtors also submit that they have amply demonstrated that the terms of the DIP Facility are fair and reasonable and are in

the best interests of their estate. Accordingly, the Debtors should be granted the requested relief to borrow funds from the DIP Lender on a secured and superpriority basis, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

        **E.**      **The Automatic Stay Should Be Modified on a Limited Basis**

        53.      The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to: (i) grant the security interests, liens, and superpriority claims described above with respect to Crystal and the Prepetition Lenders and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, (ii) permit Crystal to exercise, upon the occurrence and during the continuance of an Event of Default, after the expiration of the applicable grace period, if any, or the occurrence of a Termination Event, certain remedies under the DIP Financing Agreements at any time seven (7) business days after giving notice; and (iii) implement the terms of the proposed DIP Orders.

        54.      Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.

        **REQUEST FOR A FINAL HEARING**

        55.      Bankruptcy Rule 4001(c)(2) provides that a final hearing on a motion to obtain postpetition financing may commence no earlier than 14 days after service of the motion but, "[i]f the motion so requests, the court may conduct a preliminary hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Similarly, Bankruptcy Rule 4001(b)(2) provides that a final hearing on the use of cash collateral may commence no earlier than 14 days after service of the motion but, "[i]f the motion so requests, the court may conduct a prelimi-

nary hearing before such 14 day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  At the preliminary hearing, the court may authorize the use of cash collateral only if there is a reasonable likelihood that the debtor will prevail at the final hearing.  11 U.S.C. § 363(c)(3).  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g.,* *In re Ames Dep't Stores Inc.*, 115 B.R. 34, 38 (Bank. S.D.N.Y. 1990).

56.     Bankruptcy Rule 4001(c)(3) provides that notice of a motion to obtain financing shall be served upon any committee appointed under section 1102 of the Bankruptcy Code or its authorized agent, or if no committee has been appointed then to the creditors on the list filed pursuant to Bankruptcy Rule 1007(d), and any other entity that the Court directs.  Bankruptcy Rule 4001(b)(3) provides that notice of a motion to use cash collateral shall also be served upon any entity with an interest in the cash collateral.   Local Bankruptcy Rule 4001-2(i) provides that the motion shall also be served upon the United States Trustee, and any person whose interests may be directly affected by the outcome of the motion or any provision of the proposed order authorizing the use of cash collateral.

57.     Notice and hearing are governed by section 102(1) of the Bankruptcy Code, which, among other things, prescribes "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances."  11 U.S.C. § 102(1)(A).  Any hearing on the use of cash collateral … *"shall be scheduled in accordance with the needs of the debtor."*  11 U.S.C. § 363(c)(3).  The court may authorize use of cash collateral subsequent to a preliminary hearing only

if there is a reasonable likelihood that the debtor will prevail at a final hearing, but *the court shall act promptly on any request for the use of cash collateral.  Id.*

58.     It is a condition of the DIP Facility that the Borrower obtains entry of the Final Borrowing Order within 30 days of the Petition Date.  Accordingly, pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), the Debtors respectfully request that the Court set a date for the Final Hearing that is no later than 30 days following the Petition Date and approve the provisions for notice of the proposed Final DIP Order and the objection procedures that are set forth therein.  The Debtors propose to give notice of the Final Hearing by first class mail to: (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel for any statutory committees appointed in these cases, or if no such committees have been appointed, to the creditors holding the 30 largest unsecured claims against the Debtors' estates on a consolidated basis, as identified in the Debtors' chapter 11 petitions; (c) counsel to Crystal; (d) the Internal Revenue Service; and (e) all persons who have filed a notice of appearance and request for service in these cases.  Objections shall be served upon (i) Togut, Segal & Segal LLP, counsel for the Debtors, (ii) counsel to Crystal; (iii) the United States Trustee; and (iv) counsel to any committees, in the manner set forth in the proposed Interim Order.

## NOTICE

59.     No trustee or examiner has been appointed in these chapter 11 cases.  Consistent with the foregoing, notice of this Motion has been given to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); and (c) counsel to Crystal.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## NO PRIOR REQUEST

60.     No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that this Court: (i) enter an interim order substantially in the form attached as Exhibit 1 granting the relief sought herein; and (ii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated:  New York, New York          TOGUT, SEGAL & SEGAL LLP
        November 15, 2010           Proposed Counsel to the Debtors and
                                    Debtors in Possession
                                    By:


                                    /s/ Frank A. Oswald
                                    FRANK A. OSWALD
                                    HOWARD P. MAGALIFF
                                    Members of the Firm
                                    One Penn Plaza, Suite 3335
                                    New York, New York  10119
                                    (212) 594-5000