| | |
|---|---|
| TOGUT, SEGAL & SEGAL LLP<br>One Penn Plaza – Suite 3335<br>New York, New York 10119<br>(212) 594-5000<br>Frank A. Oswald<br>Howard P. Magaliff | **HEARING DATE: 12/14/10 at 2:00 PM**<br>**OBJECTION DEADLINE: 12/10/10 at 4:00 PM** |

Counsel to the Debtors and
Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                :
In re:               :  Chapter 11
                :
LOEHMANN'S HOLDINGS, INC., *et al.*, :  Case No. 10-16077 (REG)
               :  Jointly Administered
         Debtors. :
                :
-----------------------------------------------------------------x

**AMENDMENT TO DEBTORS' MOTION FOR AUTHORITY
TO INCUR POSTPETITION SECURED INDEBTEDNESS, TO
APPROVE AMENDED AND RESTATED DIP CREDIT AGREEMENT TO
PROVIDE, *INTER ALIA*, FOR A JUNIOR TRANCHE OF REVOLVING CREDIT**

TO THE HON. ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

    Loehmann's Holdings, Inc. ("Loehmann's Holdings") and its debtor affiliates, Loehmann's, Inc., Loehmann's Operating Co. ("Loehmann's Opco") and Loehmann's Real Estate Holdings, Inc. ("Loehmann's Real Estate Holdings"), as debtors and debtors in possession in the above-captioned cases (collectively, "Loehmann's" or the "Debtors")[1], by their attorneys, Togut, Segal & Segal LLP, respectfully submit this amendment to the motion dated November 15, 2010 [Docket No. 20], as supplemented on November 29, 2010 [Docket No. 104] (the "DIP Financing Motion"), for an order ap-

---

[1]  Loehmann's Capital Corp. ("Capco") is also a debtor, but is not a Credit Party under the DIP Facility.

proving an amendment to the DIP Credit Agreement,[2] to provide for a $7 million junior facility to be used for inventory purchases and a reduction in the overall amount of the DIP Facility from $45 million to $40 million, and state:

## PRELIMINARY STATEMENT

On November 17, 2010, pursuant to the Interim Borrowing Order (as defined below), the Debtors other than Capco (the "DIP Credit Parties") entered into a $45 million revolving credit facility (the "DIP Facility") with Crystal Financial LLC ("Crystal") for postpetition financing. The Interim Borrowing Order authorized the Debtors to borrow up to $6 million under the DIP Facility and to use cash collateral on an interim basis until entry of the Final Borrowing Order. Pursuant to a Stipulation "so ordered" on December 3, 2010, the Debtors are authorized to borrow on an interim basis through December 14, when the final hearing will be held.

The Debtors filed their proposed plan of reorganization and disclosure statement on December 1, 2010. The milestones in the DIP Facility require the Debtors to confirm their plan by February 7, 2011, and for the plan to become effective and the Debtors to exit chapter 11 on or before February 18. The Debtors have struggled with low inventory for months as limited liquidity, no factor support, and no vendor credit and payable terms have left them with minimal stocks of inventory. While the Debtors are slowly rebuilding their inventory, to ensure that there is sufficient inventory on hand when they exit chapter 11, it is critical that the Debtors be able to purchase and commit for future inventory now. Otherwise, key product will continue to be sold to their competitors, which will cause the Debtors to lose customers and market share.

Whippoorwill Associates, Inc. ("Whippoorwill" or the "Tranche B Lender"), the largest of Capco's prepetition secured noteholders, has offered to make

---

[2] Capitalized terms not defined herein have the meanings given to them in the DIP Financing Motion.

2

available to the Debtors a $7 million first-in, last-out revolving loan (the "Tranche B Revolving Loan") that will be junior to the existing Crystal revolving loan (the "Tranche A Revolving Loan"). The Tranche B Revolving Loan, after payment of Whippoorwill's fees and expenses, will be used solely to purchase inventory for the Debtors' stores, and will not be dependent on a borrowing base. The full $7 million, net of required fees and expenses will be available to the Debtors immediately.

Subject to Court approval, the parties will enter into the Amended and Restated Debtor-in-Possession Credit Agreement (the "A&R DIP Credit Agreement"), substantially in the form attached as Exhibit 1.[3] The DIP Credit Agreement will be amended and restated, *inter alia*, to: (1) reduce the aggregate facility cap from $45 million to $40 million; (2) reduce the existing Crystal facility from $45 million to a $33 million Tranche A Revolving Loan; (3) provide for the $7 million Tranche B Revolving Loan from Whippoorwill; (4) provide for the Debtors to immediately draw the full amount of the Tranche B Revolving Loan upon Court approval; and (5) provide for the Debtors to pay certain fees and reimburse certain expenses to the lenders. No new liens will be created, nor will the DIP liens and superpriority claims that are set forth in the existing DIP Credit Agreement and Interim Borrowing Order be changed.

