**AMENDED AND RESTATED**

**DEBTOR-IN-POSSESSION**

**CREDIT AGREEMENT**

Dated as of ~~November 17,~~December ___, 2010
by and among

**LOEHMANN'S OPERATING CO.**
**Debtor and Debtor-In-Possession**
**(as Borrower),**

**LOEHMANN'S HOLDINGS INC.,**
**LOEHMANN'S, INC.,**
**LOEHMANN'S REAL ESTATE HOLDINGS, INC.**
**Each as a Debtor and Debtor-In-Possession**
**(collectively, as Guarantors),**

**ANY OTHER PERSONS PARTY HERETO THAT ARE**
**DESIGNATED AS CREDIT PARTIES,**

**WHIPPOORWILL ASSOCIATES, INC.,**
**as special representative for the Tranche B Lenders,**

**CRYSTAL FINANCIAL LLC,**
**(as a Lender and as Agent for all Lenders),**

**and**

**ANY OTHER LENDERS PARTY HERETO FROM TIME TO TIME**

---

# TABLE OF CONTENTS

**Page**

ARTICLE I. THE CREDITS................................................................................................ ~~2~~3

    1.1    Amounts and Terms of the Revolving Loan Commitment............................... ~~2~~3
    1.2    Note................................................................................................................ ~~7~~8
    1.3    Interest........................................................................................................... ~~7~~8
    1.4    Loan Accounts............................................................................................... ~~8~~9
    1.5    Procedure for Revolving Credit Borrowing.................................................. ~~9~~11
    1.6    [Intentionally Omitted]................................................................................. ~~9~~11
    1.7    Voluntary Termination of Revolving Loan Commitments............................ ~~9~~11
    1.8    Mandatory Prepayments of Loans and Commitment Termination.................. ~~10~~11
    1.9    Fees................................................................................................................ ~~11~~13
    1.10   Payments by Borrower................................................................................... ~~12~~15
    1.11   Payments by the Lenders to Agent; Settlement; Non-Funding Lenders....... ~~16~~19
    1.12   Super Priority Nature of Obligations and Secured Party's Liens................... ~~18~~21
    1.13   Payment of Obligations................................................................................ ~~19~~22
    1.14   No Discharge; Survival of Claims................................................................ ~~19~~22
    1.15   Release........................................................................................................... ~~19~~22
    1.16   Waiver of any Priming Rights...................................................................... ~~20~~23

ARTICLE II. CONDITIONS PRECEDENT........................................................................ ~~20~~23

    2.1    Conditions of Initial Loans........................................................................... ~~20~~23
    2.2    Conditions to All <u>Tranche A</u> Borrowings................................................. ~~21~~25
    <u>2.3</u>    <u>Conditions to All Tranche B Borrowings.</u>..................................................... <u>25</u>
    <u>2.4</u>    <u>Conditions to the Effective Date.</u>................................................................ <u>26</u>

ARTICLE III. REPRESENTATIONS AND WARRANTIES............................................... ~~22~~27

    3.1    Corporate Existence and Power.................................................................... ~~22~~27
    3.2    Corporate Authorization; No Contravention................................................ ~~23~~27
    3.3    Governmental Authorization......................................................................... ~~23~~28
    3.4    Binding Effect............................................................................................... ~~23~~28
    3.5    Litigation...................................................................................................... ~~23~~28
    3.6    No Default..................................................................................................... ~~24~~29
    3.7    ERISA Compliance....................................................................................... ~~24~~29
    3.8    Use of Proceeds; Margin Regulations.......................................................... ~~25~~29
    3.9    Ownership of Property.................................................................................. ~~25~~29
    3.10   Taxes............................................................................................................. ~~25~~30
    3.11   Financial Condition...................................................................................... ~~25~~30
    3.12   Environmental Matters.................................................................................. ~~25~~30
    3.13   Regulated Entities......................................................................................... ~~26~~31
    3.14   Labor Relations............................................................................................. ~~26~~31

| | | |
|---|---|---|
| 3.15 | Intellectual Property | ~~27~~31 |
| 3.16 | Broker's Fees | ~~27~~32 |
| 3.17 | Insurance | ~~27~~32 |
| 3.18 | Ventures, Subsidiaries and Affiliates; Outstanding Stock | ~~27~~32 |
| 3.19 | Government Contracts | ~~28~~32 |
| 3.20 | Reserved | ~~28~~33 |
| 3.21 | Bonding; Licenses | ~~28~~33 |
| 3.22 | Status of Holdings and Parent | ~~28~~33 |
| 3.23 | Lease Documents and Senior Secured Notes | ~~28~~33 |
| 3.24 | Full Disclosure | ~~28~~33 |
| 3.25 | Foreign Assets Control Regulations and Anti-Money Laundering | ~~29~~33 |
| 3.26 | Patriot Act | ~~29~~34 |
| 3.27 | Reorganization Matters | ~~29~~34 |

**ARTICLE IV. AFFIRMATIVE COVENANTS** ......... ~~30~~34

| | | |
|---|---|---|
| 4.1 | Financial Statements | ~~30~~34 |
| 4.2 | Appraisals; Certificates; Other Information | ~~31~~35 |
| 4.3 | Notices | ~~33~~37 |
| 4.4 | Preservation of Corporate Existence, Etc | ~~35~~40 |
| 4.5 | Maintenance of Property | ~~36~~40 |
| 4.6 | Insurance | ~~36~~40 |
| 4.7 | Payment of Obligations | ~~37~~41 |
| 4.8 | Compliance with Laws | ~~37~~42 |
| 4.9 | Inspection of Property and Books and Records | ~~37~~42 |
| 4.10 | Use of Proceeds | ~~38~~43 |
| 4.11 | Cash Management Systems | ~~38~~43 |
| 4.12 | [Intentionally Omitted] | ~~39~~44 |
| 4.13 | Further Assurances | ~~39~~44 |
| 4.14 | Environmental Matters | ~~40~~45 |
| 4.15 | Sponsor Credit Support | ~~41~~45 |
| 4.16 | [Intentionally Omitted] | ~~42~~47 |
| 4.17 | Milestones | ~~42~~47 |

**ARTICLE V. NEGATIVE COVENANTS** ......... ~~43~~48

| | | |
|---|---|---|
| 5.1 | Limitation on Liens | ~~43~~48 |
| 5.2 | Disposition of Assets | ~~44~~49 |
| 5.3 | Consolidations and Mergers | ~~45~~50 |
| 5.4 | Acquisitions; Loans and Investments | ~~45~~50 |
| 5.5 | Limitation on Indebtedness | ~~46~~51 |
| 5.6 | Employee Loans and Transactions with Affiliates | ~~47~~52 |
| 5.7 | Compensation | ~~47~~52 |
| 5.8 | Margin Stock; Use of Proceeds | ~~48~~53 |
| 5.9 | Contingent Obligations | ~~48~~53 |
| 5.10 | Compliance with ERISA | ~~49~~54 |
| 5.11 | Restricted Payments | ~~49~~54 |

ii

| | | |
|---|---|---|
| 5.12 | Change in Business. | 49<u>54</u> |
| 5.13 | Change in Structure. | 49<u>54</u> |
| 5.14 | Changes in Accounting, Name or Jurisdiction of Organization. | 49<u>54</u> |
| 5.15 | [Intentionally Omitted.] | 49<u>54</u> |
| 5.16 | No Negative Pledges. | 49<u>54</u> |
| 5.17 | OFAC; Patriot Act. | 50<u>55</u> |
| 5.18 | Sale-Leasebacks. | 50<u>55</u> |
| 5.19 | Hazardous Materials. | 50<u>55</u> |
| 5.20 | Prepayments of Other Indebtedness. | 50<u>55</u> |
| 5.21 | Lease Obligations and Lease Documents. | 51<u>56</u> |
| 5.22 | Bankruptcy Related Negative Covenants. | 51<u>56</u> |
| <u>5.23</u> | <u>Inventory Purchases.</u> | <u>57</u> |

**ARTICLE VI. FINANCIAL COVENANTS** ....... 52<u>57</u>

| | | |
|---|---|---|
| 6.1 | Compliance with the Approved Budget. | 52<u>57</u> |

**ARTICLE VII. EVENTS OF DEFAULT** ....... 53<u>58</u>

| | | |
|---|---|---|
| 7.1 | Events of Default. | 53<u>58</u> |
| 7.2 | Remedies. | 55<u>60</u> |
| 7.3 | Rights Not Exclusive. | 56<u>61</u> |
| 7.4 | Cash Collateral for Letters of Credit. | 56<u>61</u> |

**ARTICLE VIII. THE AGENT** ....... 57<u>62</u>

| | | |
|---|---|---|
| 8.1 | Appointment and Duties. | 57<u>62</u> |
| 8.2 | Binding Effect. | 58<u>63</u> |
| 8.3 | Use of Discretion. | 58<u>63</u> |
| 8.4 | Delegation of Rights and Duties. | 58<u>63</u> |
| 8.5 | Reliance and Liability. | 59<u>64</u> |
| 8.6 | Agent Individually. | 61<u>66</u> |
| 8.7 | Lender Credit Decision. | 61<u>66</u> |
| 8.8 | Expenses; Indemnities; Withholding. | 62<u>67</u> |
| 8.9 | Resignation of Agent ~~or L/C Issuer.~~    ~~63~~<u>; Appointment of Successor Agent by Tranche B Lenders.</u> | 68 |
| 8.10 | Release of Collateral or Guarantors. | 63<u>69</u> |
| <u>8.11</u> | <u>Appointment of Special Tranche B Representative.</u> | <u>69</u> |

**ARTICLE IX. MISCELLANEOUS** ....... 64<u>70</u>

| | | |
|---|---|---|
| 9.1 | Amendments and Waivers. | 64<u>70</u> |
| 9.2 | Notices. | 66<u>73</u> |
| 9.3 | Electronic Transmissions. | 66<u>73</u> |
| 9.4 | No Waiver; Cumulative Remedies. | 67<u>74</u> |
| 9.5 | Costs and Expenses. | 67<u>74</u> |
| 9.6 | Indemnity. | 68<u>75</u> |
| 9.7 | Marshaling; Payments Set Aside. | 69<u>76</u> |

iii

9.8    Successors and Assigns..................................................................6976
9.9    Assignments and Participations; Binding Effect...........................6976
9.10   Non-Public Information; Confidentiality.......................................7279
9.11   Set-off; Sharing of Payments.......................................................7481
9.12   Counterparts; Facsimile Signature................................................7582
9.13   Severability....................................................................................7582
9.14   Captions..........................................................................................7582
9.15   Independence of Provisions...........................................................7583
9.16   Interpretation.................................................................................7583
9.17   No Third Parties Benefited............................................................7683
9.18   Governing Law and Jurisdiction...................................................7683
9.19   Waiver of Jury Trial......................................................................7784
9.20   Entire Agreement; Release; Survival............................................7784
9.21   Patriot Act.....................................................................................7885
9.22   Replacement of Lender..................................................................7885
9.23   Joint and Several...........................................................................7986
9.24   Creditor-Debtor Relationship.......................................................7986
9.25   Actions in Concert........................................................................7986
9.26   Parties Including Trustees; Bankruptcy Court Proceedings..........7987
9.27   Prepetition Credit Documents.......................................................8087

ARTICLE X. TAXES AND YIELD PROTECTION................................8088

10.1   Taxes..............................................................................................8088
10.2   Increased Costs and Reduction of Return.....................................8391
10.3   Certificates of Lenders..................................................................8491

ARTICLE XI. EXIT FINANCING.........................................................8491

11.1   Exit Commitment...........................................................................8491

ARTICLE XII. DEFINITIONS...............................................................8492

12.1   Defined Terms...............................................................................8492
12.2   Other Interpretive Provisions........................................................98127
12.3   Accounting Terms and Principles..................................................98128
12.4   Payments........................................................................................98128
12.5   Amendment and Restatement........................................................129

iv

# SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Revolving Loan ~~Commitment~~Commitments |
| Schedule 3.5 | Litigation |
| Schedule 3.7 | ERISA |
| Schedule 3.9 | Ownership of Property |
| Schedule 3.10 | Tax Audits |
| Schedule 3.12 | Environmental |
| Schedule 3.14 | Labor Relations |
| Schedule 3.15 | Intellectual Property |
| Schedule 3.16 | Broker's Fees |
| Schedule 3.17 | Insurance |
| Schedule 3.18 | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Schedule 3.19 | Government Contracts |
| Schedule 3.21 | Bonding; Licenses |
| Schedule 5.1 | Liens |
| Schedule 5.4 | Investments |
| Schedule 5.5 | Indebtedness |
| Schedule 5.6 | Transactions with Affiliates |
| Schedule 5.9 | Contingent Obligations |

# EXHIBITS

| | |
|---|---|
| Exhibit 1.1(b) | Form of L/C Request |
| Exhibit 2.1(a) | Closing Checklist |
| Exhibit 2.1(i) | Approved Budget |
| Exhibit 4.2(b) | Form of Compliance Certificate |
| Exhibit 4.15 | Form of Participation Agreement |
| Exhibit 8.1(a) | Interim Borrowing Order |
| Exhibit 11.1 | Exit Financing Term Sheet |
| Exhibit 12.1(a) | Form of Assignment |
| Exhibit 12.1(b) | Form of Borrowing Base Certificate |
| Exhibit 12.1(c) | Form of Notice of Borrowing |
| Exhibit 12.1(d) | Form of Revolving Note |
| Exhibit 12.1(e) | Form of Term Note |
| Exhibit 12.1(f) | Equity Agency Agreement |

**<u>AMENDED AND RESTATED</u> DEBTOR-IN-POSSESSION**
**CREDIT AGREEMENT**

THIS <u>AMENDED AND RESTATED DEBTOR-IN-POSSESSION</u> CREDIT AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, modified and/or restated from time to time, this "<u>Agreement</u>") is entered into as of ~~November 17,~~December __, 2010, by and among LOEHMANN'S OPERATING CO., as a debtor and a debtor-in-possession, a Delaware corporation ("<u>Borrower</u>"), LOEHMANN'S, INC., a Delaware corporation ("<u>Parent</u>"), LOEHMANN'S HOLDINGS INC., a Delaware corporation ("<u>Holdings</u>"), LOEHMANN'S REAL ESTATE HOLDINGS, INC., a Delaware corporation ("<u>REH</u>", and collectively, together with Parent and Holdings, each as a debtor and a debtor-in-possession, "<u>Guarantors</u>"), any other Credit Parties party hereto from time to time, any and all lenders parties hereto from time to time (each, a "<u>Lender</u>", and collectively, the "<u>Lenders</u>"), <u>WHIPPOORWILL ASSOCIATES, INC., ("Whippoorwill"), as special representative for the Tranche B Lenders,</u> and CRYSTAL FINANCIAL LLC, a Delaware limited liability company (in its individual capacity, "<u>Crystal</u>"), as a Lender and as administrative agent for the Lenders and the L/C Issuers (in such capacity, the "<u>Agent</u>")~~.~~<u>, amends the Existing Credit Agreement (as defined below) as set forth herein, and restates the Existing Credit Agreement, as so amended, as provided herein. The Existing Credit Agreement, as amended and restated hereby, continues in full force and effect as provided herein.</u>

**W I T N E S S E T H :**

**WHEREAS,** on November 15, 2010 (the "<u>Petition Date</u>"), the Borrower and each Guarantor commenced Chapter 11 Cases Nos. 10-16077 through 10-16081, as administratively consolidated as Chapter 11 Cases No. 10-16077 (singly and collectively, the "<u>Chapter 11 Cases</u>") by filing separate voluntary petitions for reorganization under Chapter 11, 11 U.S.C. 101 <u>et seq.</u> (the "<u>Bankruptcy Code</u>"), with the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"). The Borrower continues to operate its businesses and manage its properties as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

**WHEREAS**, <u>Crystal, as the existing agent (the "Existing Agent"), the lenders parties thereto (the "Existing Lenders") and t</u>he Credit Parties ~~have requested that Lenders provide a senior secured, super-priority revolving credit facility to Borrower on the terms and conditions set forth herein:~~<u>entered into that certain Debtor-In-Possession Credit Agreement dated as of November 17, 2010 (the "Existing Credit Agreement"), pursuant to which the Existing Agent and the Existing Lenders established a senior secured working capital facility;</u>

<u>**WHEREAS**, the Borrower has requested that the Existing Agent and the Existing Lenders permit an additional $7,000,000 first-in, last-out revolving loan facility on the terms and conditions contained herein;</u>

**WHEREAS**, the Credit Parties, the Agent and the other parties thereto have agreed to amend and restate the Existing Credit Agreement on the terms and conditions set forth herein;

**WHEREAS**, it is the intention of the parties hereto that (a) this Agreement not constitute a novation, refinancing or replacement of the obligations and liabilities existing under the Existing Credit Agreement or evidence of payment or termination of all or any of such obligations and liabilities, it being agreed that all such obligations and liabilities incurred by the Borrower under the Existing Credit Agreement shall continue in full force and effect and shall continue to be evidenced hereby, (b) this Agreement amend and restate in its entirety the Existing Credit Agreement and (c) from and after the Effective Date (as defined below), the Existing Credit Agreement, as amended and restated hereby, continues in force or effect, including as to the continued existence of the "Obligations" under and as defined thereunder, the representations and warranties made, covenants agreed to, and the actions or omissions performed or required to be performed thereunder, in each case, prior to the Effective Date;

**NOW, THEREFORE**, in consideration of the mutual agreements, provisions and covenants contained herein and benefits to be derived herefrom, the parties hereto agree as follows:

## ARTICLE I.
## THE CREDITS

1.1     Amounts and Terms of the Revolving Loan Commitment.

(a)     ~~The~~Tranche A Revolving ~~Credit~~Loans.

(i)     Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, each Lender listed in Part I of Schedule 1.1(a) (a "Tranche A Lender") severally and not jointly agrees to make Loans to Borrower (each such Loan, a "Tranche A Revolving Loan", and all such Loans by all Tranche A Lenders, collectively, the "Tranche A Revolving Loans") from time to time on any Business Day during the period from the Closing Date through the Final Availability Date, in an aggregate amount not to exceed at any time outstanding the amount set forth opposite such Tranche A Lender's name in ~~Schedule 1.1(a)~~Part I of Schedule 1.1(a) under the heading "Tranche A Revolving Loan Commitment" (as the same may be reduced from time to time in accordance with the terms of this Agreement, being referred to herein as such Lender's "Tranche A Revolving Loan Commitment"); provided, however, that, after giving effect to any Borrowing of Tranche A Revolving Loans, the aggregate principal amount of all outstanding Tranche A Revolving Loans shall not exceed the Maximum Tranche A Revolving Loan Balance. Subject to the other terms and conditions hereof, amounts borrowed under this subsection 1.1(a) may be repaid and reborrowed from time to time. If at any time the then outstanding principal balance of Tranche A Revolving Loans exceeds the Maximum Tranche A Revolving Loan Balance, then Borrower shall immediately prepay the outstanding Tranche A Revolving Loans and cash collateralize outstanding Letters of

~~1819~~8069/21798-~~000~~010 Current/~~2100~~8698v1~~5~~21388094v4
~~11~~12/~~2008~~2010 ~~11:46 am~~3:30 pm

Credit in an amount sufficient to eliminate such excess in accordance herewith and in a manner satisfactory to the Agent and the L/C Issuers. Notwithstanding anything contained herein to the contrary, prior to the entry of the Final Borrowing Order and subject to the terms of the Interim Borrowing Order, the Maximum Tranche A Revolving Loan Balance shall not exceed $6,000,000.

(ii) If the Borrower requests that Tranche A Lenders make, or permit to remain outstanding, Tranche A Revolving Loans in excess of the Borrowing Base (any such excess Tranche A Revolving Loan is herein referred to as an "Overadvance"), Agent may, in its sole discretion, elect to make, or permit to remain outstanding, such Overadvance; provided, however, that (A) Agent may not cause the Tranche A Lenders to make, or permit to remain outstanding, (x) aggregate Tranche A Revolving Loans in excess of the Aggregate Tranche A Revolving Loan Commitment less the aggregate amount of Letter of Credit Obligations or (y) Overadvances in an aggregate amount in excess of 10% of the Aggregate Tranche A Revolving Loan Commitment, and (B) any one Overadvance may not remain outstanding for more than ninety (90) days. If an Overadvance is made, or permitted to remain outstanding, pursuant to the preceding sentence, then all Tranche A Lenders shall be bound to make, or permit to remain outstanding, such Overadvance based upon their Commitment Percentage of the Aggregate Tranche A Revolving Loan Commitment in accordance with the terms of this Agreement, regardless of whether the conditions to lending set forth in Section 2.2 have been met. All Overadvances shall constitute Tranche A Revolving Loans and shall bear interest at the default rate under subsection 1.3(c).

(b)     Letters of Credit.

(i)     Conditions. On the terms and subject to the conditions contained herein, the Agent shall use commercially reasonable efforts to cause a bank or other legally authorized Person selected by or acceptable to Agent and Borrower (each, an "L/C Issuer") to Issue, at the request of Borrower, in accordance with such L/C Issuer's usual and customary business practices, and for the account of Borrower, Letters of Credit (denominated in Dollars) from time to time on any Business Day during the period from the Closing Date through the earlier of (x) the Revolving Termination Date and (y) seven (7) days prior to the Scheduled Revolving Termination Date; provided, however, that no L/C Issuer shall Issue any Letter of Credit upon the occurrence of any of the following or if after giving effect to such Issuance:

(A)     (i) the aggregate outstanding principal balance of all Tranche A Revolving Loans would exceed the Maximum Tranche A Revolving Loan Balance, (ii) the aggregate Letter of Credit Obligations for all Letters of Credit would exceed $15,000,000 (the "L/C Sublimit"), or (iii) the Availability would be less than zero;

(B)     the expiration date of such Letter of Credit (i) is not a Business Day, (ii) is more than one year after the date of issuance thereof or (iii) is later than seven (7) days prior to the Scheduled Revolving Termination Date; provided, however, that any Letter of Credit with a term not exceeding one year may provide for its renewal for additional periods not exceeding one year as long as (x) each of Borrower and the applicable L/C

Issuer have the option to prevent such renewal before the expiration of such term or any such period and (y) neither such L/C Issuer nor Borrower shall permit any such renewal to extend such expiration date beyond the date set forth in clause (iii) above; or

(C)     (i) any fee due in connection with, and on or prior to, such Issuance has not been paid, (ii) such Letter of Credit is requested to be issued in a form that is not acceptable to the applicable L/C Issuer or (iii) such L/C Issuer shall not have received, each in form and substance reasonably acceptable to it and duly executed by Borrower, the documents that such L/C Issuer generally uses in the Ordinary Course of Business for the Issuance of letters of credit of the type of such Letter of Credit (collectively, the "L/C Reimbursement Agreement").

Furthermore, the L/C Issuer may only issue Letters of Credit to the extent permitted by Requirements of Law and such Letters of Credit may not be accepted by certain beneficiaries such as insurance companies. For each Issuance, the applicable L/C Issuer may, but shall not be required to, determine that, or take notice whether, the conditions precedent set forth in Section 2.2 have been satisfied or waived in connection with the Issuance of any Letter of Credit; provided, however, that no Letter of Credit shall be Issued during the period starting on the first Business Day after the receipt by such L/C Issuer of notice from Agent that any condition precedent contained in Section 2.2 is not satisfied and ending on the date all such conditions are satisfied or duly waived. If (i) any Tranche A Lender is a Non-Funding Lender or Agent determines that any of the Tranche A Lenders is an Impacted Lender and (ii) the reallocation of that Non-Funding Lender's or Impacted Lender's Letter of Credit Obligations to the other Tranche A Lenders would reasonably be expected to cause the Letter of Credit Obligations and Tranche A Revolving Loans of any Tranche A Lender to exceed its Tranche A Revolving Loan Commitment, taking into account the amount of outstanding Tranche A Revolving Loans and expected advances of Tranche A Revolving Loans as determined by Agent, then no Letters of Credit may be issued or renewed unless the Non-Funding Lender or Impacted Lender has been replaced, the Letter of Credit Obligations of that Non-Funding Lender or Impacted Lender have been cash collateralized, or the Tranche A Revolving Loan Commitments of the other Tranche A Lenders have been increased by an amount sufficient to satisfy Agent that all future Letter of Credit Obligations will be covered by all Tranche A Lenders who are not Non-Funding Lenders or Impacted Lenders.

(ii)     Notice of Issuance.  The Borrower shall give the relevant L/C Issuer and Agent a notice of any requested Issuance of any Letter of Credit, which shall be effective only if received by such L/C Issuer and Agent not later than 2:00 p.m. (New York time) on the third Business Day prior to the date of such requested Issuance. Such notice shall be made in writing or Electronic Transmission substantially in the form of Exhibit 1.1(b) duly completed or in writing in any other form acceptable to such L/C Issuer (each, an "L/C Request").

(iii)     Reporting Obligations of L/C Issuers.  Each L/C Issuer agrees to provide Agent, in form and substance satisfactory to Agent, each of the following on the following dates:  (A) (i) on or prior to any Issuance of any Letter of Credit by such L/C Issuer, (ii) immediately after any drawing under any such Letter of

Credit or (iii) immediately after any payment (or failure to pay when due) by the Borrower of any related L/C Reimbursement Obligation, notice thereof, which shall contain a detailed description of such Issuance, drawing or payment, and Agent shall provide copies of such notices to each Lender reasonably promptly after receipt thereof; (B) upon the request of Agent (or any Lender through Agent), copies of any Letter of Credit Issued by such L/C Issuer and any related L/C Reimbursement Agreement and such other documents and information as may reasonably be requested by Agent; and (C) on the first Business Day of each calendar week, a schedule of the Letters of Credit Issued by such L/C Issuer, in form and substance reasonably satisfactory to Agent, setting forth the Letter of Credit Obligations for such Letters of Credit outstanding on the last Business Day of the previous calendar week.

(iv) <u>Acquisition of Participations</u>. Upon any Issuance of a Letter of Credit in accordance with the terms of this Agreement resulting in any increase in the Letter of Credit Obligations, each <u>Tranche A</u> Lender shall be deemed to have acquired, without recourse or warranty, an undivided interest and participation in such Letter of Credit and the related Letter of Credit Obligations in an amount equal to its Commitment Percentage of such Letter of Credit Obligations.

(v) <u>Reimbursement Obligations of Borrower</u>. Borrower agrees to pay to the L/C Issuer of any Letter of Credit each L/C Reimbursement Obligation owing with respect to such Letter of Credit no later than the first Business Day after Borrower receives notice from such L/C Issuer that payment has been made under such Letter of Credit or that such L/C Reimbursement Obligation is otherwise due (the "<u>L/C Reimbursement Date</u>") with interest thereon computed as set forth in <u>clause (A)</u> below. In the event that any L/C Issuer incurs any L/C Reimbursement Obligation which is not repaid by Borrower as provided in this <u>clause (v)</u> (or any such payment by Borrower is rescinded or set aside for any reason), such L/C Issuer shall promptly notify Agent of such failure (and, upon receipt of such notice, Agent shall notify each <u>Tranche A</u> Lender) and, irrespective of whether such notice is given, such L/C Reimbursement Obligation shall be payable on demand by Borrower with interest thereon computed (A) from the date on which such L/C Reimbursement Obligation arose to the L/C Reimbursement Date, at the interest rate applicable during such period to <u>Tranche A</u> Revolving Loans and (B) thereafter until payment in full, at the interest rate applicable during such period to past due <u>Tranche A</u> Revolving Loans.

(vi) <u>Reimbursement Obligations of the <u>Tranche A</u> Lenders</u>. If no <u>Tranche A</u> Lender is a Non-Funding Lender, upon receipt of the notice described in <u>clause (v)</u> above from Agent, each <u>Tranche A</u> Lender shall pay to Agent for the account of such L/C Issuer its Commitment Percentage of such Letter of Credit Obligations. If any <u>Tranche A</u> Lender is a Non-Funding Lender, that Non-Funding Lender's Letter of Credit Obligations shall be reallocated to and assumed by the other <u>Tranche A</u> Lenders pro rata in accordance with their Commitment Percentages of the <u>Tranche A</u> Revolving Loan (calculated as if the Non-Funding Lender's Commitment Percentage was reduced to zero and each other <u>Tranche A</u> Lender's Commitment Percentage had been increased proportionately). If any <u>Tranche A</u> Lender is a Non-Funding Lender, upon receipt of the notice described in <u>clause (v)</u> above from Agent, each <u>Tranche A</u> Lender that is not a

18198069/21798-009010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

Non-Funding Lender shall pay to Agent for the account of such L/C Issuer its pro-rata share (increased as described above) of the Letter of Credit Obligations that from time to time remain outstanding; provided that no Tranche A Lender shall be required to fund any amount which would result in the sum of its outstanding Tranche A Revolving Loans and outstanding Letter of Credit Obligations exceeding its Tranche A Revolving Loan Commitment. By making such payment, such Tranche A Lender shall be deemed to have made a Tranche A Revolving Loan to the Borrower, which, upon receipt thereof by such L/C Issuer, the Borrower shall be deemed to have used in whole to repay such L/C Reimbursement Obligation. Any such payment that is not deemed a Tranche A Revolving Loan shall be deemed a funding by such Tranche A Lender of its participation in the applicable Letter of Credit and the Letter of Credit Obligation in respect of the related L/C Reimbursement Obligations. Such participation shall not otherwise be required to be funded. Following receipt by any L/C Issuer of any payment from any Tranche A Lender pursuant to this clause (vi) with respect to any portion of any L/C Reimbursement Obligation, such L/C Issuer shall promptly pay over to such Tranche A Lender all duplicate payments received from Persons other than Lenders making payment on behalf of a Credit Party by such L/C Issuer with respect to such portion of such L/C Reimbursement Obligation. In addition, Borrower shall pay to such L/C Issuer, on demand, its customary fees at then prevailing rates, without duplication of fees otherwise payable hereunder (including all per annum fees), charges and expenses of such L/C Issuer in respect of the issuance, negotiation, acceptance, amendment, transfer and payment of such Letter of Credit or otherwise payable pursuant to the application and related documentation under which such Letter of Credit is issued. The Tranche B Lenders shall have no obligation to acquire any participation in, or any other liability whatsoever in respect of, any Letter of Credit or the related Letter of Credit Obligations.

(vii)     Obligations Absolute. The obligations of the Borrower and the Tranche A Lenders pursuant to clauses (iv), (v) and (vi) above shall be absolute, unconditional and irrevocable and performed strictly in accordance with the terms of this Agreement irrespective of (A) (i) the invalidity or unenforceability of any term or provision in any Letter of Credit, any document transferring or purporting to transfer a Letter of Credit, any Loan Document (including the sufficiency of any such instrument), or any modification to any provision of any of the foregoing, (ii) any document presented under a Letter of Credit being forged, fraudulent, invalid, insufficient or inaccurate in any respect or failing to comply with the terms of such Letter of Credit or (iii) any loss or delay, including in the transmission of any document, (B) the existence of any setoff, claim, abatement, recoupment, defense or other right that any Person (including any Credit Party) may have against the beneficiary of any Letter of Credit or any other Person, whether in connection with any Loan Document or any other Contractual Obligation or transaction, or the existence of any other withholding, abatement or reduction, (C) in the case of the obligations of any Tranche A Lender, (i) the failure of any condition precedent set forth in Section 2.2 to be satisfied (each of which conditions precedent the Tranche A Lenders hereby irrevocably waive) or (ii) any adverse change in the condition (financial or otherwise) of any Credit Party and (D) any other act or omission to act or delay of any kind of Agent, any Tranche A Lender or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this clause (vii), constitute a legal or equitable discharge of any

7

obligation of the Borrower or any Tranche A Lender hereunder. No provision hereof shall be deemed to waive or limit Borrower's right to seek repayment of any payment of any L/C Reimbursement Obligations from the L/C Issuer under the terms of the applicable L/C Reimbursement Agreement or applicable law. The Tranche B Lenders shall have no obligation or liability whatsoever in respect of any Letter of Credit or the related Letter of Credit Obligations or participations therein or reimbursements in respect thereof, or otherwise under this subsection 1.1(b).

(c) Tranche B Revolving Loans. Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, each Lender listed in Part II of Schedule 1.1(a) (a "Tranche B Lender") severally and not jointly agrees to make Loans to Borrower (each such Loan, a "Tranche B Revolving Loan", and all such Loans by all Tranche B Lenders, collectively, the "Tranche B Revolving Loans") from time to time on any Business Day during the period from the Effective Date through the Final Availability Date, in an aggregate amount not to exceed at any time outstanding the amount set forth opposite such Tranche B Lender's name in Part II of Schedule 1.1(a) under the heading "Tranche B Revolving Loan Commitment" (as the same may be reduced from time to time in accordance with the terms of this Agreement, being referred to herein as such Lender's "Tranche B Revolving Loan Commitment"); provided, however, that, after giving effect to any Borrowing of Tranche B Revolving Loans, the aggregate principal amount of all outstanding Tranche B Revolving Loans shall not exceed the Aggregate Tranche B Revolving Loan Commitments. Subject to the other terms and conditions hereof, amounts borrowed under this subsection 1.1(c) may be repaid and reborrowed from time to time, provided that any repayments shall be applied in accordance with Section 1.8(g). If at any time the then outstanding principal balance of Tranche B Revolving Loans exceeds the Aggregate Tranche B Revolving Loan Commitments, then Borrower shall immediately prepay the outstanding Tranche B Revolving Loans in an amount sufficient to eliminate such excess.

1.2 Note. The Loans made by each Lender shall be evidenced by this Agreement and, if requested by such Lender, a Note payable to the order of such Lender in an original stated principal amount equal to such Lender's Tranche A Revolving Loan Commitment or Tranche B Revolving Loan Commitment, as applicable.

1.3 Interest.

(a) Subject to subsections 1.3(c) and 1.3(d), each Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to the Interest Rate applicable thereto. Each determination of an interest rate applicable to the Tranche A Revolving Loans and the Term Loans by Agent shall be conclusive and binding on Borrower and the Lenders in the absence of manifest error. All computations of fees and interest payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed. Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

8

(b)    Subject to Section 4.15(c), interest on each Loan shall be paid in arrears on each applicable Interest Payment Date.  Interest shall also be paid on the date of any payment of Loans in full or prepayment of Loans in full.  For the avoidance of doubt, except for the distribution of payments pursuant to Section 1.10(d)(ii) during an Event of Default, nothing herein shall prevent the Tranche B Lenders from receiving current payments when due of interest and fees.

(c)    (i) At the election of Agent or the Required Lenders while any Event of Default exists, and without further notice, motion or application to, hearing before or order from the Bankruptcy Court, Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Tranche A Revolving Loans under the Loan Documents from and after the date of occurrence of such Event of Default, at a rate per annum which is determined by adding three percentage points (3.0%) per annum to the Interest Rate then in effect for such Tranche A Revolving Loans.  All such interest, other than interest which accrues in respect of the Term Loans, shall be payable on demand of Agent or the Required Lenders.  In the case of any Term Loan issued pursuant to Section 4.15(c), any default interest shall accrue and be paid on the Term Loan Maturity Date.

(ii)    At the election of Whippoorwill while any Event of Default exists, and without further notice, motion or application to, hearing before or order from the Bankruptcy Court, Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Tranche B Revolving Loans under the Loan Documents from and after the date of occurrence of such Event of Default, at a rate per annum which is determined by adding three percentage points (3.0%) per annum to the Interest Rate then in effect for such Tranche B Revolving Loans.  All such interest shall be payable on demand of Whippoorwill.

