TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald
Jonathan P. Ibsen
Lara R. Sheikh

Counsel to the
Debtors and Debtors in Possession

Adjourned Hrg. Date: 12/14/10 at 2 p.m.
Objection Deadline: 12/6/10 at 4 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
                                :
In re:                          :    Chapter 11
                                :
LOEHMANN'S HOLDINGS, INC., *et al.*,  :    Case No. 10-16077 (REG)
                                :
                    Debtors.    :    (Jointly Administered)
                                :
---------------------------------------------------------------X

**DEBTORS' RESPONSE TO OFFICIAL COMMITTEE
OF UNSECURED CREDITORS' OBJECTION TO DEBTORS'
MOTION FOR AN ORDER (I) APPROVING AND AUTHORIZING
ASSUMPTION OF INVESTMENT AGREEMENT; (II) APPROVING
THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING
PAYMENT OF COMMITMENT FEE AND EXPENSE REIMBURSEMENT,
AS ADMINISTRATIVE EXPENSE; AND (III) APPROVING DEBTORS' ENTRY
INTO AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT**

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

        Loehmann's Holdings Inc. ("Loehmann's Holdings"), and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, "Loehmann's" or the "Debtors"),[1] hereby submit this response (the "Response") to the Official Committee of Unsecured Creditors' (the "Committee") Objection (the "Objection") to the Debtors' motion, dated November 19, 2010 and supplemented on December 3, 2010 (as supplemented, the "Motion") [Docket Nos. 77,

---

[1] The Debtors are the following entities: Loehmann's Holdings, Inc., Loehmann's, Inc., Loehmann's Real Estate Holdings, Inc., Loehmann's Operating Co., and Loehmann's Capital Corp.

124] seeking the entry of an order (i) approving and authorizing the Debtors' assumption of a certain Investment Commitment Letter, dated November 14, 2010 (as amended and restated on December 1, 2010, the "Investment Agreement") by and among Istithmar Retail Investments ("Istithmar"), Whippoorwill Associates, Inc., as agent for certain of its discretionary funds and accounts that are legal and/or beneficial owners of the Notes[2] ("Whippoorwill"), and each of the Debtors; (ii) approving the Debtors' payment of certain fees and expenses thereunder; and (iii) approving the Debtors' entry into the Restructuring Support Agreement, dated November 14, 2010 (as amended and restated on December 1, 2010, the "Restructuring Support Agreement," together with the Investment Agreement, the "Agreements"), and respectfully represent:

## PRELIMINARY STATEMENT

1. The Objection must fail for several substantive reasons set forth in the Declaration of Richard J. Shinder, of Perella Weinberg Partners - the Debtors' Investment Banker and Financial Advisor (the "Shinder Declaration") [Docket No. 153], and the Declaration of Joseph Melvin – The Debtors' Chief Operating Officer, Chief Financial Officer, and Secretary (the "Melvin Declaration," together with the Shinder Declaration, the "Declarations") [Docket No. 154] filed in support of the Motion, including that the Investment Agreement and the Restructuring Support Agreement represent the best strategy available to provide Loehmann's with the liquidity necessary to reorganize.

2. The *gravamen* of the legal argument in the Objection rests on the premise that, approval of the Motion, would assure confirmation of the proposed Plan –

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

which the Committee maintains is unconfirmable because it violates the absolute priority rule by allowing equity to retain its interests without a marketing process, as the Committee erroneously maintains is required by *Bank of America National Trust and Savings Assoc. v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 456 (1999) ("*LaSalle*").

3. Putting aside that this is not the time to raise objections to confirmation of the Plan and that cram-down issues become relevant only if a class rejects the Plan, the Committee ignores the factual distinction between the proposed Plan and *LaSalle*. In sum, *LaSalle* applied the absolute priority rule in the context of an *exclusive* right by "old equity" to preserve its rights by purchasing "new equity." Here, such an option is open, in the first instance, to Class A Noteholders, in their capacity as such. The Backstop Parties -- an existing non-insider noteholder, Whippoorwill, and the existing equity holder, Istithmar – are merely agreeing at the request of the Debtors to purchase new equity that the Class A Noteholders do not purchase in order to ensure the success of the proposed $25 million capital raise. To the extent Istithmar receives any "new equity," it will do so only on account of any debt it holds or to the extent that creditors elect not to participate in the Backstopped Rights Offering and Istithmar is therefore liable on its backstop commitment.