As discussed below, the proposed Tranche B Revolving Loan provides the Debtors with the necessary liquidity to immediately purchase inventory for the spring. The existing DIP Facility with Crystal, while adequate to sustain operations and administer the chapter 11 case, does not provide sufficient liquidity to buy inventory in advance. Vendors are not holding product for the Debtors, but selling it off to their competitors, and much of the most desirable product that forms the nucleus for the Debtors' designer dress category, "Back Room" product, *etc.* would no longer be available. If the

---

[3] Attached as Exhibit 2 is a redline showing the changes from the existing DIP Credit Agreement.

Debtors were forced to await the infusion of new equity upon confirmation before ordering new inventory, there would be approximately a 5-6 week delay before delivery of new product. Whatever product is left would not reach the shelves until after the peak of the spring selling season.

## **SUMMARY OF TRANCHE B REVOLVING LOAN**

1. In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, the Debtors provide the following concise summary of the proposed Tranche B Revolving Loan. Material provisions of the A&R DIP Credit Agreement that pertain specifically to the new Tranche B Revolving Loan are set out at the following sections of the A&R DIP Credit Agreement:[4]

| **TERM** | **DESCRIPTION** | **LOCATION IN A&R DIP CREDIT AGREEMENT (CA)** |
|---|---|---|
| **Tranche B Agent and Lender** | Whippoorwill Associates, Inc. | CA Preamble (p. 2) CA Schedule 1.1(a) |
| **Borrowing Limits; Reduction of Tranche A and Facility Cap.** | Tranche B: $7,000,000 upon entry of the Final Borrowing Order (the "Effective Date"). The Tranche A Revolving Loan is reduced from $45 million to $33 million, and the total DIP Facility is reduced from $45 million to $40 million. | CA Schedule 1.1(a) |
| **Use of Funds** | Use of the Tranche B Revolving Loan is limited to the purchase of inventory. The Tranche A Revolving Loan may not be used to purchase inventory unless the Tranche B Revolving Loan is fully drawn and outstanding. | CA § 4.10 (p. 43) |
| **Tranche B Interest Rate** | Non-Default Rate: 16% Default Rate: Non-Default Rate + 3% | CA Definition of "Interest Rate" (p. 112) CA § 1.3(c)(ii) (p. 9) |

---

[4] The descriptions set forth in this Amendment are summaries only. If there is any inconsistency between the summaries set forth in this Amendment and the terms of the A&R DIP Credit Agreement, the A&R DIP Credit Agreement shall govern. Unless otherwise stated, the provisions of the DIP Credit Agreement are unchanged in the A&R DIP Credit Agreement.

4

| **Tranche B Fees and Expenses** | <u>Commitment Fee</u>: $420,000, deemed earned and payable on the Effective Date. | CA § 1.9(a) (p. 13) |
|---|---|---|
| | <u>Unused Commitment Fee</u>: 4.5% annually of the amount of the unused portion of the Tranche B Revolving Loan. | CA § 1.9(b)(ii) (p. 14) |
| **Tranche B Collateral** | The Tranche B Revolving Loan is secured by the same liens and security interests, in the same DIP Collateral, that secure the Tranche A Revolving Loan, but is subordinate in priority to Tranche A Revolving Loan. | CA §§ 1.10(c)-(d) (pp. 15-16) |

## NO EXTRAORDINARY PROVISIONS

2. The Debtors submit there are no **Extraordinary Provisions** of the Tranche B Revolving Loan within the meaning of General Order 274 (Guidelines for Financing Requests).

## THE WHIPPOORWILL FACILITY IS CRITICAL

### A. The Existing Crystal Facility

3. On November 16, 2010, the Court entered the *Interim Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363 and 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (i) Authorizing Incurrence by the Debtor of Postpetition Secured Indebtedness With Priority Over All Secured Indebtedness and With Administrative Superpriority, (ii) Granting Liens, (iii) Authorizing Use of Cash Collateral by the Debtor Pursuant to 11 U.S.C. Section 363 and Providing for Adequate Protection, (iv) Modifying the Automatic Stay and (v) Scheduling a Final Hearing* (the "Interim Borrowing Order") [Docket No. 55].