(d)    Anything herein to the contrary notwithstanding, the obligations of Borrower hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the respective Lender would be contrary to the provisions of any law applicable to Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by such Lender, and in such event Borrower shall pay such Lender interest at the highest rate permitted by applicable law (the "Maximum Lawful Rate"); provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Agent, on behalf of Lenders, is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

1.4    Loan Accounts.

(a)    Agent, on behalf of the Lenders, shall record on its books and records the amount of each Loan made, the interest rate applicable, all payments of

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

principal and interest thereon and the principal balance thereof from time to time outstanding. Agent shall deliver to Borrower on a monthly basis a loan statement setting forth such record for the immediately preceding calendar month. Such record shall, absent manifest error, be conclusive evidence of the amount of the Loans made by the Lenders to Borrower and the interest and payments thereon. Any failure to so record or any error in doing so, or any failure to deliver such loan statement shall not, however, limit or otherwise affect the obligation of Borrower hereunder (and under any Note) to pay any amount owing with respect to the Loans or provide the basis for any claim against Agent.

(b)     Agent, acting as a non-fiduciary agent of Borrower solely for tax purposes and solely with respect to the actions described in this subsection 1.4(b), shall establish and maintain at its address referred to in Section 9.2 (or at such other address as Agent may notify Borrower) (A) A record of ownership (the "Register") in which Agent agrees to register by book entry the interests (including any rights to receive payment hereunder) of Agent, each Lender and each L/C Issuer in the Loans, L/C Reimbursement Obligations, and Letter of Credit Obligations, each of their obligations under this Agreement to participate in each Loan, Letter of Credit, Letter of Credit Obligations, and L/C Reimbursement Obligations, and any assignment of any such interest, obligation or right and (B) accounts in the Register in accordance with its usual practice in which it shall record (1) the names and addresses of the Lenders and the L/C Issuers (and each change thereto pursuant to Section 9.9 or 9.22), (2) the Commitments of each Lender, (3) the amount of each Loan and each funding of any participation described in clause (A) above, and for Revolving Loans, the Interest Period applicable thereto, (4) the amount of any principal or interest due and payable or paid, (5) the amount of the L/C Reimbursement Obligations due and payable or paid in respect of Letters of Credit and (6) any other payment received by Agent from Borrower and its application to the Obligations.

(c)     Notwithstanding anything to the contrary contained in this Agreement, the Loans (including any Notes evidencing such Loans and, in the case of Tranche A Revolving Loans, the corresponding obligations to participate in Letter of Credit Obligations) and the L/C Reimbursement Obligations are registered obligations, the right, title and interest of the Lenders and the L/C Issuers and their assignees in and to such Loans or L/C Reimbursement Obligations, as the case may be, shall be transferable only upon notation of such transfer in the Register and no assignment thereof shall be effective until recorded therein. This Section 1.4 and Section 9.9 shall be construed so that the Loans and L/C Reimbursement Obligations are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)     The Credit Parties, Agent, the Lenders and the L/C Issuers shall treat each Person whose name is recorded in the Register as Lender or L/C Issuer, as applicable, for all purposes of this Agreement. Information contained in the Register with respect to any Lender or any L/C Issuer shall be available for access by Borrower, Agent, such Lender (or in the case of all Tranche B Lenders, by Whippoorwill) or such L/C Issuer during normal business hours and from time to time upon at least one Business

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

Day's prior notice.  No Lender or L/C Issuer shall, in such capacity, have access to or be otherwise permitted to review any information in the Register other than information with respect to such Lender or L/C Issuer, and in the case of Whippoorwill, with respect to the Tranche B Lenders, unless otherwise agreed by Agent.

1.5     Procedure for Revolving Credit Borrowing.

(a)     Each Borrowing of a Revolving Loan shall be made upon Borrower's irrevocable written notice delivered to Agent substantially in the form of a Notice of Borrowing or in a writing in any other form acceptable to Agent, which notice must be received by Agent prior to 2:00 p.m. (New York time) on the date which is two (2) Business Days prior to the requested Borrowing date of each Loan, and be accompanied, in the case of the request for a Tranche A Revolving Loan, a Borrowing Base Certificate.  Such Notice of Borrowing shall specify:

()     Whether such Borrowing is a Tranche A Revolving Loan or a Tranche B Revolving Loan;

(i)     (i) the amount of the Borrowing (which shall be in an aggregate minimum principal amount of $100,000); and

(ii)     (ii) the requested Borrowing date, which shall be a Business Day.

(b)     Upon receipt of a Notice of Borrowing, Agent may notify each applicable Lender of such Notice of Borrowing and of the amount of such applicable Lender's Commitment Percentage of the related Borrowing.

(c)     Unless Agent is otherwise directed in writing by Borrower, the proceeds of each requested Borrowing after the Closing Date will be made available to Borrower by Agent by wire transfer of such amount to Borrower pursuant to the wire transfer instructions specified on the signature page hereto.

(d)     Borrower may request up to three (3) Borrowings with respect to Tranche A Revolving Loans in any fiscal week and up to three (3) Borrowings with respect to Tranche B Revolving Loans in any fiscal week.

1.6     [Intentionally Omitted].

1.7     Voluntary Termination of Revolving Loan Commitments.  Borrower may at any time on at least ten (10) days' prior written notice by Borrower to Agent terminate the Aggregatein their entirety the Revolving Loan Commitments; provided that, upon such termination, all Obligations shall be immediately due and payable in full and all Letter of Credit Obligations shall be cash collateralized or otherwise satisfied in accordance herewith.     Any optional termination of the Revolving Loan CommitmentCommitments shall be without premium or penalty except as provided in Section 1.9.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

1.8    Mandatory Prepayments of Loans and Commitment Termination.

(a)    Revolving Termination Date.  Borrower shall repay to the Lenders in full on the Revolving Termination Date the aggregate principal amount of the Revolving Loans outstanding on the Revolving Termination Date.

(b)    Asset Dispositions.  If a Credit Party or any Subsidiaries of a Credit Party shall at any time or from time to time:

(i)    make a Disposition; or

(ii)    suffer an Event of Loss;

and the aggregate amount of the Net Proceeds received by the Credit Parties and their Subsidiaries in connection with such Disposition or Event of Loss and all other Dispositions and Events of Loss occurring during the Fiscal Year exceeds $150,000, then (A) Borrower shall promptly notify Agent of such proposed Disposition or Event of Loss (including the amount of the estimated Net Proceeds to be received by a Credit Party and/or such Subsidiary in respect thereof) and (B) promptly upon receipt by Borrower and/or such Subsidiary of the Net Proceeds of such Disposition or Event of Loss, the Credit Parties shall deliver, or cause to be delivered, such excess Net Proceeds to Agent for distribution to the Lenders as a prepayment of the Loans, which prepayment shall be applied in accordance with subsection 1.8(~~h~~g).

(c)    Issuance of Securities.  Immediately upon the receipt by any Credit Party or any Subsidiary of any Credit Party of the Net Issuance Proceeds of the issuance of Stock or Stock Equivalents (including any capital contribution) (other than Net Issuance Proceeds from any Excluded Equity Issuances), Borrower shall deliver, or cause to be delivered, to Agent an amount equal to such Net Issuance Proceeds, for application to the Loans in accordance with subsection 1.8(~~h~~g).

(d)    Extraordinary Receipts.  Within five (5) Business Days of the date of receipt by any Credit Party or any Subsidiary of any Credit Party of any Extraordinary Receipts, Borrower shall prepay the outstanding principal amount of the Obligations in accordance with subsection 1.8(~~h~~g) in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.

(e)    Indebtedness.  Within five (5) Business Days of the date of incurrence by any Credit Party or any Subsidiary of any Credit Party of any Indebtedness (other than Indebtedness permitted under Section 5.5 of this Agreement), Borrower shall prepay the outstanding principal amount of the Obligations in accordance with subsection 1.8(~~h~~g) in an amount equal to 100% of the Net Proceeds received by such Person in connection with such incurrence.

(f)    Change of Control.  Immediately upon the occurrence of an Event of Default under subsection 7.1(j), Borrower shall deliver, or cause to be delivered, to

Agent an amount equal to Net Issuance Proceeds or Net Proceeds, as applicable, received by Borrower, for application to the Loans in accordance with subsection 1.8(~~h~~g).

(g)     Application of Prepayments.  Subject to subsections 1.10(c) and 1.10(d), any prepayments pursuant to subsection 1.8(b), 1.8(c), 1.8(d), or 1.8(e) shall be applied first to prepay ~~outstanding Revolving Loans~~the Obligations (other than Obligations in respect of the Tranche B Revolving Loans and the Term Loan), and cash collateralization of unmatured LC Reimbursement Obligations and Bank Product Obligations, without a permanent reduction of the Aggregate Tranche A Revolving Loan Commitments ~~and second, upon the payment in full of the Revolving Loans, shall be applied~~, second, provided that all Obligations (other than Obligations in respect of the Tranche B Revolving Loans and the Term Loan) have been irrevocably paid in full in cash, and unmatured LC Reimbursement Obligations and Bank Product Obligations have been cash collateralized, and all Revolving Loan Commitments have been terminated, to prepay the Obligations in respect of the Tranche B Revolving Loans, without a permanent reduction of the Aggregate Tranche B Revolving Loan Commitments, and third, provided, that all Obligations (other than the Term Loan) shall have been irrevocably paid in full in cash and all Revolving Loan Commitments have been terminated, to prepay the outstanding principal balance of the Term Loan, together with any interest and fees in respect thereof.   Any prepayment pursuant to subsection 1.8(f) shall be applied to first to prepay ~~outstanding Revolving Loans~~the Obligations (other than Obligations in respect of the Tranche B Revolving Loans and the Term Loan) (including, without limitation, any applicable prepayment premium required to be paid pursuant to Section 1.9(d)), and cash collateralization of unmatured LC Reimbursement Obligations and Bank Product Obligations, with a permanent reduction of the Aggregate Tranche A Revolving Loan Commitments ~~until paid in full together with~~ in respect thereof, second, provided that all Obligations (other than Obligations in respect of the Tranche B Revolving Loans and the Term Loan) have been irrevocably paid in full in cash, and unmatured LC Reimbursement Obligations and Bank Product Obligations have been cash collateralized, and all Tranche A Revolving Loan Commitments have been terminated, to prepay the Obligations in respect of the Tranche B Revolving Loans, including without limitation, any applicable prepayment premium required to be paid pursuant to Section 1.9(d)~~ and second~~) in respect thereof, with a permanent reduction of the Aggregate Tranche B Revolving Loan Commitments, and third, to prepay the outstanding ~~Term Loans~~balance of the Term Loan, together with any interest and fees in respect thereof.

(h)     No Implied Consent.  Provisions contained in this Section 1.8 for the application of proceeds of certain transactions shall not be deemed to constitute consent of the Lenders to transactions that are not otherwise permitted by the terms hereof or the other Loan Documents.

1.9     Fees.

(a)      Arrangement and Commitment Fee.  In consideration of (i) the Agent having arranged the financing hereunder and the Exit Commitment, Borrower shall pay to Agent, for Agent's own account, a fee of $500,000 (without reduction, offset or credit on account of any commitment fee paid to the Prepetition Agent in connection with

13

the Prepetition Credit Agreement, it being understood that the Credit Parties waive the right to any such reduction, offset or credit), which shall be fully earned and payable as follows: (i) $250,000 shall be fully earned and payable upon entry of the Interim Borrowing Order and (ii) $250,000 shall be fully earned and payable upon entry of the Final Borrowing Order. and (ii) the Tranche B Lenders' commitments hereunder, Borrower shall pay to the Tranche B Lenders an aggregate fee of $420,000, which fee shall be fully earned and payable on the Effective Date.

(b)    Unused Commitment Fee.  Borrower shall pay

()    (b)  Unused Commitment Fee.  Borrower shall pay to Agent for the ratable benefit of the Tranche A Lenders, as compensation to such Tranche A Lenders for making their Tranche A Revolving Loan Commitments available hereunder, a fee (the "Tranche A Unused Commitment Fee") in an amount equal to:

(i)    (i) the average daily balance of the Aggregate Tranche A Revolving Loan Commitments during the preceding calendar month, less

(ii)    (ii) the sum of (x) the average daily balance of all Tranche A Revolving Loans outstanding plus (y) the average daily amount of Letter of Credit Obligations, in each case, during the preceding calendar month,

multiplied by (0.50%) per annum (calculated on the basis of a 360 day year for actual days elapsed).  Such fee shall be payable monthly in arrears on the first day of the calendar month following the date hereof and the first day of each calendar month thereafter.  The Tranche A Unused Commitment Fee provided in this subsection 1.9(b) shall accrue at all times from and after mutual execution and delivery of this Agreement; and

(iii)    to the Tranche B Lenders, as compensation to such Tranche B Lenders for making Tranche B Revolving Loan Commitments available hereunder, a fee (the "Tranche B Unused Commitment Fee") in an amount equal to:

(@)    the average daily balance of the Aggregate Tranche B Revolving Loan Commitments during the preceding calendar month, less

(A)    the sum of the average daily balance of all Tranche B Revolving Loans outstanding during the preceding calendar month,

multiplied by (4.50%) per annum (calculated on the basis of a 360 day year for actual days elapsed).  Such fee shall be payable monthly in arrears on the first day of the calendar month following the date hereof and the first day of each calendar month thereafter.  The Tranche B Unused Commitment Fee provided in this subsection 1.9(b) shall accrue at all times from and after mutual execution and delivery of this Agreement.

(c)    Letter of Credit Fee.  Borrower agrees to pay to Agent for the ratable benefit of the Tranche A Lenders, as compensation to such Tranche A Lenders for Letter of Credit Obligations incurred hereunder, (i) without duplication of any additional

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

fees, costs and expenses otherwise payable to Agent or Tranche A Lenders hereunder or fees otherwise paid by Borrower, all costs and expenses imposed or incurred by Agent or any Tranche A Lender or L/C Issuer on account of such Letter of Credit Obligations, and (ii) for each calendar month during which any Letter of Credit Obligation shall remain outstanding, a fee (the "Letter of Credit Fee") in an amount equal to the product of the average daily undrawn face amount of all Letters of Credit issued, guaranteed or supported by risk participation agreements multiplied by a per annum rate equal to the Interest Rate; provided, however, at Agent's or the Required Lenders' option, while an Event of Default exists, such rate shall be increased by three percentage points (3.00%) per annum. Such fee shall be paid to Agent for the ratable benefit of the Tranche A Lenders in arrears, on the first day of each calendar month and on the date on which all Letter of Credit Obligations have been discharged.

(d) Prepayment Fee. If prior to the first anniversary of the Petition Date, the Aggregate Tranche A Revolving Loan Commitments are terminated or permanently reduced for any reason, Borrower shall pay to Agent, for the pro rata benefit of the Lenders, as liquidated damages and compensation for the costs of being prepared to make funds available hereunder an amount equal to three percent (3.0%) (the "Applicable Tranche A Percentage") multiplied by the amount of the Aggregate Tranche A Revolving Loan Commitments so terminated. The Credit Parties agree that the Applicable Tranche A Percentage is a reasonable calculation of the Tranche A Lenders' lost profits in view of the difficulties and impracticality of determining actual damages resulting from an early termination of ~~the~~such Tranche A Lender's Aggregate Revolving Loan Commitments. Upon the Final Borrowing Order becoming a Final Order, which approves the prepayment fee contained herein, it is understood and agreed that the Prepetition Lenders shall be deemed to have waived any prepayment fee that may be due, or become due, pursuant to the terms of the Prepetition Credit Agreement.

(e) Monitoring Fee. Borrower agrees to pay to Agent, for the benefit of the Agent, a monitoring fee of $65,000 fully earned and payable as of the Closing Date.

1.10 Payments by Borrower.

(a) All payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without set off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein, be made to Agent (for the ratable account of the Persons entitled thereto) at the address for payment specified in the signature page hereof in relation to Agent (or such other address as Agent may from time to time specify in accordance with Section 9.2), including payments utilizing the ACH system, and shall be made in Dollars and by wire transfer or ACH transfer in immediately available funds (which shall be the exclusive means of payment hereunder), no later than 1:00 p.m. (New York time) on the date due. Any payment which is received by Agent later than 1:00 p.m. (New York time) may in Agent's discretion be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue. Borrower and each other Credit Party hereby irrevocably waives the right to

~~18198~~069/21798-~~009~~010 Current/~~21008698v15~~21388094v4
~~11~~12/~~2008~~2010 ~~11:46 am~~3:30 pm

direct the application during the continuance of an Event of Default of any and all payments in respect of any Obligation and any proceeds of Collateral. Borrower hereby authorizes Agent and each Lender to make a Tranche A Revolving Loan to pay (i) interest, principal, L/C Reimbursement Obligations, agent fees, Unused Commitment Fees and Letter of Credit Fees, in each instance, on the date due, or (ii) after five (5) days' prior notice to Borrower, other fees, costs or expenses payable by Borrower or any of its Subsidiaries hereunder or under the other Loan Documents.

(b)     ~~Subject to the provisions set forth in the definition of "Interest Period" herein, if~~If any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

(c)     Prior to the entry of the Final Borrowing Order:

(i)     So long as no Event of Default has occurred and is continuing, Agent may (and shall upon the direction of the Required Lenders) apply any and all payments received by Agent in respect of any Obligation first to repay the Obligations pursuant to the terms of this Agreement and second to the Prepetition Liabilities pursuant to the terms of the Prepetition Credit Agreement.

(i)     ~~(ii)~~     During the continuance of an Event of Default, Agent may (and shall upon the direction of the Required Lenders) apply any and all payments and proceeds of Collateral received by Agent in respect of any Obligation in accordance with clauses first through thirteenth below. Notwithstanding any provision herein to the contrary, all amounts collected or received by Agent after the due date of any or all of the Obligations have been accelerated or demanded (so long as such acceleration or demand has not been rescinded), including proceeds of Collateral, shall be applied as follows:

first, to fund the Carve-Out;

second, to payment of costs and expenses, including Attorney Costs, of Agent payable or reimbursable by the Credit Parties under the Loan Documents, to the extent then due and payable;

third, to payment of Attorney Costs of Lenders to the extent then payable or reimbursable by Borrower under this Agreement;

fourth, to payment of all accrued unpaid interest on the Obligations (other than Bank Product Obligations and the Term Loan) and fees owed to Agent, Lenders and L/C Issuers;

fifth, to payment of principal of the Obligations (other than Bank Product Obligations and the Term Loan) to the extent then due and payable, including L/C Reimbursement Obligations then due and payable;

sixth, to cash collateralization of unmatured L/C Reimbursement Obligations to the extent not then due and payable;

16

seventh, to payment of any other amounts owing constituting Obligations (other than Bank Product Obligations and the Term Loan) to the extent then due and payable;

eighth, to payment of any other amounts owing then constituting Notified Bank Product Obligations to the extent then due and payable;

ninth, to pay the Prepetition Liabilities in accordance with the terms of the Prepetition Credit Agreement;

tenth, to payment of all accrued unpaid interest on the Obligations with respect to the Term Loan and fees owed to the Term Loan Lenders;

eleventh, to payment of principal of the Obligations respect to the Term Loan to the extent then due and payable;

twelfth, to payment of any other amounts owing constituting Obligations owing with respect to the Term Loan to the extent then due and payable; and

thirteenth, any remainder shall be for the account of and paid to whoever may be lawfully entitled thereto.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category and (ii) each of the Lenders or other Persons entitled to payment shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to clauses fourth, fifth, ninth, tenth, eleventh, and twelfth above.

(d)    Upon the entry of the Final Borrowing Order:

()                                        (i)    So long as no Event of Default has occurred and is continuing, Agent shall apply any and all payments and proceeds of Collateral received by the Agent first, to the Prepetition Liabilities and second until the Prepetition Liabilities are paid in full and all Letters of Credit Obligations (as defined in the Prepetition Credit Agreement) shall be cash collateralized or otherwise satisfied in accordance herewith or therewith, and may (and shall upon the direction of the Required Lenders) apply any and all payments and proceeds of Collateral received by Agent in respect of any Obligation to the Obligations pursuant to the terms of this Agreement, second, to the Obligations (other than Obligations in respect of the Tranche B Revolving Loans and the Term Loan), and cash collateralization of unmatured LC Reimbursement Obligations and Bank Product Obligations, without a permanent reduction of the Aggregate Tranche A Revolving Loan Commitments, third, provided that all Obligations (other than Obligations in respect of the Tranche B Revolving Loans and the Term Loan) have been irrevocably paid in full in cash, and unmatured LC Reimbursement Obligations and Bank Product Obligations have been cash collateralized, and all Tranche A Revolving Loan Commitments have been terminated, to the Obligations in respect of the Tranche B Revolving Loans, without a permanent reduction of the Aggregate Tranche B Revolving Loan Commitments, and fourth, provided, that all Obligations (other than the Term Loan) shall have been irrevocably paid in full in cash

17

and all Revolving Loan Commitments have been terminated, to the outstanding balance of the Term Loan, together with any interest and fees in respect thereof; and

(i) ~~(ii)~~ During the continuance of an Event of Default, Agent may (and shall upon the direction of the Required Lenders) apply any and all payments received by Agent in respect of any Obligation and proceeds of Collateral in accordance with clauses first through ~~twelfth~~fifteenth below. Notwithstanding any provision herein to the contrary, all amounts collected or received by Agent after the due date of any or all of the Obligations have been accelerated or demanded (so long as such acceleration or demand has not been rescinded), including proceeds of Collateral, shall be applied as follows:

first, to fund the Carve-Out;

second, to payment of costs and expenses, including Attorney Costs, of Agent payable or reimbursable by the Credit Parties under the Loan Documents, to the extent then due and payable;

third, to payment of Attorney Costs of Lenders to the extent then payable or reimbursable by Borrower under this Agreement;

fourth, to payment of all accrued unpaid interest on the Obligations (other than Bank Product Obligations, the Tranche B Revolving Loans and the Term Loan) and fees owed to Agent, Lenders and L/C Issuers;

fifth, to payment of principal of the Obligations (other than Bank Product Obligations, the Tranche B Revolving Loans and the Term Loan) to the extent then due and payable, including L/C Reimbursement Obligations then due and payable;

sixth, to cash collateralization of unmatured L/C Reimbursement Obligations to the extent not then due and payable;

seventh, to payment of any other amounts owing constituting Obligations (other than Bank Product Obligations, the Tranche B Revolving Loans and the Term Loan) to the extent then due and payable;

eighth, to payment of any other amounts owing then constituting Notified Bank Product Obligations to the extent then due and payable;

ninth, to payment of all accrued unpaid interest on the Obligations with respect to the ~~Term Loan and fees owed~~Tranche B Revolving Loans and all accrued and unpaid fees and other Obligations (other than principal) payable to the ~~Term Loan~~Tranche B Lenders or Whippoorwill;

tenth, to payment of principal of the Obligations with respect to the ~~Term Loan~~Tranche B Revolving Loans to the extent then due and payable;

18

**eleventh**, to the payment of any other amounts ~~owing~~ constituting Obligations owing with respect to the ~~Term Loan~~Tranche B Revolving Loans or otherwise owing to Whippoorwill or the Tranche B Lenders to the extent then due and payable;~~and~~

**twelfth**, to the payment of all accrued unpaid interest on the Obligations with respect to the Term Loan;

**thirteenth**, to payment of principal of the Obligations with respect to the Term Loan to the extent then due and payable;

**fourteenth**, to payment of any other amounts owing with respect to the Term Loan to the extent then due and payable; and

**fifteenth,** any remainder shall be for the account of and paid to whoever may be lawfully entitled thereto.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category and (ii) each of the Lenders or other Persons entitled to payment shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to clauses third, fourth, eighth, ninth, tenth, ~~and~~ eleventh, twelfth, thirteenth and fourteenth above.

1.11    Payments by the Lenders to Agent; Settlement; Non-Funding Lenders.

(a)    Disbursement and Reimbursement.    Agent may, on behalf of Lenders, disburse funds to the Borrower for Loans requested. Each Lender shall reimburse Agent on demand for all funds disbursed on its behalf by Agent, or if Agent so requests, each Lender will remit to Agent its Commitment Percentage of any Loan before Agent disburses same to the Borrower. If Agent elects to require that each Lender make funds available to Agent prior to disbursement by Agent to the Borrower, Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of the Loan requested by the Borrower no later than the Business Day prior to the scheduled Borrowing date applicable thereto, and each such Lender shall pay Agent such Lender's Commitment Percentage of such requested Loan, in same day funds, by wire transfer to Agent's account, as set forth on Agent's signature page hereto, no later than 1:00 p.m. (New York time) on such scheduled Borrowing date. Nothing in this subsection 1.11(a) or elsewhere in this Agreement or the other Loan Documents, including the remaining provisions of Section 1.11, shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitment hereunder or to prejudice any rights that Agent, any Lender or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(b)    Lender Settlement.    At least once each calendar week or more frequently at Agent's election (each, a "Settlement Date"), Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of principal, interest and Fees paid for the benefit of Lenders with respect to each applicable

~~18198069~~/21798-~~000010~~ Current/~~21008698v15~~21388094v4
~~1112/2008~~/2010 ~~11:46 am~~3:30 pm

Loan. Provided that each Lender has funded all payments required to be made by it and funded all purchases of participations required to be funded by it under this Agreement and the other Loan Documents as of such Settlement Date, Agent shall pay to each Lender such Lender's Commitment Percentage of principal, interest and fees paid by the Borrower since the previous Settlement Date for the benefit of such Lender on the Loans held by it. Such payments shall be made by wire transfer to such Lender not later than 2:00 p.m. (New York time) on the next Business Day following each Settlement Date. Agent shall be entitled to set off the funding shortfall against any Non-Funding Lender's Commitment Percentage of all payments received from the Borrower and hold, in a non-interest bearing account, all payments received by Agent for the benefit of any Non-Funding Lender pursuant to this Agreement as cash collateral for any unfunded reimbursement obligations of such Non-Funding Lender until the Obligations are paid in full in cash, all Letter of Credit Obligations have been discharged or cash collateralized and all Commitments have been terminated, and upon such unfunded obligations owing by a Non-Funding Lender becoming due and payable, Agent shall be authorized to use such cash collateral to make such payment on behalf of such Non-Funding Lender. Any amounts owing by a Non-Funding Lender to Agent which are not paid when due shall accrue interest at the interest rate applicable during such period to the applicable Revolving ~~Loans~~Loan.

(c)    Availability of Lender's Commitment Percentage. Agent may assume that each Lender will make its Commitment Percentage of each Revolving Loan available to Agent on each Borrowing date. If such Commitment Percentage is not, in fact, paid to Agent by such Lender when due, Agent will be entitled to recover such amount on demand from such Lender without setoff, counterclaim or deduction of any kind. If any Lender fails to pay the amount of its Commitment Percentage forthwith upon Agent's demand, Agent shall promptly notify the Borrower and the Borrower shall immediately repay such amount to Agent. Nothing in this subsection 1.11(c) or elsewhere in this Agreement or the other Loan Documents shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder. Without limiting the provisions of subsection 1.11(b), to the extent that Agent advances funds to the Borrower on behalf of any Lender and is not reimbursed therefor on the same Business Day as such advance is made, Agent shall be entitled to retain for its account all interest accrued on such advance from the date such advance was made until reimbursed by the applicable Lender.

(d)    Return of Payments.

(i)    If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from the Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

~~18~~19~~8069~~/21798-~~0009~~010 Current/~~21008698v15~~21388094v4
~~11~~12/~~2008~~/2010 ~~11:46 am~~3:30 pm

(ii)     If Agent determines at any time that any amount received by Agent under this Agreement or any other Loan Document must be returned to any Credit Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind, and Agent will be entitled to set-off against future distributions to such Lender any such amounts (with interest) that are not repaid on demand.

(e)     <u>Non-Funding Lenders</u>.  The failure of any Non-Funding Lender to make any Revolving Loan, Letter of Credit Obligation or any payment required by it hereunder, or to fund any purchase of any participation to be made or funded by it on the date specified therefor shall not relieve any other Lender (each such other Lender, an "<u>Other Lender</u>") of its obligations to make such loan or fund the purchase of any such participation on such date, but neither Agent nor, other than as expressly set forth herein, any Other Lender shall be responsible for the failure of any Non-Funding Lender to make a loan, fund the purchase of a participation or make any other payment required hereunder.  Notwithstanding anything set forth herein to the contrary, a Non-Funding Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" or a "Lender" (or be, or have its Loans and Commitments, included in the determination of "Required Lenders" or "Lenders directly affected" pursuant to <u>Section 9.1</u>) for any voting or consent rights under or with respect to any Loan Document.  Moreover, for the purposes of determining Required Lenders, the Loans and Commitments held by Non-Funding Lenders shall be excluded from the total Loans and Commitments outstanding.

(f)     <u>Procedures</u>.  Agent is hereby authorized by each Credit Party and each other Secured Party to establish procedures (and to amend such procedures from time to time) to facilitate administration and servicing of the Loans and other matters incidental thereto.

1.12     <u>Super Priority Nature of Obligations and Secured Party's Liens</u>.  All Obligations of the Credit Parties hereunder and under the other Loan Documents, including, without limitation, all principal, accrued interest, costs, fees and expenses, shall be:

(a)     Claims, entitled to the benefits of Bankruptcy Code § 364(c)(1), having a super-priority over any and all administrative expenses of the kind specified in Bankruptcy Code §§ 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1) and/or 726 ("<u>Super-Priority Claims</u>"), subject only to a carve-out (the "<u>Carve-Out</u>") for (x) the payment of allowed Professional Fees and Expenses incurred from the Petition Date until the date of a Carve-Out Notice in an aggregate amount not to exceed the Pre-Default Carve-Out; (y) the payment of allowed Professional Fees and Expenses and other so-called "burial costs" incurred in the wind-down of the estate incurred after the date of a Carve-Out Notice in an aggregate amount not to exceed $350,000 (the "<u>Post-Default</u>

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

Carve-Out") and (z) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court. For the purposes of calculating the Pre-Default Carve-Out, the Borrower shall, not later than the 10th day of each month, certify to the Administrative Agent the amount of the Pre-Default Carve-Out as of the date of such certification. The Agent may conclusively rely upon the Borrower's certification of the Pre-Default Carve-Out and the Agent shall have no liability for any errors in the Borrower's calculation of the Pre-Default Carve-Out.

(b)     Secured, pursuant to Bankruptcy Code § 364(c)(2), subject to the Carve-Out, by a first-priority senior perfected Lien on all present and after-acquired assets and property of the Credit Parties not subject to a Lien on the Petition Date, other than the Lease Priority Collateral and Avoidance Actions and proceeds of Avoidance Actions.

(c)     Secured, pursuant to Bankruptcy Code § 364(d)(1), subject to the Carve-Out, by a first-priority, senior priming perfected Lien on all property of the Credit Parties that is subject to a Lien on the Petition Date, including, without limitation, the Liens of the Prepetition Agent on behalf of the Prepetition Lenders, other than Lease Priority Collateral and Avoidance Actions and proceeds of Avoidance Actions.

(d)     Secured, pursuant to Bankruptcy Code § 364(c)(3), subject to the Carve-Out, by a Lien on the Lease Priority Collateral subject only to the Liens of Loehmann's Capital.

(e)     Subject only to the Carve-Out, no cost or expense of administration under Bankruptcy Code §§ 364(c)(1), 503(b), 506(c), 507(b) or otherwise, and those resulting from the conversion of the Chapter 11 Cases pursuant to Bankruptcy Code § 1112, shall be senior to, or *pari passu* with, the Super-Priority Claims of Agent and Lenders arising out of the Loans. Upon written notice by the Agent to the Borrower, the Borrower shall be deemed to have authorized the Agent (and shall be deemed to have made a Borrowing Request in amount necessary) to fund the Carve-Out in a segregated account, which account shall be maintained for the benefit of the professionals.

1.13     Payment of Obligations. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lenders shall be entitled to immediate indefeasible payment in full in cash of such Obligations without further application to or order of the Bankruptcy Court.

1.14     No Discharge; Survival of Claims. To the extent that any Obligations (other than inchoate indemnity Obligations) are then outstanding or Lenders then have any commitment to make Loans hereunder, each Credit Party agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a Plan of Reorganization in any Chapter 11 Cases (and each Credit Party pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the superpriority administrative claim granted to the Agent and Lenders pursuant to the DIP Borrowing Orders and described in Section 1.12 and the Liens granted to the Agent pursuant to the DIP Borrowing Orders and described in Section 1.12 shall not be affected

18198069/21798-000010 Current/21008698v152138894v4
1112/2008/2010 11:46 am3:30 pm

in any manner by the entry of an order confirming a Plan of Reorganization in any Chapter 11 Cases.

1.15     Release.  No Credit Party nor any of their respective Subsidiaries has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Credit Parties or their Subsidiaries' liability to repay the Agent, Whippoorwill or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Agent or any Lender or Whippoorwill.  Credit Parties, each in their own right and with respect to the other Credit Parties, on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge Agent and Lenders and Whippoorwill and all of Agent's and Lenders' and Whippoorwill's past and present officers, directors, servants, agents, attorneys, assigns, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Loan Documents, the DIP Borrowing Orders and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing (but, in the case of the Tranche B Lenders and Whippoorwill, to the extent they are a party thereto, excluding (i) the Restructuring Support Agreement and (ii) the Commitment Letter), provided that solely in the case of attorneys, the provisions of this Section 1.15 shall be limited to the extent that any such release would violate any professional disciplinary rules, including Disciplinary Rule 6-102 of the Code of Professional Conduct, to the extent applicable.

1.16     Waiver of any Priming Rights.  Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, other than as expressly set forth in the Interim Borrowing Order (or the equivalent sections of the Final Borrowing Order, when applicable), each Credit Party hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

18198069/21798-009010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

## ARTICLE II.
## CONDITIONS PRECEDENT

2.1     Conditions of Initial Loans.  The obligation of each Lender to make its initial Loans and of each L/C Issuer to Issue, or cause to be Issued, the initial Letters of Credit hereunder is subject to satisfaction of the following conditions in a manner satisfactory to Agent:

(a)     Loan Documents.  Agent shall have received on or before the Closing Date all of the agreements, documents, instruments and other items set forth on the closing checklist attached hereto as Exhibit 2.1(a), each in form and substance reasonably satisfactory to Agent;

(b)     Sponsor Credit Support.  The Sponsor Credit Support shall be in full force and effect.

(c)     Cash Management.  The Borrower shall have established or shall maintain the cash management systems described in Section 4.11 and the Cash Management Order shall have been entered, shall be in full force and effect, and shall not have been reversed, vacated or stayed, or modified without the prior written consent of the Agent;

(d)     Sponsor Participation Agreement.  On or before the Closing Date, the Agent shall have received from the Equity Sponsor the Sponsor Participation Agreement fully executed;

(e)     Approvals.  Agent shall have received satisfactory evidence that the Credit Parties have obtained all required consents and approvals of all Persons including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement and the other Loan Documents and the consummation this Agreement and the other Loan Documents;

(f)     Payment of Fees.  Borrower shall have paid the fees required to be paid on the Closing Date under the Fee Letter, and shall have reimbursed Agent for all fees, costs and expenses (including Attorney Costs) of closing this Agreement incurred by Agent and  presented as of the Closing Date;

(g)     Representations and Warranties.   The representations and warranties of the Credit Parties and their Subsidiaries contained in this Agreement and in the other Loan Documents shall be true and correct in all respects; and

(h)     Approved Budget.  The Agent shall have received the Approved Budget, which shall be in form and substance satisfactory to the Agent.

(i)     Bankruptcy Pleadings.  All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with this Agreement (including, without limitation, the DIP Borrowing Orders) shall be in form and substance reasonably satisfactory to the Agent and the Interim Borrowing Order, in form and

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

substance acceptable to the Agent, shall have been entered and shall not be subject to any stay.

(j)  No Default.  After giving effect to the consummation of the transactions contemplated under this Agreement and the other Loan Documents on the Closing Date (including any Loans made or Letters of Credit issued hereunder), all representations and warranties by any Credit Party contained herein or in any other Loan Document are true and correct and no Default or Event of Default shall exist

(k)  No contravention.  The terms and provisions of this Agreement shall not be prohibited by the Amended and Restated Intercreditor Agreement.