4. Moreover, there is nothing in the Bankruptcy Code or case law requiring the Debtors to market the company prior to proceeding with any particular restructuring transaction. In fact, case law indicates that a market process is not required if the debtor articulates good reason.

5. Further, the Committee ignores the business realities of this case. As set forth in the Declarations, the Debtors cannot survive a formal marketing process. Given their liquidity constraints and vendor issues, any such process would doom the

potential for reorganization and likely result in liquidation and the attendant loss of jobs for the Debtors' approximately 1,900 employees.

6. Finally, the Committee argues that approval of the Motion should be delayed until confirmation to permit a marketing process; and that the Commitment Fee is unreasonable and be denied.

7. As set forth below and for the reasons set forth in the Motion and the Declarations, the Objection should be overruled on all points.

**RESPONSE**

8. The Agreements are the culmination of extensive arms' length negotiation among the Debtors, Whippoorwill, Istithmar and their respective advisors both before and after the Petition Date. As stated in the Declarations, the Debtors believed it was critical to file these chapter 11 cases with a "pre-negotiated" plan that showed a clear path to emergence from chapter 11. The Debtors worked diligently over the weekend prior to the Petition Date to reach agreement with Whippoorwill and Istithmar to demonstrate to the Debtors' vendors, customers and employees that (i) Loehmann's had obtained agreements from investors willing to inject new capital into the company, (ii) the Debtors would have adequate liquidity to support the business during and after the chapter 11 cases, and (iii) the Debtors were not at risk of immediate liquidation, unlike so many retail companies in bankruptcy. After the Petition Date, the Debtors worked diligently to improve the terms of the "pre-negotiated" plan by permitting the only "in-the-money" constituency – the holders of Class A Notes – to participate in the New Equity Investment through a $25 million Backstopped Rights Offering.

4

## I. *LASALLE* IS INAPPLICABLE TO THIS CASE

9. The Objection erroneously posits that the United States Supreme Court's *LaSalle* decision requires that any plan of reorganization that provides for the contribution of new value by a debtor's pre-bankruptcy equity holder in exchange for an equity stake in the reorganized debtor be "market-tested" and that assumption of the Investment Agreement and approval of the fees and expenses thereunder should be delayed to permit such market-test.

10. In *Lasalle*, the Supreme Court concluded that the absolute priority rule was violated where the debtor's plan granted the *exclusive* right to its existing partners to invest new capital in exchange for all of the partnership interests in the reorganized debtor. The Agreements that lay the groundwork for the Debtors' proposed Plan are distinguishable from *Lasalle* on at least the following four bases:

11. *First*, even if the Plan provided Istithmar with value on account of its old equity (and it clearly does not), any discussion of Bankruptcy Code section 1129(b) is entirely premature at this point insofar as creditors have not yet voted, let alone voted against, the proposed Plan. Here, the Debtors believe that the Plan is not only confirmable but in the best interests of all creditors, and that after reading the Disclosure Statement and considering the alternatives, creditors are likely to vote in favor of the Plan, which provides them with a recovery notwithstanding the fact that senior secured creditors are taking a substantial haircut under the Plan. Discussion of the absolute priority rule – which will only be relevant if unsecured creditors vote against the Plan – is neither ripe nor relevant at this juncture in the case.

12. *Second*, the New Equity Investment contemplated by the Agreements is open to participation by all eligible holders of Class A Notes pursuant to the Backstopped Rights Offering and is, therefore, *not* an opportunity available

5

*exclusively* to the Debtors' existing equity holder "on account of" its junior interest, as prohibited by the absolute priority rule. The Backstop Parties, which include a non-insider noteholder as well as the existing equity holder, have agreed at the request of the Debtors to ensure the success of the Backstopped Rights Offering by promising to purchase unsubscribed shares.