4. The DIP Facility is an asset-based facility governed by a borrowing base formula of accounts receivable, credit card receivables, and inventory, less reserves for unfunded letters of credit, professional fees, contingent indemnity obligations and other items that are required by the DIP Credit Agreement. Once the borrowing base is established, the Debtors are authorized to borrow up to 90% of the Net Orderly Liqui-

dation Value of the eligible collateral.  The DIP Facility is secured by liens and security interests pursuant to Bankruptcy Code §§ 361, 362, 364(c)(2), 364(c)(3) and 364(d) on the DIP Credit Parties' existing and after-acquired property and assets, but excluding Avoidance Actions and the proceeds thereof (the "DIP Collateral").  The liens on the DIP Collateral prime the liens currently securing the Prepetition Obligations except for the collateral securing the Borrower's obligations under the Capco Lease, but are subject to all other valid and enforceable senior liens of record, and a carve-out for professional fees and expenses.  The DIP Facility increases the Debtors' availability from 85% to 90% of eligible inventory and accounts receivable, subject to a borrowing base similar to the borrowing base in the Prepetition Credit Agreement.

5.  The existing facility, by itself, does not provide enough liquidity for the Debtors to obtain the most desirable inventory at the right times to adequately stock their stores during the upcoming selling seasons.

**B.  Increased Liquidity Under the Whippoorwill Facility**

6.  The Tranche B Revolving Loan will provide for an increase in liquidity for the Debtors under the DIP Facility in two ways. <u>First</u>, the Tranche B Revolving Loan is a "first in, last out" line of credit.  This means that the Debtors will have immediate access to the full line of credit net of fees and expenses, but will not be required to repay the facility until Crystal's Tranche A Revolving Loan has been paid.  The Tranche B Revolving Loan is not subject to a borrowing base.  <u>Second</u>, upon the purchase of inventory with the proceeds of the Tranche B Revolving Loan, that inventory will immediately become a part of and increase the borrowing base under Crystal's Tranche A Revolving Loan.  This will enable the Debtors to borrow additional funds from Crystal that otherwise would not be supported by the borrowing base.

## C. Reduction of Tranche A Revolving Loan

7. As part of the A&R DIP Credit Agreement, the Tranche A Revolving Loan will be reduced from $45 million to $33 million, and the overall DIP Facility will now be $40 million. The reduction in Crystal's portion of the facility reflects that the borrowing base, even with the addition of the inventory purchased with the Tranche B Revolving Loan proceeds, will not support a $45 million revolving credit line. Nonetheless, the overall availability to the Debtors increases as described above. As a result of this reduction, the amount of the prepayment fee to Crystal is reduced from $1,350,000 (3% x $45 million) to $990,000 (3% x $33 million). Further, the Debtors will not incur an unused line fee for a facility they will never access.

## D. Necessity of the Whippoorwill Facility

8. There are three critical components of Loehmann's inventory purchasing that are immediately addressed by the proposed Whippoorwill facility.

(i) <u>Spring Inventory</u>. In years past and prior to the filing, the Debtors in the ordinary course purchased inventory during the fall and winter for the spring selling season. Normally, for immediately available inventory, it takes approximately 2-4 weeks from the time that Loehmann's issues a purchase order until delivery of product to the distribution center. Due to their liquidity problems, the Debtors were under-stocked coming into the 2010 holiday selling season. Postpetition, most vendors are selling product to the Debtor. However, due to the limited availability under the Crystal DIP Facility, the Debtors are unable to purchase or commit to the entire levels of inventory they need for the spring selling season. As such, some vendors are not holding product for the Debtors, but instead selling it to their competitors. Delay in the ability to acquire the spring selling season inventory will cause the Debtors to lose customers and market share. This in turn could cause the Debtors to miss a good portion of the

7

spring selling season opportunity, and threaten the execution of their business plan after confirmation.

(ii) <u>Reserve Inventory</u>. Loehmann's typically buys products at the end of a selling season to hold for the next season. This allows Loehmann's to acquire key product at great prices and margins. For example, Loehmann's normally has, in the past, purchased approximately $3 million at cost of swimwear at the end of the summer selling season that it holds in reserve until the start of the following season. Loehmann's reserve inventory is now at its lowest point in a decade. Due to its current financial condition, Loehmann's is unable to take advantage of purchasing end-of-season or reserve inventory at this time. Use of the Whippoorwill Tranche B Revolving Loan will give Loehmann's the opportunity to take advantage of such opportunistic buys during the chapter 11 process, rather than having to wait until emergence.