2.2  Conditions to All Tranche A Borrowings.  Except as otherwise expressly provided herein, no Tranche A Lender or L/C Issuer shall be obligated to fund any Loan or incur any Letter of Credit Obligation, if, as of the date thereof:

(a)  any representation or warranty by any Credit Party contained herein or in any other Loan Document is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date), and Agent or Required Lenders have determined not to make such Loan or incur such Letter of Credit Obligation as a result of the fact that such warranty or representation is untrue or incorrect;

(b)  any Default or Event of Default has occurred and is continuing or would reasonably be expected to result after giving effect to any Tranche A Revolving Loan (or the incurrence of any Letter of Credit Obligation), and Agent or the Required Lenders shall have determined not to make any Tranche A Revolving Loan or incur any Letter of Credit Obligation as a result of that Default or Event of Default;

(c)  after giving effect to any Tranche A Revolving Loan (or the incurrence of any Letter of Credit Obligations), the aggregate outstanding amount of the Tranche A Revolving Loans would exceed the Maximum Tranche A Revolving Loan Balance (except as provided in subsection 1.1(a)(ii));

(d)  after giving effect to any Tranche A Revolving Loan and the contemporaneous uses of proceeds thereof, the Credit Parties' cash and Cash Equivalents would violate subsection 4.11(b) or Section 6.1; and

(e)  after giving effect to any Tranche A Revolving Loan, the terms and provisions of this Agreement shall notwould be prohibited by the Amended and Restated Intercreditor Agreement.; and

(f)  the Final Borrowing Order has not been entered, is not in full force and effect, or is subject to an appeal or request for reconsideration.

25

2.3     Conditions to All Tranche B Borrowings.  Except as otherwise expressly provided herein, no Tranche B Lender shall be obligated to fund any Tranche B Revolving Loan, if, as of the date thereof:

(a)     any representation or warranty by any Credit Party contained herein or in any other Loan Document is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date), and the Tranche B Lenders have determined not to make such Tranche B Revolving Loans as a result of the fact that such warranty or representation is untrue or incorrect;

(b)     any Default or Event of Default has occurred and is continuing or would reasonably be expected to result after giving effect to any Tranche B Revolving Loan, and the Tranche B Lenders shall have determined not to make any Tranche B Revolving Loans as a result of that Default or Event of Default;

(c)     after giving effect to any Tranche B Revolving Loan, the aggregate outstanding amount of the Tranche B Revolving Loans would exceed the Aggregate Tranche B Revolving Loan Commitments;

(a)     after giving effect to any Tranche B Revolving Loan and the contemporaneous uses of proceeds thereof, the Credit Parties' cash and Cash Equivalents would violate subsection 4.11(b) or Section 6.1;

(d)     after giving effect to any Tranche B Revolving Loan, the terms and provisions of this Agreement would be prohibited by the Amended and Restated Intercreditor Agreement; or

(e)     the Final Borrowing Order has not been entered, is not in full force and effect, or is subject to an appeal or request for reconsideration.

The request by Borrower and acceptance by Borrower of the proceeds of any Loan or the incurrence of any Letter of Credit Obligations shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by Borrower that the conditions in ~~this Section~~Sections 2.2 and 2.3 have been satisfied and (ii) a reaffirmation by each Credit Party of the granting and continuance of Agent's Liens, on behalf of itself and the Secured Parties, pursuant to the Collateral Documents.

2.4     Conditions to the Effective Date.  This Amendment shall become effective (the "Effective Date") upon satisfaction (or written waiver thereof by the Agent and Whippoorwill) of each of the following conditions:

(a)     The Agent shall have received this Agreement duly executed by Credit Parties, Lenders and Agent;

26

(b)     The Borrower shall have paid the fees required to be paid as of the Effective Date and shall have reimbursed the Agent and Whippoorwill and the Tranche B Lenders all reasonable fees, costs and expenses of the Agent and Whippoorwill and the Tranche B Lenders in connection with this Agreement, including, without limitation, fees, costs and expenses of Proskauer Rose, LLP and Gibson, Dunn & Crutcher LLP;

(c)     The Bankruptcy Court shall have entered the Final Borrowing Order, in form and substance acceptable to the Agent and Whippoorwill, as special representative for the Tranche B Lenders, provided that such order shall not then be subject to appeal or request for reconsideration; and

(d)     After giving effect to the consummation of the transactions contemplated under this Agreement and the other Loan Documents on the Effective Date, all representations and warranties by any Credit Party contained herein or in any other Loan Document are true and correct and no Default or Event of Default shall exist.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

The Credit Parties, jointly and severally, represent and warrant to Agent, Whippoorwill and each Lender that the following are, and after giving effect to the Loan Documents, will be, true, correct and complete:

3.1     Corporate Existence and Power.  Each Credit Party and each of their respective Subsidiaries:

(a)     is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(b)     has the power and authority and all governmental licenses, authorizations, Permits, consents and approvals to own its assets, carry on its business and execute, deliver, and perform its obligations under, the Loan Documents to which it is a party;

(c)     is duly qualified as a foreign corporation, limited liability company or limited partnership, as applicable, and licensed and in good standing, under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification or license; and

(d)     is in compliance with all Requirements of Law;

except, in each case referred to in clause (c) or clause (d), to the extent that the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

3.2     Corporate Authorization; No Contravention.  Upon entry by the Bankruptcy Court of the Interim Borrowing Order (or the Final Borrowing Order, when

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

applicable), the execution, delivery and performance by each of the Credit Parties of this Agreement, and by each Credit Party and each of their respective Subsidiaries of any other Loan Document to which such Person is party, have been duly authorized by all necessary action, and do not and will not:

        (i)     contravene the terms of any of that Person's Organization Documents;

        (ii)     conflict with or result in any material breach or contravention of, or result in the creation of any Lien under, any document evidencing any material Contractual Obligation to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its Property is subject; or

        (iii)     violate any Requirement of Law in any material respect.

    3.3    <u>Governmental Authorization</u>.  Subject to the entry of the Interim Borrowing Order (or the Final Borrowing Order, when applicable), no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party or any Subsidiary of any Credit Party of this Agreement or other Loan Document except (a) for recordings and filings in connection with the Liens granted to the Agent under the Collateral Documents and (b) those obtained or made on or prior to the Closing Date.

    3.4    <u>Binding Effect</u>.  This Agreement and each other Loan Document to which any Credit Party or any Subsidiary of any Credit Party is a party constitute the legal, valid and binding obligations of each such Person which is a party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

    3.5    <u>Litigation</u>.

        (a)     Except for the Chapter 11 Cases and as specifically disclosed in <u>Schedule 3.5</u>, there are no actions, suits, proceedings, claims or disputes pending, or to the best knowledge of each Credit Party, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, against any Credit Party, any Subsidiary of any Credit Party or any of their respective Properties which:

        (i)     purport to affect or pertain to this Agreement or other Loan Document, or any of the transactions contemplated hereby or thereby;

        (ii)     as of the Closing Date would reasonably be expected to result in equitable relief or monetary judgment(s), individually or in the aggregate, in excess of $500,000 (but, in the case of personal injury matters, net of any insurance the proceeds of which the Borrower reasonably believes will cover such

judgment(s) and as to which the applicable insurer(s) has confirmed coverage in writing); or

(iii)    would reasonably be expected to have a Material Adverse Effect.

(b)    No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement or other Loan Document, or directing that the transactions provided for herein or therein not be consummated as herein or therein provided.  As of the Closing Date, no Credit Party or any Subsidiary of any Credit Party is the subject of an audit or, to each Credit Party's knowledge, any review or investigation by any Governmental Authority (excluding the IRS and other taxing authorities) concerning the violation or possible violation of any Requirement of Law.

3.6    No Default.  No Default or Event of Default exists or would result from the incurring of any Obligations by any Credit Party or the grant or perfection of Agent's Liens on the Collateral.  No Credit Party and no Subsidiary of any Credit Party is in default under or with respect to any Contractual Obligation in any respect which, individually or together with all such defaults, would reasonably be expected to have a Material Adverse Effect.

3.7    ERISA Compliance.  Schedule 3.7 sets forth, as of the Closing Date, a complete and correct list of, and that separately identifies, (a) all Title IV Plans, (b) all Multiemployer Plans and (c) all material Benefit Plans.  Each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law so qualifies.  Except for those that would not reasonably be expected to result in Liabilities in excess of $250,000 in the aggregate, (x) each Benefit Plan is in compliance with applicable provisions of ERISA, the Code and other Requirements of Law, (y) there are no existing or pending (or to the knowledge of any Credit Party, threatened) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigation involving any Benefit Plan to which any Credit Party incurs or otherwise has or could have an obligation or any Liability and (z) no ERISA Event is reasonably expected to occur.  No ERISA Event has occurred Post-Petition in connection with which obligations and liabilities (contingent or otherwise) remain outstanding.

3.8    Use of Proceeds; Margin Regulations.  No Credit Party and no Subsidiary of any Credit Party is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.

3.9    Ownership of Property.  As of the Closing Date, the Real Estate listed in Schedule 3.9 constitutes all of the Real Estate of each Credit Party and each of their respective Subsidiaries.  Each of the Credit Parties and each of their respective Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all Real Estate, and good and valid title to all owned personal property and

valid leasehold interests in all leased personal property, in each instance, necessary or used in the ordinary conduct of their respective businesses. As of the Closing Date, there are no Liens on any interest of any Credit Party or any Subsidiary in any Real Estate other than Permitted Liens. As of the Closing Date, Schedule 3.9 also describes any purchase options, rights of first refusal or other similar contractual rights pertaining to any Real Estate. As of the Closing Date, all material permits required to have been issued or appropriate to enable the Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect.

3.10  Taxes. All federal, state, local and foreign income and franchise and other material tax returns, reports and statements (collectively, the "Tax Returns") required to be filed by any Tax Affiliate have been filed with the appropriate Governmental Authorities, all such Tax Returns are true and correct in all material respects, and all taxes, assessments and other governmental charges and impositions reflected therein or otherwise due and payable Post-Petition have been paid, except for those contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Tax Affiliate in accordance with GAAP. As of the Closing Date, except as disclosed on Schedule 3.10, no Tax Return is under audit or examination by any Governmental Authority, and no notice of any audit or examination or any assertion of any claim for Taxes has been given or made by any Governmental Authority. Proper and accurate amounts have been withheld by each Tax Affiliate from their respective employees for all periods in full and complete compliance with the tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities. No Tax Affiliate has participated in a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b) or has been a member of an affiliated, combined or unitary group other than the group of which a Tax Affiliate is the common parent.

3.11  Financial Condition. Since the Petition Date, there have been no changes in the assets, liabilities, financial condition or business of any Credit Party or any Subsidiary of any Credit Party other than changes in the ordinary course of business or those which have not had, and would not reasonably be expected to have, a Material Adverse Effect.

3.12  Environmental Matters. Except as set forth in Schedule 3.12, and except where any failures to comply would not reasonably be expected to result in a Material Adverse Effect, (a) the operations of each Credit Party and each Subsidiary of each Credit Party are and have been in compliance with all applicable Environmental Laws, including obtaining, maintaining and complying with all Permits required by any applicable Environmental Law, (b) no Credit Party and no Subsidiary of any Credit Party is party to, and no Credit Party and no Subsidiary of any Credit Party and no Real Estate currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Person is subject to or the subject of, any Contractual Obligation or any pending (or, to the knowledge of any Credit Party, threatened) order, action, investigation, suit, proceeding, audit, claim, demand, dispute or

notice of violation or of potential liability or similar notice relating in any manner to any Environmental Laws, (c) no Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities has attached to any property of any Credit Party or any Subsidiary of any Credit Party and, to the knowledge of any Credit Party, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such property, (d) no Credit Party and no Subsidiary of any Credit Party has caused or suffered to occur a Release of Hazardous Materials at, to or from any Real Estate, (e) all Real Estate currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Credit Party and each Subsidiary of each Credit Party is free of contamination by any Hazardous Materials except for such Release or contamination that could not reasonably be expected to result in any Liabilities to any Credit Party or any Subsidiary of any Credit Party, and (f) no Credit Party and no Subsidiary of any Credit Party (i) is or has been engaged in, or has permitted any current or former tenant to engage in, operations or (ii) knows of any facts, circumstances or conditions, including receipt of any information request or notice of potential responsibility under the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601 et seq.) or similar Environmental Laws. Each Credit Party has made available to Agent copies of all existing environmental reports, reviews and audits and all documents pertaining to actual or potential Environmental Liabilities, in each case to the extent such reports, reviews, audits and documents are in their possession, custody, control or otherwise available to the Credit Parties.

3.13    Regulated Entities. None of any Credit Party, any Person controlling any Credit Party, or any Subsidiary of any Credit Party, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other Federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its Obligations under the Loan Documents.

3.14    Labor Relations. There are no strikes, work stoppages, slowdowns or lockouts existing, pending (or, to the knowledge of any Credit Party, threatened) against or involving any Credit Party or any Subsidiary of any Credit Party, except for those that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect. Except as set forth in Schedule 3.14, as of the Closing Date, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Credit Party or any Subsidiary of any Credit Party, (b) no petition for certification or election of any such representative is existing or pending with respect to any employee of any Credit Party or any Subsidiary of any Credit Party and (c) no such representative has sought certification or recognition with respect to any employee of any Credit Party or any Subsidiary of any Credit Party.

3.15    Intellectual Property. Schedule 3.15 sets forth a true and complete list of the following Intellectual Property each Credit Party owns, licenses or otherwise has the right to use: (i) Intellectual Property that is registered or subject to applications for registration, (ii) Internet Domain Names and (iii) material Intellectual Property and material Software, separately identifying that owned and licensed to such Credit Party and

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

including for each of the foregoing items (1) the owner, (2) the title, (3) the jurisdiction in which such item has been registered or otherwise arises or in which an application for registration has been filed, (4) as applicable, the registration or application number and registration or application date and (5) any material IP Licenses or other rights (including franchises) granted by such Credit Party with respect thereto. Each Credit Party and each Subsidiary of each Credit Party owns, or is licensed to use, all Intellectual Property necessary to conduct its business as currently conducted except for such Intellectual Property the failure of which to own or license would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. To the knowledge of each Credit Party, (a) the conduct and operations of the businesses of each Credit Party and each Subsidiary of each Credit Party does not infringe, misappropriate, dilute, violate or otherwise impair any Intellectual Property owned by any other Person and (b) no other Person has contested any right, title or interest of any Credit Party or any Subsidiary of any Credit Party in, or relating to, any Intellectual Property, other than, in each case, as cannot reasonably be expected to affect the Loan Documents and the transactions contemplated therein and would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.16     Broker's Fees. Except for fees payable to Agent, Whippoorwill and Lenders and except as may be disclosed on Schedule 3.16, none of the Credit Parties or any of their respective Subsidiaries has any obligation to any Person in respect of any finder's, broker's or investment banker's fee in connection with the transactions contemplated hereby.

3.17     Insurance. Schedule 3.17 lists all insurance policies of any nature maintained, as of the Closing Date, for current occurrences by each Credit Party, including issuers, coverages and deductibles. Each of the Credit Parties and each of their respective Subsidiaries and their respective Properties are insured with financially sound and reputable insurance companies which are not Affiliates of Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar Properties in localities where such Person operates.

3.18     Ventures, Subsidiaries and Affiliates; Outstanding Stock. Except as set forth in Schedule 3.18 as of the Closing Date, no Credit Party and no Subsidiary of any Credit Party has any Subsidiaries, is engaged in any joint venture or partnership with any other Person, or is an Affiliate of any other Person. All issued and outstanding Stock and Stock Equivalents of each of the Credit Parties and each of their respective Subsidiaries are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than, with respect to the Stock and Stock Equivalents of Borrower, Parent, REH, and Subsidiaries of Borrower, those in favor of Agent, for the benefit of the Secured Parties and those in favor of Loehmann's Capital under the Lease Documents. All such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities. All of the issued and outstanding Stock of each Credit Party (other than Holdings), each Subsidiary of each Credit Party and, as of the Closing Date, Holdings is owned by each of the Persons and in the amounts set forth in Schedule 3.18 Except as set forth in Schedule 3.18 there are no pre-emptive or other

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party may be required to issue, sell, repurchase or redeem any of its Stock or Stock Equivalents or any Stock or Stock Equivalents of its Subsidiaries. Set forth in Schedule 3.18 is a true and complete organizational chart of Holdings and all of its Subsidiaries as of the Closing Date.

3.19    Government Contracts.  Except as set forth in Schedule 3.19 of the Closing Date, no Credit Party is a party to any contract or agreement with any Governmental Authority and no Credit Party's Accounts are subject to the Federal Assignment of Claims Act (31 U.S.C. Section 3727) or any similar state or local law.

3.20    Reserved.

3.21    Bonding; Licenses.  Except as set forth in Schedule 3.21 as of the Closing Date, no Credit Party is a party to or bound by any surety bond agreement, indemnification agreement therefor or bonding requirement with respect to products or services sold by it.

3.22    Status of Holdings and Parent.  Neither Holdings nor Parent has engaged in any business activities other than (i) ownership of the Stock and Stock Equivalents of one or more of the other Credit Parties, (ii) activities and contractual rights incidental to maintenance of its corporate existence, (iii) performance of its obligations under any Loan Document to which it is a party, (iv) performance of its obligations under any Prepetition Loan Document to which it is a party, and (v) other ancillary activities relating to the operation of the Borrower's business.

3.23    Lease Documents and Senior Secured Notes  As of the Closing Date, Borrower has delivered to Agent a true, correct and complete copy of each of the Lease Documents and the Senior Secured Note Documents (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents delivered pursuant thereto or in connection therewith).

3.24    Full Disclosure.  None of the representations or warranties made by any Credit Party or any of their Subsidiaries in the Loan Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any Credit Party or any of their Subsidiaries in connection with the Loan Documents (including the offering and disclosure materials, if any, delivered by or on behalf of any Credit Party to Agent  or the Lenders prior to the Closing Date), contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

3.25    Foreign Assets Control Regulations and Anti-Money Laundering.

(a)    OFAC.  Each Credit Party and each Subsidiary of Credit Party is and will remain in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

Treasury Department's Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it. No Credit Party and no Subsidiary or Affiliate of a Credit Party (i) is a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including without limitation by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

3.26    Patriot Act. The Credit Parties, each of their Subsidiaries and each of their Affiliates are in compliance with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "*know your customer*" and anti-money laundering rules and regulations. No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

3.27    Reorganization Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motion seeking approval of the Loan Documents and the DIP Borrowing Orders, (y) the hearing for the approval of the Interim Borrowing Order, and (z) the hearing for the approval of the Final Borrowing Order has been or will be given. The Credit Parties shall give, on a timely basis as specified in the DIP Borrowing Orders, as applicable, all notices required to be given to all parties specified in the DIP Borrowing Orders, as applicable.

(b)    The Interim Borrowing Order (with respect to the period prior to entry of the Final Borrowing Order) or the Final Borrowing Order (with respect to the period on and after entry of the Final Borrowing Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended.

Subject to the terms of the DIP Borrowing Orders, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Agent, Whippoorwill, as special representative of the Tranche B Lenders, and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

## ARTICLE IV.
## AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

4.1     Financial Statements.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (provided that monthly financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments).   Borrower shall deliver to Agent, Whippoorwill and each Lender by Electronic Transmission and in detail reasonably satisfactory to Agent:

(a)     as soon as available, but not later than ninety (90) days after the end of each Fiscal Year, a copy of the audited consolidated (and, if requested by Agent, consolidating) balance sheets of Holdings and each of its Subsidiaries as at the end of such year and the related consolidated (and, if requested by Agent, consolidating) statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, and accompanied by the report of any "Big Four" or other nationally recognized independent public accounting firm reasonably acceptable to Agent which report shall (i) contain an unqualified opinion, stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years and (ii) not include any explanatory paragraph expressing substantial doubt as to going concern status;

(b)     as soon as available, but not later than thirty (30) days after the end of each fiscal month of each year (or, for any fiscal month ending at the end of any Fiscal Quarter, forty-five (45) days after the end of such fiscal month), a copy of the unaudited consolidated and consolidating balance sheets of Holdings and each of its Subsidiaries, and the related consolidated and consolidating statements of income, shareholders' equity and cash flows as of the end of such fiscal month and for the portion of the Fiscal Year then ended, all certified on behalf of Borrower by an appropriate Responsible Officer of Borrower as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures; and

(c)     a Variance Report, on the Tuesday of each calendar week for the prior calendar week period.

4.2     Appraisals; Certificates; Other Information.  Borrower shall furnish to Agent, Whippoorwill and each Lender by Electronic Transmission:

35

(a)     together with each delivery of financial statements pursuant to subsections 4.1(a) and 4.1(b), (i) a management discussion and analysis report, in reasonable detail, signed by the chief financial officer of Borrower, describing the operations and financial condition of the Credit Parties and their Subsidiaries for the fiscal month and the portion of the Fiscal Year then ended (or for the Fiscal Year then ended in the case of annual financial statements), and (ii) a report setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the most recent projections for the current Fiscal Year delivered pursuant to subsection 4.2(i) and discussing the reasons for any significant variations;

(b)     concurrently with the delivery of the financial statements referred to in subsections 4.1(a) and 4.1(b) above, a fully and properly completed Compliance Certificate in the form of Exhibit 4.2(b), certified on behalf of Borrower by a Responsible Officer of Borrower;

(c)     promptly after the same are sent, copies of all financial statements and reports which any Credit Party sends to its shareholders or other equity holders, as applicable, generally and promptly after the same are filed, copies of all financial statements and regular, periodic or special reports which such Person may make to, or file with, the Securities and Exchange Commission or any successor or similar Governmental Authority;

(d)     Borrowing Base Certificates  which shall be delivered on Wednesday of each calendar week and shall set forth the Borrowing Base as of the close of business on the immediately preceding Saturday;

(e)     concurrently with the delivery of each Borrowing Base Certificate, a summary of Inventory by location and type (with a supporting perpetual Inventory report in the case of Borrowing Base Certificate delivered at month-end), in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(f)     concurrently with the delivery of the financial statements required by subsection 4.1(b), an aging of accounts payable accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(g)     on a weekly basis or at such other intervals as Agent may request from time to time (together with a copy of all or any part of such delivery requested by Whippoorwill or any Lender in writing after the Closing Date), collateral reports, including if requested by Agent all additions and reductions (cash and non-cash) with respect to Accounts of the Credit Parties in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion each of which shall be prepared by Borrower as of the last day of the immediately preceding week or the date 2 days prior to the date of any request;

18198069/21798-000010 Current/21008698v1521388094v4
11/12/2008/2010 11:46 am3:30 pm

(h)    to Agent and Whippoorwill, at the time of delivery of each of the monthly financial statements delivered pursuant to subsection 4.1(b) and to the extent requested by Agent:

(i)    a reconciliation of the most recent Borrowing Base, general ledger and month-end Inventory reports of Borrower to its general ledger and monthly financial statements delivered pursuant to subsection 4.1(b), in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(ii)    a reconciliation of the perpetual inventory by location and to Borrower's most recent Borrowing Base Certificate, general ledger and monthly Financial Statements delivered pursuant to subsection 4.1(b), in each case, in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion; and

(iii)    a reconciliation of the outstanding Loans as set forth in the monthly loan account statement provided by Agent to Borrower's general ledger and monthly Financial Statements delivered pursuant to subsection 4.1(b), in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(i)    as soon as available and in any event no later than the last day of each Fiscal Year of Borrower, projections of the Credit Parties (and their Subsidiaries') consolidated financial performance for the forthcoming three Fiscal Years on a year by year basis, and for the forthcoming Fiscal Year on a month by month basis, including projections of Availability and the Borrowing Base on a month by month basis;

(j)    promptly upon receipt thereof, copies of any reports submitted by the certified public accountants in connection with each annual, interim or special audit or review of any type of the financial statements or internal control systems of any Credit Party made by such accountants, including any comment letters submitted by such accountants to management of any Credit Party in connection with their services;

(k)    upon Agent's request from time to time, the Credit Parties shall permit and enable Agent and Whippoorwill to obtain appraisals in form and substance and from appraisers reasonably satisfactory to Agent stating the then Net Orderly Liquidation Value, or such other value as determined by Agent, of all or any portion of the Inventory of Borrower; provided that, notwithstanding any provision herein to the contrary, the Credit Parties shall only be obligated to reimburse Agent for the expenses of such appraisals occurring four (4) times per year or more frequently so long as an Event of Default has occurred and is continuing and for expenses of desktop appraisal that may be performed with such frequency as the Agent may determine in its discretion;

(l)    promptly after the same are filed, copies of any financial statements and regular, periodic or special reports which any Credit Party may make to, or

37

file with, the Securities and Exchange Commission or any successor or similar Governmental Authority; ~~and~~

(m)    promptly, such additional business, financial, corporate affairs, perfection certificates and other information as Agent or Whippoorwill may from time to time reasonably request~~.~~; and

(n)    simultaneous with the delivery of any notices, statements or other information to the Agent required under Sections 4.1, 4.2 or 4.3, Borrower shall provide copies of any such deliveries to Whippoorwill and each Tranche B Lender.

4.3    Notices.  Borrower shall notify promptly Agent, Whippoorwill and each Lender of each of the following (and in no event later than three (3) Business Days after a Responsible Officer becoming aware thereof):

(a)    the occurrence or existence of any Default or Event of Default, or any event or circumstance that could reasonably be expected to become a Default or Event of Default;

(b)    any breach or non-performance by any Credit Party of, or any default by any Credit Party under, any of the Lease Documents;

(c)    any breach or non performance of, or any default under, any Contractual Obligation of any Credit Party or any Subsidiary of any Credit Party, or any violation of, or non-compliance with, any Requirement of Law, which would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, including a description of such breach, non-performance, default, violation or non-compliance and the steps, if any, such Person has taken, is taking or proposes to take in respect thereof;

(d)    any dispute, litigation, investigation, proceeding or suspension which may exist at any time between any Credit Party or any Subsidiary of any Credit Party and any Governmental Authority which would reasonably be expected to result, either individually or in the aggregate, in Liabilities in excess of $500,000 (but, in the case of personal injury matters, net of any insurance the proceeds of which the Borrower reasonably believes will cover such matters and as to which the applicable insurer(s) has confirmed coverage in writing);

(e)    the commencement of, or any material development in, any litigation or proceeding affecting any Credit Party or any Subsidiary of any Credit Party (i) in which the amount of damages claimed is $500,000 (or its equivalent in another currency or currencies) or more (but, in the case of personal injury matters, net of any insurance the proceeds of which the Borrower reasonably believes will cover such matters and as to which the applicable insurer has confirmed coverage in writing), (ii) in which injunctive or similar relief is sought and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect, or (iii) in which the relief sought is an injunction or other stay of the performance of this Agreement or other Loan Document;

(f)     (i) the receipt by any Credit Party of any notice of violation of or potential liability or similar notice under Environmental Law, (ii) the receipt by any Credit Party of any notice of (A) unpermitted Releases, (B) the existence of any condition that could reasonably be expected to result in violations of or Liabilities under, any Environmental Law or (C) the commencement of, or any material change to, any action, investigation, suit, proceeding, audit, claim, demand, dispute alleging a violation of or Liability under any Environmental Law which in the case of clauses (A), (B) or (C) would reasonably be expected to result in a Material Adverse Effect, and (iii) the receipt by any Credit Party of notification that any property of any Credit Party is subject to any Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities;

(g)     (i) on or prior to any filing by any ERISA Affiliate of any notice of any reportable event under Section 4043 of ERISA, or intent to terminate any Title IV Plan, a copy of such notice (ii) promptly, and in any event within ten (10) days, after any officer of any ERISA Affiliate knows or has reason to know that a request for a minimum funding waiver under Section 412 of the Code has been filed with respect to any Title IV Plan or Multiemployer Plan, a notice describing such waiver request and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto, and (iii) promptly, and in any event within ten (10) days after any officer of any ERISA Affiliate knows or has reason to know that an ERISA Event will or has occurred, a notice describing such ERISA Event, and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notices received from or filed with the PBGC, IRS, Multiemployer Plan or other Benefit Plan pertaining thereto;

(h)     any Material Adverse Effect subsequent to the date of the most recent audited financial statements delivered to Agent, Whippoorwill and Lenders pursuant to this Agreement;

(i)     any material change in accounting policies or financial reporting practices by any Credit Party or any Subsidiary of any Credit Party;

(j)     any labor controversy resulting in or threatening to result in any strike, work stoppage, boycott, shutdown or other labor disruption against or involving any Credit Party or any Subsidiary of any Credit Party if the same would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(k)     the creation, establishment or acquisition of any Subsidiary or the issuance by or to any Credit Party of any Stock or Stock Equivalent (other than issuances by Holdings of Stock or Stock Equivalent not requiring a mandatory prepayment hereunder);

(l)     (i) the creation, or filing with the IRS or any other Governmental Authority, of any Contractual Obligation or other document extending, or having the effect of extending, the period for assessment or collection of any income or franchise or other material taxes with respect to any Tax Affiliate and (ii) the creation of any

39

Contractual Obligation of any Tax Affiliate, or the receipt of any request directed to any Tax Affiliate, to make any material adjustment under Section 481(a) of the Code, by reason of a change in accounting method or otherwise;

(m)     the receipt of any correspondence from a credit card issuer or processor with respect to any Credit Card Agreement or Credit Card Acknowledgment; and

(n)     the receipt of any termination notice with respect to the Sponsor Credit Support, except with respect to any termination provided for in Section 4.15, or DIP Sponsor Credit Support from the issuer thereof.

Each notice pursuant to this Section 4.3 shall be in electronic form accompanied by a statement by a Responsible Officer of Borrower, on behalf of Borrower, setting forth details of the occurrence referred to therein, and stating what action Borrower or other Person proposes to take with respect thereto and at what time.  Each notice under subsection 4.3(a) shall describe with particularity any and all clauses or provisions of this Agreement or other Loan Document that have been breached or violated.

4.4     Preservation of Corporate Existence, Etc.  Each Credit Party shall, and shall cause each of its Subsidiaries to:

(a)     preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of incorporation, organization or formation, as applicable, except, with respect to Holdings' Subsidiaries, in connection with transactions permitted by Section 5.3;

(b)     preserve and maintain in full force and effect all rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except in connection with transactions permitted by Section 5.3 and sales of assets permitted by Section 5.2 and except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(c)     use its commercially reasonable efforts, in the Ordinary Course of Business, to preserve its business organization and preserve the goodwill and business of the customers, suppliers and others having material business relations with it;

(d)     preserve or renew all of its registered trademarks, trade names and service marks, the non preservation of which would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(e)     conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect and shall comply in all material respects with the terms of its IP Licenses.

4.5     Maintenance of Property.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, and preserve all its Property which is used or useful in its business in good working order and condition, ordinary wear and tear

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

excepted and shall make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.6    Insurance.

(a)    Each Credit Party shall, and shall cause each of its Subsidiaries to, (i) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the property and businesses of the Credit Parties and such Subsidiaries (including policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, business interruption and employee health and welfare insurance) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of Borrower) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Credit Parties and (ii) cause all such insurance relating to any property or business of any Credit Party to name Agent as additional insured or loss payee, as appropriate.  All policies of insurance on real and personal property of the Credit Parties will contain an endorsement, in form and substance acceptable to Agent, showing loss payable to Agent (Form CP 1218 or equivalent) and extra expense and business interruption endorsements.  Such endorsement, or an independent instrument furnished to Agent, will provide that the insurance companies will give Agent at least 30 days' prior written notice before any such policy or policies of insurance shall be altered or canceled and that no act or default of the Credit Parties or any other Person shall affect the right of Agent to recover under such policy or policies of insurance in case of loss or damage.  Each Credit Party shall direct all present and future insurers under its "All Risk" policies of property insurance to pay all proceeds payable thereunder directly to Agent.  If any insurance proceeds are paid by check, draft or other instrument payable to any Credit Party and Agent jointly, Agent may endorse such Credit Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash.  Agent reserves the right at any time, upon review of each Credit Party's risk profile, to require additional forms and limits of insurance.

(b)    Unless the Credit Parties provide Agent with evidence of the insurance coverage required by this Agreement, Agent may purchase insurance at the Credit Parties' expense to protect Agent's and Lenders' interests in the Credit Parties' and their Subsidiaries' properties.  This insurance may, but need not, protect the Credit Parties' and their Subsidiaries' interests.  The coverage that Agent purchases may not pay any claim that any Credit Party or any Subsidiary of any Credit Party makes or any claim that is made against such Credit Party or any Subsidiary in connection with said Property.  Borrower may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that there has been obtained insurance as required by this Agreement.  If Agent purchases insurance, the Credit Parties will be responsible for the costs of that insurance, including interest and any other charges Agent may impose in connection with the placement of insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance shall be added to the Obligations. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on their own.

4.7     Payment of Obligations.  Such Credit Party shall, and shall cause each of its Subsidiaries to, pay, discharge and perform as the same shall become due and payable or required to be performed, all their respective Post-Petition obligations and liabilities, including:

(a)     all tax liabilities, assessments and governmental charges or levies upon it or its Property, unless (i) the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the filing or enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person and (ii) the aggregate Liabilities secured by such Lien do not exceed $250,000;

(b)     all lawful claims which, if unpaid, would by law become a Lien upon its Property unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the imposition or enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person;

(c)     all Indebtedness, as and when due and payable, but subject to any subordination provisions contained herein, in any other Loan Documents and/or in any instrument or agreement evidencing such Indebtedness;

(d)     the performance of all obligations under any Contractual Obligation to such Credit Party or any of its Subsidiaries is bound, or to which it or any of its Property is subject, except where the failure to perform would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(e)     payments to the extent necessary to avoid the imposition of a Lien with respect to, or the involuntary termination of any underfunded Benefit Plan.

4.8     Compliance with Laws.  Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except where the failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.9     Inspection of Property and Books and Records.  Each Credit Party shall maintain and shall cause each of its Subsidiaries to maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person.  Each Credit Party shall, and shall cause each of its Subsidiaries to, with respect to each owned, leased, or controlled property, during normal business hours and upon reasonable advance notice (unless an Event of Default shall have occurred and be continuing, in which event no notice shall be required and Agent shall have access at any and all times during the continuance thereof):  (a) provide access to such property to Agent and any of its Related Persons, as frequently as Agent determines to be appropriate; and (b) permit Agent and any of its Related Persons to conduct field

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

examinations, audit, inspect and make extracts and copies (or take originals if reasonably necessary) from all of such Credit Party's books and records, and evaluate and make physical verifications of the Inventory and other Collateral in any manner and through any medium that Agent considers advisable, in each instance, at the Credit Parties' expense; provided the Credit Parties shall only be obligated to reimburse Agent for the expenses for three (3) such field examinations, audits and inspections per year or more frequently if an Event of Default has occurred and is continuing.  Any Lender may accompany Agent or its Related Persons in connection with any inspection at such Lender's expense.

4.10   Use of Proceeds.  Borrower shall use the proceeds of (a) the Tranche A Revolving Loans solely to (ai) upon entry of the Final Borrowing Order, to refinance the Prepetition Liabilities, (bii) to pay costs and expenses required to be paid pursuant to Section 2.1, and (ciii) for working capital, capital expenditures and other general corporate purposes which may include payment to essential vendors, warehousemen, and freight handlers as approved by the Bankruptcy Court and not in contravention of any Requirement of Law and not in violation of this Agreement and not in excess of amounts set forth in the Approved Budget.; provided that Borrower shall not use the proceeds of the Tranche A Revolving Loans to purchase Inventory (other than pursuant to the issuance of Letters of Credit) unless the Tranche B Revolving Loans have been fully drawn and remain outstanding and (b) the Tranche B Revolving Loans, net of any fees, costs or expenses (including attorney's fees of Whippoorwill and the Tranche B Lenders payable therefrom as of the Effective Date) solely to purchase Inventory or to pay Attorney Costs of the Tranche B Lenders and Whippoorwill.