13. *Third*, under case law interpreting *Lasalle*, the Agreements satisfy the "market-test" allegedly required by *Lasalle* by virtue of the non-insider Supporting Secured Noteholders' participation, consent and "veto rights" relating to the transactions reflected therein and incorporated in the Plan.

14. *Finally*, assumption and/or approval of the Agreements will not preclude the Debtors from soliciting or engaging with other interested parties regarding an alternative transaction, nor is there anything preventing any party, including the Committee, from proposing an alternative transaction for the Debtors' consideration. In fact, the Agreements expressly provide the Debtors with a "fiduciary out" to solicit and consider alternative transactions. The Agreements do not include any "no shop" covenants. As stated in the Declarations, consistent with their fiduciary duties, the Debtors will consider any credible offers to "top" the currently contemplated transactions.

15. As noted above, in *Lasalle*, existing equity owners were the only ones eligible to contribute and acquire interests in the reorganized entity. The Supreme Court was particularly concerned by this fact because the debtor had retained the exclusive right to propose a plan and, as a result, other parties were precluded from proposing a plan "selling" the reorganized equity stake to another party at a higher price. *Lasalle*, 526 U.S. at 456. Based upon the "exclusiveness" of the opportunity, the Supreme Court found that the plan could not be confirmed because the equity would

retain their interests "on account of" their prior interests in violation of the absolute priority rule. *Lasalle*, 526 U.S. at 456 ("it is that the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interest extended 'on account of' the old equity position and therefore subject to an unpaid senior creditor class's objection.").

16. The Supreme Court reserved for another day whether a "market test" for new value must be satisfied by providing the opportunity for a competing plan through termination of the debtor's exclusivity period or could be satisfied by merely opening up a right to bid on the same interest within the debtor's plan. *Id.* at 458 ("whether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity, is a question we do not decide here.").

17. In *GI Holdings Inc.*, the Court relied on the Supreme Court's suggestion in *Lasalle* that a plan proposed by a non-debtor may provide a market test for the reasonableness of the new value contribution as a basis to find that such a market test was satisfied where an asbestos claimants' committee, whose constituency had the power to prevent confirmation of any plan, served as a co-proponent of such plan. *In re GI Holdings, Inc.*, 420 B.R. 216, 269 (D. N.J. 2009) (citing *Lasalle*, 526 U.S. at 458). The Court found that old equity's contribution reflected in the debtor's chapter 11 plan satisfied the new value exception to the absolute priority rule where the contributions to the plan's funding were substantial and necessary for the debtor's successful reorganization; and creditors "essentially held a veto power over any chapter 11 plan because the votes of 75% of its constituency were necessary for the irrevocable § 524(g) injunction." Based on these findings, the Court held that the "market test" of the

reasonableness of the new value contribution was satisfied by the non-debtor constituency's consent and "veto power" to prevent confirmation of any going concern plan. *In re GI Holdings, Inc.*, 420 B.R. at 269.

18. Here, contrary to the facts in *Lasalle*, the Investment Agreement is not an option available exclusively to old equity and, therefore, cannot be deemed to provide a distribution to the Debtors' existing shareholder "on account of" its old equity in violation of the absolute priority rule. Rather, at the post-petition urging of certain Class A Noteholders and after substantial arms' length negotiations between Whippoorwill, Istithmar and the Debtors, the Agreements were amended and restated on December 1, 2010 to open participation in the New Equity Investment to all Class A Noteholders pursuant to a rights offering backstopped by Whippoorwill and Istithmar. Thus, *Lasalle* and the absolute priority rule's policy of preventing a debtor from using its exclusivity period to foreclose creditors from bargaining for a fair and equitable outcome is not present here where the Debtors' largest creditors bargained for and obtained agreement on not only favorable recoveries under a Plan but also the opportunity for creditors to contribute new value and obtain an equity stake in the reorganized Debtors.