(iii) <u>Make-Up Inventory</u>. "Make-up" product is manufactured specifically for Loehmann's by some of the Debtors' key vendors to create cost efficiencies in their own manufacturing processes. A vendor might sell only 80% of a particular production run to another customer, and would then offer Loehmann's the option to buy the excess inventory at a discount. Make-up product accounts for 35-45% of some key merchandise categories. Loehmann's estimates that it has a shortfall of make-up merchandise of approximately $14.4 million at cost that is critical for the second and third quarters, which the vendors are unwilling to provide until the Debtors have more liquidity. These vendors are providing some minimal levels of support during the chapter 11 case but will not provide their full support until they are more comfortable with the Debtors' liquidity. The Whippoorwill Tranche B Facility will provide this comfort to the vendors so that they will commit to manufacturing the make-up products for the Debtors to have on hand in the second and third quarters of 2011. The lack of this

inventory would cause the Debtors to miss sales revenue and margin targets, putting the execution of their reorganization plan at risk.

   E.  **The Whippoorwill Facility Should be Approved
In the Exercise of the Debtors' Business Judgment**

   9.  In consideration of Whippoorwill agreeing to make the Tranche B Facility available on a "first in, last out" basis, the Debtors have agreed to pay a commitment fee to Whippoorwill of $420,000. In addition, the Debtors have agreed to pay interest to Whippoorwill at the rate of 16% per annum on the amount of the facility that is drawn, which is expected to be the full $7 million. The Debtors have also agreed to reimburse Whippoorwill for its attorney fees and expenses incurred in connection with documenting and obtaining approval of the loan.

   10.  Approval of the commitment fee and reimbursement of Whippoorwill's expenses is appropriate. Section 363 of the Bankruptcy Code provides, that after notice and a hearing, the debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The commitment fee and expense reimbursement requested would constitute use of property of the Debtors' estates. Historically, bankruptcy courts in the Second Circuit and elsewhere have approved commitment fees and expense reimbursements by deferring to the debtor's business judgment. In essence, the "business judgment rule" discourages judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See In re Johns-Manville Corp.* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions."). Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the

action was in the best interests of the company.'" *In re Integrated Res. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872, (Del. 1985)).

11. As noted in the DIP Financing Motion, Perella Weinberg contacted numerous potential lenders but none were willing to provide debtor in possession financing on terms similar to what Crystal offered. At the time, Whippoorwill indicated that it might be interested in participating in DIP financing as junior lender. After reviewing the Debtors' post-petition cash flow projections, Whippoorwill determined that the Debtors' prospects for a successful exit from chapter 11 would be materially enhanced if they had access to incremental liquidity. Whippoorwill understood that no other lender was willing to provide a junior facility on a "first in, last out" basis, and offered to make the Tranche B Revolving Loan on the terms discussed herein. The interest rate of 16% compensates Whippoorwill for the increased risk of making a junior "last out" loan. There is no prepayment fee.

12. The Debtors submit that in the circumstances, entering into the A&R DIP Credit Agreement and the Tranche B Facility reflects a prudent and sound exercise of their business judgment. It is essential to the Debtors' reorganization efforts and long term strategic business plan that they have immediate access to the liquidity offered by Whippoorwill to purchase inventory for the spring selling season, as well as commit to "make-up" inventory for the fall. To be clear, the liquidity is not absolutely necessary for the administration of the chapter 11 case, but without immediate access to the funds, the Debtors will not be in a position to place orders for future inventory until they confirm a plan and the new equity investment from Istithmar Retail Investments and Whippoorwill is made. This will result in a delay of at least 5-6 weeks or more, by which time the inventory may no longer be available and the Debtors will have missed

the peak selling season. This would have a detrimental impact on their ability to successfully reorganize and consummate their business plan.

**NOTICE**

13. Notice of this amendment to the DIP Financing Motion has been provided be overnight delivery to (i) the United States Trustee and the other parties on the Master Service List pursuant to the Court's November 17, 2010 Order, *inter alia*, establishing notice procedures, (ii) counsel for Crystal and Whippoorwill, (iii) counsel for the Official Committee of Unsecured Creditors and (iv) all parties who filed a notice of appearance in the case. The Debtors submit that, under the circumstances, no other or further notice is necessary.

**WHEREFORE**, the Debtors respectfully request that this Court (i) enter a final order approving the A&R Dip Credit Agreement and the Tranche B Facility, and granting the relief sought in the DIP Financing Motion, as modified by the Interim Borrowing Order and the proposed Final Borrowing Order; and (ii) grant such other and further relief as the Court deems just and proper.

Dated:  New York, New York  TOGUT, SEGAL & SEGAL LLP
    December 8, 2010     Counsel to the Debtors and
                Debtors in Possession
                By:

                /s/ Frank A. Oswald
                FRANK A. OSWALD
                HOWARD P. MAGALIFF
                One Penn Plaza, Suite 3335
                New York, New York  10119
                (212) 594-5000