4.11   Cash Management Systems.(a)

(a)   (b) Each Credit Party shall enter into, and cause each depository, securities intermediary or commodities intermediary to enter into, Control Agreements providing for (i) "full" cash dominion with respect to each non-disbursement deposit account and each securities, commodity or similar account maintained by such Credit Party as of or after the Closing Date and (ii) "springing" cash dominion with respect to each disbursement deposit account maintained by such Credit Party as of or after the Closing Date other than the Credit Parties' payroll account (so long as such payroll account is used only for such purpose and the balance of funds at any time on deposit therein does not exceed the amount necessary to pay the Credit Parties' current or reasonably anticipated payroll liabilities) and their withholding tax, customs merchandise, expense and fiduciary accounts (collectively, the "Other Deposit Accounts").   For purposes of this subsection 4.11(a), Borrower's Funding Concentration Account shall be treated as a disbursement deposit account.  With respect to disbursement deposit accounts subject to such "springing" Control Agreements, unless and until an Event of Default has occurred and is continuing, Agent shall not deliver to the relevant depository, securities intermediary or commodities intermediary a notice or other instruction which provides for exclusive control over such account by Agent. The Credit Parties shall not maintain cash on deposit in disbursement accounts (including Other Deposit Accounts) in excess of outstanding checks and wire transfers payable from such accounts and amounts necessary to meet minimum balance requirements. Credit Parties shall cause all payments received by them each day to be deposited in a deposit account subject to a Control Agreement (a

"Blocked Account") within one (1) Business Day following receipt by a Credit Party and Credit Parties shall cause all funds in such Blocked Account to be transferred on a daily basis to the Collection Account (except in the case of the Credit Card Concentration Account, a minimum balance of $50,000 shall be retained in the account); provided that (i) if and for so long as Credit Parties use only two Blocked Accounts for receipt of such payments, the Credit Parties shall cause all funds in one of such Blocked Accounts to be transferred on a daily basis to the other Blocked Account and Credit Parties shall cause all funds in such other Blocked Account to be transferred on a daily basis to the Collection Account, and (ii) if Credit Parties use more than two (2) Blocked Accounts for such receipt of payments, then (i) Credit Parties shall establish a concentration deposit account subject to a Control Agreement (the "Concentration Account"), (ii) Credit Parties shall cause all funds in each Blocked Account to be transferred on a daily basis to the Concentration Account, and (iii) Credit Parties shall cause all funds in the Concentration Account to be transferred on a daily basis to the Collection Account (except in the case of the Credit Card Concentration Account, a minimum balance of $50,000 shall be retained in the account).

(b)     (c) The Credit Parties shall not permit, for a period in excess of 3 Business Days, cash or Cash Equivalents in an aggregate amount in excess of $5 million (other than cash necessary for the Credit Parties to satisfy the current liabilities incurred by them in the ordinary course of their business and without acceleration of the satisfaction of such current liabilities) to accumulate and be maintained in deposit or investment accounts of the Credit Parties; provided that this covenant shall be suspended if and for so long as no Loans are outstanding and all Letters of Credit issued under the Financing have been cash collateralized in accordance with Section 7.4.

(c)     (d) Without Agent's prior written consent, Borrower shall not change or withdraw the payment instruction given to PNC in the PNC Credit Card Notice or give any other instructions to PNC with respect to the payment by PNC of any amounts now or hereafter payable to the Borrower under the Borrower's credit card processing agreement with PNC.

(d)     (e) The Agent shall, pursuant to the DIP Borrowing Orders and the Cash Management Order, be deemed to be the successor in interest to the Prepetition Agent with respect to any and all credit card notifications, blocked account or deposit account control agreements required to have been executed and delivered under the Prepetition Credit Agreement.

4.12     [Intentionally Omitted].

4.13     Further Assurances.

(a)     Each Credit Party shall ensure that all written information, exhibits and reports furnished to Agent, Whippoorwill or the Lenders do not and will not contain any untrue statement of a material fact and do not and will not omit to state any material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and will promptly disclose to Agent, Whippoorwill

44

and the Lenders and correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement or recordation thereof.

(b)     Promptly upon request by Agent, the Credit Parties shall (and, subject to the limitations hereinafter set forth, shall cause each of their Subsidiaries to) take such additional actions and execute such documents as Agent may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement or any other Loan Document, (ii) to subject to the Liens created by any of the Collateral Documents any of the Properties, rights or interests covered by any of the Collateral Documents, (iii) to perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document.   Without limiting the generality of the foregoing and except as otherwise approved in writing by the Agent, the Credit Parties shall cause each of their Domestic Subsidiaries (other than Domestic Subsidiaries owned indirectly through a Foreign Subsidiary) and, to the extent no 956 Impact (as defined below) exists, Foreign Subsidiaries, and Domestic Subsidiaries owned indirectly through a Foreign Subsidiary, to guaranty the Obligations and to cause each such Subsidiary to grant to Agent, for the benefit of the Secured Parties, a security interest in, subject to the limitations hereinafter set forth, all of such Subsidiary's Property to secure such guaranty. Furthermore and except as otherwise approved in writing by the Agent, each Credit Party shall, and shall cause each of its Domestic Subsidiaries (other than Domestic Subsidiaries owned indirectly through a Foreign Subsidiary) to, pledge all of the Stock and Stock Equivalents of each of its Domestic Subsidiaries (other than Domestic Subsidiaries owned indirectly through a Foreign Subsidiary) and First Tier Foreign Subsidiaries (provided that with respect to any First Tier Foreign Subsidiary, if a 956 Impact exists such pledge shall be limited to sixty-five percent (65%) of such Foreign Subsidiary's outstanding voting Stock and Stock Equivalents and one hundred percent (100%) of such Foreign Subsidiary's outstanding non-voting Stock and Stock Equivalents) and to the extent no 956 Impact exists, each of its Foreign Subsidiaries to pledge all of the Stock and Stock Equivalent of each of its Subsidiaries, in each instance, to Agent, for the benefit of the Secured Parties, to secure the Obligations.  In connection with each pledge of Stock and Stock Equivalents, the Credit Parties shall deliver, or cause to be delivered, to Agent, irrevocable proxies and stock powers and/or assignments, as applicable, duly executed in blank.  A "956 Impact" shall be deemed to exist to the extent the issuance of a guaranty by, grant of a Lien by, or pledge of greater than two-thirds of the voting Stock and Stock Equivalents of, a Foreign Subsidiary, would result in material incremental income tax liability as a result of the application of Section 956 of the Code, taking into account actual anticipated repatriation of funds, foreign tax credits and other relevant factors.

4.14     Environmental Matters.  Without limiting the generality of the foregoing, each Credit Party shall, and shall cause each of its Subsidiaries to, comply with, and maintain its Real Estate, whether owned, leased, subleased or otherwise operated or occupied, in compliance with, all applicable Environmental Laws (including by implementing any Remedial Action not required to be taken by other Persons and

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

necessary to achieve such compliance or that is required by orders and directives of any Governmental Authority except where the failure to comply would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.

4.15    Sponsor Credit Support.

(a)    The Sponsor Credit Support shall be in effect at all times until replaced by the DIP Sponsor Credit Support. Reasonably contemporaneously with entry of the Final Borrowing Order, the Agent shall have received from the Equity Sponsor, against delivery of the Sponsor Credit Support to the issuing bank for cancellation in accordance with its terms, a new standby letter of credit, naming the Agent as sole beneficiary, in the face amount, or cash collateral in the initial amount, of $7,500,000, less any amounts drawn on under the Sponsor Credit Support (the "DIP Sponsor Credit Support"), to secure the Equity Sponsor's obligations pursuant to Section 4.15 of this Agreement. The DIP Sponsor Credit Support shall be in effect on the date of the entry of a Final Borrowing Order and shall remain in effect until 30 days after the Revolving Termination Date (the "DIP Sponsor Credit Support Termination Date"). For the avoidance of doubt, in the event that the Sponsor Credit Support is fully drawn prior to the entry of the Final Borrowing Order, the Borrower shall not be required to deliver the DIP Sponsor Credit Support.

(b)    Each Credit Party shall cause the Equity Sponsor, and the Equity Sponsor shall cause the DIP Sponsor Credit Support to be in full force and effect at all times through the DIP Sponsor Credit Support Termination Date, respectively, and fully available to be drawn upon, in whole or in part, by the Agent in its discretion (or at the direction of the Required Lenders or written direction of the Borrower) at any time following the occurrence of any of the Draw Conditions.

(c)    Each draw by the Agent upon the DIP Sponsor Credit Support pursuant to Section 4.15(a), shall automatically result in a reclassification of Revolving Loans (on a pro rata basis for each Lender that then holds Revolving Loansas further described herein) to a term loan (each, a "Term Loan") in an amount equal to the amount of DIP Sponsor Credit Support drawn by the Agent (with the aggregate principal balance of the Term Loans increasing by the amount of each such draw) and, upon each such draw, the Equity Sponsor simultaneously and automatically shall be deemed to have purchased a participation interest in 100% of such Term Loan pursuant to the terms of the Sponsor Participation Agreement. The Agent shall distribute the proceeds of the draw, on a pro rata basis, to Tranche A Lenders in consideration of their interest in Revolving Loans reclassified to Term Loans pursuant to this Section 4.15. Any proceeds of the draw in excess of the amount of outstanding Tranche A Revolving Loans shall be distributed to the Tranche B Lenders in consideration of their interests in the outstanding Tranche B Revolving Loans and such Tranche B Revolving Loans shall be reclassified to Term Loans pursuant to this Section 4.15. Upon entry of the Final Borrowing Order, any Term Loans then extant under the Prepetition Credit Agreement shall be deemed Term Loans under the terms of this Agreement.

18198069/21798-000010 Current/21008698v1521388094v4
11/12/2008/2010 11:46 am3:30 pm

(d) Each Term Loan shall be deemed a "Loan" for all purposes hereunder and shall accrue interest at the Interest Rate. Interest on each Term Loan shall not be paid on the applicable Interest Payment Date but shall be payable solely on the Term Loan Maturity Date. All Obligations outstanding under the Term Loans shall be due and payable on the Term Loan Maturity Date unless otherwise required to be paid earlier pursuant to the terms of this Agreement.

(e) If any Draw Condition occurs when no Tranche A Revolving Loans are outstanding or the amount of outstanding Tranche A Revolving Loans is less than the amount available to be drawn under the DIP Sponsor Credit Support, the Agent shall, at the direction of Whippoorwill, draw any available amounts under the DIP Sponsor Credit Support (to the extent not in excess of the Revolving Loans outstanding at such time) and distribute the proceeds in accordance with Section 4.15(c).

4.16 [Intentionally Omitted].

4.17 Milestones.

(a) Within 30 days from the Petition Date, the Bankruptcy Court shall have entered the Final Borrowing Order;

(b) Within 45 days from the Petition Date, the Bankruptcy Court shall have entered a Final Order extending the Borrower's time to assume or reject each of its real property leases until 210 days after the Petition Date;

(c) On or before December 1, 2010, the Credit Parties shall have filed with the Bankruptcy Court a Plan of Reorganization and Disclosure Statement, each in form and substance satisfactory to Agent;

(d) On or before January 7, 2011, the Bankruptcy Court shall have entered an order approving the Disclosure Statement respecting the Plan of Reorganization;

(e) On or before January 14, 2011, the Credit Parties shall have filed a motion pursuant to Section 363 of the Bankruptcy Code seeking authorization from the Bankruptcy Court to conduct a Permitted Sale of all or substantially all of Credit Parties' assets, which motion shall be in form and substance satisfactory to the Agent;

(f) On or before February 7, 2011, the Bankruptcy Court shall have entered an order confirming the Credit Parties' Plan of Reorganization;

(g) On or before February 18, 2011, the effective date of the Plan of Reorganization shall have occurred; and

(h) On or before February 23, 2011, the Bankruptcy Court shall have entered a Final Order, in form and substance satisfactory to Agent, authorizing the Credit Parties to engage in a Permitted Sale of all or substantially all of its assets, which sale shall be completed within 60 days from the date of such order.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

provided, however, that if ~~(i) a capital infusion of $10,000,000 is made on or before~~ the Tranche B Revolving Loans have been fully funded and remain outstanding as of January 14, 2011, ~~on terms and conditions acceptable to the Agent in its discretion and (ii)~~ the payment date of April 1, 2011 on account of the Lease Obligations set forth in the Senior Secured Note Indenture is extended to May 1, ~~2001~~2011 (exclusive of any cure periods), then the dates set forth in clauses (e) and (h) above shall each be extended, at Borrower's election, by not more than 45 calendar days.

# ARTICLE V.
## NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

5.1    Limitation on Liens.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired, other than the following ("Permitted Liens"):

(a)    (i) any Lien on the Collateral existing as of the Petition Date that secures the Lease Obligations to the extent permitted by subsection 5.5(c)(i) and that is subject to and in accordance with the Amended and Restated Intercreditor Agreement, (ii) the New York state sale tax liens set forth on Schedule 5.1, and (iii) any other Lien existing on the Property of a Credit Party or a Subsidiary of a Credit Party existing as of the Petition Date and set forth in Schedule 5.1 securing Indebtedness outstanding on the Petition Date and permitted by subsection 5.5(c)(ii) including replacement Liens on the Property currently subject to such Liens securing Indebtedness permitted by subsection 5.5(c)(ii);

(b)    any Lien created under any Loan Document and DIP Borrowing Orders;

(c)    Liens for taxes, fees, assessments or other governmental charges (i) which are not past due or remain payable without penalty, or (ii) the non payment of which is permitted by Section 4.7;

(d)    To the extent existing on the Petition Date, carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's or other similar Liens arising in the Ordinary Course of Business which are not past due or remain payable without penalty or which are being contested in good faith and by appropriate proceedings diligently prosecuted, which proceedings have the effect of preventing the forfeiture or sale of the Property subject thereto and for which adequate reserves in accordance with GAAP are being maintained;

(e)    Liens (other than any Lien imposed by ERISA) consisting of pledges or deposits required in the Ordinary Course of Business in connection with

48

workers' compensation, unemployment insurance and other social security legislation or to secure the performance of tenders, statutory obligations, surety, stay, customs and appeals bonds, bids, leases, governmental contract, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or to secure liability to insurance carriers;

(f)     To the extent existing on the Petition Date, Liens consisting of judgment or judicial attachment liens (other than for payment of taxes, assessments or other governmental charges), provided that the enforcement of such Liens is effectively stayed and all such Liens secure claims in the aggregate at any time outstanding for the Credit Parties and their Subsidiaries not exceeding $250,000;

(g)     easements, rights of way, zoning and other restrictions, minor defects or other irregularities in title, and other similar encumbrances incurred in the Ordinary Course of Business which, either individually or in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the Property subject thereto or interfere in any material respect with the ordinary conduct of the businesses of any Credit Party or any Subsidiary of any Credit Party;

(h)     [Reserved];

(i)     [Reserved];

(j)     any interest or title of a lessor or sublessor under any lease permitted by this Agreement;

(k)     non-exclusive licenses and sublicenses (including IP Licenses) granted by a Credit Party and leases or subleases (by a Credit Party as lessor or sublessor) to third parties in the Ordinary Course of Business not interfering with the business of the Credit Parties or any of their Subsidiaries;

(l)     Liens in favor of collecting banks arising by operation of law under Section 4-210 of the Uniform Commercial Code or, with respect to collecting banks located in the State of New York, under 4-208 of the Uniform Commercial Code;

(m)     Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits;

(n)     Liens in favor of customs and revenue authorities arising as a matter of law which secure payment of customs duties in connection with the importation of goods in the Ordinary Course of Business;

(o)     Liens arising from precautionary uniform commercial code financing statements filed under any Equipment lease permitted by this Agreement;

(p)     Liens arising out of consignment or similar arrangements for the sale of goods entered into in the Ordinary Course of Business;

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

(q)     Any Liens in favor of an Acceptable Liquidation Agent arising pursuant to clause (ii) of the definition of Equity Agency Agreement; and

(r)     Liens securing Prepetition Liabilities.

5.2     Disposition of Assets.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Property (including the Stock of any Subsidiary of any Credit Party, whether in a public or a private offering or otherwise, and accounts and notes receivable, with or without recourse) or enter into any agreement to do any of the foregoing, except:

(a)     dispositions in the Ordinary Course of Business of Inventory;

(b)     (i) dispositions of Inventory made in connection with the closing of retail stores permitted by this Section 5.2; and (ii) other dispositions of Inventory and dispositions in the Ordinary Course of Business of worn out or surplus Equipment having a book value not exceeding $350,000 in the aggregate for all such Inventory and Equipment dispositions made in any Fiscal Year;

(c)     dispositions of Cash Equivalents;

(d)     transactions permitted under Section 5.1(k);

(e)     dispositions of any Intellectual Property of any Credit Party as such Credit Party determines in its reasonable business judgment and in the best interests of its business is no longer material to the business of such Credit Party;

(f)     [Reserved]; and

(g)     Permitted Sales, and such other sales and dispositions consented to by the Agent and approved by the Bankruptcy Court.

5.3     Consolidations and Mergers.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to (a) merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except upon not less than five (5) Business Days prior written notice to Agent, (a) any Subsidiary of Holdings may merge with, or dissolve or liquidate into, Borrower or a Wholly-Owned Subsidiary of Borrower which is a Domestic Subsidiary, provided that Borrower or such Wholly-Owned Subsidiary which is a Domestic Subsidiary shall be the continuing or surviving entity and all actions required to maintain perfected Liens on the Stock of the surviving entity and other Collateral in favor of Agent shall have been completed and (b) any Foreign Subsidiary may merge with or dissolve or liquidate into another Foreign Subsidiary, provided that if a First Tier Foreign Subsidiary is a constituent entity in such merger, dissolution or liquidation, such First Tier Foreign Subsidiary shall be the continuing or surviving entity.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

5.4     Acquisitions; Loans and Investments.  No Credit Party shall and no Credit Party shall suffer or permit any of its Subsidiaries to (i) purchase or acquire, or make any commitment to purchase or acquire any Stock or Stock Equivalents, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of a Subsidiary, or (ii) make or commit to make any Acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including without limitation, by way of merger, consolidation or other combination or (iii) make or purchase, commit to make or purchase, any advance, loan, extension of credit or capital contribution to or any other investment in, any Person including Borrower, any Affiliate of Borrower or any Subsidiary of Borrower (the items described in clauses (i), (ii) and (iii) are referred to as "Investments"), except for:

(a)     Investments in cash and Cash Equivalents;

(b)     Investments acquired in connection with the settlement of delinquent Accounts in the Ordinary Course of Business or in connection with the bankruptcy or reorganization of suppliers or customers;

(c)     Prepetition Investments existing on the Closing Date and set forth in Schedule 5.4;

(d)     loans or advances to employees permitted under Section 5.6;

(e)     Investments permitted under Section 5.2; and

(f)     acquisitions of bulk Inventory of another Person made during such Person's bankruptcy, insolvency or other similar proceeding provided that (i) the aggregate consideration paid by Credit Parties in connection with all such acquisitions shall not exceed $3,000,000 during any Buying Season in any Fiscal Year, (ii) no liabilities of such Person are assumed or incurred by any Credit Party in connection with such acquisition, and (iii) no Default or Event of Default exists immediately after giving effect to any such acquisition.

5.5     Limitation on Indebtedness.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(a)     the Obligations;

(b)     Indebtedness consisting of Contingent Obligations described in clause (j) of the definition ~~thereof~~of Indebtedness and permitted pursuant to Section 5.9;

(c)     (i) the Lease Obligations under the Lease Documents and any amendment, supplement, restatement, replacement, or refinancing thereof to the extent permitted under Section 5.21 and (ii) the Prepetition Indebtedness existing on the Closing Date and set forth in Schedule 5.5;

~~18198~~069/21798-~~000~~010 Current/~~21008698v15~~21388094v4
~~11~~12/~~2008~~/2010 ~~11:46 am~~3:30 pm

(d)　　[Reserved];

(e)　　Prepetition Liabilities;

(f)　　other unsecured Indebtedness owing to Persons that are not Affiliates of the Credit Parties not exceeding $2,000,000 in the aggregate at any time outstanding; and

(g)　　Indebtedness of the Borrower not to exceed $5,500,000 in the aggregate in respect of stock certificates of the Borrower not tendered for redemption in accordance with the Borrower's October 13, 2004 "going private" transaction.

provided that no Indebtedness under subsections (b) through (eg) above shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or *pari passu* with the Super-Priority Claims for Agent and the Lenders set forth in the DIP Borrowing Orders and consistent with Section 1.12.

5.6　　Employee Loans and Transactions with Affiliates.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, enter into any transaction with any Affiliate of Borrower or of any such Subsidiary, except:

(a)　　as expressly permitted by this Agreement; or

(b)　　in the Ordinary Course of Business and pursuant to the reasonable requirements of the business of such Credit Party or such Subsidiary upon fair and reasonable terms no less favorable to such Credit Party or such Subsidiary than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of Borrower or such Subsidiary and which are disclosed in writing to Agent;

(c)　　loans or advances to employees of Credit Parties for travel, entertainment and relocation expenses and other ordinary business purposes in the Ordinary Course of Business not to exceed $200,000 in the aggregate outstanding at any time; and

(d)　　non-cash loans or advances made by Holdings to employees of Credit Parties that are simultaneously used by such Persons to purchase Stock or Stock Equivalents of Holdings.

All such transactions existing as of the Closing Date are described in Schedule 5.6.

5.7　　Compensation.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, pay any management, consulting or similar fees to any Affiliate of any Credit Party or to any officer, director or employee of any Credit Party or any Affiliate of any Credit Party except:

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

(a)     payment of reasonable compensation to officers and employees for actual services rendered to the Credit Parties and their Subsidiaries in the Ordinary Course of Business;

(b)     payment of directors' fees and reimbursement of actual out-of-pocket expenses incurred in connection with attending board of director meetings not to exceed in the aggregate, with respect to all such items, $350,000 in any Fiscal Year of Borrower;

(c)     [Reserved]; and

(d)     cash advances made or cash dividends paid by Borrower to Parent in an aggregate amount not to exceed $250,000 in any Fiscal Year, which advances or dividends are used solely to fund actual and reasonable out-of-pocket administrative or other miscellaneous expenses incurred by Parent so long as no Default or Event of Default exists at the time of such payment.

5.8     Margin Stock; Use of Proceeds.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, use any portion of the Loan proceeds, directly or indirectly, to purchase or carry Margin Stock or repay or otherwise refinance Indebtedness of any Credit Party or others incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law or in violation of this Agreement.

5.9     Contingent Obligations.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Contingent Obligations except in respect of the Obligations and except:

(a)     endorsements for collection or deposit in the Ordinary Course of Business;

(b)     Rate Contracts entered into in the Ordinary Course of Business for bona fide hedging purposes and not for speculation with Agent's prior written consent;

(c)     Contingent Obligations of the Credit Parties and their Subsidiaries existing as of the Closing Date and listed in Schedule 5.9, including extension and renewals thereof which do not increase the amount of such Contingent Obligations or impose materially more restrictive or adverse terms on the Credit Parties or their Subsidiaries as compared to the terms of the Contingent Obligation being renewed or extended;

(d)     Contingent Obligations arising under indemnity agreements to title insurers to cause such title insurers to issue to Agent title insurance policies;

(e)     Contingent Obligations arising under Letters of Credit;

(f)     Contingent Obligations arising under guarantees made in the Ordinary Course of Business of obligations of any Credit Party (other than Holdings),

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

which obligations are otherwise permitted hereunder (including any guarantees by a Credit Party of the obligations of another Credit Party as a lessee of any Real Estate); provided that if such obligation is subordinated to the Obligations, such guarantee shall be subordinated to the same extent;

(g)     Contingent Obligations incurred in the Ordinary Course of Business with respect to surety and appeals bonds, performance bonds and other similar obligations; and

(h)     Contingent Obligations that constitute Prepetition Liabilities.

5.10     Compliance with ERISA.  No ERISA Affiliate shall cause or suffer to exist (a) any event that could result in the imposition of a Lien on any asset of a Credit Party or a Subsidiary of a Credit Party with respect to any Title IV Plan or Multiemployer Plan or (b) any other ERISA Event, that would, in the aggregate, result in Post-Petition Liabilities in excess of $250,000.  No Credit Party shall cause or suffer to exist any event that could result in the imposition of a Lien with respect to any Benefit Plan.

5.11     Restricted Payments.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Stock or Stock Equivalent, (ii) purchase, redeem or otherwise acquire for value any Stock or Stock Equivalent now or hereafter outstanding or (iii) make any payment or prepayment of principal of, premium, if any, interest, fees, redemption, exchange, purchase, retirement, defeasance, sinking fund or similar payment with respect to, Subordinated Indebtedness (the items described in clauses (i), (ii) and (iii) above are referred to as "Restricted Payments").

5.12     Change in Business.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in any line of business different from those lines of business carried on by it on the date hereof.  Holdings and Parent each shall not engage in any business activities or own any assets other than (i) ownership of the Stock and Stock Equivalents of other Credit Parties, (ii) activities and contractual rights incidental to maintenance of its corporate existence and (iii) other ancillary activities relating to the operation of the Borrower's business.

5.13     Change in Structure.  Except as expressly permitted under Section 5.3, no Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, make any material changes in its equity capital structure or amend any of its Organization Documents in any material respect and, in each case, in any respect adverse to Agent or Lender.

5.14     Changes in Accounting, Name or Jurisdiction of Organization.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) make any significant change in accounting treatment or reporting practices, except as required by GAAP, (ii) change the Fiscal Year or method for determining Fiscal Quarters of any Credit Party or of any consolidated Subsidiary of any Credit Party, (iii) change its name

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

as it appears in official filings in its jurisdiction of organization or (iv) change its jurisdiction of organization, in the case of clauses (iii) and (iv), without at least twenty (20) days' prior written notice to Agent and the acknowledgement of Agent that all actions required by Agent, including those to continue the perfection of its Liens, have been completed.

5.15    [Intentionally Omitted.]

5.16    No Negative Pledges.

(a)    Except pursuant to the DIP Borrowing Orders, Loan Documents or Lease Documents as in effect on the Closing Date, no Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of any Credit Party or Subsidiary to pay dividends or make any other distribution on any of such Credit Party's or Subsidiary's Stock or Stock Equivalents or to pay fees, including management fees, or make other payments and distributions to Borrower or any Credit Party. Except pursuant to the Loan Documents or pursuant to the Lease Documents as in effect on the Closing Date, no Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, enter into, assume or become subject to any Contractual Obligation prohibiting or otherwise restricting the existence of any Lien upon any of its assets in favor of Agent, whether now owned or hereafter acquired except in connection with any document or instrument governing Liens permitted pursuant to subsections 5.1(h) and 5.1(i) provided that any such restriction contained therein relates only to the asset or assets subject to such permitted Liens.

(b)    No Credit Party (other than Holdings) shall issue any Stock or Stock Equivalents (i) if such issuance would result in an Event of Default under subsection 7.1(j) and (ii) unless such Stock and Stock Equivalents are pledged to Agent, for the benefit of the Secured Parties, as security for the Obligations, on substantially the same terms and conditions as the Stock and Stock Equivalents of the Credit Parties owned by Holdings are pledged to Agent as of the Closing Date.

5.17    OFAC; Patriot Act. No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to fail to comply with the laws, regulations and executive orders referred to in Sections 3.25 and 3.26.

5.18    Sale-Leasebacks. No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in a sale leaseback, synthetic lease or similar transaction involving any of its assets.

5.19    Hazardous Materials. No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, cause or suffer to exist any Release of any Hazardous Material at, to or from any Real Estate that would violate any Environmental Law, form the basis for any Environmental Liabilities or otherwise adversely affect the value or marketability of any Real Estate (whether or not owned by any Credit Party or any

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

Subsidiary of any Credit Party) and, in each case, which would reasonably be expected to result in A Material Adverse Effect.

5.20 <u>Prepayments of Other Indebtedness</u>. No Credit Party shall, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness (including the Lease Obligations) prior to its scheduled maturity, other than (a) the Obligations or (b) Indebtedness secured by a Permitted Lien if the asset securing such Indebtedness has been sold or otherwise disposed of in a transaction permitted hereunder.

5.21 <u>Lease Obligations and Lease Documents</u>. No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, amend, supplement, restate, or replace any of the terms and conditions of any of the Lease Obligations or any of the Lease Documents or refinance any of the Lease Obligations if the effect of such amendment, supplement, restatement, replacement, or refinancing is to (i) increase the outstanding principal balance of the Lease Obligations (other than by adding thereto any accrued interest or fees or any transaction costs associated with any such amendment, supplement, restatement, replacement, or refinancing), (ii) change to an earlier date the scheduled dates of payment of any component of principal, interest or other amounts thereon, (iii) increase principal prepayments or amortization payments thereon, (iv) alter the redemption, prepayment or subordination provisions thereof, (v) add to or alter the covenants, defaults and events of default set forth therein in a manner that would make such provisions more onerous or restrictive to any Credit Party, (vi) otherwise increase the obligations of any Credit Party in respect of the Lease Obligations or the Lease Documents or confer additional rights upon Loehmann's Capital (or its assignees or such assignees' trustee or agent) which individually or in the aggregate would be adverse to any Credit Party or to the Agent or the Lenders, (vii) grant a Lien on any additional collateral to secure any of the Lease Obligations unless the Agent (on behalf of itself and the Lenders) also obtains a Lien on the same collateral to secure the Obligations and all such Liens are subject to the Amended and Restated Intercreditor Agreement, or (viii) cause a violation of the Amended and Restated Intercreditor Agreement.

5.22 <u>Bankruptcy Related Negative Covenants</u>. The Borrower will not seek, consent to, or permit to exist any of the following:

(a) Any modification, stay, vacation or amendment to the DIP Borrowing Orders to which the Agent has not consented in writing;

(b) A priority claim or administrative expense or unsecured claim against Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent and the Lenders in respect of the Obligations, consistent with <u>Section 1.12</u>, except with respect to the Carve-Out;

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

(c)     Any Lien on any Collateral (other than permitted liens as may be granted by the DIP Borrowing Orders) having a priority equal or superior to the Lien securing the Obligations, other than with respect to the Carve-Out and Liens permitted pursuant to Section 5.1 of this Agreement which are equal or superior to the Lien securing the Obligations and which are not primed pursuant to the terms of the DIP Borrowing Orders;

(d)     Any order which authorizes the return of any of the Credit Parties' property, which is not in the Ordinary Course of Business and consistent with past practices, pursuant to Section 546(h) of the Bankruptcy Code without the Agent's consent;

(e)     Any order which authorizes the payment of any Indebtedness (other than the Prepetition Liabilities and adequate protection payments on account of the Loan) incurred prior to the Petition Date, unless such payments are in compliance with the Approved Budget;

(f)     Any order which would have the effect of impairing the nature, priority or terms of the Obligations or the Liens securing the Obligations pursuant to the terms of the Loan Documents; or

(g)     Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents, or the DIP Borrowing Orders, or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents, or the DIP Borrowing Orders.

5.23     Inventory Purchases.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, permit the use of any Tranche B Revolving Loans for the purchase of Inventory [**TBD** - unless [   ] approves the proposed Inventory purchase in writing (a copy of which shall be delivered by the Borrower to Whippoorwill)].

# ARTICLE VI.
## FINANCIAL COVENANTS

Each Credit Party covenants and agrees that, so long as Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

6.1     Compliance with the Approved Budget.

(a)     Actual Disbursement Amounts, tested on an aggregate basis and not on a line-item basis and tested on the Tuesday of each week for the prior Cumulative Period, shall not exceed Approved Budgeted Disbursement Amounts, tested on an aggregate basis and not on a line-item basis, for the corresponding Cumulative Period by more than 20%; provided, however, that in the event that the Actual Disbursement Amounts, tested on an aggregate basis and not on a line-item basis, in any Cumulative Period are less than the Approved Budgeted Disbursement Amounts, tested on an

57

aggregate basis and not on a line-item basis, for such Cumulative Period (the "<u>Disbursement Delta</u>"), Actual Disbursement Amounts during succeeding Cumulative Periods shall not exceed Approved Budgeted Disbursement Amounts, tested on an aggregate basis and not on a line-item basis, for the corresponding Cumulative Period, by more than an amount equal to 20% plus the Disbursement Delta for all prior Cumulative Periods.

(b)     Actual Receipts, tested on the Tuesday of each week for the prior Cumulative Period, shall not be less than 80% of Approved Budgeted Receipts for the corresponding Cumulative Period.

(c)     Actual Inventory Availability, tested on the Tuesday of each week for the prior Cumulative Period, shall not be less than 90% of Approved Budgeted Inventory Availability for the corresponding Cumulative Period.

## ARTICLE VII.
## EVENTS OF DEFAULT

7.1     <u>Events of Default</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court or any notice to any Credit Party, and subject to <u>Section 7.2</u>, any of the following shall constitute an "<u>Event of Default</u>":

(a)     <u>Non-Payment</u>.  Any Credit Party fails (i) to pay when and as required to be paid herein, any amount of principal of, or interest on, any Loan, including after maturity of the Loans, or to pay any L/C Reimbursement Obligation or (ii) to pay within three (3) Business Days after the same shall become due, any fee or any other amount payable hereunder or pursuant to any other Loan Document;

(b)     <u>Representation or Warranty</u>. (i)  any representation, warranty or certification by or on behalf of any Credit Party or any of its Subsidiaries made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made or (ii) any information contained in any Borrowing Base Certificate is untrue or incorrect in any respect (other than inadvertent, immaterial errors not exceeding $50,000 in the aggregate in any Borrowing Base Certificate);

(c)     <u>Specific Defaults</u>.

(i)     Any Credit Party fails to perform or observe any term, covenant or agreement contained in any of <u>subsection 4.3(a)</u> or <u>9.10(d)</u>, <u>Section 1.12</u>, <u>4.6</u>, <u>4.9</u>, <u>4.10</u>, <u>4.11</u>, <u>4.15</u>, or <u>4.17</u>, or <u>Article V</u> or <u>VI</u>;

(ii)     Any Credit Party fails to perform or observe any term, covenant or agreement contained in any of <u>Section 4.1</u> or <u>subsection 4.2(a)</u>, <u>4.2(b)</u>, or

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

4.2(d), and such default shall continue unremedied for a period of three (3) Business Days after the earlier to occur of (i) the date upon which a Responsible Officer of any Credit Party becomes aware of such default and (ii) the date upon which written notice thereof is given to Borrower by Agent;

(d)     Other Defaults.  Any Credit Party or Subsidiary of any Credit Party fails to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document, and such default shall continue unremedied for a period of thirty (30) days after the earlier to occur of (i) the date upon which a Responsible Officer of any Credit Party becomes aware of such default and (ii) the date upon which written notice thereof is given to Borrower by Agent;

(e)     Reserved.