19. Additionally, under the Restructuring Support Agreement, Whippoorwill, in its capacity as a Supporting Secured Noteholder holding approximately 70% of the Notes, committed to support the Plan after arms' length negotiations with the Debtors and Istithmar culminating in execution of the Agreements. Pursuant to these Agreements, the Plan and related ancillary confirmation documents must be acceptable to Whippoorwill in its sole discretion. Thus, as the Court found in *GI Holdings*, the transactions reflected in the Agreements, including, without limitation, the New Equity Investment, have been "market tested" as such

Agreements are propounded with the consent of the Debtors' largest Class A and Class B Noteholder, the party best motivated to obtain the largest possible recovery for the Debtors' estates.

20. Finally, unlike the *fait accompli* presented in *Lasalle*, the rights of the Debtors and/or the Committee to pursue one or more alternative transactions are preserved. The Agreements provide the Debtors with the ability to solicit, consider and, if appropriate, pursue an alternative transaction if such strategy is in the best interests of the Debtors' estates. *See* Shinder Declaration ¶ 56; Melvin Declaration ¶ 47; Investment Agreement ¶ 4(c); Restructuring Support Agreement ¶ 4(c). The Debtors and their investment banker, Perella Weinberg, are willing to assist with and consider any alternative transaction that enhances value to the stakeholders in these chapter 11 cases. Contrary to the allegations in the Objection, there is nothing to prevent such a process to occur in tandem with the Plan process.

21. However, as set forth in the Shinder Declaration (¶¶ 45-46), the Debtors have considered alternative transaction structures to the one currently being pursued, and ultimately have concluded, with respect to a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, that it is unlikely that a buyer could be found willing to purchase substantially all of the Debtors' assets at a value above the Debtors' approximately $150 million in secured claims plus administrative expenses, particularly considering an estimated valuation for the Reorganized Debtors ranging from $89 to $114 million. *See* Disclosure Statement at 71 [Docket No. 113].

## II. THE BANKRUPTCY CODE DOES NOT REQUIRE THE DEBTORS TO MARKET THE COMPANY

22. The Debtors are not required to formally or actively market their assets pursuant to section 363 or any other section of the Bankruptcy Code prior to confirming the proposed Plan. Section 363 of the Bankruptcy Code does not set forth an express standard for determining whether a sale of property or other transaction should be approved. In determining whether to approve a proposed sale or other transaction under section 363(b) of the Bankruptcy Code, courts that have interpreted this section consistently apply "an articulated business judgment" standard. *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re G.S. Distribution, Inc.*, 331 B.R. 552, 559 (Bankr. S.D.N.Y. 2005).

23. Although marketing can aid in helping a debtor value its assets, it is not required. In *In re Spa Chakra*, the Court found that the debtor had not engaged in meaningful marketing efforts to sell its assets to anyone other than the proposed purchaser. *In re Spa Chakra*, 2010 WL 779270 *4 (Bankr. S.D.N.Y. 2010). Nonetheless, based on the record before it, the Court rejected the notion that the debtor was motivated by bad faith or that the process was skewed in favor of the purchaser and approved the sale based, in part, on its findings that:

- Greater marketing efforts would not have produced a higher bid. *Id.* at *6.

- The objectors failed to offer any compelling evidence why the sale was not justified. *Id.*

- The debtor would be unable to continue to operate without financing, which would not be available indefinitely. *Id.*

24. All of these factors relied upon by the *Spa Chakra* Court to approve a sale notwithstanding a lack of marketing are present here. As set forth at length in the Declarations:

- The Debtors, in consultation with their financial advisors, do not believe that greater marketing would have produced a higher value transaction for stakeholders. *See* Shinder Declaration ¶ 46; Melvin Declaration ¶¶ 44-45.

- The Committee has not suggested any evidence why the Agreements are not justified, nor proposed any alternative transaction that would result in a higher recovery to creditors.

- The Debtors' debtor-in-possession financing contains tight milestones and cash flow projections that rely on the consummation of a Plan, the funding of which depends on the infusion of $25 million from the New Equity Investment on an expedited basis. *See* Shinder Declaration ¶¶ 12, 39; Melvin Declaration ¶¶ 46, 55.