(f)     Monetary Judgments.  One or more judgments, non-interlocutory orders, decrees or arbitration awards, not subject to the automatic stay, shall be entered against any one or more of the Credit Parties or any of their respective Subsidiaries involving in the aggregate a liability of $100,000 or more (excluding amounts covered by insurance to the extent the relevant independent third party insurer has not denied coverage therefor), and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of thirty (30) days after the entry thereof;

(g)     Non Monetary Judgments.  One or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Credit Parties or any of their respective Subsidiaries which has or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(h)     Material Adverse Effect.  The occurrence of a Material Adverse Effect;

(i)     Collateral.  Any material provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against any Credit Party or any Subsidiary of any Credit Party thereto or any Credit Party or any Subsidiary of any Credit Party shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any Collateral Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in the Collateral purported to be covered thereby or such security interest shall for any reason cease to be a perfected and first priority security interest subject only to Liens permitted pursuant to Section 5.1;

(j)     Ownership.  (i) Holdings ceases to own one hundred percent (100%) of the issued and outstanding Stock and Stock Equivalents of Parent, (ii) Parent ceases to own one hundred percent (100%) of the issued and outstanding Stock and Stock Equivalents of Borrower, in each instance in clauses (i), and (ii), free and clear of all Liens, rights, options, warrants or other similar agreements or understandings, other than Liens in favor of Agent, for the benefit of the Secured Parties; or (iii) the sale of all or substantially all of the assets of the Credit Parties pursuant to Section 363 of the Bankruptcy Code (other than in connection with a Permitted Sale);

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

(k)      Sponsor Credit Support.  (i) If the Sponsor Credit Support or DIP Sponsor Credit Support is in the form of a standby letter of credit, such standby letter of credit shall for any reason cease to be in full force and effect other than in accordance with its express terms or in accordance with the terms set forth in Section 4.15, or the issuer of such standby letter of credit shall seek to terminate the standby letter of credit or is unwilling or unable to honor a draw request by the Agent, (ii) the ability of the Agent to draw upon the Sponsor Credit Support or DIP Sponsor Credit Support following the occurrence of the Draw Conditions is stayed or enjoined or otherwise impaired or delayed, (iii) the Equity Sponsor shall seek to terminate or repudiate the Sponsor Credit Support (other than in accordance with the terms of Section 4.15) or DIP Sponsor Credit Support or deny that its obligations in respect thereof are valid, binding and enforceable, or (iv) Sponsor Credit Support or DIP Sponsor Credit Support is otherwise limited or terminated other than in accordance with the express terms of the Sponsor Credit Support (or Section 4.15) or DIP Sponsor Credit Support;

(l)      Dismissal or Conversion.  The entry of an order dismissing any Chapter 11 Case or converting any Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(m)      Enlarged Powers.  The entry of an order appointing a trustee in any Chapter 11 Case or an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4));

(n)      Superior Claims.  The entry of an order granting any other super-priority claim or lien equal or superior in priority to that granted to Agent or Lender, other than the Carve-Out, without the Agent's prior written consent;

(o)      Relief from Automatic Stay.  The entry of one or more orders granting relief from the automatic stay so as to allow third parties to proceed against any asset of any Credit Party having a fair market value in excess of $100,000 in the aggregate;

(p)      Material Contracts and Leases.  The termination or rejection, or the filing by the Credit Parties of a motion terminating or rejecting material leases, material contracts or any other material agreement, document or instrument following the Petition Date to which any Credit Party is a party, except those approved by the Agent; or

(q)      DIP Borrowing Orders.  The entry of an order staying, reversing, vacating or otherwise modifying the Loans, Liens securing the Obligations or the DIP Borrowing Orders.

7.2      Remedies.  Upon the occurrence and during the continuance of any Event of Default, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before or order from, the Bankruptcy Court, Agent may, upon seven (7) Business Days' notice to the Borrower, the United States Trustee and any Committee:

18198069/21798-000010 Current/21008698v152 1388094v4
11 12/2008/2010 11:46 am3:30 pm

(a)     declare all or any portion of the Commitment of each Lender to make Loans or of the L/C Issuer to issue Letters of Credit to be suspended or terminated, whereupon such Commitments shall forthwith be suspended or terminated (as applicable);

(b)     declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable; without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Credit Party;

(c)     direct any or all of the Credit Parties to engage in Permitted Sales or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Agent and Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Credit Party to assume and assign any lease or executory contract included in the Collateral to the Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code);

(d)     enter onto the premises of any Credit Party in connection with an orderly liquidation of the Collateral;

(e)     terminate, reduce or restrict any right or the ability of any of the Borrower to use any cash collateral; and/or

(f)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law, including all remedies provided under the Uniform Commercial Code; and pursuant to the DIP Borrowing Orders, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Agent to exercise its remedies under this Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court.

Upon the occurrence of an Event of Default and the exercise by the Agent of its rights and remedies under this Agreement and the other Loan Documents, the Credit Parties shall assist the Agent in effecting a Permitted Sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Agent.

7.3     Rights Not Exclusive.  The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

7.4     Cash Collateral for Letters of Credit.  If an Event of Default has occurred and is continuing, this Agreement (or the Revolving Loan Commitment) shall be terminated for any reason or if otherwise required by the terms of this Agreement, Agent may, and shall upon the request of the Required Lenders, demand (which demand shall be deemed to have been delivered automatically upon any acceleration of the Loans and

other obligations hereunder pursuant to Section 7.2), and Borrower shall thereupon deliver to Agent, to be held for the benefit of the L/C Issuer, Agent and the Lenders entitled thereto, an amount of cash equal to 106% of the amount of L/C Reimbursement Obligations as additional collateral security for Obligations. Agent may at any time apply any or all of such cash and cash collateral to the payment of any or all of the Credit Parties' Obligations. The remaining balance of the cash collateral will be returned to Borrower when all Letters of Credit have been terminated or discharged, all of the Lenders' Commitments have been terminated and all Obligations have been paid in full in cash.

## ARTICLE VIII.
## THE AGENT

8.1    Appointment and Duties.

(a)    Appointment of Agent. Each Lender and each L/C Issuer hereby appoints Crystal (together with any successor Agent pursuant to Section 8.9) as Agent hereunder and authorizes Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Credit Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to Agent under such Loan Documents, including consenting to, on behalf of each Lender, to an Interim Borrowing Order substantially in the form attached as Exhibit 8.1(a) hereto and a Final Borrowing Order to be negotiated between the Borrower, the Agent and the Committee, and (iii) exercise such powers as are incidental thereto.

(b)    Duties as Collateral and Disbursing Agent. Without limiting the generality of clause (a) above, Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders and L/C Issuers), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders and the L/C Issuers with respect to all payments and collections arising in connection with the Loan Documents (including as related to the Chapter 11 Cases), and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any proceeding related to the Chapter 11 Cases (but not to vote, consent or otherwise act on behalf of such Person), (iii) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to Agent and the other Secured Parties with respect to the Collateral, whether under the Loan Documents, applicable Requirements of Law or otherwise and (vii) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; provided, however, that Agent hereby appoints, authorizes and directs each Lender and L/C Issuer to act as collateral sub-agent for Agent, the Lenders and the L/C Issuers for purposes of the perfection of Liens with

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

respect to any deposit account maintained by a Credit Party with, and cash and Cash Equivalents held by, such Lender or L/C Issuer, and may further authorize and direct the Lenders and the L/C Issuers to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to Agent, and each Lender and L/C Issuer hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)     Limited Duties.  Under the Loan Documents, Agent (i) is acting solely on behalf of the Secured Parties (except to the limited extent provided in subsection 1.4(b) with respect to the Register), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Agent" and "collateral agent" and similar terms in any Loan Document to refer to Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender, L/C Issuer or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and each Secured Party, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

8.2     Binding Effect.  Each Secured Party, by accepting the benefits of the Loan Documents, agrees that (i) any action taken by Agent or the Required Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by Agent in reliance upon the instructions of Required Lenders (or, where so required, such greater proportion) and (iii) the exercise by Agent or the Required Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are incidental thereto, shall be authorized and binding upon all of the Secured Parties.

8.3     Use of Discretion.

(a)     Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Agent to liability or that is contrary to any Loan Document or applicable Requirement of Law; and

(b)     Agent shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Credit Party or its Affiliates that is communicated to or obtained by Agent or any of its Affiliates in any capacity.

8.4     Delegation of Rights and Duties.  Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and

delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party). Any such Person shall benefit from this Article VIII to the extent provided by Agent.

      8.5    <u>Reliance and Liability</u>.

      (a)    Agent may, without incurring any liability hereunder, (i) treat the payee of any Note as its holder until such Note has been assigned in accordance with <u>Section 9.9</u>, (ii) rely on the Register to the extent set forth in <u>Section 1.4</u>, (iii) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Credit Party) and (iv) rely and act upon any document and information (including those transmitted by Electronic Transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties.

      (b)    None of Agent and its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Secured Party, Holdings, Borrower and each other Credit Party hereby waive and shall not assert (and each of Holdings and the Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein. Without limiting the foregoing, Agent:

      (i)    shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Required Lenders or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of Agent, when acting on behalf of Agent);

      (ii)    shall not be responsible to any Lender, L/C Issuer or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

      (iii)    makes no warranty or representation, and shall not be responsible, to any Lender, L/C Issuer or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Credit Party or any Related Person of any Credit Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Credit Party, whether or not transmitted or (except for documents expressly

1819<s>8069</s>/21798-<s>000</s>010 Current/<s>21008698v15</s>21388094v4
<s>11</s>12/<s>2008</s>2010 <s>11:46 am</s>3:30 pm

required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by Agent in connection with the Loan Documents;

(iv)    shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Credit Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Borrower, any Lender or L/C Issuer describing such Default or Event of Default clearly labeled "notice of default" (in which case Agent shall promptly give notice of such receipt to all Lenders); and

(v)    and, for each of the items set forth in clauses (i) through (iv) above, each Lender, L/C Issuer, Holdings and Borrower hereby waives and agrees not to assert (and each of Holdings and Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action it might have against Agent based thereon.

(c)    Each Lender and L/C Issuer (i) acknowledges that it has performed and will continue to perform its own diligence and has made and will continue to make its own independent investigation of the operations, financial conditions and affairs of the Credit Parties and (ii) agrees that is shall not rely on any audit or other report provided by Agent or its Related Persons (an "Agent Report").  Each Lender and L/C Issuer further acknowledges that any Agent Report (i) is provided to the Lenders and L/C Issuers solely as a courtesy, without consideration, and based upon the understanding that such Lender or L/C Issuer will not rely on such Agent Report, (ii) was prepared by Agent or its Related Persons based upon information provided by the Credit Parties solely for Agent's own internal use, (iii) may not be complete and may not reflect all information and findings obtained by Agent or its Related Persons regarding the operations and condition of the Credit Parties.   Neither Agent nor any of its Related Persons makes any representations or warranties of any kind with respect to (i) any existing or proposed financing, (ii) the accuracy or completeness of the information contained in any Agent Report or in any related documentation, (iii) the scope or adequacy of Agent's and its Related Persons' due diligence, or the presence or absence of any errors or omissions contained in any Agent Report or in any related documentation, and (iv) any work performed by Agent or Agent's Related Persons in connection with or using any Agent Report or any related documentation.

(d)    Neither Agent nor any of its Related Persons shall have any duties or obligations in connection with or as a result of any Lender or L/C Issuer receiving a copy of any Agent Report.  Without limiting the generality of the forgoing, neither Agent nor any of its Related Persons shall have any responsibility for the accuracy or

18198069/21798-000010 Current/21008698v152138809v4
11/12/2008/2010 11:46 am3:30 pm

completeness of any Agent Report, or the appropriateness of any Agent Report for any Lender's or L/C Issuer's purposes, and shall have no duty or responsibility to correct or update any Agent Report or disclose to any Lender or L/C Issuer any other information not embodied in any Agent Report, including any supplemental information obtained after the date of any Agent Report.  Each Lender and L/C Issuer releases, and agrees that it will not assert, any claim against Agent or its Related Persons that in any way relates to any Agent Report or arises out of any Lender or L/C Issuer having access to any Agent Report or any discussion of its contents, and agrees to indemnify and hold harmless Agent and its Related Persons from all claims, liabilities and expenses relating to a breach by any Lender or L/C Issuer arising out of such Lender's or L/C Issuer's access to any Agent Report or any discussion of its contents.

8.6     Agent Individually.  Agent and its Affiliates may make loans and other extensions of credit to, acquire Stock and Stock Equivalents of, engage in any kind of business with, any Credit Party or Affiliate thereof as though it were not acting as Agent and may receive separate fees and other payments therefor.  To the extent Agent or any of its Affiliates makes any Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender," "Lender", "Required Lender" and any similar terms shall, except where otherwise expressly provided in any Loan Document, include, without limitation, Agent or such Affiliate, as the case may be, in its individual capacity as Lender, Lender or as one of the Required Lenders.

8.7     Lender Credit Decision.

(a)     Each Lender and each L/C Issuer acknowledges that it shall, independently and without reliance upon Agent, Whippoorwill, any Lender or L/C Issuer or any of their Related Persons or upon any document (including any offering and disclosure materials in connection with the syndication of the Loans) solely or in part because such document was transmitted by Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Credit Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate.  Except for documents expressly required by any Loan Document to be transmitted by Agent to the Lenders or L/C Issuers, Agent shall not have any duty or responsibility to provide any Lender or L/C Issuer with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Credit Party or any Affiliate of any Credit Party that may come in to the possession of Agent or any of its Related Persons.

(b)     If any Lender or L/C Issuer has elected to abstain from receiving MNPI concerning the Credit Parties or their Affiliates, such Lender or L/C Issuer acknowledges that, notwithstanding such election, Agent and/or the Credit Parties will, from time to time, make available syndicate-information (which may contain MNPI) as required by the terms of, or in the course of administering the Loans to the credit

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

contact(s) identified for receipt of such information on the Lender's administrative questionnaire who are able to receive and use all syndicate-level information (which may contain MNPI) in accordance with such Lender's compliance policies and contractual obligations and applicable law, including federal and state securities laws; <u>provided</u> <u>that</u> if such contact is not so identified in such questionnaire, the relevant Lender or L/C Issuer hereby agrees to promptly (and in any event within one (1) Business Day) provide such a contact to Agent and the Credit Parties upon request therefor by Agent or the Credit Parties.  Notwithstanding such Lender's or L/C Issuer's election to abstain from receiving MNPI, such Lender or L/C Issuer acknowledges that if such Lender or L/C Issuer chooses to communicate with Agent, it assumes the risk of receiving MNPI concerning the Credit Parties or their Affiliates.

      8.8     <u>Expenses; Indemnities; Withholding</u>.

      (a)     Each Lender agrees to reimburse Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party) promptly upon demand, severally and ratably, for any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of, any Credit Party) that may be incurred by Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding or otherwise) of, or legal advice in respect of its rights or responsibilities under, (i) any Loan Document and (ii) in connection with the Chapter 11 Cases and the enforcement of this Agreement.

      (b)     Each Lender further agrees to indemnify Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party), severally and ratably, from and against Liabilities (including, to the extent not indemnified pursuant to <u>Section 8.8(c)</u>, taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to or for the account of any Lender) that may be imposed on, incurred by or asserted against Agent or any of its Related Persons in any matter relating to or arising out of, in connection with or as a result of any Loan Document, any Related Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by Agent or any of its Related Persons under or with respect to any of the foregoing; <u>provided</u>, <u>however</u>, that no Lender shall be liable to Agent or any of its Related Persons to the extent such liability has resulted primarily from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

      (c)     To the extent required by any applicable law, Agent may withhold from any payment to any Lender under a Loan Document an amount equal to any applicable withholding tax.  If the Internal Revenue Service or any other Governmental Authority asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate certification form was not delivered, was not properly executed, or fails to establish an exemption from, or reduction

of, withholding tax with respect to a particular type of payment, or because such Lender failed to notify Agent or any other Person of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), or Agent reasonably determines that it was required to withhold taxes from a prior payment but failed to do so, such Lender shall promptly indemnify Agent fully for all amounts paid, directly or indirectly, by such Agent as tax or otherwise, including penalties and interest, and together with all expenses incurred by Agent, including legal expenses, allocated internal costs and out-of-pocket expenses.  Agent may offset against any payment to any Lender under a Loan Document, any applicable withholding tax that was required to be withheld from any prior payment to such Lender but which was not so withheld, as well as any other amounts for which Agent is entitled to indemnification from such Lender under this <u>Section 8.8(c)</u>.

8.9    Resignation of Agent or L/C Issuer; Appointment of Successor Agent by Tranche B Lenders.

(a)    Agent may resign at any time by delivering notice of such resignation to the Lenders and the Borrower, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective in accordance with the terms of this <u>Section 8.9</u>.  If Agent delivers any such notice, the Required Lenders shall have the right to appoint a successor Agent.  If, within 30 days after the retiring Agent having given notice of resignation, no successor Agent has been appointed by the Required Lenders that has accepted such appointment, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent from among the Lenders. Each appointment under this <u>clause (a)</u> shall be subject to the prior consent of the Borrower, which may not be unreasonably withheld but shall not be required during the continuance of an Event of Default.

(b)    Effective immediately upon its resignation, (i) the retiring Agent shall be discharged from its duties and obligations under the Loan Documents, (ii) the Lenders shall assume and perform all of the duties of Agent until a successor Agent shall have accepted a valid appointment hereunder, (iii) the retiring Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to any actions taken or omitted to be taken while such retiring Agent was, or because such Agent had been, validly acting as Agent under the Loan Documents and (iv) subject to its rights under <u>Section 8.3</u>, the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Loan Documents.  Effective immediately upon its acceptance of a valid appointment as Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the Loan Documents.

(c)    Upon payment in full of all Obligations (other than Obligations in respect of the Tranche B Revolving Loans and the Term Loan) (including, without limitation, any applicable prepayment premium required to be paid pursuant to Section 1.9(d)), and cash collateralization of unmatured LC Reimbursement Obligations and Bank Product Obligations, with a permanent termination of the Aggregate Tranche A Revolving Loan Commitments    in respect thereof, the  Tranche B Lenders shall

18198069/21798-000010 Current/21008698v1521388094v4
11/12/2008/2010 11:46 am3:30 pm

immediately have the right to appoint a successor Agent, which appointment, if of a Person other than Whippoorwill, shall be subject to the prior consent of the Borrower, which may not be unreasonably withheld, and such consent shall not in any event be required during the continuance of an Event of Default. The retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Loan Documents. Effective immediately upon its acceptance of a valid appointment as Agent, the successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the Loan Documents.

8.10 <u>Release of Collateral or Guarantors</u>. Each Lender and L/C Issuer hereby consents to the release and hereby directs Agent to release (or, in the case of <u>clause (b)(ii)</u> below, release or subordinate) the following:

(a) any Subsidiary of Borrower from its guaranty of any Obligation if all of the Stock and Stock Equivalents of such Subsidiary owned by any Credit Party are sold or transferred in a transaction permitted under the Loan Documents (including pursuant to a waiver or consent); and

(b) any Lien held by Agent for the benefit of the Secured Parties against (i) any Collateral that is sold, transferred, conveyed or otherwise disposed of by a Credit Party in a transaction permitted by the Loan Documents (including pursuant to a waiver or consent) and (ii) all of the Collateral and all Credit Parties, upon (A) termination of the Revolving Loan Commitments, (B) payment and satisfaction in full of all Loans, all L/C Reimbursement Obligations and all other Obligations under the Loan Documents that Agent has theretofore been notified in writing by the holder of such Obligation are then due and payable, (C) deposit of cash collateral with respect to all contingent Obligations (or, as an alternative to cash collateral in the case of any Letter of Credit Obligation, receipt by Agent of a back-up letter of credit), in amounts and on terms and conditions and with parties satisfactory to Agent and each Indemnitee that is, or may be, owed such Obligations (excluding contingent Obligations (other than L/C Reimbursement Obligations) as to which no claim has been asserted) and (D) to the extent requested by Agent, receipt by Agent and the Secured Parties of liability releases from the Credit Parties each in form and substance acceptable to Agent.

(c) Each Lender and L/C Issuer hereby directs Agent, and Agent hereby agrees, upon receipt of at least five (5) Business Days' advance notice from the Borrower, to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guaranties and Liens when and as directed in this <u>Section 8.10</u>.

8.11 Appointment of Special Tranche B Representative. Each Tranche B Lender hereby appoints Whippoorwill (together with any successor Agent pursuant to Section 8.9(c)) as its special representative hereunder and authorizes Whippoorwill to (i) execute and deliver this Agreement and any other Loan Document and accept delivery thereof, and of all documents required to be delivered to the Tranche B Lenders pursuant to any Loan Document, on its behalf from any Credit Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

expressly delegated to the Tranche B Lenders under this Agreement or any other Loan Documents, including consenting to, on behalf of each Tranche B Lender, a Final Borrowing Order to be negotiated between the Borrower, the Agent, the Tranche B Lender and the Committee, and any other court order relating to the Loan Documents and the transactions contemplated thereby, and (iii) exercise such powers as are incidental thereto. The consent of Whippoorwill, acting alone, shall be sufficient to waive any conditions precedent under Sections 2.3 and 2.4 hereof, or to consent to any waiver, amendment or consent under Section 9.1(b) hereof.

## ARTICLE IX.
## MISCELLANEOUS

9.1     Amendments and Waivers.

(a)     No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Credit Party therefrom, shall be effective unless the same shall be in writing and signed by Agent, the Required Lenders (or by Agent with the consent of the Required Lenders), and the Borrower, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, or consent shall, unless in writing and signed by all the Lenders (other than the Tranche B Lenders) directly affected thereby (or by Agent with the consent of all the Lenders directly affected thereby), in addition to Agent and the Required Lenders (or by Agent with the consent of the Required Lenders) and the Borrower, do any of the following:

(i)     increase or extend the Commitment of any Lender (or reinstate any Commitment terminated pursuant to subsection 7.2(a));

(ii)    postpone or delay any date fixed for, or reduce or waive, any scheduled installment of principal or any payment of interest, fees or other amounts (other than principal) due to the Lenders (or any of them) or L/C Issuer hereunder or under any other Loan Document (for the avoidance of doubt, mandatory prepayments pursuant to Section 1.8 (other than scheduled installments under subsection 1.8(a)) may be postponed, delayed, waived or modified with the consent of Required Lenders);

(iii)   reduce the principal of, or the rate of interest specified herein or the amount of interest payable in cash specified herein on any Loan, or of any fees or other amounts payable hereunder or under any other Loan Document, including L/C Reimbursement Obligations;

(iv)    change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans which shall be required for the Lenders or any of them to take any action hereunder;

(v)     amend or modify Section 6.1, or amend or modify any of the definitions of Eligible Credit Card Receivables, Eligible Inventory, Eligible In-Transit Inventory, Eligible LC Inventory, or Borrowing Base, including any increase in the

70

percentage advance rates in the definition of Borrowing Base, in a manner which would increase the availability of credit under the Maximum Tranche A Revolving Loan Balance;

(vi)    amend this Section 9.1 or the definition of Required Lenders or any provision providing for consent or other action by all Lenders; or

(vii)    discharge any Credit Party from its respective payment Obligations under the Loan Documents, or release all or substantially all of the Collateral, except as otherwise may be provided in this Agreement or the other Loan Documents;

it being agreed that all Lenders (other than the Tranche B Lenders) shall be deemed to be directly affected by an amendment or waiver of the type described in the preceding clauses (iv), (v) and (vi).

(b)    No waiver, amendment, or consent shall, unless in writing and signed by the Tranche B Lenders, or by Whippoorwill on their behalf, do any of the following:

()    increase or extend the Tranche B Commitment;

(i)    postpone or delay any date fixed for, or reduce or waive, any scheduled installment of principal or any payment of interest, fees or other amounts (other than principal) due to the Tranche B Lenders hereunder or under any other Loan Document;

(ii)    (A) reduce the principal of, or the rate of interest specified herein or the amount of interest payable in cash specified herein on any Tranche B Revolving Loan, or of any fees or other amounts payable hereunder or under any other Loan Document or (B) increase the rate of interest specified herein or the amount of interest payable in cash specified herein on any Tranche A Revolving Loan, or of any fees or other amounts payable to the Tranche A Lenders hereunder or under any other Loan Document without an equal corresponding increase in the rate of interest on the Tranche B Revolving Loan, or any fees or other amounts payable to the Tranche B Lenders hereunder or under any other Loan Documents;

(iii)    amend or waive any provision of this Sections 9.1(b), 8.9(c), 4.10 (with respect to clause (b) and the proviso in clause (a)), the definition of "Draw Condition", or any other provision providing for consent or other action by the Tranche B Lenders;

(iv)    discharge any Credit Party from its respective payment Obligations with respect to the Tranche B Revolving Loans under the Loan Documents, or release all or substantially all of the Collateral, except as otherwise may be provided on the date hereof in this Agreement or the other Loan Documents;

(v) increase the amount of total Commitments under this Agreement in excess of the Priority Lien Cap (as defined in the Amended and Restated Intercreditor as in effect on the date hereof);

(vi) amend the Amended and Restated Intercreditor in a manner adverse to the Tranche B Lenders;

(vii) increase the amount of total Commitments under this Agreement in excess of $40,000,000;

(viii) (A) modify, waive or amend the terms of the Sponsor Participation Agreement in a manner adverse to the Tranche B Lenders, (B) terminate the Sponsor Participation Agreement without the consent of the Tranche B Lenders, (C) modify, waive or amend the terms of Section 4.15 hereof in a manner adverse to the Tranche B Lenders, or (D) release, modify or amend the DIP Sponsor Credit Support in a manner adverse to the Tranche B Lenders or terminate the DIP Sponsor Credit Support; or

(ix) modify, waive or amend any condition to the borrowing of the Tranche B Revolving Loans without the consent of the Tranche B Lenders other than an Event of Default under clauses (c)(ii), (d) and (g) of Section 7.1.

Notwithstanding anything herein to the contrary, the Tranche B Lenders shall not have the right to (i) receive information made available to the Lenders hereunder by the Agent; (ii) participate in any meeting (or portion of any meeting) of the Lenders, or participate in communications with counsel for the Agent.

(c) (b) No amendment, waiver or consent shall, unless in writing and signed by Agent or the L/C Issuer, as the case may be, in addition to the Required Lenders or all Lenders directly affected thereby, as the case may be (or by Agent with the consent of the Required Lenders or all Lenders directly affected thereby, as the case may be), affect the rights or duties of Agent or the L/C Issuer, as applicable, under this Agreement or any other Loan Document.

(d) (c) [Reserved].

(e) (d) Notwithstanding anything to the contrary contained in this Section 9.1, (x) Borrower may amend Schedule 3.18 upon notice to Agent, (y) Agent may amend Schedule 1.1(a) to reflect Sales entered into pursuant to Section 9.9, and (z) Agent and Borrower may amend or modify this Agreement and any other Loan Document to (1) cure any ambiguity, omission, defect or inconsistency therein, or (2) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional property for the benefit of the Secured Parties or join additional Persons as Credit Parties; provided that no Credit Card Receivables or Inventory of such Person shall be included as Eligible Credit Card Accounts or Eligible Inventory until a field examination (and, if required by Agent, an Inventory appraisal) with respect thereto has been completed to the satisfaction of Agent, including the establishment of Reserves required in Agent's Permitted Discretion.

18198069/21798-000010 Current/21008698v1521388094v4
11/12/20082010 11:46 am3:30 pm

9.2    Notices.

(a)    Addresses.  All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing, unless otherwise expressly specified herein, and (i) addressed to the address set forth on the applicable signature page hereto, or (ii) addressed to such other address as shall be notified in writing (A) in the case of Borrower and Agent, to the other parties hereto and (B) in the case of all other parties, to Borrower and Agent.  Transmissions made by electronic mail or E-Fax to Agent shall be effective only (x) for notices where such transmission is specifically authorized by this Agreement, (y) if such transmission is delivered in compliance with procedures of Agent applicable at the time and previously communicated to Borrower, and (z) if receipt of such transmission is acknowledged by Agent.

(b)    Effectiveness.  All communications described in clause (a) above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (iii) if delivered by mail, three (3) Business Days after deposit in the mail, and (iv) if delivered by facsimile, upon sender's receipt of confirmation of proper transmission,; provided, however, that no communications to Agent pursuant to Article I shall be effective until received by Agent.

(c)    Each Lender shall notify Agent in writing of any changes in the address to which notices to such Lender should be directed, of addresses of its Lending Office, of payment instructions in respect of all payments to be made to it hereunder and of such other administrative information as Agent shall reasonably request.

9.3    Electronic Transmissions.

(a)    Subject to the provisions of subsection 9.2(a), each of Agent, Whippoorwill, Lenders, each Credit Party and each of their Related Persons, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein.  Each Credit Party and each Secured Party hereto acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)    LIMITATION OF LIABILITY.  ALL ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE."  NONE OF AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN.  NO WARRANTY OF ANY KIND IS MADE BY AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH

73

ANY ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS. Each of Borrower, each other Credit Party executing this Agreement and each Secured Party agrees that Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission.

9.4    No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of Agent, Whippoorwill or Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. No course of dealing between any Credit Party, any Affiliate of any Credit Party, Agent or any Lender shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Loan Documents.

9.5    Costs and Expenses. Any action taken by any Credit Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of Agent or Required Lenders, shall be at the expense of such Credit Party, and neither Agent nor any other Secured Party shall be required under any Loan Document to reimburse any Credit Party or any Subsidiary of any Credit Party therefor except as expressly provided therein. In addition, Borrower agrees to pay or reimburse upon demand (a) Agenteach of Agent and Whippoorwill, as special representative of the Tranche B Revolving Lenders, for all out-of-pocket costs and expenses incurred by it or any of its Related Persons, in connection with the investigation, development, preparation, negotiation, syndication, execution, interpretation or administration of, any modification of any term of or termination of, any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including Attorney Costs of Agent, Attorney Costs of Whippoorwill, as special representative of the Tranche B Revolving Lenders, the cost of environmental audits, Collateral audits and appraisals, background checks and similar expenses, (b) Agent for all costs and expenses incurred by it or any of its Related Persons in connection with internal audit reviews, field examinations and Collateral examinations (which shall be reimbursed, in addition to the out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by Agent for its examiners), (c) each of Agent, its Related Persons, and L/C Issuer for all costs and expenses incurred in connection with (i) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out", (ii) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy or (iii) the commencement, defense, conduct of, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any Subsidiary of any Credit Party, Loan Document or Obligation (or the response to and preparation for any subpoena or request for document production relating thereto), including their respective Attorney Costs and (d) fees and disbursements of Attorney Costs of one law firm on behalf of all

18198069/21798-000010 Current/21008698v1521388094v4
11/12/2008/2010 11:46 am3:30 pm

Tranche A Lenders (other than Agent) and one additional law firm on behalf of Whippoorwill, as special representative of the Tranche B Revolving Lenders, and all Tranche B Lenders, incurred in connection with any of the matters referred to in clause (c) above.

9.6    Indemnity.

Each Credit Party agrees to indemnify, hold harmless and defend Agent, each Lender, each L/C Issuer, Whippoorwill and each of their respective Related Persons (each such Person being an "Indemnitee") from and against all Liabilities (including brokerage commissions, fees and other compensation) that may be imposed on, incurred by or asserted against any such Indemnitee in any matter relating to or arising out of, in connection with or as a result of (i) any Loan Document or any Obligation (or the repayment thereof), any Letter of Credit, the use or intended use of the proceeds of any Loan or the use of any Letter of Credit or any securities filing of, or with respect to, any Credit Party, (ii) in connection with the transactions contemplated by this Agreement, any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any Electronic Transmissions, (iii) in connection with the transactions contemplated by this Agreement, any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including attorneys' fees in any case), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "Indemnified Matters"); provided, however, that no Credit Party shall have any liability under this Section 9.6 to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability has resulted primarily from the gross negligence or willful misconduct of such Indemnitee or from such Indemnitee's material breach of its obligations under this Agreement, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. Furthermore, each of Borrower and each other Credit Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person.

(a)    Without limiting the foregoing, "Indemnified Matters" includes all Environmental Liabilities, including those arising from, or otherwise involving, any property of any Credit Party or any Related Person of any Credit Party or any actual, alleged or prospective damage to property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property or natural resource or any property on or contiguous to any Real Estate of any Credit

18198069/21798-000010 Current/21008698v152138894v4
1112/2008/2010 11:46 am3:30 pm

Party or any Related Person or any Credit Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor-in-interest to any Credit Party or any Related Person of any Credit Party or the owner, lessee or operator of any property of any Related Person through any foreclosure action, in each case except to the extent such Environmental Liabilities (i) are incurred solely following foreclosure by Agent or following Agent or any Lender having become the successor-in-interest to any Credit Party or any Related Person of any Credit Party and (ii) are attributable solely to acts of such Indemnitee.

9.7 <u>Marshaling; Payments Set Aside</u>. No Secured Party shall be under any obligation to marshal any property in favor of any Credit Party or any other Person or against or in payment of any Obligation. To the extent that any Secured Party receives a payment from Borrower, from any other Credit Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.8 <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; <u>provided</u> <u>that</u> any assignment by any Lender shall be subject to the provisions of <u>Section 9.9</u>, and <u>provided</u> <u>further</u> that no Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

9.9 <u>Assignments and Participations; Binding Effect</u>.

(a) <u>Binding Effect</u>. This Agreement shall become effective when it shall have been executed by Borrower, the Guarantors, the other Credit Parties signatory hereto and Agent and when Agent shall have been notified by each Lender and the initial L/C Issuer that such Lender or L/C Issuer has executed it. Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of Borrower, the Guarantors, the other Credit Parties signatory hereto (in each case except for <u>Article VIII</u>), Agent, Lender and L/C Issuer receiving the benefits of the Loan Documents and, to the extent provided in <u>Section 8.11</u>, each other Secured Party and, in each case, their respective successors and permitted assigns. Except as expressly provided in any Loan Document, none of Borrower, any Guarantor, any other Credit Party, L/C Issuer or Agent shall have the right to assign any rights or obligations hereunder or any interest herein. NOTWITHSTANDING THE FOREGOING, IF ANY PROVISION IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT CONFLICTS WITH ANY PROVISION IN THE DIP BORROWING ORDERS, THE PROVISION IN THE DIP BORROWING ORDERS SHALL GOVERN AND CONTROL.

~~1819~~8069/21798-~~0009~~010 Current/~~21008698v15~~21388094v4
~~11~~12/~~2008~~2010 ~~11:46 am~~3:30 pm

(b)  <u>Right to Assign</u>.  Each Lender may sell, transfer, negotiate or assign (a "<u>Sale</u>") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitment and its rights and obligations with respect to Loans and Letters of Credit) to (i) an existing Lender, (ii) any Affiliate or Approved Fund of any existing Lender or (iii) any other Person acceptable (which acceptance shall not be unreasonably withheld or delayed) to Agent and, with respect to Sales of Revolving Loan Commitments, each L/C Issuer that is a Lender and, as long as no Event of Default is continuing, Borrower (which acceptances shall be deemed to have been given unless an objection is delivered to Agent within five (5) Business Days after notice of a proposed sale is delivered to Borrower); <u>provided</u>, <u>however</u>, that for each Loan, the aggregate outstanding principal amount (determined as of the effective date of the applicable Assignment) of the Loans, Commitments and Letter of Credit Obligations subject to any such Sale shall be in a minimum amount of $1,000,000, unless such Sale is made to an existing Lender or an Affiliate or Approved Fund of any existing Lender, is of the assignor's (together with its Affiliates and Approved Funds) entire interest in such facility or is made with the prior consent of Borrower (to the extent required) and Agent, (x) such Sales shall be effective only upon the acknowledgement in writing of such Sale by Agent, (y) interest accrued prior to and through the date of any such Sale may not be assigned, and (z) such Sales by Non-Funding Lenders shall be subject to Agent's prior written consent in all instances. Agent's refusal to accept a Sale to a Credit Party, an Affiliate of a Credit Party, a holder of Subordinated Debt or an Affiliate of such a holder, or the imposition of conditions or limitations (including limitations on voting) upon Sales to such Persons, shall not be deemed to be unreasonable.

(c)  <u>Procedure</u>.  The parties to each Sale made in reliance on <u>clause (b)</u> above (other than those described in <u>clause (e)</u> or <u>(f)</u> below) shall execute and deliver to Agent an Assignment via an electronic settlement system designated by Agent (or, if previously agreed with Agent, via a manual execution and delivery of the Assignment) evidencing such Sale, together with any existing Note subject to such Sale (or any affidavit of loss therefor acceptable to Agent), any tax forms required to be delivered pursuant to <u>Section 10.1</u> and payment of an assignment fee in the amount of $3,500 to Agent, unless waived or reduced by Agent; <u>provided that</u> (i) if a Sale by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such Sale, and (ii) if a Sale by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such assignee, then only one assignment fee of $3,500 shall be due in connection with such Sale (unless waived or reduced by Agent).  Upon receipt of all the foregoing, and conditioned upon such receipt and, if such Assignment is made in accordance with <u>clause (iii)</u> of <u>subsection 9.9(b)</u>, upon Agent (and Borrower, if applicable) consenting to such Assignment, from and after the effective date specified in such Assignment, Agent shall record or cause to be recorded in the Register the information contained in such Assignment.