25. Moreover, as set forth at length in the Motion, as supported by the Melvin Declaration, the Debtors believe, in their reasonable business judgment, that, given liquidity issues, the need to emerge from chapter 11 as expeditiously as possible, and the critical need to maintain relationships with customers, vendors and employees, it is in the best interests of their estates and creditors to assume the Investment Agreement and consummate the transactions contemplated therein and in the Restructuring Support Agreement.

### III. ALL ADMISSIBLE EVIDENCE ESTABLISHS THAT ANY DELAY IN THE CONFIRMATION PROCESS ALL BUT GUARANTEES LIQUIDATION

26. Additionally, as described at length in the Declarations in support of the Motion, the delay associated with a sale or other "market test" of the transactions reflected in the Agreements is not feasible or warranted. In the months leading up to the filing of these cases and during the post-petition period, the universe of potentially interested parties have been on more than sufficient notice of the Debtors' dire straits.

To the extent that any party is or was interested in making a proposal to the Debtors for an alternative transaction with or investment in the reorganization Debtors, they have been afforded ample time to do so. Notwithstanding the public nature of the Debtors' out-of and in-court restructuring efforts, no such alternative has come to light. With each day that passes, the Debtors are at greater risk of losing their customers and vendors' business. The risks associated with further delay to conduct a marketing process are clearly outweighed by the risk that the Debtors will be forced to liquidate if they do not expeditiously consummate the Agreements in hand and reflected in the proposed Plan. If the Debtors delay the process in order to engage in a marketing process, it could squander the opportunity to consummate the Plan and Backstopped Rights Offering, which actually provide value to junior creditors that otherwise would not be available in light of the Debtors' valuation. Consistent with their fiduciary duties, the Debtors are not willing to take that risk.

**IV. THE COMMITMENT FEE IS REASONABLE AND SHOULD BE APPROVED**

27. Finally, the Committee's unsupported objection to the Commitment Fee should be denied. Without citing any precedent, and notwithstanding the fact that the Backstop Parties have fully committed to fund a $25 million investment, the Objection argues that $25 million principal amount of the investment on which the 4% fee is calculated should be reduced to $3 million because Whippoorwill holds prepetition debt and is therefore entitled to participate in the rights offering. But the fact that Whippoorwill holds debt does not in any way reduce the aggregate amount of the $25 million in new money that the Backstop Parties have agreed to fund. The Committee's attenuated and unsupported logic is countenanced by numerous examples of commitment fees and expense reimbursements similar to the

12

Commitment Fee and Expense Reimbursement proposed here that have been approved by bankruptcy courts, including in this District. See Motion ¶ 39.

28. Payment of a commitment fee for a firm commitment to fund is the basis upon which commitments of this nature are made in our economy. That commitment deprives the committing party of the ability to use those funds for another purpose during the commitment period. The fee is compensation to the committing party for its loss of alternative investment opportunities, whether or not the commitment is utilized.

29. Additionally, although the Objection claims that the 4% fee is "exorbitant," the Objection fails to note that Istithmar's portion of the Commitment Fee is payable only in the form of New Convertible Preferred Stock and is not payable unless the transactions contemplated by the Agreements are consummated and the Plan Effective Date occurs. If the Plan is not consummated, the aggregate cash fee payable to Whippoorwill will be $356,000, or 1.4% of the aggregate $25 million investment.

**V.  CONCLUSION.**

30. Based on the foregoing and for the reasons set forth in the Motion and the Declarations, the Debtors submit that the relief requested in the Motion is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects; and that the Objection be overruled in its entirety.

WHEREFORE, the Debtors respectfully request entry of an order, substantially similar to the proposed form of Order attached to the Motion, and such other and further relief as the Court may deem just.

Dated: New York, New York
December 12, 2010

TOGUT, SEGAL & SEGAL LLP
Counsel to the Debtors
and Debtors in Possession
By:

/s/ Frank A. Oswald
FRANK A. OSWALD
A Member of the Firm
One Penn Plaza, Suite 3335
New York, New York 10019
(212) 594-5000