(d)  <u>Effectiveness</u>.  Subject to the recording of an Assignment by Agent in the Register pursuant to <u>subsection 1.4(b)</u>, (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Loan Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

obligations of a Lender, (ii) any applicable Note shall be transferred to such assignee through such entry and (iii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment, relinquish its rights (except for those surviving the termination of the Commitments and the payment in full of the Obligations) and be released from its obligations under the Loan Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment covering all or the remaining portion of an assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto).

(e)     Grant of Security Interests.  In addition to the other rights provided in this Section 9.9, each Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board), without notice to Agent or (B) any holder of, or trustee for the benefit of the holders of, such Lender's Indebtedness or equity securities, by notice to Agent; provided, however, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of such Lender hereunder and no such Lender shall be relieved of any of its obligations hereunder.

(f)     Restricted Lenders.     Notwithstanding anything to the contrary contained herein, in the event that a Restricted Lender becomes a Lender hereunder, then, so long as such Restricted Lender remains a Lender, it shall (i) have no right to receive information made available to Lenders hereunder (other than information delivered by any of the Borrowers or any other Credit Party to the Agent or the Lenders under the Loan Documents), participate in any meeting (or portion of any meeting) of the Lenders, or participate in communications with counsel for the Agent, and (ii) except as provided below and except in the case of the Tranche B Lenders, who shall have the rights set forth in Section 9.1(b), have no voting or consent rights or constitute a "Lender" for the purpose of any consent, waiver, or amendment hereunder or under any Loan Document (or be, or have its Commitments included in the determination of, "Required Lenders" or "Lenders directly affected" for such purpose), provided, however, no such waiver, amendment or consent shall, unless in writing and signed by the Restricted Lender directly affected thereby (or by the Agent with the consent of the Restricted Lender directly affected thereby), in addition to the Agent and the Required Lenders (or the Agent with the consent of the Required Lenders) and the Borrower, do any of the following (i) increase the Commitment of any Restricted Lender (or reinstate any Commitment terminated pursuant to subsection 7.2(a)), (ii) reduce the principal of any Loan, or (iii) amend or otherwise modify any provision of the Loan Document to discriminate among holders of Revolving Loans, as a class.  Moreover, for purposes of determining Required Lenders, the Loans held by Restricted Lenders shall be excluded from Loans outstanding.

(g)     Participants and SPVs.  In addition to the other rights provided in this Section 9.9, each Lender may, (x) with notice to Agent, grant to an SPV the option to

18198069/21798-009010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

make all or any part of any Loan that such Lender would otherwise be required to make hereunder (and the exercise of such option by such SPV and the making of Loans pursuant thereto shall satisfy the obligation of such Lender to make such Loans hereunder) and such SPV may assign to such Lender the right to receive payment with respect to any Obligation and (y) without notice to or consent from Agent or Borrower, sell participations to one or more Persons in or to all or a portion of its rights and obligations under the Loan Documents (including all its rights and obligations with respect to the Revolving Loans and Letters of Credit); provided, however, that, whether as a result of any term of any Loan Document or of such grant or participation, (i) no such SPV or participant shall have a commitment, or be deemed to have made an offer to commit, to make Loans hereunder, and, except as provided in the applicable option agreement, none shall be liable for any obligation of such Lender hereunder, (ii) such Lender's rights and obligations, and the rights and obligations of the Credit Parties and the Secured Parties towards such Lender, under any Loan Document shall remain unchanged and each other party hereto shall continue to deal solely with such Lender, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be entitled to the benefit of Article X, but, with respect to Section 10.1, only to the extent such participant or SPV delivers the tax forms such Lender is required to collect pursuant to subsection 10.1(f) and then only to the extent of any amount to which such Lender would be entitled in the absence of any such grant or participation and (B) each such SPV may receive other payments that would otherwise be made to such Lender with respect to Loans funded by such SPV to the extent provided in the applicable option agreement and set forth in a notice provided to Agent by such SPV and such Lender, provided, however, that in no case (including pursuant to clause (A) or (B) above) shall an SPV or participant have the right to enforce any of the terms of any Loan Document, and (iii) the consent of such SPV or participant shall not be required (either directly, as a restraint on such Lender's ability to consent hereunder or otherwise) for any amendments, waivers or consents with respect to any Loan Document or to exercise or refrain from exercising any powers or rights such Lender may have under or in respect of the Loan Documents (including the right to enforce or direct enforcement of the Obligations), except for those described in clauses (ii) and (iii) of subsection 9.1(a) with respect to amounts, or dates fixed for payment of amounts, to which such participant or SPV would otherwise be entitled and, in the case of participants, except for those described in clause (vi) of subsection 9.1(a).  No party hereto shall institute (and Borrower and Holdings shall cause each other Credit Party not to institute) against any SPV grantee of an option pursuant to this clause (f) any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper of such SPV; provided, however, that each Lender having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to get reimbursed by such SPV for any such Liability).   The agreement in the preceding sentence shall survive the termination of the Commitments and the payment in full of the Obligations.

   9.10    Non-Public Information; Confidentiality.

(a)  Non-Public Information.  Agent, each Lender and L/C Issuer acknowledges and agrees that it may receive material non-public information ("MNPI") hereunder concerning the Credit Parties and their Affiliates and agrees to use such information in compliance with all relevant policies, procedures and applicable Requirements of Laws (including United States federal and state security laws and regulations).

(b)  Confidential Information.  Each Lender, L/C Issuer and Agent agrees to use all reasonable efforts to maintain, in accordance with its customary practices, the confidentiality of information obtained by it pursuant to any Loan Document and designated in writing by any Credit Party as confidential, except that such information may be disclosed (i) with Borrower's consent, (ii) to Related Persons of such Lender, L/C Issuer or Agent, as the case may be, or to any Person that any L/C Issuer causes to issue Letters of Credit hereunder, that are advised of the confidential nature of such information and are instructed to keep such information confidential in accordance with the terms hereof, (iii) to the extent such information presently is or hereafter becomes (A) publicly available other than as a result of a breach of this Section 9.10 or (B) available to such Lender, L/C Issuer or Agent or any of their Related Persons, as the case may be, from a source (other than any Credit Party) not known by them to be subject to disclosure restrictions, (iv) to the extent disclosure is required by applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority, (v) to the extent necessary or customary for inclusion in league table measurements, (vi) (A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify Credit Parties, (vii) to current or prospective assignees, SPVs (including the investors or prospective investors therein) or participants, and to their respective Related Persons, in each case to the extent such assignees, investors, participants, counterparties or Related Persons agree to be bound by provisions substantially similar to the provisions of this Section 9.10 (and such Person may disclose information to their respective Related Persons in accordance with clause (ii) above), (viii) to any other party hereto, including without limitation the Bankruptcy Court, and (ix) in connection with the exercise or enforcement of any right or remedy under any Loan Document, in connection with any litigation or other proceeding to which such Lender, L/C Issuer or Agent or any of their Related Persons is a party or bound, or to the extent necessary to respond to public statements or disclosures by Credit Parties or their Related Persons referring to a Lender, L/C Issuer or Agent or any of their Related Persons.  In the event of any conflict between the terms of this Section 9.10 and those of any other Contractual Obligation entered into with any Credit Party (whether or not a Loan Document), the terms of this Section 9.10 shall govern.

(c)  Tombstones.  Each Credit Party consents to the publication by Agent, Whippoorwill or any Lender of advertising material relating to the financing transactions contemplated by this Agreement using any Credit Party's name, product photographs, logo or trademark.  Agent, Whippoorwill or Lender shall provide a draft of any advertising material to Borrower for review and comment prior to the publication thereof.

80

(d)  <u>Press Release and Related Matters</u>.  No Credit Party shall, and no Credit Party shall permit any of its Affiliates to, issue any press release or other public disclosure (other than any document filed with any Governmental Authority relating to a public offering of securities of any Credit Party or any document filed with the Bankruptcy Court) using the name, logo or otherwise referring to Crystal or Whippoorwill or of any of its their respective Affiliates, the Loan Documents or any transaction contemplated therein to which Agent or Whippoorwill is party without the prior consent of Crystal or Whippoorwill, as applicable, except to the extent required to do so under applicable Requirements of Law and then, only after consulting with Crystal or Whippoorwill, as applicable.

(e)  [Reserved].

(f)  <u>Material Non-Public Information</u>.  The Credit Parties hereby agree that if either they, any parent company or any Subsidiary of the Credit Parties has publicly traded equity or debt securities in the U.S., they shall (and shall cause such parent company or Subsidiary, as the case may be, to) (i) identify in writing, and (ii) to the extent reasonably practicable, clearly and conspicuously mark such Borrower Materials that contain only information that is publicly available or that is not material for purposes of U.S. federal and state securities laws as "PUBLIC".  The Credit Parties agree that by identifying such Borrower Materials as "PUBLIC" or publicly filing such Borrower Materials with the Securities and Exchange Commission, then Agent, the Lenders and the L/C Issuers shall be entitled to treat such Borrower Materials as not containing any MNPI for purposes of U.S. federal and state securities laws.  The Credit Parties further represent, warrant, acknowledge and agree that the following documents and materials shall be deemed to be PUBLIC, whether or not so marked, and do not contain any MNPI: (A) the Loan Documents, including the schedules and exhibits attached thereto, and (B) administrative materials of a customary nature prepared by the Credit Parties or Agent.  Before distribution of any Borrower Materials, the Credit Parties agree to execute and deliver to Agent a letter authorizing distribution of the evaluation materials to prospective Lenders and their employees willing to receive MNPI, and a separate letter authorizing distribution of evaluation materials that do not contain MNPI and represent that no MNPI is contained therein.

9.11  <u>Set-off; Sharing of Payments</u>.

(a)  <u>Right of Setoff</u>.  Each of Agent, each Lender, each L/C Issuer and each Affiliate (including each branch office thereof) of any of them is hereby authorized, without notice or demand (each of which is hereby waived by each Credit Party), at any time and from time to time during the continuance of any Event of Default and to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final) at any time held and other Indebtedness, claims or other obligations at any time owing by Agent, such Lender, such L/C Issuer or any of their respective Affiliates to or for the credit or the account of the Borrower or any other Credit Party against any Obligation of any Credit Party now or hereafter existing, whether or not any demand was made under any Loan Document with respect to such Obligation and even though such Obligation may be

unmatured. No Lender or L/C Issuer shall exercise any such right of setoff without the prior consent of Agent or Required Lenders. Each of Agent, each Lender and each L/C Issuer agrees promptly to notify the Borrower and Agent after any such setoff and application made by such Lender or its Affiliates; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application. The rights under this Section 9.11 are in addition to any other rights and remedies (including other rights of setoff) that Agent, the Lenders, the L/C Issuer, their Affiliates and the other Secured Parties, may have.

(b)     Sharing of Payments, Etc. If any Lender, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Credit Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any Collateral or "proceeds" (as defined under the applicable UCC) of Collateral) other than pursuant to Section 9.9 or Article X and such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as though it had been received by Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of the Borrower, applied to repay the Obligations in accordance herewith); provided, however, that (a) if such payment is rescinded or otherwise recovered from such Lender or L/C Issuer in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such Lender or L/C Issuer without interest and (b) such Lender shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of the applicable Credit Party in the amount of such participation. If a Non-Funding Lender or Impacted Lender receives any such payment as described in the previous sentence, such Lender shall turn over such payments to Agent in an amount that would satisfy the cash collateral requirements set forth in subsection 1.11(b).

9.12   Counterparts; Facsimile Signature. This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.13   Severability. The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

9.14   Captions. The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

18198069/21798-000010 Current/21008698v1521388094v4
11/12/2008/2010 11:46 am3:30 pm

9.15    Independence of Provisions.   The parties hereto acknowledge that this Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

9.16    Interpretation.  This Agreement is the result of negotiations among and has been reviewed by counsel to Credit Parties, Agent, Whippoorwill, each Lender and other parties hereto, and is the product of all parties hereto.  Accordingly, this Agreement and the other Loan Documents shall not be construed against the Lenders or Agent or Whippoorwill merely because of Agent's or Whippoorwill's or Lenders' involvement in the preparation of such documents and agreements.  Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to Sections 9.18 and 9.19.

9.17    No Third Parties Benefited.  This Agreement is made and entered into for the sole protection and legal benefit of Borrower, the Lenders, the L/C Issuers party hereto, Agent and, subject to the provisions of Section 8.11, each other Secured Party, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  Neither Agent nor any Lender shall have any obligation to any Person not a party to this Agreement or the other Loan Documents.

9.18    Governing Law and Jurisdiction.

(a)    Governing Law.  THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN ALL MATTERS ARISING OUT OF, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT.

(b)    Submission to Jurisdiction.  EACH LOAN PARTY HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE LOAN PARTIES, THE AGENT AND LENDERS PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT THE AGENT, LENDERS AND THE LOAN PARTIES ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE AGENT.  EACH

83

LOAN PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH LOAN PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH LOAN PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

(c)     Service of Process.    EACH CREDIT PARTY HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND OTHER DOCUMENTS AND OTHER SERVICE OF PROCESS OF ANY KIND AND CONSENTS TO SUCH SERVICE IN ANY SUIT, ACTION OR PROCEEDING BROUGHT IN THE UNITED STATES OF AMERICA WITH RESPECT TO OR OTHERWISE ARISING OUT OF OR IN CONNECTION WITH ANY LOAN DOCUMENT BY ANY MEANS PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, INCLUDING BY THE MAILING THEREOF (BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID) TO THE ADDRESS OF BORROWER SPECIFIED HEREIN (AND SHALL BE EFFECTIVE WHEN SUCH MAILING SHALL BE EFFECTIVE, AS PROVIDED THEREIN). EACH CREDIT PARTY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(d)     Non-Exclusive Jurisdiction.  NOTHING CONTAINED IN THIS SECTION 9.18 SHALL AFFECT THE RIGHT OF AGENT OR LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE REQUIREMENTS OF LAW OR COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY CREDIT PARTY IN ANY OTHER JURISDICTION.

9.19   Waiver of Jury Trial.   THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY.  THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.20   Entire Agreement; Release; Survival.

(a)     THE  LOAN  DOCUMENTS  EMBODY  THE  ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND  ANY  PRIOR  LETTER  OF  INTEREST,  COMMITMENT  LETTER, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING ANY CREDIT PARTY  AND  ANY  LENDER  OR  ANY  L/C  ISSUER  OR  ANY  OF  THEIR

84

RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE OR EFFECT OTHER THAN THE FEE LETTER. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)    Execution of this Agreement by the Credit Parties constitutes a full, complete and irrevocable release of any and all claims which each Credit Party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Loan Documents. In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings). Each of Borrower and each other Credit Party signatory hereto hereby waives, releases and agrees (and shall cause each other Credit Party to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)    (i) Any indemnification or other protection provided to any Indemnitee pursuant to this <u>Section 9.20</u>, <u>Sections 9.5</u> (Costs and Expenses) and <u>9.6</u> (Indemnity) and <u>Articles VIII</u> (Agent) and <u>X</u> (Taxes and Yield Protection), and (ii) the provisions of <u>Section 8.1</u> of the Guaranty and Security Agreement, in each case, shall (x) survive the termination of the Commitments and the payment in full of all other Obligations and (y) with respect to <u>clause (i)</u> above, inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

9.21    <u>Patriot Act</u>. Lender that is subject to the Patriot Act hereby notifies the Credit Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow Lender to identify each Credit Party in accordance with the Patriot Act.

9.22    <u>Replacement of Lender</u>. Within forty-five days after: (i) receipt by the Borrower of written notice and demand from any Lender that is not Agent or an Affiliate of Agent (an "<u>Affected Lender</u>") for payment of additional costs as provided in <u>Sections 10.1</u> and <u>10.2</u>; or (ii) any failure by any Lender (other than Agent) to consent to a requested amendment, waiver or modification to any Loan Document in which Required Lenders <s>or Required Lenders</s><u>(or in the case of amendments referred to in Section 9.1(b), holders of a majority of the Tranche B Revolving Loan Commitments, if in effect, or the outstanding Tranche B Revolving Loans, in all other cases)</u> have already consented to such amendment, waiver or modification but the consent of each Lender (or each Lender directly affected thereby, as applicable) is required with respect thereto, the Borrower may, at its option, notify Agent and such Affected Lender (or such defaulting or

85

non-consenting Lender, as the case may be) of the Borrower's intention to obtain, at the Borrower's expense, a replacement Lender ("Replacement Lender") for such Affected Lender (or such defaulting or non-consenting Lender, as the case may be), which Replacement Lender shall be reasonably satisfactory to Agent. In the event the Borrower obtains a Replacement Lender within forty-five (45) days following notice of its intention to do so, the Affected Lender (or defaulting or non-consenting Lender, as the case may be) shall sell and assign its Loans and Commitments to such Replacement Lender, at par, provided that the Borrower has reimbursed such Affected Lender for its increased costs for which it is entitled to reimbursement under this Agreement through the date of such sale and assignment. In the event that a replaced Lender does not execute an Assignment pursuant to Section 9.9 within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this Section 9.22 and presentation to such replaced Lender of an Assignment evidencing an assignment pursuant to this Section 9.22, the Borrower shall be entitled (but not obligated) to execute such an Assignment on behalf of such replaced Lender, and any such Assignment so executed by the Borrower, the Replacement Lender and Agent, shall be effective for purposes of this Section 9.22 and Section 9.9. Notwithstanding the foregoing, with respect to a Lender that is a Non-Funding Lender or an Impacted Lender, the Borrower or Agent may obtain a Replacement Lender and execute an Assignment on behalf of such Non-Funding Lender or an Impacted Lender at any time and without prior notice to such Non-Funding Lender or an Impacted Lender and cause its Loans and Commitments to be sold and assigned at par. Upon any such assignment and payment and compliance with the other provisions of Section 9.9, such replaced Lender shall no longer constitute a "Lender" for purposes hereof; provided, any rights of such replaced Lender to indemnification hereunder shall survive.

9.23     Joint and Several. The obligations of the Credit Parties hereunder and under the other Loan Documents are joint and several. Without limiting the generality of the foregoing, reference is hereby made to Article II of the Guaranty and Security Agreement, to which the obligations of Borrower and the other Credit Parties are subject.

9.24     Creditor-Debtor Relationship. The relationship between Agent, Lender and the L/C Issuer, on the one hand, and the Credit Parties, on the other hand, is solely that of creditor and debtor. No Secured Party has any fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Credit Parties by virtue of, any Loan Document or any transaction contemplated therein.

9.25     Actions in Concert. Notwithstanding anything contained herein to the contrary, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights against any Credit Party arising out of this Agreement or any other Loan Document (including exercising any rights of setoff) without first obtaining the prior written consent of Agent or Required Lenders, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the other Loan Documents shall be taken in concert and at the direction or with the consent of Agent or Required Lenders.

9.26    **Parties Including Trustees; Bankruptcy Court Proceedings.**    This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Credit Party, the estate of each Borrower, and any trustee, other estate representative or any successor in interest of any Borrower in any Chapter 11 Case or any case under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agent and Lenders and their respective assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Credit Party to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its Liens under applicable law.  No Credit Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Agent, Whippoorwill and Required Lenders.    Any such purported assignment, transfer, hypothecation or other conveyance by any Credit Party without the prior express written consent of the Agent, Whippoorwill and Required Lenders shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Credit Party, the Agent, Whippoorwill and Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

9.27    **Prepetition Credit Documents.**  The Credit Parties hereby agree that (a) this Agreement is separate and distinct from the Prepetition Credit Agreement and (b) the Prepetition Credit Agreement is in full force and effect.  The Credit Parties further agree that by entering into this Agreement, the Lenders do not waive any Default or Event of Default under the Prepetition Loan Documents or any of their liens, claims, priorities, rights and remedies thereunder.  Each Credit Party hereby further acknowledges and agrees that, (y) upon filing of the Chapter 11 Cases, the Agent and the Lenders shall have no further obligations under the Prepetition Credit Agreement to the Credit Parties, including, without limitation, to fund any advance or make any other loan under the Prepetition Credit Agreement to any Credit Party and no additional advances or loans shall be made under the Prepetition Credit Agreement to the Credit Parties, and (y) notwithstanding the foregoing to the contrary, no Credit Parties shall be relieved of their obligations under Prepetition Credit Agreement and the other Prepetition Loan Documents.

18198069/21798-009010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

## ARTICLE X.
## TAXES AND YIELD PROTECTION

10.1    Taxes.

(a)    Except as otherwise provided in this Section 10.1, each payment by any Credit Party under any Loan Document shall be made free and clear of all present or future taxes, levies, imposts, deductions, charges or withholdings imposed by any Governmental Authority and all liabilities with respect thereto (and without deduction for any of them) (collectively, but excluding the taxes set forth in clauses (i), (ii) and (iii) below, the "Taxes") other than for (i) taxes measured by overall net income (however denominated, including branch profits taxes) and franchise taxes imposed in lieu of net income taxes, in each case imposed on any Secured Party by the jurisdiction (or any political subdivision thereof) in which such Secured Party is organized, maintains its principal office or applicable Lending Office, (ii) taxes that are directly attributable to the failure (other than as a result of a change in any Requirement of Law) by Agent or any Lender to deliver the documentation required to be delivered pursuant to clause (f) below, or (iii) any tax, assessment or other governmental charge that would not have been imposed but for a failure to comply with any other applicable certification, documentation, information or other reporting requirement concerning the nationality, residence, identity, direct or indirect ownership of or investment in, or connection with the United States of America of the applicable Lender, its SPV or participant under subsection 9.9(f), the Agent, any Person to which the applicable Lender sells, transfers, negotiates or assigns all or a portion of its rights and obligations hereunder pursuant to subsection 9.9(b), or any other holder or beneficial owner of such rights or obligations (or any financial institution through which such rights or obligations are held or through which payment thereof is made) if, without regard to any tax treaty, such compliance is required by statute or regulation of the United States of America as a precondition to relief or exemption from such tax, assessment or other governmental charge.  In the event that (i) the Foreign Tax Compliance Act of 2009 (or similar legislation) is enacted into law; and (ii) Borrower intends to withhold taxes applicable to any payment to any Lender pursuant to changes in existing law under such Act (or such similar legislation), Borrower agrees to provide such Lender with 30 days advance written notice of such intention, accompanied by the rationale underlying the Borrower's conclusion that such withholding is necessary.  Within 10 days after its receipt of such notice, the applicable Lender shall be provided an opportunity to discuss the issue with Borrower before such withholding taxes are remitted by Borrower to the applicable Governmental Authority.

(b)    If any Taxes shall be required by law to be deducted from or in respect of any amount payable under any Loan Document to any Secured Party (i) such amount shall be increased as necessary to ensure that, after all required deductions for Taxes are made (including deductions applicable to any increases to any amount under this Section 10.1), such Secured Party receives the amount it would have received had no such deductions been made, (ii) the relevant Credit Party shall make such deductions, (iii) the relevant Credit Party shall timely pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable Requirements of Law and (iv) within 30 days after such payment is made, the relevant Credit Party shall deliver to

88

Agent an original or certified copy of a receipt evidencing such payment or other evidence of payment reasonably satisfactory to Agent; provided, however, that no such increase shall be made with respect to, and no Credit Party shall be required to indemnify any Secured Party pursuant to <u>clause (d)</u> below for, (x) withholding taxes to the extent that the obligation to withhold amounts existed on the date that such Person became a "Secured Party" under this Agreement in the capacity under which such Person makes a claim under this <u>clause (b)</u>, designates a new Lending Office or experiences a change in circumstances (other than a change in a Requirement of Law), except in each case to the extent such Person is a direct or indirect assignee (other than pursuant to <u>Section 9.22</u>) of any other Secured Party that was entitled, at the time the assignment to such Person became effective, or such Secured Party was entitled at the time of designation of a new Lending Office or change in circumstances, to receive additional amounts under this <u>clause (b)</u>, or (y) any United States backup withholding tax required by the Code to be withheld from amounts payable to a Secured Party that is subject to backup withholding due to (A) notified payee underreporting of reportable interest or dividend payments or other reportable payments or (B) the IRS notifying Agent or Borrower that the furnished taxpayer identification number is incorrect.

(c)     In addition, Borrower agrees to pay, and authorize Agent to pay in their name, any stamp, documentary, excise or property tax, charges or similar levies imposed by any applicable Requirement of Law or Governmental Authority and all Liabilities with respect thereto (including by reason of any delay in payment thereof), in each case arising from the execution, delivery or registration of, or otherwise with respect to, any Loan Document or any transaction contemplated therein (collectively, "Other Taxes").  Within 30 days after the date of any payment of Other Taxes by any Credit Party, Borrower shall furnish to Agent, at its address referred to in <u>Section 9.2</u>, the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to Agent.

(d)     Borrower shall reimburse and indemnify, within 30 days after receipt of demand therefor (with copy to Agent), each Secured Party for all Taxes and Other Taxes (including any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this <u>Section 10.1</u>) paid by such Secured Party and any Liabilities arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.  A certificate of the Secured Party (or of Agent on behalf of such Secured Party) claiming any compensation under this <u>clause (d)</u>, setting forth the amounts to be paid thereunder and delivered to Borrower with copy to Agent, shall be conclusive, binding and final for all purposes, absent manifest error.  In determining such amount, Agent and such Secured Party may use any reasonable averaging and attribution methods.

(e)     Any Lender claiming any additional amounts payable pursuant to this <u>Section 10.1</u> shall use its commercially reasonable efforts (consistent with its internal policies and Requirements of Law) to change the jurisdiction of its Lending Office if such a change would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, be otherwise disadvantageous to such Lender.

(f)    (i)    Each Non-U.S. Lender Party that, at any of the following times, is entitled to an exemption from United States withholding tax or is subject to such withholding tax at a reduced rate under an applicable tax treaty, shall (w) on or prior to the date such Non-U.S. Lender Party becomes a "Non-U.S. Lender Party" hereunder, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (i) and (z) from time to time if requested by Borrower or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and Borrower (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of each of the following, as applicable: (A) Forms W-8ECI (claiming exemption from U.S. withholding tax because the income is effectively connected with a U.S. trade or business), W-8BEN (claiming exemption from, or a reduction of, U.S. withholding tax under an income tax treaty) and/or W-8IMY (together with appropriate forms, certifications and supporting statements) or any successor forms, (B) in the case of a Non-U.S. Lender Party claiming exemption under Sections 871(h) or 881(c) of the Code, Form W-8BEN (claiming exemption from U.S. withholding tax under the portfolio interest exemption) or any successor form and a certificate in form and substance acceptable to Agent that such Non-U.S. Lender Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Code or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (C) any other applicable document prescribed by the IRS certifying as to the entitlement of such Non-U.S. Lender Party to such exemption from United States withholding tax or reduced rate with respect to all payments to be made to such Non-U.S. Lender Party under the Loan Documents.  Unless Borrower and Agent have received forms or other documents satisfactory to them indicating that payments under any Loan Document to or for a Non-U.S. Lender Party are not subject to United States withholding tax or are subject to such tax at a rate reduced by an applicable tax treaty, the Credit Parties and Agent shall withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate.

(ii)    Each U.S. Lender Party shall (A) on or prior to the date such U.S. Lender Party becomes a "U.S. Lender Party" hereunder, (B) on or prior to the date on which any such form or certification expires or becomes obsolete, (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (f) and (D) from time to time if requested by Borrower or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and Borrower (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of Form W-9 (certifying that such U.S. Lender Party is entitled to an exemption from U.S. backup withholding tax) or any successor form.

(iii)    Each Lender having sold a participation in any of its Obligations or identified an SPV as such to Agent shall collect from such participant or SPV the documents described in this clause (f) and provide them to Agent.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

10.2    Increased Costs and Reduction of Return.

(a)    If any Lender or L/C Issuer shall have determined that:

(i)    the introduction of any Capital Adequacy Regulation;

(ii)    any change in any Capital Adequacy Regulation;

(iii)    any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof; or

(iv)    compliance by such Lender or L/C Issuer (or its Lending Office) or any entity controlling the Lender or L/C Issuer, with any Capital Adequacy Regulation;

affects the amount of capital required or expected to be maintained by such Lender or L/C Issuer or any entity controlling such Lender or L/C Issuer and (taking into consideration such Lender's or such entities' policies with respect to capital adequacy and such Lender's or L/C Issuer's desired return on capital) determines that the amount of such capital is increased as a consequence of its Commitment(s), loans, credits or obligations under this Agreement, then, within thirty (30) days of demand of such Lender or L/C Issuer (with a copy to Agent), Borrower shall pay to Lender or L/C Issuer, from time to time as specified by such Lender or L/C Issuer, additional amounts sufficient to compensate such Lender or L/C Issuer (or the entity controlling the Lender or L/C Issuer) for such increase; provided that Borrower shall not be required to compensate any Lender or L/C Issuer pursuant to this subsection 10.2(a) for any amounts incurred more than 180 days prior to the date that such Lender or L/C Issuer notifies Borrower, in writing of the amounts and of such Lender's or L/C Issuer's intention to claim compensation thereof; provided further, that if the event giving rise to such increase is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

10.3    Certificates of Lenders.    Any Lender claiming reimbursement or compensation pursuant to this Article X, Lender shall deliver to Borrower (with a copy to Agent) a certificate setting forth in reasonable detail the amount payable to such Lender hereunder and such certificate shall be conclusive and binding on Borrower in the absence of manifest error.

## ARTICLE XI.
## EXIT FINANCING

11.1    Exit Commitment.    Effective as of the date of the entry of the Final Borrowing Order, Crystal Financial LLC hereby agrees to provide a $45,000,000 revolving exit facility on the terms and subject to the conditions set forth in Exhibit 11.1 attached hereto (the "Exit Commitment").  The Exit Commitment shall terminate upon the earlier of (i) ~~February 18, 2011~~the date specified in Section 4.17(g) of this Agreement (as such date may be extended by agreement with the Agent) or (ii) the occurrence of an

Event of Default under this Agreement. The Borrower shall not be obligated to consummate the financing which is the subject matter of the Exit Commitment, to seek approval to accept the Exit Commitment or to expend any funds in connection with the Exit Commitment.

## ARTICLE XII.
## DEFINITIONS

12.1 <u>Defined Terms</u>. The following terms are defined in the Sections or subsections referenced opposite such terms:

| | |
|---|---|
| "956 Impact" | 4.13(b) |
| "Affected Lender" | 9.22 |
| "Agent Report" | 8.5(c) |
| "Applicable Tranche A Percentage" | 1.9(db) |
| "Bankruptcy Code" | Recitals |
| "Bankruptcy Court" | Recitals |
| "Blocked Account" | 4.11(a) |
| "Borrower" | Preamble |
| "Carve-Out" | 1.12(a) |
| "Change Control" | 7.1(j) |
| "Chapter 11 Cases" | Recitals |
| "Concentration Account" | 4.11(a) |
| "Crystal" | Preamble |
| "DIP Sponsor Credit Support" | 4.15(a) |
| "DIP Sponsor Credit Support Termination Date" | 4.15(a) |
| "Disbursement Delta" | 6.1(a) |
| "Effective Date" | 2.4 |
| "Event of Default" | 7.1 |
| "Existing Agent" | Recitals |
| "Existing Credit Agreement" | Recitals |
| "Existing Lenders" | Recitals |
| "Exit Commitment" | 11.1 |
| "Fee Letter" | 2.1(f) |
| "Guarantors" | Preamble |
| "Holdings" | Preamble |
| "Indemnified Matters" | 9.6 |
| "Indemnitees" | 9.6 |
| "Investments" | 5.4 |
| "L/C Issuer" | 1.1(b) |
| "L/C Reimbursement Agreement" | 1.1(b) |
| "L/C Reimbursement Date" | 1.1(b) |
| "L/C Request" | 1.1(b) |
| "L/C Sublimit" | 1.1(b) |
| "Lender" and "Lenders" | Preamble |
| "Letter of Credit Fee" | 1.9(c) |

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

| | |
|---|---|
| "Maximum Lawful Rate" | 1.3(d) |
| "Milestones" | 4.17 |
| "MNPI" | 9.10(a) |
| "OFAC" | 3.25(a) |
| "Other Deposit Accounts" | 4.11(a) |
| "Other Lender" | 1.1(e) |
| "Other Taxes" | 10.1(b) |
| "Overadvance" | 1.1(a) |
| "Parent" | Preamble |
| "Permitted Liens" | 5.1 |
| "Petition Date" | Recitals |
| "Post-Default Carve-Out" | 1.12(a) |
| "Register" | 1.4(b) |
| "REH" | Preamble |
| "Released Parties" | 1.15 |
| "Releasing Parties" | 1.15 |
| "Replacement Lender" | 9.22 |
| "Restricted Payments" | 5.11 |
| ~~"Revolving Loan" and "Revolving Loans"~~ | ~~1.1(a)~~ |
| ~~"Revolving Loan Commitment"~~ | ~~1.1(a)~~ |
| "Sale" | 9.9(b) |
| "SDN List" | 3.25(a) |
| "Settlement Date" | 1.11(b) |
| "Super-Priority Claims" | 1.12(a) |
| "Tax Returns" | 3.10 |
| "Taxes" | 10.1(c) |
| "Term Loan" | 4.15(b) |
| "Tranche A Lender" | 1.1(a) |
| "Tranche B Lender" | 1.1(c) |
| "Tranche A Revolving Loan" | 1.1(a) |
| "Tranche B Revolving Loan" | 1.1(c) |
| "Tranche A Revolving Loan Commitment" | 1.1(a) |
| "Tranche B Revolving Loan Commitment" | 1.1(c) |
| "Tranche A Unused Commitment Fee" | 1.9(b) |
| "Tranche B Unused Commitment Fee" | 1.9(b) |
| "Whippoorwill" | Preamble |

In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

"Acceptable Liquidation Agent" means a nationally recognized professional liquidator of retail inventory.

"Account" means, as at any date of determination, all "accounts" (as such term is defined in the UCC) of the Credit Parties, including, without limitation, the unpaid portion of the obligation of a customer of a Credit Party in respect of Inventory purchased by and shipped to such customer and/or the rendition of services by a Credit Party, as

93

stated on the respective invoice of a Credit Party, net of any credits, rebates or offsets owed to such customer.

"Account Debtor" means the customer of a Credit Party who is obligated on or under an Account.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person , (b) the acquisition of in excess of fifty percent (50%) of the Stock and Stock Equivalents of any Person or otherwise causing any Person to become a Subsidiary of Borrower, or (c) a merger or consolidation or any other combination with another Person.

"Actual Disbursement Amount" means the actual amount of all expense disbursements, excluding Inventory purchases, in the aggregate made by the Credit Parties during the applicable period.

"Actual Inventory Availability" means the actual gross Inventory amount, reported on the Borrowing Base Certificate of the Credit Parties as "Cumulative Retail Inventory Available" during the applicable period.

"Actual Receipts" means the actual amount of all receipts for the sale of Inventory received by the Credit Parties during the applicable period.

"Affiliate" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract or otherwise. Without limitation, any director, executive officer or beneficial owner of five percent (5%) or more of the Stock (either directly or through ownership of Stock Equivalents) of a Person shall for the purposes of this Agreement, be deemed to be an Affiliate of the other Person. Notwithstanding the foregoing, neither Agent nor Lender shall be deemed an "Affiliate" of any Credit Party or of any Subsidiary of any Credit Party solely by reason of the provisions of the Loan Documents.

"Agent" means has the meaning given such term in the preamble to this Agreement and includes any successor administrative agent for the Lenders and the L/C Issuers.

"Aggregate Revolving Loan Commitments" means the Aggregate Tranche A Revolving Loan Commitments and the Aggregate Tranche B Revolving Loan Commitments, which shall initially be in the aggregate amount of $40,000,000 (as such amount may be changed from time to time pursuant to this Agreement).

"Aggregate Tranche A Revolving Loan Commitments" means the total Tranche A Revolving Loan Commitments of the Tranche A Lenders, which shall initially be in the amount of $45,000,00033,000,000 (as such amount may be changed from time to time

pursuant to this Agreement) less (a) the aggregate amount of any "Net Proceeds" of "Asset Sales" (as such terms are defined in the Lease Agreement), other than in accordance with Section 5.2(f), applied to the payment of Obligations from time to time, (b) the aggregate amount of any net proceeds of "Parity Lien Obligations" (as such term is defined in the Lease Agreement) applied to the payment of Obligations from time to time, and (c) the amount of Revolving Loans that are reclassified to Term Loans pursuant to Section 4.15.

"Aggregate Tranche B Revolving Loan Commitments" means the total Tranche B Revolving Loan Commitments of the Tranche B Lenders, which shall initially be in the amount of $7,000,000 (as such amount may be changed from time to time pursuant to this Agreement).

"Agreement" shall have the meaning given such term in the preamble to this Agreement and shall include any and all amendments of, supplements to, or other changes to this Agreement that may be hereafter made in accordance with the terms and conditions of this Agreement.

"Amended and Restated Intercreditor Agreement" means the Amended and Restated Intercreditor Agreement, dated as of December 18, 2009, among the Agent, Loehmann's Capital and the Credit Parties, as the same may be amended, restated and/or modified from time to time with the written consent of the Agent and the Required Lenders.

"Approved Budget" means the Borrowers' rolling twenty-six (26) week cash flow projection, reflecting on a line-item basis anticipated sales, cash receipts, inventory levels, and expenditures for the subject period and annexed hereto as Exhibit 2.1(i), as the same shall be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) including pursuant to Section 6.1, in each of the initial budget or subsequent modifications or supplements to which the Agent agrees in writing in its discretion and as to the initial budget or subsequent modifications or supplements, together with such supporting documentation as reasonably requested by the Agent.

"Approved Budgeted Disbursement Amount" means the line-item contained in the Approved Budget under the heading "Total Disbursements" less amounts budgeted for the purchase of Inventory.

"Approved Budgeted Inventory Availability" means the line-item contained in the Approved Budget under the heading "Inventory Availability."

"Approved Budgeted Receipts" means the line-item contained in the Approved Budget reflecting cash receipts for the sale of Inventory (without regard to sales or other taxes collected on account of such sales).

"Approved Fund" means, with respect to any Lender, any Person (other than a natural Person) that (a) (i) is or will be engaged in making, purchasing, holding or

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business or (ii) temporarily warehouses loans for any Lender or any Person described in clause (i) above and (b) is advised or managed by (i) such Lender, (ii) any Affiliate of such Lender or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Lender.

"Assignment" means an assignment agreement entered into by a Lender, as assignor, and any Person, as assignee, pursuant to the terms and provisions of Section 9.9 (with the consent of any party whose consent is required by Section 9.9), accepted by Agent, in substantially in the form of Exhibit 12.1(a) or any other form approved by Agent.

"Attorney Costs" means and includes all fees and disbursements of any law firm or other external counsel.

"Availability" means, as of any date of determination, the amount by which the Maximum Tranche A Revolving Loan Balance at such time, exceeds the aggregate outstanding principal balance of Tranche A Revolving Loans at such time. In calculating Availability at any time and for any purpose under this Agreement, the Borrower shall certify to the Agent that all accounts payable and Taxes (in each case, to the extent incurred or arising Post-Petition) are being paid on a timely basis and consistent with past practices, other than accounts payable and Taxes incurred or arising Post-Petition which are being contested in good faith and in accordance with the provisions of this Agreement.

"Avoidance Actions" means causes of action under Chapter 5 of the Bankruptcy Code.

"Bank Product" means any of the following products, services or facilities extended to Credit Parties or any Subsidiary thereof by any Lender or any of its Affiliates: (a) Cash Management Services; (b) products under Rate Contracts; (c) commercial credit card, purchase card and merchant card services extended to such Credit Party or such Subsidiary; and (d) leases and other banking products or services as may be requested by any Credit Party or any Subsidiary thereof, other than Letters of Credit; provided, however, that for any of the foregoing to be included as an "Obligation" for purposes of a distribution under subsections 1.10(c) and (d), (i) the applicable Bank Product provider and Credit Party must have previously provided written notice to Agent of (x) the existence of such Bank Product and the related Bank Product Obligations, (y) the maximum dollar amount of Bank Product Obligations arising thereunder to be included as a Reserve ("Bank Product Amount"), and (z) the methodology to be used by such parties in determining such Bank Product Obligations owing from time to time and (ii) Agent, in its discretion, shall have approved in writing the inclusion of such Bank Product and the related Bank Product Obligations in the Obligations. The Bank Product Amount may be changed from time to time upon written notice to Agent by the provider of the Bank Product and the applicable Credit Party.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"Bank Product Amount" shall have the meaning given such term in the definition herein of Bank Product.

"Bank Product Obligations" shall mean any and all Obligations that arise from the provision or extension of any Bank Product.

"Benefit Plan" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Credit Party incurs or otherwise has any obligation or liability, contingent or otherwise.

"Borrower Materials" means the Loan Documents and all reports, notices, communications and other information or materials provided or delivered by, or on behalf of, the Credit Parties hereunder.

"Borrowing" means a borrowing hereunder consisting of Loans made to or for the benefit of Borrower on the same day by the Lenders pursuant to Article I.

"Borrowing Base" means, as of any date of determination by Agent, from time to time, an amount equal to the sum at such time of:

      (a)    90% of the book value of Eligible Credit Card Receivables at such time;

      (b)    90% of the book value of Eligible Magazine Subscription Receivables at such time (but the book value of each Eligible Magazine Subscription Receivable shall be reduced by the maximum discount for early payment that the Borrower may elect to accept under the applicable Magazine Subscription Agreement);

      (c)    90% of the book value of Eligible Inventory multiplied by the NOLV Factor; and

      (d)    90% of the book value of Eligible In-Transit Inventory and Eligible LC Inventory, multiplied by the NOLV Factor.

In the case of clauses (a), (b), (c) and (d), less any and all Reserves (including the Credit Support Reserve, if applicable) established by Agent at such time in its Permitted Discretion.

"Borrowing Base Certificate" means a certificate of Borrower in substantially the form of Exhibit 12.1(b) hereto, duly completed as of a date acceptable to Agent in its sole discretion.

"Business Day" means any day other than a Saturday, Sunday or other day on which federal reserve banks are authorized or required by law to close and, if the applicable Business Day relates to any Revolving Loan, a day on which dealings are carried on in the London interbank market.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"Buying Season" means, with respect to any Fiscal Year, each of (i) the period from the beginning of such Fiscal Year through the end of July in such Fiscal Year and (ii) the period from the beginning of August in such Fiscal Year through the end of such Fiscal Year.

"Capital Adequacy Regulation" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any Lender or of any corporation controlling a Lender.

"Capital Lease" means any leasing or similar arrangement which, in accordance with GAAP, is classified as a capital lease.

"Capital Lease Obligations" means all monetary obligations of any Credit Party or any Subsidiary of any Credit Party under any Capital Leases.

"Carve-Out Notice" means written notice from the Agent to the Credit Parties, their counsel, counsel to any Committee and the United States Trustee of the occurrence of an Event of Default and terminating the Pre-Default Carve-Out.

"Carve-Out Reserve" means a Reserve equal to the maximum possible amount of the Carve-Out.

"Cash Equivalents" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"Cash Management Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after the "first day" hearings, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Agent and Lenders, which among other matters authorizes the Credit Parties to maintain their existing cash management and treasury arrangements or such other arrangements as shall be acceptable to the Agent and Lenders.

"Cash Management Services" means any services provided from time to time by Agent, any Lender or any such Person's Affiliates to Borrower, any other Credit Party or any Subsidiary thereof in connection with operating, collections, payroll, trust, or other depository or disbursement accounts, including automatic clearinghouse, controlled disbursement, depository, electronic funds transfer, information reporting, lockbox, stop payment, overdraft and/or wire transfer services.

"Closing Date" means November 17, 2010.

"Code" means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

"Collateral" means all Property and interests in Property and proceeds thereof now owned or hereafter acquired by any Credit Party who has granted a Lien to Agent, in or upon which a Lien is granted or purported to be granted or now or hereafter exists in favor of Lender or Agent for the benefit of Agent, Lenders and other Secured Parties, whether under this Agreement or under any other documents executed by any such Persons and delivered to Agent.

"Collateral Documents" means, collectively, the Guaranty and Security Agreement, any Mortgages, the Credit Card Acknowledgments, each Control Agreement, and all other security agreements, pledge agreements, patent and trademark security agreements, lease assignments, guarantees and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, by or between any one or more of any Credit Party, and any Lender or Agent for the benefit of Agent, the Lenders and other Secured Parties now or hereafter delivered to the Lenders or Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against any such Person as debtor in favor of any Lender or Agent for the benefit of Agent, the Lenders and the other Secured Parties, as secured party, as any of the foregoing may be amended, restated and/or modified from time to time.

"Collection Account" means that certain account of Agent, account number 9977665971 in the name of Agent at CitiBank N.A.. ABA No. 021000089, or such other account as may be specified in writing by Agent to the Borrower as the "Collection Account."

"Commitment" means, for any Lender, its Revolving Loan Commitment and/or Term Loan Commitment, as the case may be.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"**Commitment Letter**" means that certain Amended and Restated Commitment Letter, dated as of November 14, 2010 and amended and restated on December 1, 2010, among the Credit Parties, the Equity Sponsor and Whippoorwill, as further amended from time to time in accordance with the terms thereof.

"**Commitment Percentage**" means, (a) as to any Tranche A Lender, the percentage equivalent of such Tranche A Lender's Tranche A Revolving Loan Commitment, divided by the Aggregate Tranche A Revolving Loan Commitments, and (b) as to any Tranche B Lender, the percentage equivalent of such Tranche B Lender's Tranche B Revolving Loan Commitment divided by the Aggregate Tranche B Revolving Loan Commitments.

"**Committee**" shall mean collectively, the official committee of unsecured creditors formed, appointed, or approved in the Chapter 11 Cases.

"**Contingent Obligation**" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person:  (a) with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (c) under any Rate Contracts; (d) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (e) for the obligations of another Person through any agreement to purchase, repurchase or otherwise acquire such obligation or any Property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another Person.  The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determined amount, the maximum amount so guaranteed or supported.

"**Contractual Obligations**" means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its Property is bound.

"**Contra-Reserve**" shall mean an amount equal to $1,200,000 as of the September 15, 2010 which shall be reduced by $300,000 on the first day of each fiscal quarter after September 15, 2010, commencing on December 1, 2010 until such Contra-Reserve is equal to zero; provided that there does not exist an Event of Default after giving effect to such reduction.

"**Control Agreement**" means a tri-party deposit account, securities account, or commodities account control agreement by and among the applicable Credit Party, Agent and the depository, securities intermediary or commodities intermediary, and each in form and substance satisfactory to Agent and in any event providing to Agent "control" of such

deposit account, securities or commodities account within the meaning of Articles 8 and 9 of the UCC.

"Copyrights" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to copyrights and all mask work, database and design rights, whether or not registered or published, all registrations and recordations thereof and all applications in connection therewith.

"Credit Card Acknowledgments" means, individually and collectively, the agreements in favor of Agent by any credit card issuer or any credit card processor who are parties to Credit Card Agreements acknowledging the first priority priming security interest of Agent in the monies due and to become due to Borrower (including credits and reserves) under the Credit Card Agreements, and providing, among other things, that each such credit card issuer or processor shall transfer all proceeds due with respect to credit card charges for sales (net of expenses and chargebacks of the credit card issuer or processor) by Borrower received by it (or other amounts payable by such credit card processor) into a designated concentration account on a daily basis, or on such other basis as the Agent may agree in writing in the exercise of its Permitted Discretion.

"Credit Card Agreements" shall mean all agreements or notices, each in form and substance reasonably satisfactory to Agent, now or hereafter entered into by Borrower with any credit card issuer or any credit card processor, as the same may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, including, without limitation, any agreements or notices entered into in connection with any Private Label Credit Cards.

"Credit Card Concentration Account" shall mean the deposit account of Borrower into which credit card receivables are initially deposited (which account as of the Closing Date is account number 4602287492 maintained by Borrower with Bank of America, N.A.).

"Credit Card Receivables" shall mean, collectively, all present and future rights of Borrower to payment from (a) any major credit card issuer or major credit card processor arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card, (b) any major credit card issuer or major credit card processor in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any major credit card issuer or major credit card processor under the Credit Card Agreements or otherwise and (c) the issuers of Private Label Credit Cards.

"Credit Parties" means Borrower, Guarantors and each other Person (i) which executes a guaranty of the Obligations, (ii) which grants a Lien on all or substantially all of its assets to secure payment of the Obligations and (iii) all of the Stock of which is pledged to Agent for the benefit of the Secured Parties.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"Credit Support Reserve" shall mean, upon the drawing under the Sponsor Credit Support or DIP Sponsor Credit Support, as applicable, a Reserve equal to the amount drawn.

"Cumulative Period" means the period after the Petition Date on a rolling four (4) week basis (other than the first three (3) weeks which shall be measured for the applicable period commencing on the Petition Date).

"Default" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"DIP Borrowing Orders" means and refers to the Interim Borrowing Order and the Final Borrowing Order.

"Sponsor Participation Agreement" means that Participation Agreement, in form and substance attached hereto as Exhibit 4.15.

"Disclosure Statement" means a disclosure statement filed in the Chapter 11 Cases in connection with a Plan of Reorganization.

"Disposition" means (i) the sale, lease, conveyance or other disposition of Property, other than sales or other dispositions expressly permitted under subsection 5.2(a), (b), (c), (d) or (e), and (ii) the sale or transfer by Borrower or any Subsidiary of Borrower of any Stock or Stock Equivalent issued by any Subsidiary of Borrower and held by such transferor Person.

"Dollars", "dollars" and "$" each mean lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary other than a Foreign Subsidiary.

"Draw Conditions" means the occurrence of any of the following events: (i) the occurrence of an Event of Default, (ii) the occurrence of a Material Adverse Effect at any time after the Closing Date, as determined by the Required Lenders in their sole discretion, or (iii) the issuer of the DIP Sponsor Credit Support delivers a notice providing that it elects to not extend the expiration date of the DIP Sponsor Credit Support at any time prior to the DIP Sponsor Credit Support Termination Date unless the expiration date is on or after the DIP Sponsor Credit Support Termination Date.

"E-Fax" means any system used to receive or transmit faxes electronically.

"Electronic Transmission" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax.

"Eligible Credit Card Receivables" means all of the Credit Card Receivables of Borrower that arise in the Ordinary Course of Business, which have been earned by

performance, that are not excluded as ineligible by virtue of one or more of the criteria set forth below and are reflected in the most recent Borrowing Base Certificate delivered by Borrower to the Agent.  None of the following shall be deemed to be Eligible Credit Card Receivables:

(i)     Credit Card Receivables due from major credit card processors that have been outstanding for more than five (5) Business Days from the date of sale;

(ii)    Credit Card Receivables due from major credit card processors with respect to which Borrower does not have good, valid and marketable title thereto, free and clear of any Lien other than Liens permitted and described in subsections 5.1(b), (c), and (f);

(iii)   Credit Card Receivables due from major credit card processors that are not subject to a first priority security interest in favor of the Agent, as applicable, for its own benefit and the benefit of the Lender except for Liens described in subsection 5.1(d) (subject to Reserves);

(iv)    Credit Card Receivables due from major credit card processors which are disputed, or with respect to which a claim, counterclaim, offset or chargeback has been asserted, by the related credit card processor (but only to the extent of such dispute, counterclaim, offset or chargeback);

(v)     Credit Card Receivables due from major credit card processors as to which the credit card processor has the right under certain circumstances to require Borrower to repurchase such Accounts from such credit card processor;

(vi)    Except as otherwise approved by the Agent, Credit Card Receivables due from major credit card processors as to which the Agent has not received an acceptable Credit Card Agreement or Credit Card Acknowledgement (or, in the case of Credit Card Receivables payable by or through PNC, the Borrower has not given the PNC Credit Card Notice to PNC or PNC has rejected such notice);

(vii)   Accounts due from major credit card issuers or processors (other than Visa, Mastercard, American Express – including, but not limited to American Express Travel Related Services Company, Inc., Diners Club and Discover) which the Agent determines, in its Permitted Discretion, to be unlikely to be collected; or

(viii)  Except as otherwise approved by the Agent in its sole discretion, Credit Card Receivables of Borrower arising from Private Label Credit Cards.

Notwithstanding the above, the Agent reserves the right, at any time and from time to time after the Closing Date, to adjust the criteria set forth above, to establish new criteria and to adjust the applicable advance rate with respect to Eligible Credit Card Receivables in its Permitted Discretion.  The Agent shall have the right to establish, modify or eliminate Reserves against Eligible Credit Card Receivables (including, without limitation, for estimates, chargeback or other accrued liabilities or offsets by credit card issuers or processors and amounts to adjust for material claims, offsets,

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

defenses or counterclaims or other material disputes with an Account Debtor) from time to time in its Permitted Discretion.

"Eligible In-Transit Inventory" means all Inventory owned by Borrower which is in transit for not more than thirty (30) days directly from the point of shipment to one of the domestic owned or leased locations (provided that, if any such leased location is either Borrower's distribution center regardless of where it is located or is another location of Borrower that is located in a Landlord Lien State and in either case a landlord lien waiver reasonably acceptable to the Agent has not been obtained from the lessor of such leased location, Agent may establish a Reserve with respect thereto) of Borrower in the continental United States, provided that (a) Borrower has title to and has paid for such Inventory, (b) either (i) such Inventory is not subject to a negotiable bill of lading or other document of title and the shipping documents relating to such Inventory (including, without limitation, so-called "forwarders cargo receipts" or "non-negotiable express bills of lading") acceptable to the Agent that have been delivered to the Agent or an agent acting on behalf of the Agent or an agent of such agent and such shipping documents name Borrower as consignee and shipper (or such other arrangements satisfactory to the Agent relating to such shipping documents in respect of such Inventory shall have been made) or (ii) in the event such Inventory is subject to negotiable bills of lading or other documents of title, such negotiable bills of lading or other documents of title have been (x) issued with the Agent as consignee and Borrower as shipper and (y) delivered to the Agent or an agent acting on behalf of the Agent or an agent of such agent (or such other arrangements satisfactory to the Agent relating to such negotiable bills of lading or other documents of title in respect of such Inventory shall have been made), (c) such Inventory is subject, to the reasonable satisfaction of the Agent, to a first priority perfected security interest in favor of the Agent for its own benefit and the benefit of the Secured Parties, (d) the vendor or the supplier of such Inventory has agreed to waive its claims in or to such Inventory (including any right to stop such Inventory in transit), in a manner acceptable to the Agent, once such Inventory is delivered to a freight forwarder or other representative of Borrower who has entered into an agreement of the type described in clause (f) below, (e) such Inventory is covered by insurance reasonably acceptable to the Agent, (f) each relevant freight carrier, freight forwarder, customs broker and shipping company in possession of such in-transit Inventory shall have (x) entered into bailee arrangements satisfactory to the Agent, for the benefit of the Secured Parties and (y) indicated or otherwise acknowledged the Agent's security interest in such Inventory in any shipping documents issued or carried by such freight carrier or shipping company (including, without limitation, waybills, airway bills, seaway bills, receipts, or any similar document), in each case, in a manner satisfactory to the Agent, (g) such Inventory would otherwise satisfy all of the requirements of "Eligible Inventory" hereunder and (h) in no event shall the amount of Eligible In-Transit Inventory and Eligible LC Inventory included in the Borrowing Base exceed $5,000,000 in the aggregate.

"Eligible Inventory" means all of the Inventory owned by Borrower that is properly reflected as "Eligible Inventory" in the most recent Borrowing Base Certificate delivered by Borrower to Agent shall be "Eligible Inventory", except any such Inventory to which any of the exclusionary criteria set forth below or in the component definitions

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

herein applies. Eligible Inventory shall not include the following Inventory of a Credit Party:

(i)     Inventory that is excess, obsolete, unsaleable, shopworn, or seconds or consists of damaged goods, goods to be returned to vendors, or sample goods at Borrower's corporate offices;

(ii)    Inventory that is damaged or unfit for sale;

(iii)   Inventory (other than Eligible In-Transit Inventory or Eligible LC Inventory) that is located at any site if the aggregate book value of Inventory at any such location is less than $100,000;

(iv)    Inventory (other than Eligible In-Transit Inventory or Eligible LC Inventory) that (i) is not located on premises owned, leased or rented by Borrower and set forth in Schedule 4 to the Guaranty and Security Agreement (as supplemented by Borrower from time to time in accordance with the terms and conditions of the Guaranty and Security Agreement) (provided that, if any Inventory is stored at a leased location that is either Borrower's distribution center regardless of where it is located or is another location of Borrower that is located in a Landlord Lien State and in either case a landlord lien waiver reasonably acceptable to the Agent has not been obtained from the lessor of such leased location, Agent may establish a Reserve with respect thereto), or (ii) is stored with a bailee or warehouseman unless (x) a reasonably satisfactory, acknowledged bailee letter has been received by Agent with respect thereto and (y) Reserves satisfactory to Agent have been established with respect thereto, or (iii) is located at an owned location subject to a mortgage in favor of Lender other than Agent, unless a reasonably satisfactory mortgagee waiver has been delivered to Agent;

(v)     Inventory that is in transit, except for (x) Eligible In-Transit Inventory, (y) Eligible LC Inventory, and (z) Inventory in transit between domestic locations of Borrower as to which Agent's Liens have been perfected at origin and destination;

(vi)    Inventory subject to any licensing, trademark, trade name or copyright agreements with any third parties which would require any consent of any third party for the sale or disposition of that Inventory (which consent has not been obtained) or the payment of any monies to any third party upon such sale or other disposition (to the extent of such monies);

(vii)   Inventory that consists of packing or shipping materials, or manufacturing supplies;

(viii)  Inventory that consists of tooling or replacement parts;

(ix)    Inventory that consists of display items;

(x)     Inventory that was produced in violation of the Fair Labor Standards Act and is subject to the so-called "hot goods" provisions contained in Title 29,

105

Chapter 8, U.S.C. Section 215(a), or Inventory that does not meet all standards imposed by any Government Authority having regulatory authority over such Inventory or the use or sale thereof;

(xi)     Inventory that consists of "reserve inventory load" charges;

(xii)    Inventory that consists of Hazardous Materials or goods that can be transported or sold only with licenses that are not readily available;

(xiii)   Inventory that is not covered by casualty insurance reasonably acceptable to Agent;

(xiv)   Inventory that is not owned by Borrower (other than Eligible LC Inventory) or is subject to Liens other than Permitted Liens described in subsections 5.1(b), (c), (d) and (f) (but subject to Reserves for any such Lien established by Agent in its Permitted Discretion) or rights of any other Person (including the rights of a purchaser that has made progress payments and the rights of a surety that has issued a bond to assure Borrower's performance with respect to that Inventory);

(xv)     Inventory that is not subject to a first priority Lien in favor of Agent on behalf of itself and the Secured Parties, except for Liens described in subsection 5.1(d) (subject to Reserves);

(xvi)    Inventory that is covered by a negotiable document of title, unless such document has been delivered to Agent with all necessary endorsements, free and clear of all Liens except Liens in favor of Agent, on behalf of itself and the other Secured Parties;

(xvii)   Inventory that is not of a type held for sale in the Ordinary Course of Business of Borrower; or

(xviii)  Inventory of Borrower that is placed on consignment with another Person.

Notwithstanding the above, the Agent reserves the right, at any time and from time to time after the Closing Date, to adjust the criteria set forth above, to establish new criteria and to adjust the applicable advance rate with respect to Eligible Inventory in its Permitted Discretion.   Agent shall have the right to establish, modify, or eliminate Reserves against Eligible Inventory from time to time in its Permitted Discretion.

"Eligible LC Inventory" means finished goods Inventory owned or to be owned by Borrower and covered by Letters of Credit issued by the L/C Issuer for the account of Borrower; provided that:

(i)      Such finished goods Inventory is or will be in transit to one of Borrower's owned or leased locations in the continental United States (provided that, if any such leased location is either Borrower's distribution center regardless of where it is located or is another location of Borrower that is located in a Landlord Lien

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

State and in either case a landlord lien waiver reasonably acceptable to the Agent has not been obtained from the lessor of such leased location, Agent may establish a Reserve with respect thereto);

(ii)     Such finished goods Inventory is, as of the date such Inventory is owned by Borrower, fully insured and subject to a first priority security interest in and Lien upon such goods in favor of the Agent (except for any possessory lien upon such goods in the possession of a freight carrier or shipping company securing only the freight charges for the transportation of such goods to Borrower);

(iii)    All documents, notices, instruments, statements, and bills of lading related to such finished goods Inventory that Agent may deem necessary or reasonably desirable to evidence ownership by Borrower and/or to give effect to and protect the Liens and other rights of the Agent in connection therewith, are delivered to Agent (or an agent of Agent), and are and remain acceptable to Agent for lending purposes in its sole discretion;  and

(iv)    Such Inventory is subject to a Letter of Credit with an expiry date that is not more than sixty (60) days from the date of the most recently delivered Borrowing Base Certificate of the Borrower;

(v)     Such Inventory would otherwise satisfy all of the requirements of "Eligible Inventory" hereunder; and

(vi)    In no event shall the amount of Eligible In-Transit Inventory and Eligible LC Inventory included in the Borrowing Base exceed $5,000,000 in the aggregate.

"Eligible Magazine Subscription Receivables" means all of the Magazine Subscription Receivables of Borrower that arise in the Ordinary Course of Business, that are not excluded as ineligible by virtue of one or more of the criteria set forth below, that are reflected in the most recent Borrowing Base Certificate delivered by Borrower to Agent, and that are shown on the two most recent monthly statements received by Borrower from the applicable Magazine Subscription Marketer prior to the date of such Borrowing Base Certificate.  None of the following shall be deemed to be Eligible Magazine Subscription Receivables:

(i)     Any Magazine Subscription Receivable (x) upon which Borrower's right to receive payment is not absolute or is contingent upon the fulfillment of any condition whatsoever or (y) as to which Borrower is not able to bring suit or otherwise enforce its remedies against the applicable Magazine Subscription Marketer through judicial process;

(ii)    Any Magazine Subscription Receivable to the extent that any defense, counterclaim, setoff or dispute is asserted as to such Magazine Subscription Receivable by or on behalf of the applicable Magazine Subscription Marketer;

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

(iii)    Any Magazine Subscription Receivable that (x) is not owned by Borrower or (y) is subject to any right, claim, security interest or other interest of any other Person, other than Liens in favor of Agent, on behalf of itself and Lenders;

(iv)    Any Magazine Subscription Receivable that is the obligation of a Magazine Subscription Marketer located in any nation other than the United States of America or Canada;

(v)    Any Magazine Subscription Receivable that is in default; provided, that, without limiting the generality of the foregoing, a Magazine Subscription Receivable shall be deemed to be in default upon the occurrence and during the continuation of any of the following:  (x) either Borrower or the Magazine Subscription Marketer obligated upon such Magazine Subscription Receivable  is in default under the applicable Magazine Subscription Agreement or any other event has occurred and is continuing that would entitle either party to terminate such Magazine Subscription Agreement; (y) the Magazine Subscription Marketer obligated upon such Magazine Subscription Receivable suspends business, makes a general assignment for the benefit of creditors or fails to pay its debts generally as they come due; or (z) a petition is filed by or against the Magazine Subscription Marketer obligated upon such Magazine Subscription Receivable under any bankruptcy law or any other federal, state or foreign (including any provincial) receivership, insolvency relief or other law or laws for the relief of debtors;

(vi)    Any Magazine Subscription Receivable as to which the Agent's Lien thereon, on behalf of itself and Lenders, is not a first priority perfected Lien;

(vii)    Any Magazine Subscription Receivable that is evidenced by a judgment, Instrument or Chattel  Paper; or

(viii)   Any Magazine Subscription Receivable that is payable in any currency other than Dollars.

Notwithstanding the above, the Agent reserves the right, at any time and from time to time after the Closing Date, to adjust the criteria set forth above, to establish new criteria and to adjust the applicable advance rate with respect to Eligible Magazine Subscription Receivables in its Permitted Discretion.  The Agent shall have the right to establish, modify or eliminate Reserves against Eligible Magazine Subscription Receivables (including, without limitation, to adjust for material claims, offsets, defenses or counterclaims or other material disputes with a Magazine Subscription Marketer) from time to time in its Permitted Discretion.

"Environmental Laws" means all present and future Requirements of Law and Permits imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the workplace, the environment and natural resources, and including public notification requirements and environmental transfer of ownership, notification or approval statutes.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"Environmental Liabilities" means all Liabilities (including costs of Remedial Actions, natural resource damages and costs and expenses of investigation and feasibility studies, including the cost of environmental consultants and the cost of attorney's fees) that may be imposed on, incurred by or asserted against any Credit Party or any Subsidiary of any Credit Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law or in connection with any environmental, health or safety condition or with any Release and resulting from the ownership, lease, sublease or other operation or occupation of property by any Credit Party or any Subsidiary of any Credit Party, whether on, prior or after the date hereof.

"Equity Agency Agreement" means an agency agreement, in form and substance acceptable to the Agent, between the Credit Parties and an Acceptable Liquidation Agent pursuant to which, either (i) the Acceptable Liquidation Agent guaranties the net recovery proceeds to be realized from the liquidation of Inventory which is the subject of the retail stores to be closed and such guaranty is supported by a letter of credit, in form and substance acceptable to the Agent, naming the Agent as beneficiary, the face amount of which is at least equal to 100% of the full amount the guarantied amount of the recovery; or (ii) the Borrower grants a Lien in the Inventory and other assets which are the subject of the retail stores to be closed to the Acceptable Liquidation Agent in exchange for the upfront payment to the Borrower which is at least equal to 90% of the guarantied net recovery proceeds to be realized by Borrower from the liquidation of Inventory. For purposes of this definition, the agency agreement with Gordon Brothers in substantially the form attached as Exhibit 12.1(f) (with a possible amendment to provide for payment in accordance with clause (i) above or with an advance payment in accordance with clause (ii) and the Lien is granted to the Acceptable Liquidation Agent) is acceptable in form and substance to the Agent.

"Equity Sponsor" means Istithmar Retail Investments, a Cayman Islands company.

"Equipment" means all "equipment," as such term is defined in the UCC, now owned or hereafter acquired by any Credit Party, wherever located.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means, collectively, any Credit Party and any Person under common control or treated as a single employer with, any Credit Party, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"ERISA Event" means any of the following: (a) a reportable event described in Section 4043(b) of ERISA (or, unless the 30-day notice requirement has been duly waived under the applicable regulations, Section 4043(c) of ERISA) with respect to a Title IV Plan; (b) the withdrawal of any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

ERISA Affiliate from any Multiemployer Plan; (d) with respect to any Multiemployer Plan, the filing of a notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Title IV Plan (or treatment of a plan amendment as termination) under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (g) the failure to make any required contribution to any Title IV Plan or Multiemployer Plan when due; (h) the imposition of a lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA Affiliate; (i) the failure of a Benefit Plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law to qualify thereunder; (j) a Title IV plan is in "at risk" status within the meaning of Code Section 430(i); (k) a Multiemployer Plan is in "endangered status" or "critical status" within the meaning of Section 432(b) of the Code; and (l) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of any material liability upon any ERISA Affiliate under Title IV of ERISA other than for PBGC premiums due but not delinquent.

"Event of Loss" means, with respect to any Property, any of the following:  (a) any loss, destruction or damage of such Property; (b) any pending or threatened institution of any proceedings for the condemnation or seizure of such Property or for the exercise of any right of eminent domain; or (c) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"Excluded Equity Issuance" means the issuance of (a) Stock or Stock Equivalents by Holdings to any officers or employees of a Credit Party under any employee stock option or stock purchase plan or other employee benefits plan in existence from time to time, (b) Stock or Stock Equivalents by a Wholly-Owned Subsidiary of a Credit Party to such Credit Party or another Wholly-Owned Subsidiary of such Credit Party constituting an Investment permitted hereunder, and (c) Stock or Stock Equivalents by a Foreign Subsidiary of such Foreign Subsidiary to qualify directors where required pursuant to a Requirement of Law or to satisfy other requirements of applicable law, in each instance, with respect to the ownership of Stock of Foreign Subsidiaries.

"Extraordinary Receipts" means any cash received by any Credit Party or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 1.8(b) of this Agreement) consisting of (a) proceeds of judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (b) indemnity payments (other than to the extent such indemnity payments are (i) immediately payable to a Person that is not an Affiliate of any Credit Party or any of its Subsidiaries, or (ii) received by any Credit Party or any of its Subsidiaries as reimbursement for any payment previously made to such Person), and (c) any purchase price adjustment (other than a working capital adjustment) received in connection with any purchase agreement.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

"Final Availability Date" means the earlier of the Revolving Termination Date and one (1) Business Day prior to the Scheduled Revolving Termination Date.

"Final Borrowing Order" means an order of the Bankruptcy Court approving the Loans and the Loan Documents on a final basis as contemplated by the Interim Borrowing Order following a hearing as required by Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure, in form and substance satisfactory to the Agent, which shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or has otherwise been dismissed with prejudice.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"First Tier Foreign Subsidiary" means a Foreign Subsidiary held directly by a Credit Party or indirectly by a Credit Party through one or more Domestic Subsidiaries.

"Fiscal Quarter" means each of the three month periods ending on the Saturday closest to April 30, July 31, October 31 and January 31.

"Fiscal Year" means each of the fiscal years of the Credit Parties ending on the Saturday nearest to January 31st of the applicable year.

"Foreign Subsidiary" means, with respect to any Person, a Subsidiary of such Person that is a "controlled foreign corporation" under Section 957 of the Code.

"Funding Concentration Account" shall mean the deposit account of Borrower into which Loan proceeds are initially deposited by Borrower and which deposit account, in turn, is used by Borrower to fund Borrower's payroll deposit account, merchandise disbursement deposit account, expense disbursement deposit account, customs and duty disbursement deposit account, store disbursement deposit account and other disbursement deposit accounts (which account as of the Closing Date is account number 4602287450 maintained by Borrower with Bank of America, N.A.).

"GAAP" means generally accepted accounting principles in the United States set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and

pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), which are applicable to the circumstances as of the date of determination, subject to <u>Section 11.3</u> hereof.

"<u>Governmental Authority</u>" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"<u>Guaranty and Security Agreement</u>" means that certain Guaranty and Security Agreement, executed in connection with this Agreement in form and substance reasonably acceptable to Agent and Borrower, made by the Credit Parties in favor of Agent, for the benefit of the Secured Parties, as the same may be amended, restated and/or modified from time to time.

"<u>Hazardous Materials</u>" means any substance, material or waste that is regulated or otherwise gives rise to liability under any Environmental Law, including but not limited to any "Hazardous Waste" as defined by the Resource Conservation and Recovery Act (RCRA) (42 U.S.C. § 6901 et seq. (1976)), any "Hazardous Substance" as defined under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. §9601 et seq. (1980)), any contaminant, pollutant, petroleum or any fraction thereof, asbestos, asbestos containing material, polychlorinated biphenyls, mold, and radioactive substances or any other substance that is toxic, ignitable, reactive, corrosive, caustic, or dangerous.

"<u>Impacted Lender</u>" means any Lender that fails promptly to provide Agent, upon Agent's request, satisfactory assurance that such Lender will not become a Non-Funding Lender.

"<u>Indebtedness</u>" of any Person means, without duplication: (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of Property or services (other than trade payables entered into in the Ordinary Course of Business); (c) the face amount of all letters of credit issued for the account of such Person and without duplication, all drafts drawn thereunder and all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments issued by such Person; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of Property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by the Person (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such Property); (f) all Capital Lease Obligations; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing product; (h) all obligations, whether or not contingent,

18198069/21798-000010 Current/21008698v152138094v4
1112/2008/2010 11:46 am3:30 pm

to purchase, redeem, retire, defease or otherwise acquire for value any of its own Stock or Stock Equivalents (or any Stock or Stock Equivalent of a direct or indirect parent entity thereof) prior to the date that is 180 days after the Scheduled Revolving Termination Date, valued at, in the case of redeemable preferred Stock, the greater of the voluntary liquidation preference and the involuntary liquidation preference of such Stock plus accrued and unpaid dividends; (i) all Indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; and (j) all Contingent Obligations in respect of Indebtedness of others of the kinds referred to in clauses (a) through (i) above. Notwithstanding anything herein to the contrary, the Lease Obligations shall constitute Indebtedness hereunder.

"Intellectual Property" means all rights, title and interests in or relating to intellectual property and industrial property arising under any Requirement of Law and all IP Ancillary Rights relating thereto, including all Copyrights, Patents, Trademarks, Internet Domain Names, Trade Secrets and IP Licenses.

"Interest Payment Date" means for any Loan the first day after the end of each Interest Period applicable to such Loan.

"Interest Period" means (a) with respect to the Tranche A Revolving Loans and the Term Loans, the period commencing on the first Business Day such Tranche A Revolving Loan or Term Loan is disbursed and ending on the last day of such calendar month in which such Tranche A Revolving Loan is disbursed, and thereafter each successive period commencing on the last day of the preceding Interest Period for such Tranche A Revolving Loan and ending on the last day of the next succeeding calendar month, provided that no Interest Period for any Revolving Loan shall extend beyond the Revolving Termination Date, and (b) with respect to each Tranche B Revolving Loan, initially the period commencing on the first day such Tranche B Revolving Loan is disbursed and ending on the last day of the calendar month in which such Tranche B Revolving Loan is disbursed, and thereafter each successive period commencing on the last day of the preceding Interest Period for such Tranche B Revolving Loan and ending on the last day of the next succeeding calendar month, provided that no Interest Period for any Revolving Loan shall extend beyond the Revolving Termination Date.

"Interest Rate" means (a) with respect to the Tranche A Revolving Loans and the Term Loans, the LIBOR Rate plus 8.50% per annum and (b) with respect to the Tranche B Revolving Loans, 16.0% per annum.

"Interim Borrowing Order" means an order of the Bankruptcy Court approving the Loans and the Loan Documents on an interim basis, in form and substance satisfactory to the Agent, which shall be in full force and effect until the entry of the Final Borrowing Order approving the Loans and the Loan Documents and shall not have been stayed, reversed, vacated or otherwise modified.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"Internet Domain Name" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to internet domain names.

"Inventory" means all of the "inventory" (as such term is defined in the UCC) of the Credit Parties, including, but not limited to, all merchandise, raw materials, parts, supplies, work in process and finished goods intended for sale, together with all the containers, packing, packaging, shipping and similar materials related thereto, and including such inventory as is temporarily out of a Credit Party's custody or possession, including inventory on the premises of others and items in transit.

"IP Ancillary Rights" means, with respect to any other Intellectual Property, as applicable, all foreign counterparts to, and all divisionals, reversions, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of, such Intellectual Property and all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof, and, in each case, all rights to obtain any other IP Ancillary Right.

"IP License" means all Contractual Obligations (and all related IP Ancillary Rights), whether written or oral, granting any right, title and interest in or relating to any Intellectual Property.

"IRS" means the Internal Revenue Service of the United States and any successor thereto.

"Issue" means, with respect to any Letter of Credit, to issue, extend the expiration date of, renew (including by failure to object to any automatic renewal on the last day such objection is permitted), increase the face amount of, or reduce or eliminate any scheduled decrease in the face amount of, such Letter of Credit, or to cause any Person to do any of the foregoing. The terms "Issued" and "Issuance" have correlative meanings.

"Landlord Lien State" means any of the States of Pennsylvania, Virginia or Washington or any other State in the United States of America in which the statutory lien of a landlord or lessor at such time takes priority over a prior perfected security interest.

"L/C Reimbursement Obligation" means, for any Letter of Credit, the obligation of Borrower to the L/C Issuer thereof, as and when matured, to pay all amounts drawn under such Letter of Credit.

"Lease Agreement" means the Lease and License Financing and Purchase Option Agreement, dated as of October 13, 2004, between Borrower and Loehmann's Capital, as such agreement may be amended, supplemented, restated, replaced or refinanced from time to time in accordance with the provisions thereof and the provisions of Section 5.21 hereof.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"Lease Collateral" means all of the Collateral, as such term is defined in the Lease Security Agreement dated October 13, 2004, by and between the grantors party thereto and Loehmann's Capital.

"Lease Documents" means (i) the Lease Agreement and (ii) any and all other documents and agreements, including acknowledgements and consents with respect thereto, assignments thereof and exhibits and schedules thereto, delivered in connection with the Lease Agreement, including the Lease Guarantee, dated as of October 13, 2004, entered into by Holdings, Parent and REH with respect to the obligations of Borrower under the Lease Agreement and the security and pledge agreements entered into to secure Borrower's obligations under the Lease Agreement and the obligations of Holdings, Parent and REH under such Lease Guarantee, each in form and substance reasonably satisfactory to Agent, and as any such document or agreement may be amended, supplemented, restated, replaced or refinanced from time to time in accordance with the provisions thereof and the provisions of Section 5.21 hereof.

"Lease Obligations" means any and all indebtedness, liabilities and obligations of any or all of the Credit Parties that may now or hereafter arise under any or all of the Lease Documents.

"Lease Priority Collateral" means all of the Lease Collateral other than the Revolving Facility Collateral, as such term is defined in the Amended and Restated Intercreditor Agreement.

"Lender" means the Tranche A Lenders and the Tranche B Lenders.

"Lender-Related Distress Event" means, with respect to any Lender or any Person that directly or indirectly controls such Lender (each a "Distressed Person"), (a) a voluntary or involuntary case with respect to such Distressed Person under the Bankruptcy Code or any similar bankruptcy laws of its jurisdiction of formation, (b) a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, (c) such Distressed Person is subject to a forced liquidation, merger, sale or other change of majority control supported in whole or in part by guaranties or other support (including, without limitation, the nationalization or assumption of majority ownership or operating control by) the U.S. government or other Governmental Authority, or (d) such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt. For purposes of this definition, control of a Person shall have the same meaning as in the second sentence of the definition herein of "Affiliate".

"Lending Office" means, with respect to any Lender, the office or offices of such Lender specified as its "Lending Office" beneath its name on the applicable signature page hereto, or such other office or offices of such Lender as it may from time to time notify Borrower and Agent.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"Letter of Credit" means documentary or standby letters of credit issued for the account of Borrower by L/C Issuers, and bankers' acceptances issued by Borrower, for which Agent and Lenders have incurred Letter of Credit Obligations.

"Letter of Credit Obligations" means all outstanding obligations incurred by Agent and Lenders at the request of Borrower, whether direct or indirect, contingent or otherwise, due or not due, in connection with the issuance of Letters of Credit by L/C Issuers or the purchase of a participation as set forth in subsection 1.1(b) with respect to any Letter of Credit. The amount of such Letter of Credit Obligations shall equal the maximum amount that may be payable by Agent and Lenders thereupon or pursuant thereto. Without limiting the generality of the foregoing, all Letter of Credit Obligations outstanding under the Prepetition Credit Agreement shall be deemed to have been issued under this Agreement and shall be deemed to be "Letters of Credit" hereunder.

"Liabilities" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"LIBOR" means the offered British Bankers' Association interest settlement rates for deposits in Dollars for a ninety (90) day period quoted by The Wall Street Journal two (2) LIBOR Business Days prior to the first day of the applicable Interest Period (but if no such offered rate exists, such rate will be the rate of interest per annum, as determined by Agent at which deposits of Dollars in immediately available funds are offered at 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in the applicable Interest Period by major financial institutions reasonably satisfactory to Agent in the London interbank market for such Interest Period for the applicable principal amount on such date of determination).

"LIBOR Business Day" means a Business Day on which banks in the City of London are generally open for interbank or foreign exchange transactions.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, encumbrance, lien (statutory or otherwise) or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including those created by, arising under or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of any financing statement naming the owner of the asset to which such lien relates as debtor, under the UCC or any comparable law) and any contingent or other agreement to provide any of the foregoing, but not including the interest of a lessor under a lease which is not a Capital Lease.

"Loan" means any advance by a Lender or a Term Loan Lender to Borrower pursuant to Sections 1.1 or 4.15 and "Loans" means all Loans made by all Lenders.

116

"Loan Documents" means this Agreement, the Notes, the Fee Letter, the Collateral Documents, the Amended and Restated Intercreditor Agreement, and all documents delivered to Agent and/or Lender in connection with any of the foregoing. Notwithstanding anything herein to the contrary, the Loan Documents shall not include any agreement, instrument or other document evidencing or governing any Bank Product (other than the Collateral Documents and Amended and Restated Intercreditor Agreement).

"Loehmann's Capital" means Loehmann's Capital Corp., a Delaware corporation.

"Magazine Sale Agreement" shall mean any written agreement, in form and substance reasonably satisfactory to Agent, now or hereafter entered into by Borrower with any Magazine Subscription Marketer, as the same may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, and under which Borrower agrees to market magazine subscriptions offered by such Magazine Subscription Marketer to Borrower's customers.

"Magazine Subscription Receivables" shall mean, collectively, all present and future rights of Borrower to payment of fees, bonuses or other amounts from any Magazine Subscription Marketer under Borrower's Magazine Subscription Agreement with such Magazine Subscription Marketer.

"Magazine Subscription Marketer" means any Person (other than an Affiliate of Borrower) that is in the business of providing magazine subscription services to consumers and that is acceptable to Agent in its Permitted Discretion.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"Material Adverse Effect" means:  (a) a material adverse change in, or a material adverse effect upon, the operations, business, income, Properties, condition (financial or otherwise) or prospects of any Credit Party or the Credit Parties and their Subsidiaries taken as a whole; (b) a material impairment of the ability of any Credit Party, any Subsidiary of any Credit Party or any other Person (other than Agent or Lenders) to perform in any material respect its obligations under any Loan Document; or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability of any Loan Document, or (ii) the perfection or priority of any Lien granted to the Lenders or to Agent for the benefit of the Secured Parties under any of the Collateral Documents; provided, however, that none of the following shall be deemed, in itself or in any combination, to constitute a "Material Adverse Effect: (i) the filing of the Chapter 11 Cases (and any defaults under agreements arising solely as a result of the filing of the Chapter 11 Cases, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code), (ii) the conditions, events and changes that ordinarily occur in connection with a filing under Chapter 11 of the Bankruptcy Code, and (iii) any other event which preceded the Petition Date and which was known to the Agent or Lenders prior to the Closing Date.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"**Maximum Tranche A Revolving Loan Balance**" means, as of any date of determination thereof, the lesser of:  (x) the Borrowing Base (as calculated pursuant to the Borrowing Base Certificate) in effect at such time, or (y) the Aggregate Tranche A Revolving Loan Commitments as then in effect; <u>less</u>, in either of (x) and (y), the aggregate Prepetition Liabilities then outstanding and the aggregate outstanding amount of Letter of Credit Obligations at such time.

"**Mortgage**" means any deed of trust, leasehold deed of trust, mortgage, leasehold mortgage, deed to secure debt, leasehold deed to secure debt or other document creating a Lien on Real Estate or any interest in Real Estate to secure any of the Obligations.

"**Multiemployer Plan**" means any multiemployer plan, as defined in Section 3(37) or 4001(a)(3) of ERISA, as to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"**Net Issuance Proceeds**" means, in respect of any issuance of debt or equity, cash proceeds (including cash proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such issuance), net of underwriting discounts and reasonable out-of-pocket costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of Borrower.

"**Net Orderly Liquidation Value**" means the cash proceeds of Inventory which could be obtained in an orderly liquidation (net of all liquidation expenses, costs of sale, operating expenses and retrieval and related costs), as determined pursuant to the most recent third-party appraisal of such Inventory (in form, scope and methodology acceptable to Agent in its Permitted Discretion) delivered to Agent by an appraiser reasonably acceptable to Agent.

"**Net Proceeds**" means proceeds in cash, checks or other cash equivalent financial instruments (including Cash Equivalents) as and when received by the Person making a Disposition and insurance proceeds received on account of an Event of Loss, net of:  (a) in the event of a Disposition (i) the direct costs relating to such Disposition excluding amounts payable to Borrower or any Affiliate of Borrower, (ii) sale, use or other transaction taxes paid or payable as a result thereof, and (iii) amounts required to be applied to pay principal, interest and prepayment premiums and penalties on Indebtedness secured by a Lien on the asset which is the subject of such Disposition (which, in the case of a Disposition of any Lease Priority Collateral, shall include any amounts required to be paid on the Lease Obligations under the terms of the Lease Documents and the Amended and Restated Intercreditor Agreement) and (b) in the event of an Event of Loss, (i) all money actually applied to repair or reconstruct the damaged Property or Property affected by the condemnation or taking, (ii) all of the costs and expenses reasonably incurred in connection with the collection of such proceeds, award or other payments, and (iii) any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments.

"**NOLV Factor**" means, as of the date of the appraisal of Borrower's Inventory most recently received by Agent, the quotient of the Net Orderly Liquidation Value of

18198069/21798-000010 Current/21008698v152138094v4
1112/2008/2010 11:46 am3:30 pm

such Inventory divided by the book value of such Inventory, expressed as a percentage. The NOLV Factor will be increased or reduced promptly upon receipt by Agent of each updated appraisal; provided, that, following consultation with the Lenders and any participants, the Agent, in its sole discretion, may adjust the NOLV Factor upwards.

"Non-Funding Lender" means any Lender (a) that has failed to fund any payments required to be made by it under the Loan Documents within two (2) Business Days after any such payment is due, (b) that has given verbal or written notice to Borrower, Agent or any Lender or has otherwise publicly announced that such Lender believes it will fail to fund all payments required to be made by it or fund all purchases of participations required to be funded by it under this Agreement and the other Loan Documents, (c) as to which Agent has a good faith belief that such Lender or an Affiliate of such Lender has defaulted in fulfilling its obligations (as a lender, agent or letter of credit issuer) under one or more other syndicated credit facilities or (d) with respect to which one or more Lender-Related Distress Events has occurred with respect to such Lender or any Person that directly or indirectly controls such Lender and Agent has determined that such Lender may become a Non-Funding Lender.  For purposes of this definition, control of a Person shall have the same meaning as in the second sentence of the definition herein of "Affiliate".

"Non-U.S. Lender Party" means Agent, each Lender, each L/C Issuer, each SPV and each participant, in each case that is not a United States person as defined in Section 7701(a)(30) of the Code.

"Note" means any Revolving Note and any Term Note and "Notes" means all of the Revolving Notes and Term Notes.

"Notice of Borrowing" means a notice given by Borrower to Agent pursuant to Section 1.5, in substantially the form of Exhibit 12.1(c) hereto.

"Notified Bank Product Obligations" means any and all Bank Product Obligations (i) for which Agent has received written notice and (ii) which Agent, in its discretion, shall have approved in writing the inclusion of such Bank Product Obligations in the Obligations, all as provided under and in accordance with the definition herein of the term "Bank Product".

"Obligations" means all Loans, and other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by any Credit Party to any Lender, Agent, any L/C Issuer, any Lender's Affiliate, or any other Person required to be indemnified, that arises under any Loan Document or from the provision or extension of any Bank Product, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.  Without limiting the foregoing, the Obligations shall constitute allowed administrative expense claims in the Chapter 11 Cases having priority pursuant to Section 364(c)(1) of the Bankruptcy Code over all administrative expense claims and unsecured claims against the Loan

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code.

"Ordinary Course of Business" means, in respect of any transaction involving any Person, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"Organization Documents" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"Patents" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to letters patent and applications therefor.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, as amended.

"PBGC" means the United States Pension Benefit Guaranty Corporation and any successor thereto.

"Permits" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Sales"  means (i) the sale of all or substantially all of the Credit Party's assets as a going concern as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code; provided that any going concern sale shall be for cash consideration in an amount in excess of all outstanding Obligations and all Prepetition Liabilities, (ii) a transaction or transactions combining the sale of the Collateral in connection with a going out of business or similar liquidation sale and the permanent closing of all or a portion of the Credit Parties' retail stores and the sale of all Collateral located therein through the retention by the Credit Parties of one or more Acceptable

Liquidation Agent, as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code, which transaction shall be pursuant to an Equity Agency Agreement which includes a payment at closing in an amount in excess of all outstanding Obligations and all Prepetition Liabilities, which amount shall be paid to the Agent, in each case undertaken after consultation with the Agent and on terms reasonably satisfactory to the Agent and approved by the Bankruptcy Court or (iii) sales of individual stores approved by the Agent.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture or Governmental Authority.

"Plan of Reorganization" shall mean a plan filed in the Chapter 11 Cases, or any one of them.

"Pledged Collateral" has the meaning specified in the Guaranty and Security Agreement and shall include any other Collateral required to be delivered to Agent pursuant to the terms of any Collateral Document.

"PNC" means, collectively, PNC Merchant Services Company and PNC Bank, National Association.

"PNC Credit Card Notice" shall mean the letter dated the Closing Date given by the Borrower on the Closing Date to PNC in which the Borrower directs PNC to pay all amounts payable to the Borrower by or through PNC under the Borrower's credit card processing agreement with PNC by routing such payments directly to the Concentration Account.

"Post-Petition" means the time period commencing immediately upon the filing of the Chapter 11 Cases.

"Pre-Default Carve-Out" shall mean initially, as of the Petition Date, $225,000 which amount, prior to the date of a Carve-Out Notice, (x) shall increase on a weekly basis by the amounts set forth in the chart below, up to an amount not to exceed $950,000 at any time and (y) shall be reduced each month by the aggregate amount of (i) payments actually made on account of Professional Fees and Expenses for the immediately preceding calendar month (whether from the application of retainers or otherwise) and (ii) unapplied retainers then held by all professionals.

| Applicable Period | Incremental Weekly Increase In Carve- Out |
|---|---|
| December 2010 - February 2011 | $225,000 |
| March 2011 - May 2011 | $75,000 |

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"<u>Prepetition</u>" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"<u>Prepetition Agent</u>" means Crystal Financial LLC, as administrative agent pursuant to terms of the Prepetition Credit Agreement.

"<u>Prepetition Credit Agreement</u>" means that certain Credit Agreement, dated as of September 15, 2010, by and among the Borrower, the Prepetition Agent and Prepetition Lenders, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Prepetition Indebtedness</u>" means any or all Indebtedness incurred prior to the filing of the Chapter 11 Cases.

"<u>Prepetition Lenders</u>" means the lenders that are party from time to time party to the Prepetition Credit Agreement.

"<u>Prepetition Liabilities</u>" means the "Obligations" as defined in the Prepetition Credit Agreement.

"<u>Prepetition Loan Documents</u>" means the "Loan Documents" as defined in the Prepetition Credit Agreement.

"<u>Prior Indebtedness</u>" means the Indebtedness and obligations specified in <u>Schedule 5.5</u> hereto.

"<u>Private Label Credit Card</u>" shall mean a credit card that bears Borrower's trademark and/or logo and is issued by a third party which takes the credit risk as to customers on a full recourse basis and makes payments to Borrower in a manner similar to other major credit card issuers and where any indebtedness owed by Borrower to such third party is on an unsecured basis.

"<u>Professional Fees and Expenses</u>" means professional fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by the Credit Parties or any Committee or other statutory committee appointed in the Chapter 11 Cases pursuant to §§327 and 1103 of the Bankruptcy Code or any Chapter 11 trustees or examiners appointed in the Chapter 11 Cases.

"<u>Property</u>" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"<u>Rate Contracts</u>" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) and any other agreements or arrangements designed to provide protection against fluctuations in interest or currency exchange rates.

"<u>Real Estate</u>" means any real estate owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"Related Persons" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each legal, financial and other advisor (including those retained in connection with the satisfaction or attempted satisfaction of any condition set forth in Article II) and other agents and designees of or to such Person or any of its Affiliates.

"Releases" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material into or through the environment.

"Remedial Action" means all actions required to (a) clean up, remove, treat or in any other way address any Hazardous Material in the indoor or outdoor environment, (b) prevent or minimize any Release so that a Hazardous Material does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre remedial studies and investigations and post-remedial monitoring and care with respect to any Hazardous Material.

"Required Lenders" means at any time (a) Lenders then holding more than fifty percent (50%) of the sum of the Tranche A Revolving Loan Commitments then in effect, or (b) if the Aggregate Tranche A Revolving Loan Commitments have terminated, Lenders then holding more than fifty percent (50%) of the sum of the aggregate unpaid principal amount of Tranche A Revolving Loans then outstanding plus the aggregate outstanding Letter of Credit Obligations.

"Requirement of Law" and "Requirements of Law" means, as to any Person, any law (statutory or common), ordinance, treaty, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Reserves" means, with respect to the Borrowing Base, (a) any and all reserves that may be established by Agent in its Permitted Discretion from time to time against Eligible Credit Card Receivables pursuant to the definition herein of such term and Eligible Inventory pursuant to the definition herein of such term; plus (b) such other reserves against Eligible Credit Card Receivables, Eligible Inventory, or Availability that Agent may, in its Permitted Discretion and without duplication, establish from time to time; plus (c) the Credit Support Reserve; (d) the Carve-Out Reserve, minus (e) the Contra-Reserve. Without limiting the generality of the foregoing, Reserves established to ensure the payment of accrued interest expenses or Indebtedness shall be deemed to be an exercise of Agent's Permitted Discretion. In addition, the following Reserves may be established from time to time by Agent in its Permitted Discretion: (i) Inventory shrink reserve, (ii) work-in-progress Inventory reserve, (iii) reserve for damaged inventory not yet processed, (iv) rent reserve for Borrower's distribution center without a satisfactory landlord waiver agreement in favor of Agent or for other locations of Borrower that are located in Landlord Lien States without a satisfactory landlord waiver agreement in favor of Agent, (v) ad valorem tax reserve, (vi) reserves in respect of such claims against

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

Collateral or liabilities of the Credit Parties as Agent in its Permitted Discretion determines may need to be satisfied in connection with any realization on the Collateral, including past due sales tax reserve, (vii) freight and duty reserve, (viii) health insurance reserve, (ix) merchant credit reserve, (x) gift card reserve, (xi) layaway deposit reserve, and (xii) reserve for scheduled decreases in the Net Orderly Liquidation Value of Eligible Inventory between December and January in any Fiscal Year; provided that (1) Agent shall give Borrower not less than three (3) Business Days' prior written notice of Agent's intention to impose any reserve under clause (xii) and (2) Agent will pro rate the imposition of such reserve on a weekly basis over the balance of the calendar month in which such reserve is imposed.

"Responsible Officer" means the chief executive officer or the president of Borrower or any other officer of Borrower having substantially the same authority and responsibility; or, with respect to compliance with financial covenants or delivery of financial information, the chief financial officer or the treasurer of Borrower or any other officer of Borrower having substantially the same authority and responsibility.

"Restricted Lender" means any holder of the 12% Senior Secured Class A Notes due 2011, the Senior Secured Class A Floating Rate Notes due 2011 and 13% Senior Secured Class B Notes due 2011 issued by Loehmann's Capital that exercises its rights pursuant to Section 3.5 of the Amended and Restated Intercreditor Agreement and elects to participate as a "Lender" under the terms of this Agreement.

"Restructuring Support Agreement" means that certain Amended and Restated Restructuring Support Agreement dated as of November 14, 2010 and amended and restated on December 1, 2010, among the Credit Parties, Loehmann's Capital, the Equity Sponsor and those certain holders of Senior Secured Notes identified on the signature pages thereto, as amended from time to time in accordance with the terms thereof.

"Revolving Loan" means the Tranche A Revolving Loans and the Tranche B Revolving Loans.

"Revolving Loan Commitments" means the Tranche A Revolving Loan Commitments and the Tranche B Revolving Loan Commitments.

"Revolving Note" means a promissory note of Borrower payable to the order of a Lender in substantially the form of Exhibit 12.1(d) hereto, evidencing Indebtedness of Borrower under the Revolving Loan Commitment of such Lender.

"Revolving Termination Date" means the earliest to occur of (a) the Scheduled Revolving Termination Date or (b) any other date on which the Aggregate Revolving Loan Commitments shall terminate in accordance with the provisions of this Agreement.

"Scheduled Revolving Termination Date" means November 17, 2011.

"Secured Party" means Agent in such capacity under the Loan Documents, each Lender in such capacity under the Loan Documents, and each L/C Issuer in such capacity

under the Loan Documents, Whippoorwill, as special representative of the Tranche B Lenders, and each other holder of any Obligation of a Credit Party.

"Senior Secured Note Documents" means the Senior Secured Notes, the Senior Secured Note Indenture and all guaranties, collateral documents, and other agreements or instruments executed in connection with the Senior Secured Notes.

"Senior Secured Note Indenture" means the Note Indenture, dated as of October 12, 2004, between Loehmann's Capital and Wells Fargo Bank, National Association, as trustee.

"Senior Secured Notes" means $110.0 million aggregate principal amount of 12% Senior Secured Class A Notes due 2011, Senior Secured Floating Rate Class A Notes due 2011, and 13% Senior Secured Class B Notes due 2011 issued by Loehmann's Capital pursuant to the Senior Secured Note Indenture.

"Software" means (a) all computer programs, including source code and object code versions, (b) all data, databases and compilations of data, whether machine readable or otherwise, and (c) all documentation, training materials and configurations related to any of the foregoing.

"Sponsor Credit Support" shall mean that certain standby letter of credit as letter of credit number 63655546 issue by Citibank, N.A. at the request of the Equity Sponsor, naming the Agent as sole beneficiary, in the face amount of $7,500,000 pursuant to terms of the Prepetition Credit Agreement.

"Sponsor Participation Agreement" means that Participation Agreement, in form and substance attached hereto as Exhibit 4.15.

"SPV" means any special purpose funding vehicle identified as such in a writing by Lender to Agent.

"Stock" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Stock Equivalents" means all securities convertible into or exchangeable for Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

"Subordinated Indebtedness" means any Indebtedness of any Credit Party or any Subsidiary of any Credit Party which is subordinated to the Obligations as to right and time of payment and as to other rights and remedies thereunder and having such other terms as are, in each case, reasonably satisfactory to Agent.

"Subsidiary" of a Person means any corporation, association, limited liability company, partnership, joint venture or other business entity of which more than fifty percent (50%) of the voting Stock, is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof.

"Tax Affiliate" means, (a) Borrower and its Subsidiaries and (b) any Affiliate of Borrower with which Borrower files or is required to file tax returns on a consolidated, combined, unitary or similar group basis.

"Term Loan Commitment" shall mean an amount equal the amount of Revolving Loans reclassified to Term Loans pursuant to Section 4.15.

"Term Loan Lender" shall mean Crystal Financial LLC.

"Term Loan Maturity Date" means the earliest to occur of (a) the Revolving Termination Date or (b) any other date on which the Term Loan Commitments shall terminate in accordance with the provisions of this Agreement.

"Term Note" means a promissory note of Borrower payable to the order of a Term Loan Lender in substantially the form of Exhibit 12.1(e) hereto, evidencing Indebtedness of Borrower under the Term Loan Commitment of such Term Loan Lender.

"Title IV Plan" means a pension plan subject to Title IV of ERISA, other than a Multiemployer Plan, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"Trade Secrets" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trade secrets.

"Trademark" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and, in each case, all goodwill associated therewith, all registrations and recordations thereof and all applications in connection therewith.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Agent's or Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"United States" and "U.S." each means the United States of America.

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

"U.S. Lender Party" means Agent, each Lender, each L/C Issuer, each SPV and each participant, in each case that is a United States person as defined in Section 7701(a)(30) of the Code.

"Variance Report" means a report prepared by the Borrower's management reflecting on a line-item basis the Credit Parties' actual performance compared to the Approved Budget for the immediately preceding week and on a cumulative basis for the period after the Closing Date and the percentage variance of the Credit Parties' actual results from those reflected in the then existing Approved Budget, along with management's explanation of such variance.

"Wholly-Owned Subsidiary" means any Subsidiary in which (other than directors' qualifying shares required by law) one hundred percent (100%) of the Stock and Stock Equivalents, at the time as of which any determination is being made, is owned, beneficially and of record, by any Credit Party, or by one or more of the other Wholly-Owned Subsidiaries, or both.

12.2     Other Interpretive Provisions.

(a)     Defined Terms.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.  The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms.  Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the respective meanings therein described.

(b)     The Agreement.  The words "hereof", "herein", "hereunder" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(c)     Certain Common Terms.  The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.  The term "including" is not limiting and means "including without limitation."

(d)     Performance; Time.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including."  If any provision of this Agreement or any other Loan Document refers to any action taken or to be taken by any

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

(e)     Contracts.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(f)     Laws.  References to any statute or regulation are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

12.3    Accounting Terms and Principles.  All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP.  No change in the accounting principles used in the preparation of any financial statement hereafter adopted by Holdings shall be given effect for purposes of measuring compliance with any provision of Article V or VI unless Borrower, the Required Lenders, and Agent agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in Article V and Article VI shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value."  A breach of a financial covenant contained in Article VI shall be deemed to have occurred as of any date of determination by Agent or as of the last day of any specified measurement period, regardless of when the financial statements reflecting such breach are delivered to Agent.

12.4    Payments.  Agent may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Credit Party or any L/C Issuer.  Any such determination or redetermination by Agent shall be conclusive and binding for all purposes, absent manifest error.  No determination or redetermination by any Secured Party or any Credit Party and no other currency conversion shall change or release any obligation of any Credit Party or of any Secured Party (other than Agent and its Related Persons) under any Loan Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted.  Agent may round up or down, and may set up

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable de minimis payment thresholds.

12.5    Amendment and Restatement.

(a)    This Agreement amends and restates the Existing Credit Agreement in its entirety and constitutes the integrated agreement of the parties hereto, it being expressly agreed that (a) this Agreement does not constitute a novation, refinancing or replacement of the obligations and liabilities existing under the Existing Credit Agreement or evidence of payment or termination of all or any of such obligations and liabilities, all such obligations and liabilities incurred by the Borrower under the Existing Credit Agreement to continue in full force and effect and to continue to be evidenced hereby after the Effective Date, and (b) from and after the Effective Date, the Existing Credit Agreement, as amended and restated hereby, continues in force or effect, including as to the continued existence of the "Obligations" under and as defined thereunder, the representations and warranties made, covenants agreed to, and the actions or omissions performed or required to be performed thereunder, in each case, prior to the Effective Date.

(b)    On and after the Effective Date, all references to the Existing Credit Agreement (or to any amendments or amendments and restatements thereof) in the Loan Documents (other than this Agreement) shall be deemed to refer to the Existing Credit Agreement, as amended and restated hereby, and except as the context otherwise provides, on or after the Effective Date, all references to this Agreement herein shall be deemed to be references to Existing Credit Agreement, as amended and restated hereby.

(c)    This amendment and restatement is limited as written and is not a consent to any other amendment, restatement or waiver, whether or not similar, and, except as expressly provided herein or in any other Loan Document, all terms and conditions of the Loan Documents remain in full force and effect unless otherwise specifically amended hereby or by any other Loan Document.

[Signature Pages Follow]

18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

IN WITNESS WHEREOF, each of the parties hereto _that is required by the provisions of Section 9.1 of the Existing Credit Agreement and Section 5 of the Sponsor Participation Agreement to execute the amendment to the Existing Credit Agreement effected by this Agreement_ has caused this Agreement to be duly executed and delivered by its duly respective duly authorized officer or other representative as of the day and year first above written.

**BORROWER:**

**LOEHMANN'S OPERATING CO.**

By: _____

Name: _____

Title: _____

FEIN:  13-4136681

Address for notices:

Loehmann's Operating Co.
2500 Halsey Street
Bronx, NY 10461
Attn:  Chief Executive Officer
Facsimile:  718-430-5367

With a copy to:

Loehmann's Operating Co.
2500 Halsey Street
Bronx, NY 10461
Attn:  General Counsel
Facsimile:  718-430-5363

Address for wire transfers:

Bank of America, N.A.
ABA #: 026009593
A/C #: 4602287450
A/C Name: Loehmann's Operating Co. Concentration Funding Account
Ref: Loehmann's Operating Co.

**OTHER CREDIT PARTIES:**

**LOEHMANN'S HOLDINGS INC.**

By: _____
Name: _____
Title: _____
FEIN: 13-4129380

**LOEHMANN'S, INC.**

By: _____
Name: _____
Title: _____
FEIN: 22-2341356

**LOEHMANN'S REAL ESTATE HOLDINGS, INC.**

By: _____
Name: _____
Title: _____
FEIN: 13-4136682

    Address for notices to each of the above other Credit Parties:

c/o Loehmann's Holdings Inc.
2500 Halsey Street
Bronx, NY 10461
Attn: Chief Executive Officer
Facsimile: 718-430-5367

With a copy to:

c/o Loehmann's Holdings Inc.
2500 Halsey Street
Bronx, NY 10461
Attn: General Counsel
Facsimile: 718-430-5363

NewYork01 1430712v3 359301.000002 21388094_3.DOC
18198069/21798-000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

As to Section 4.15,

**[EQUITY SPONSOR].**

By: _____
Name: _____
Title: _____
FEIN: 13-4136682

Address for notices to Equity Sponsor:

c/o Loehmann's Holdings Inc.
2500 Halsey Street
Bronx, NY 10461
Attn: Chief Executive Officer
Facsimile: 718-430-5367

3

**CRYSTAL FINANCIAL LLC**, as Agent
and as a Lender

By: _____
Name:
Title:  Duly Authorized Signatory

Address for Notices:


Crystal Financial LLC
Two International Place, 17th Floor
Boston, MA 02110
Attn:  Rebecca Tarby
Facsimile:  617-428-8701


With a copy to:

Proskauer Rose LLP
One International Place
Boston, MA 02110
Attention:  Peter J. Antoszyk
Facsimile:  617-526-9899

Address for payments:

Citibank, N.A.
111 Wall Street,
New York, NY 10005
ABA No. 021-000089
Account Number 02838341

NewYork01 1430712v3 359301.000002 -
21388094_3.DOC
18198069/21798 000010 Current/21008698v1521388094v4
1112/2008/2010 11:46 am3:30 pm

**WHIPPOORWILL ASSOCIATES, INC.,**
as Special Representative for the Tranche B
Lenders.


By:
Name:  Steven K. Gendal
Title: Principal

Address for Notices:


Whippoorwill Associates, Inc.
11 Martine Avenue, Suite 1150
White Plains, N.Y. 10606
Attn: Steven K. Gendal
Facsimile: (914) 683-1242

With a copy to:

Robert L. Cunningham
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, N.Y. 10166
Facsimile:  212-351-5208

**Schedule 1.1(a)**

**Part I  Tranche A Revolving Loan Commitments**

| Lender | Tranche A Revolving Loan Commitment |
|---|---|
| Crystal Financial LLC | $45,000,000 33,000,000 |

**Part II  Tranche B Revolving Loan Commitments**

| Lender | Tranche B Revolving Loan Commitment |
|---|---|
| Whippoorwill Distressed Opportunity Fund, L. P. | $2,125,446 |
| Whippoorwill Offshore Distressed Opportunity Fund, LP | $2,087,680 |
| Whippoorwill Institutional Partners, L. P. | $  403,469 |
| Whippoorwill Associates Inc. Profit Sharing Plan | $   37,907 |
| Wellpoint, Inc. | $2,345,498 |

6

Document comparison by Workshare Professional on Wednesday, December 08, 2010 3:33:49 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://BNDMS/Current/21008698/15 |
| Description | #21008698v15<Current> - Crystal/Loehmann's - DIP Credit Agreement |
| Document 2 ID | interwovenSite://BNDMS/Current/21388094/4 |
| Description | #21388094v4<Current> - Amended and Restated DIP Credit Agreement.DOC |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 613 |
| Deletions | 279 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 898 |