UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
In re:                                                       :          Chapter 11
                                                             :
LOEHMANN'S HOLDINGS INC., *et al.*,[1]                       :          Case No.  10-16077 (REG)
                                                             :
                                        Debtors.             :          (Jointly
                                                             :          Administered)
-------------------------------------------------------------X

---

## DISCLOSURE STATEMENT FOR DEBTORS' ~~FIRST~~SECOND AMENDED JOINT PLAN
## OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A.  Oswald
Brian F. Moore
Lara R. Sheikh

Counsel to the Debtors and
Debtors in Possession

~~Dated:  December 22, 2010~~

Dated:  January 3, 2011

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS ~~5~~12:00 P.M.
PREVAILING EASTERN TIME ON [_____], 2010FEBRUARY 2], 2011, UNLESS
THE DEBTORS EXTEND THE VOTING DEADLINE.  TO BE COUNTED, THE
CLAIMS, SOLICITATION AND SUBSCRIPTION AGENT MUST **ACTUALLY**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each U.S. Debtors' Federal tax
        identification number, include:  Loehmann's Holdings Inc., (9380), Loehmann's, Inc. (1356),
        Loehmann's Real Estate Holdings, Inc. (6682), Loehmann's Operating Co. (6681) and Loehmann's
        Capital Corp. (2694).

**RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE DEBTORS' ~~FIRST~~SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON (A) THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE AND (B) TO THE EXTENT THAT SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(2) OF THE SECURITIES ACT OR REGULATION D PROMULGATED THEREUNDER.  NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH

FORWARD LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, BASED UPON INFORMATION CURRENTLY AVAILABLE TO THE DEBTORS.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT, OTHER THAN THE FINANCIAL STATEMENTS INCLUDED IN THE DEBTORS' ANNUAL REPORT, HAS NOT BEEN AUDITED.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. **PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN ARTICLES IX ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN AND X BELOW, "PLAN-RELATED RISK FACTORS".**

# TABLE OF CONTENTS

**Page**

I.   SUMMARY ................................................................................................................ 1

II.   BACKGROUND TO THESE CHAPTER 11 CASES ..................................................... 13

III.   PREPETITION NEGOTIATIONS REGARDING DEBT RESTRUCTURING ........... 22

IV.   ADMINISTRATION OF THE CHAPTER 11 CASES .................................................. 24

V.   SUMMARY OF THE ~~FIRST~~SECOND AMENDED JOINT PLAN ............................. 32

VI.   GOVERNANCE OF REORGANIZED DEBTORS ....................................................... 74

VII.   VALUATION ANALYSIS AND FINANCIAL PROJECTIONS ................................ 75

VIII.   CONFIRMATION PROCEDURES ............................................................................. 81

IX.   ALTERNATIVES TO CONFIRMATION  AND
     CONSUMMATION OF THE PLAN.. ............................................................................. 89

X.   PLAN-RELATED RISK FACTORS ............................................................................. 91

XI.   U.S. SECURITIES LAW MATTERS............................................................................. 106

XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES........ 110

XIII.   CONCLUSION AND RECOMMENDATION ......................................................... 124

## EXHIBITS

**Exhibit A** - ~~First~~<u>Second</u> Amended Joint Plan of Reorganization

**Exhibit B** - Forms of Letters to Holders in each of the Voting Classes [TO FOLLOW]

**Exhibit C** - Signed Disclosure Statement Order [TO FOLLOW]

**Exhibit D –**Restructuring Support Agreement

**Exhibit E** - Liquidation Analysis

**Exhibit F** - Financial Projections

**Exhibit G –** Annual Report for Fiscal Year Ended January 30, 2010 and
Quarterly Report for Fiscal Quarter Ended July 31, 2010

**Exhibit H –** Rights Offering Procedures

**Exhibit I –** Pro Forma Equity Ownership Immediately Upon the Effective Date

# I.    SUMMARY

Loehmann's Holdings Inc., a debtor and debtor-in-possession ("Loehmann's" and, together with its subsidiaries and CapCo, all of which are debtors and debtors-in-possession, the "Company" or the "Debtors"), on behalf of itself and the other Debtors, submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims in connection with:  (a) the solicitation of votes to accept or reject the *Debtors' ~~First~~Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, as the same may be amended from time to time (the "Plan"), which was Filed by the Debtors with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and (b) the Confirmation Hearing (the "Confirmation Hearing"), which is scheduled for [_____]February 7, 2011, at [_____]9:45 a.m. prevailing Eastern Time (the "Confirmation Hearing Date").  A copy of the Plan is attached hereto as Exhibit A and is incorporated herein by reference.

On November 15, 2010 (the "Petition Date"), each of the Debtors Filed a voluntary petition with the Bankruptcy Court under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors are operating their business and managing their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.  On the Petition Date, the Bankruptcy Court entered an order jointly administering the Debtors' Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operations and financial history, their reasons for seeking protection under chapter 11, and significant events that have occurred during the Chapter 11 Cases.  This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the requirements for Confirmation of the Plan and the voting procedures that holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

After a careful consideration of the Debtors' business and their prospects as a going concern, the Debtors, in consultation with their legal and financial advisers, concluded that recoveries to creditors will be maximized by implementing the Plan.  In other words, Loehmann's is worth more to its creditors as a going concern than upon liquidation.  The Plan provides, *inter alia*, for a $25 million equity investment in Loehmann's Holdings, Inc. pursuant to a Rights Offering through which Eligible Holders of Class A Notes Claims that vote to accept the Plan will be granted the opportunity to exercise rights to purchase shares of New Convertible Preferred Stock on the Effective Date and the conversion of the Class A Notes Claims into New Common Stock.  Only those Holders of Class A Notes Claims that are Eligible Holders (*i.e.* those Holders that are Qualified Institutional Buyers acting on their own behalf or on behalf of other Qualified Institutional Buyers) that vote to accept the Plan will be permitted to participate in the Rights Offering. If Class 4 (Class B Notes Claims) accepts the Plan, the Holders of Class B Notes Claims will receive New Common Stock.  If Class 4 (Class B

Notes Claims) does not vote to accept the Plan, the Holders of Class B Notes Claims will receive no distribution under the Plan. The Other Secured Claims will be paid in full in cash or receive such other treatment as to render such Holders Unimpaired. If Class 5 (General Unsecured Claims) accepts the Plan, the holders of General Unsecured Claims will be paid a *Pro Rata* distribution consisting of Cash in the aggregate amount of $2 million. If Class 5 (General Unsecured Claims) does not vote to accept the Plan, the Holders of General Unsecured Claims will receive no distribution under the Plan and the $2 million otherwise distributable to Holders of General Unsecured Claims will be available for working capital purposes to the Reorganized Debtors. In no event will Class 4 or Class 5's acceptance or rejection of the Plan impact the amount of the $25 million New Investment (as defined below). Distributions to Holders of Claims in Class 4 and Class 5, if any, under the Plan will be funded solely from the distributions otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Allowed Class A Notes Claims.

**The Plan is supported by the Official Committee of Unsecured Creditors (the "Committee"). In addition, holders of approximately 72% of the principal amount of the Class A Notes and 64% of the principal amount of the Class B Notes, each of which have executed the Restructuring Support Agreement. The Restructuring Support Agreement is discussed in greater detail at Article III below and a copy is attached hereto as Exhibit D.**

## A.  RULES OF INTERPRETATION

The following rules for interpretation and construction shall apply to the Disclosure Statement: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (3) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (4) unless otherwise specified, all references in the Disclosure Statement to Articles are references to Articles of the Disclosure Statement; (5) unless otherwise specified, all references in the Disclosure Statement to exhibits are references to exhibits to the Disclosure Statement; (6) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (7) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (8) unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form in the Disclosure Statement that is not otherwise defined in the Disclosure Statement, Plan, or exhibits to the Disclosure Statement Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (10) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (11) all references to

statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (12) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (13) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America.

All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

## B. RECOMMENDATION OF THE DEBTORS

**THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY, MAXIMIZE THE VALUE AVAILABLE FOR DISTRIBUTION TO CREDITORS, AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.**

## C. PURPOSE AND EFFECT OF THE PLAN

### 1. The Debtors

As provided in Article IV.A of the Plan, the Plan provides for substantive consolidation of the Debtors' Estates solely for purposes of the Plan. The Debtors are borrowers or guarantors under the Debtors' prepetition senior secured credit facility and/or secured notes.

If substantive consolidation is approved by the Bankruptcy Court, then on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as though they were merged into one for all Plan purposes, including voting, Confirmation and distribution pursuant to the Plan. Further, all guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor as well as any joint and several liability of any Debtor with respect to any other Debtor shall be treated as one collective obligation of the Debtors.

Substantive consolidation shall not affect the legal and organizational structure of the Reorganized Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or, in connection with contracts or leases that were assumed or entered into during the Chapter 11 Cases. Any alleged defaults under any applicable agreement with the Debtors, the Reorganized Debtors, or the Affiliates arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

2. **Classes Entitled to Vote on the Plan**

As set forth in Article III of the Plan, the Class 3 and 4 Secured Note Claims and the Class 5 General Unsecured Claims are Impaired and, therefore, Holders of these Claims are entitled to vote on the Plan. All other Classes of Claims are not entitled to vote on the Plan. The three Voting Classes are comprised of the following Claims:

- Class 3 (Class A Notes Claims) consists of the Claims arising on account of the Debtors' Class A Notes and the Related Agreements.

- Class 4 (Class B Notes Claims) consists of the secured Claims arising on account of the Debtors' Class B Notes and the Related Agreements.

- Class 5 (General Unsecured Claims) consists of the General Unsecured Claims (including Rejection Damage Claims).

3. **Restructuring Transactions**

The Plan contemplates the following restructuring transactions, among others (described in greater detail in Article V below, "Summary of the ~~First~~Second Amended Joint Plan"):

- Loehmann's Holdings, Inc. will offer and sell to Eligible Holders of Class A Notes Claims that vote to accept the Plan on a *Pro Rata* basis (or the Backstop Parties as described below), for an aggregate purchase price of $25 million, New Convertible Preferred Stock convertible to 47.2% of the fully diluted shares of New Common Stock to be issued on the Effective Date, prior to giving effect to any dilution resulting from the issuance of New Common Stock under any Management Incentive Plan. The New Convertible Preferred Stock will be offered pursuant to a Rights Offering. The Backstop Parties have committed to backstop the Rights Offering on the terms and conditions set forth in the Commitment Letter.

- In connection with the Commitment Letter and the Restructuring Support Agreement, Istithmar and Whippoorwill entered into a forward purchase agreement (as may be amended from time to time, the "Forward Purchase Agreement") dated as of November 14, 2010. Pursuant to the Forward Purchase Agreement, Istithmar and Whippoorwill agreed that Istithmar would purchase from Whippoorwill 50% of the Class A Notes that Whippoorwill purchased from Plainfield Special Situations Master Fund Limited, Plainfield Special Situations Master Fund II Limited, and Plainfield OC Master Fund Limited (collectively, "Plainfield") subject to the terms and conditions set forth in the Forward Purchase Agreement (Whippoorwill has purchased 100% of the Class A Notes owned by Plainfield).

- Holders of Class A Notes will receive, in full satisfaction of their Claims (and any Liens securing such Claims), their P*ro Rata* share of 42.4% (subject to any dilution based on any New Common Stock issued under any Management Incentive Plan) of the total outstanding New Common Stock on the Effective Date on a fully diluted basis assuming 100% of the New Convertible Preferred Stock is converted to New Common Stock.

- If Class 4 (Class B Notes Claims) accepts the Plan, holders of Class B Notes will receive, in full satisfaction of their Claims (and any Liens securing such Claims), their *Pro Rata* share of 8.6% (subject to any dilution based on any New Common Stock issued under any Management Incentive Plan) of the total outstanding New Common Stock on the Effective Date on a fully diluted basis assuming 100% of the New Convertible Preferred Stock in converted to New Common Stock. If Class 4 (Class B Notes Claims) does not vote to accept the Plan, the Holders of Class B Notes Claims will receive no distribution under the Plan.

- If Class 5 (General Unsecured Claims) votes to accept the Plan, holders of General Unsecured Claims will receive in full satisfaction of their Claims, their *pro rata* distribution consisting of Cash in the aggregate amount of $2 million. If Class 5 (General Unsecured Claims) does not vote to accept the Plan, the Holders of General Unsecured Claims will receive no distribution under the Plan and the $2 million otherwise distributable under this Plan will be available for working capital purposes by Reorganized Debtors. In no event will Class 5's acceptance or rejection of the Plan impact the amount of the $25 million New Investment.

- Distributions to Holders of Claims in Class 4 and Class 5, if any, under the Plan will be funded solely from the distributions otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Allowed Class A Notes Claims.

- All New Common Stock issued on the Effective Date will be subject to dilution for any new equity issued as part of any Management Incentive Plan and issued as a result of the conversion of any New Preferred Stock into New Common Stock. Shares of new common stock in the amount of up to 10.0% of the fully diluted New Common Stock may be issued under any Management Incentive Plan approved by the New Board.

The Debtors believe that any alternative to Confirmation of the Plan, such as liquidation under chapter 11 of the Bankruptcy Code or conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or any attempt by another party in interest to File a plan, would result in significant delays, litigation and additional costs and, ultimately, would substantially lower the recoveries for Holders of Allowed Claims.

## D.     OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the chapter 11 case.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of claims and equity interests in accordance with the terms of the confirmed plan.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan.  This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

## E.     SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

**THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS AND POTENTIAL DISTRIBUTIONS UNDER THE PLAN.  AS DESCRIBED IN ARTICLES IX AND X BELOW, LOEHMANN'S BUSINESSES ARE SUBJECT TO A NUMBER OF RISKS.  THE UNCERTAINTIES AND RISKS RELATED TO THE REORGANIZED DEBTORS MAKE IT DIFFICULT TO DETERMINE A PRECISE VALUE FOR THE REORGANIZED DEBTORS AND THE PLAN SECURITIES AND OTHER DISTRIBUTIONS UNDER THE PLAN.  THE RECOVERIES AND ESTIMATES DESCRIBED IN THE FOLLOWING TABLES REPRESENT THE DEBTORS' BEST ESTIMATES GIVEN THE INFORMATION AVAILABLE ON THE DATE OF THIS DISCLOSURE STATEMENT AND ARE BASED ON THE ASSUMPTION THAT THE CLASS A NOTES CLAIMS AND CLASS B NOTES CLAIMS EACH VOTE TO ACCEPT THE PLAN.  ALL STATEMENTS IN THIS DISCLOSURE STATEMENT AS TO THE AMOUNT OF CLAIMS ARE ONLY ESTIMATES BASED ON INFORMATION KNOWN TO THE DEBTORS AS OF THE DATE HEREOF, AND THE FINAL AMOUNTS OF CLAIMS ALLOWED BY**

THE BANKRUPTCY COURT MAY VARY SIGNIFICANTLY FROM THESE ESTIMATES. REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN. A MORE DETAILED DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS IS FOUND ON PAGES 31-36 HEREIN.

AS DEMONSTRATED IN THE LIQUIDATION ANALYSIS ATTACHED AS EXHIBIT E HERETO, WITH RESPECT TO EACH CLASS OF CREDITORS, RECOVERIES UNDER THE PLAN ARE EQUAL TO OR GREATER THAN RECOVERIES IN A HYPOTHETICAL CHAPTER 7 LIQUIDATION.

A CHART SUMMARIZING THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS AND POTENTIAL DISTRIBUTIONS APPEARS BELOW.

| Class | Type of Claim or Equity Interest | Treatment of Claim/Interest | Estimated Aggregate Amount of Allowed Claims or Equity Interests under the Plan[2] | Estimated Percentage Recovery of Allowed Claims or Interests under the Plan (if Classes 4 and 5 accept the Plan)[3] |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | [_____]$1,500,000 | 100% |
| 2 | Other Secured Claims | Unimpaired | $0 | 100% |
| 3 | Class A Notes Claims | Impaired | $80,421,798 | 37.1% |

---

[2] The estimated amount of Other Secured Claims assumes that the Prepetition Credit Agreement Secured Claims are satisfied pursuant to the DIP Order. The estimated amount of General Unsecured Claims is based on the Debtors' books and records and projections as of the date hereof. As noted in Article II.C.2 above, under the Plan, the Debtors have reserved the right under Bankruptcy Code section 365 to seek authorization to reject unexpired leases for under performing stores and any other unexpired leases or executory contracts up until the Confirmation Hearing. To the extent that the Debtors seek such authorization, the amount of unsecured claims for damages arising out of the rejection of such leases and contracts, subject to section 502(b)(6) of the Bankruptcy Code, would increase, and thus reduce the estimated percentage recoveries for Holders of Allowed General Unsecured Claims.

[3] Estimated recoveries for Classes 3 and 4 assume that Eligible Holder of Class A Notes Claims fully subscribe to the Rights Offering; that 100% of the New Preferred Stock is converted into New Common Stock; and that the Exit Facility is fully drawn. Additionally, recoveries for Classes 3 and 4 may vary depending upon whether New Common Stock is issued on account of any Management Incentive Plan.

| 4 | Class B Notes Claims | Impaired | $37,954,754 | 13.8% |
| 5 | General Unsecured Claims | Impaired | $26,200,000 | 7.6% |
| 6 | Equity Interests in Loehmann's Holdings Inc. | Impaired | N/A | 0.0% |
| 7 | Intercompany Claims | Unimpaired | N/A | 0.0% |

## F. PARTIES ENTITLED TO VOTE ON THE PLAN

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. Holders of Claims that are not Impaired by the Plan are deemed to Accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.

Holders of Claims or Equity Interests Impaired by the Plan and receiving no distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Class A Note Claims | Impaired | Entitled to Vote |
| 4 | Class B Note Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Equity Interests in Loehmann's Holdings Inc. | Impaired | Deemed to Reject |
| 7 | Intercompany Claims | Unimpaired | Deemed to Accept |

## G. SOLICITATION PROCEDURES

### 1. Claims, Solicitation and Subscription Agent

The Debtors have sought to retain Kurtzman Carson Consultants LLC to, among other things, act as solicitation agent in connection with the solicitation of votes to accept or reject the Plan and the solicitation of votes of Holders of Claims based on

Securities  (the "Claims, Solicitation and Subscription Agent").

**2.**     Solicitation Package

The Solicitation Package shall contain copies of the following:

- (i) the Disclosure Statement Order (with the Solicitation Procedures, which shall be attached as Exhibit ~~1~~A thereto), (ii) the approved form of this Disclosure Statement (together with the Plan) in paper format or CD-Rom format, (iii) documentation relating to the Rights Offering, if applicable, and (iv) an appropriate form of Ballot and/or Master Ballot and voting instructions with respect thereto, if applicable (with a pre-addressed, postage prepaid return envelope), for Holders of Claims who are entitled to vote on the Plan;

- to the extent a Holder of any Claim or Interest receives the materials set forth above, such Holder also shall receive letters from the Debtors and the Committee urging the Holders in each Class entitled to vote on the Plan to vote to accept the Plan, and, if applicable, a letter in form and substance, acceptable to the Debtors in their discretion, from the Debtors' other significant constituents urging the Holders in each class entitled to vote on the Plan to vote to accept the Plan;

- the notice of the Confirmation Hearing; and

- such other materials as the Bankruptcy Court may direct.

**3.**     Distribution of the Solicitation Package and Plan Supplement

Through the Claims, Solicitation and Subscription Agent, the Debtors intend to distribute the Solicitation Packages ~~no less than eighteen (18~~approximately twenty-five (25) calendar days before the Voting Deadline.  The Debtors submit that distribution of the Solicitation Packages ~~at least eighteen (18~~approximately twenty-five (25) calendar days prior the Voting Deadline will provide the requisite materials to Holders of Claims entitled to vote on the Plan in compliance with Bankruptcy Rules 3017(d) and 2002(b).  Documentation relating to the Rights Offering will be distributed to Holders of Class A Notes Claims that submit a duly executed certification in the form attached to the Rights Offering Procedures, which will be distributed to Holders of Class A Notes Claims prior to the distribution of the Solicitation Package.

The Solicitation Package will be distributed in accordance with the Solicitation Procedures, which are attached as Exhibit 1 to the Disclosure Statement Order.  The Solicitation Package (except the Ballots and Master Ballots) may also be obtained from the Claims, Solicitation and Subscription Agent retained by the Debtors in these chapter 11 cases, by: (a) visiting the Debtors' restructuring website at: www.kccllc.net/loehmanns<http://www.kccllc.net/loehmanns>; and/or (b) writing to Loehmann's Holdings Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.  You may also obtain copies of any pleadings filed in these chapter 11 cases for free by visiting the Debtors' restructuring website at

www.kccllc.net/loehmanns<http://www.kccllc.net/loehmanns> or for a fee via PACER at: http://www.nysb.uscourts.gov.

The Plan Supplement will be filed by the Debtors no later than five (5) calendar days before the Voting Deadline and, with respect to the New Shareholders' Agreement and the certificate of designation for the New Convertible Preferred Stock, no later than ten (10) calendar days before the Voting Deadline (the "Plan Supplement Filing Date"). When Filed, the Plan Supplement will be made available on the Debtors' restructuring website at: www.kccllc.net/loehmanns<http://www.kccllc.net/loehmanns>. Parties may obtain a copy of the Plan Supplement from the Claims, Solicitation and Subscription Agent by: (a) visiting the Debtors' restructuring website at: www.kccllc.net/loehmanns<http://www.kccllc.net/loehmanns>; and/or (b) writing to Loehmann's Holdings Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

## H.    VOTING PROCEDURES

The Bankruptcy Court approved the close of business on [December 28, 2010] as the Voting Record Date. The Voting Record Date is the date for determining (i) which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the Solicitation Procedures and (ii) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim. The Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

The Bankruptcy Court approved [February 2, 2011], at 512:00 p.m. prevailing Eastern Time, as the deadline (the "Voting Deadline") for the delivery of executed Ballots and Master Ballots voting to accept or reject the Plan. Under the Plan, Holders of Claims in Voting Classes are entitled to vote to accept or reject the Plan, and they may do so by completing the Ballot or Master Ballot and returning it in the envelope provided to the Voting Agent by the Voting Deadline. Voting Instructions are attached to each Ballot and Master Ballot. To be counted as votes to accept or reject the Plan, all Ballots and Master Ballots, as applicable, must be properly executed, completed and delivered by using the return envelope provided by: (a) first class mail; (b) overnight courier; or (c) personal delivery, so that they are actually received no later than the Voting Deadline by the Voting Agent. It is important to follow the specific instructions provided on each Ballot or Master Ballot. Ballots should be sent as indicated in the chart below.

## CLASS 5 BALLOTS

**Class 5 General Unsecured Claims Ballots must be actually received by the Claims, Solicitation and Subscription Agent by the Voting Deadline** by using the envelope provided, or by First Class Mail, Overnight Courier or Personal Delivery to:

Loehmann's Ballot Processing
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, California 90245

**CLASS 3 AND 4 BALLOTS AND MASTER BALLOTS**

**Class 3 and 4 Note Claims Ballots and Master Ballots must be actually received by the Claims, Solicitation and Subscription Agent by the Voting Deadline** by using the envelope provided, or by First Class Mail, overnight Courier or Personal Delivery to:

Loehmann's Holdings Inc. Balloting Center
c/o Kurtzman Carson Consultants LLC
599 Lexington Avenue
New York, New York 10022

If you have any questions on the procedures for voting on the Plan, please call the Claims, Solicitation and Subscription Agent at the following telephone number: (866) 967-0674.

**IF A BALLOT OR MASTER BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS AGREE TO THE LATE SUBMISSION OR THE BANKRUPTCY COURT DETERMINES OTHERWISE.**

**ANY BALLOT OR MASTER BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.**

**IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT OR MASTER BALLOT, AS APPROPRIATE, WHEN SUBMITTING A VOTE.**

## I.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after notice, to hold a hearing on confirmation of a plan filed under chapter 11 of the

Bankruptcy Code.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the plan.

The Confirmation Hearing will commence on [————]**February 7, 2011**, at [————]**9:45 a.m. prevailing Eastern Time**, before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the master service list and the Entities who have filed Plan Objections, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to the terms and conditions of the Restructuring Support Agreement and the Commitment Letter, the Plan may be modified, if necessary, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

The Plan Objection Deadline is [————**January 28, 2011**], **at 4:00 p.m. prevailing Eastern Time**.  All Plan Objections must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are received on or before the Plan Objection Deadline.  The Debtors believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Debtors and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

**THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY AND PROPERLY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

**J.      CONFIRMATION AND CONSUMMATION OF THE PLAN**

It will be a condition to Confirmation of the Plan that the Bankruptcy Court shall enter the Confirmation Order in form and substance satisfactory to each Backstop Party, which Confirmation Order shall approve all provisions, terms and conditions of the Plan, unless otherwise satisfied or waived pursuant to the provisions of the Restructuring Support Agreement, the Commitment Letter and Article VIII of the Plan.  Following Confirmation, the Plan will be consummated on the Effective Date.

**K.      RISK FACTORS**

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL BELOW IN ARTICLES IX ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN AND X, "PLAN-RELATED RISK FACTORS."**

## II.     BACKGROUND TO THESE CHAPTER 11 CASES

## A.     DEBTORS' BUSINESS AND INDUSTRY

### 1.     The Company

Loehmann's is the direct parent or owner of Loehmann's, Inc., which owns 100% of the common stock of Loehmann's Real Estate Holdings, Inc., and Loehmann's Operating Co. ("Opco"). Loehmann's Capital Corp. ("CapCo") was established outside of the other Debtors' corporate structure.  Although CapCo is owned by an affiliate of GSS Contract Services III, Inc., an independent corporate services company, under ASC 810-10-55, CapCo is included in the consolidated financial statements of Loehmann's.  CapCo's sole purpose was to facilitate the 2004 Transaction (defined below) so as to comply with the strictures of Shari'ah law that do not allow for the charging or payment of interest.  The Debtors are an integrated business with common management, and they share key financial and operational systems

Loehmann's, founded in 1921 as the "Original Designer Outlet," is a leading national specialty retailer, offering well-known designer and brand name women's fashion apparel, accessories and shoes, and men's and children's apparel and furnishings at prices that are typically 30% to 65% below department store prices. Loehmann's has a strong brand name, a loyal customer base and long-standing relationships with leading designers and vendors of quality merchandise.  Loehmann's' merchandise offerings include over 500 upscale and designer apparel brands such as Calvin Klein, Donna Karan, Ralph Lauren, Michael Kors and Dolce & Gabbana.  The Debtors' renowned "Back Room", which showcases Loehmann's' highest end designer merchandise, provides a key point of differentiation from other off-price retailers. Loehmann's' core customer base is mostly affluent women between the ages of 30 and 55 with household incomes in excess of $100,000 who shop at Loehmann's for its wide array of in-season designer and brand name merchandise priced at a significant discount to department stores.  Loehmann's has approximately 200,000 "Best Customers," many of whom have been Loehmann's customers for over ten years, who average approximately $1,000 in annual purchases, purchase goods an average of approximately twelve times a year and represent approximately 45% of the Debtors' annual net sales.

Loehmann's is headquartered in the Bronx, New York. As of the Petition Date, the Debtors had approximately 1900 employees and are operating 48 stores in major metropolitan areas located in 13 states and the District of Columbia. Loehmann's' stores are concentrated on the East and West coasts with a major presence in the Northeast/Mid-Atlantic, California and Florida markets.

Loehmann's is the surviving entity of the merger of DAH Merger Corporation and Loehmann's which was consummated on October 13, 2004 (the "2004 Transaction"). Because the prior equity sponsor of Loehmann's sought to comport with Islamic banking practices, the 2004 Transaction was structured to comply with the

strictures of Shari'ah law, which, inter alia, does not allow for the imposition, or payment, of interest.

In July 2006, Istithmar acquired 100% of the common stock of Designer Apparel Holding Company ("DAHC"), which in turn owns 100% of the common stock of Loehmann's Holdings.

Istithmar is a Dubai, United Arab Emirates-based alternative investment firm focusing on private equity, real estate and other alternative investments.  It is part of Dubai World, which is 100% owned by the Government of Dubai.

## 2.    Employees

As of the Petition Date, the Company employed approximately 1,900 people, the majority of whom are full-time, including a central buying staff and experienced, well respected off-price buyers.  Loehmann's management team has an average of over 28 years experience in the retail industry and has developed the operational expertise and vendor relationships that have helped Loehmann's maintain its position as one of the nation's largest upscale off-price specialty retailers.

Approximately 80% of the Company's employees are hourly wage earners and approximately 20% are salaried personnel.  The Company's employees are non-unionized.

## 3.    Earlier Operating Initiatives

After hiring Jerald S. Politzer as Chief Executive Officer in April 2008, Loehmann's began to develop a strategic re-positioning in the marketplace. Shortly thereafter, Loehmann's engaged two firms:  ARC Consulting, a strategic consulting firm and SHC Direct, a marketing consulting firm.  As a result of these efforts, strategic initiatives were established to:

- establish Loehmann's as the "trend right" fashion destination;

- rebuild the Back Room as the cornerstone of the business;

- re-define core merchandising strategy;

- improve merchandise presentation and physical condition of stores;

- establish new store prototype implemented in Spring 2010;

- shift focus from operations to customer service and develop service standards;

- improve customer checkout time;

- refine and refocus direct mail strategy and invest in new customer acquisition;  and

- invest in public relations to generate "buzz."

In April 2009, Loehmann's introduced a redesigned Insider Club loyalty program that comprises three levels of membership: Basic, Gold and Diamond. The Insider Club is the basic, no-fee club where members receive 15% off on their birthday along with special offers, discounts and notices of sales and events. The Insider Club Gold offers all the benefits of the basic membership plus 10% off every day and is open to anyone for a low annual fee of $25. Recently, Loehmann's most exclusive level, Insider Club Diamond, which offers all the benefits of Insider Club Gold plus additional soft benefits, was expanded to include Loehmann's s very best Gold Club members who had spent more than $1,000 in the prior twelve months.

In addition to these initiatives, Loehmann's negotiated rent reductions on many of its leases resulting in a cash flow savings of $3.2 million in the first 12 months of the reductions and $800,000 in the following twelve months.

In all, selling, general and administrative expenses for fiscal year 2009 decreased to $166.0 million, or 39.3% of net sales, from $178.8 million, or 39.5% of net sales in fiscal year 2008. The decrease of $12.8 million was primarily due to a $13.5 million decrease in variable sales expenses slightly offset by an increase of $0.7 million in expenses related to new stores opened within the prior past twelve months. The decrease in expense was directly attributable to Loehmann's cost reduction initiatives taken at the beginning of fiscal year 2009, which included reductions in store and corporate payroll and reductions in variable expenses (*i.e.* travel, advertising, etc.).

The strategic initiatives and expense reductions initially yielded positive results: Loehmann's gross profit increased $7.9 million from $168.2 million in fiscal year 2008 to $176.1 million in fiscal year 2009, and gross profit percentage improved to 41.7% compared to 37.1% in the prior fiscal year due to lower markdown activity and higher revenues related to gold card and magazine sales.

As such, Loehmann's had begun the process of re-positioning itself in the industry for the long term.

Notwithstanding these initiatives, however, Loehmann's business was still sensitive to customers' spending patterns, which in turn were subject to prevailing economic conditions. As a result, the significant decline over the last 12 months prior to the Petition Date in several of the markets in which Loehmann's stores are concentrated, mainly California, the Northeast, Midwest and Florida, had an adverse effect on Loehmann's financial condition and the results of their operations.

Moreover, on April 6, 2010, the New York Post erroneously reported that Loehmann's had missed an interest payment on its debt the week prior thereto and that "[s]uppliers to the off-price clothing chain have begun to withhold shipments to stores as concerns mount about the retailer's shaky finance."

Although this report was completely false, it served as a catalyst that resulted in certain suppliers holding back crucial merchandise shipments. As might be

expected, the resulting inability to obtain merchandise, which customers had come to expect be available and in stock during the same selling season as it was available in department stores, only served to further adversely impact Loehmann's financial performance.

As a result, Loehmann's found itself having to stretch payment terms with merchandise vendors, which limited Loehmann's ability to source product, a key challenge as Loehmann's sought build inventory for the Fall season.

## B.    DEBTORS' CORPORATE AND CAPITAL STRUCTURE

### 1.    General Corporate Structure

As noted, Loehmann's is the surviving entity of the merger of DAH Merger Corporation and Loehmann's Holdings, which was consummated on October 13, 2004.  Because the sponsors of the merger sought to comport with Islamic banking practices, the 2004 Transaction was structured to comply with the strictures of Shari'ah law, which, among other things, does not allow for the imposition, or payment, of interest.

Istithmar owns 100% of the common stock of DAHC, which in turn owns 100% of the common stock of Loehmann's Holdings as a result of an equity purchase transaction, which closed in July 2006.

Since purchasing Loehmann's in July 2006, Istithmar has provided Loehmann's with operating funds through a $55 million standby letter of credit (the "SLOC").  As a result of losses incurred in fiscal years 2007 and 2008, due in part to adverse economic conditions, Loehmann's had drawn $42.0 million and $5.0 million, respectively, under the SLOC.

On April 19, 2010, Loehmann's drew the remaining $8.0 million available under the SLOC, which had an expiration date of September 30, 2012.  Those drawdowns were recorded by Loehmann's as contributions of capital made by Istithmar.

Additionally, as credit support for Loehmann's obligations under its Prepetition Credit Agreement (defined below), Istithmar also posted a $7.5 million standby letter of credit.

Prior to Loehmann's entry into the Prepetition Credit Agreement, in the summer of 2010, Isthithmar had earlier provide $3 million to Loehmann's contemporaneously with Loehmann's request for an amendment from it prior secured lender in order to enhance the company's liquidity and facilitate its operational and financial initiatives.

The Debtors, in consultation with their professionals, have reviewed the 2004 Transaction and subsequent transactions with Istithmar and, based on this review, determined that there are no viable causes of action against Istithmar that could be

asserted on behalf of the Debtors' estates, whether based upon such transactions or otherwise.

## C. SUMMARY OF PREPETITION INDEBTEDNESS AND PREPETITION FINANCING

### 1. Secured Debt

#### a. Prepetition Secured Credit Agreement

The Debtors (other than CapCo) are parties to a $45 million Credit Agreement (the "Prepetition Credit Agreement"), dated as of September 15, 2010, by and among Loehmann's Opco, as borrower, Loehmann's Holdings, Loehmann's Real Estate Holdings, and Loehmann's, Inc., as guarantors and Crystal ( the "Prepetition Lender"). The Prepetition Credit Agreement is scheduled to mature on January 18, 2014. The Prepetition Credit Agreement is an asset-based facility governed by a borrowing base formula of accounts receivable, credit card receivables, and inventory. The Prepetition Credit Agreement included $15 million sublimit available for the issuance of letters of credit, of which up to $15 million could be used for stand-by letters of credit, and was secured by a security interest in all of the present and after acquired tangible and intangible assets of Loehmann's Holdings and its subsidiaries.

As of the Petition Date, approximately $30.5 million was outstanding under the revolver and there is $750,000 in open letters of credit under the Prepetition Credit Agreement.

#### b. Prepetition Secured Notes

CapCo was established outside of the other Debtors' corporate structure so that that the 2004 Transaction would comply with Shari'ah law, which prohibits charging and paying interest.

As a result, CapCo is the obligor on (a) $55 million in 12% senior secured Class A Notes due October 1, 2011 (the "Class A Fixed Rate Notes"); (b) $20 million in senior secured Class A Floating Rate Notes due October 1, 2011 (the "Class A Floating Rate Notes," and together with the Class A Fixed Rate Notes, the "Class A Notes"); and (c) $35 million in 13% senior secured Class B Notes due October 1, 2011 (the "Class B Notes, together, with the Class A Notes, the "Notes"). The Notes were issued pursuant to the Indenture, with Wells Fargo Bank, N.A., as indenture trustee (the "Indenture Trustee"). Pursuant to the Indenture, after the occurrence of an Event of Default and the acceleration of the Notes (which occurred as a result of the filing of the Chapter 11 Cases), the holders of the Class B Notes are not entitled to receive any distribution on account of their Class B Notes until the Class A Notes have been paid in full.

CapCo's obligations under the Notes are secured under the Security Agreement, pursuant to which CapCo pledged to the Indenture Trustee all of its assets to secure its obligations under the Indenture, including its rights to the Leased Assets (as defined below) and its rights under the Lease Documents (as defined in the

Indenture), and its rights to receive annual rental payments from Loehmann's Operating Co. in the amount of approximately $14 million.

CapCo used the proceeds from the Notes to fund a sale and lease-back transaction with Loehmann's Opco pursuant to a Lease and License Financing and Purchase Option Agreement, dated as of October 13, 2004 (the "CapCo Lease"), whereby (i) CapCo acquired the fixed operating assets of Opco (the "Leased Assets") and (ii) CapCo leased those assets back to Opco. Opco's obligations under the CapCo Lease are guaranteed by Loehmann's Holdings, Loehmann's Real Estate Holdings, and Loehmann's, Inc. pursuant to the Lease Guarantee, dated as of October 13, 2004 (the "Lease Guarantee") and secured under the Lease Security Agreement, pursuant to which Opco, Loehmann's Holdings, Loehmann's, Inc. and Loehmann's Real Estate Holdings (each, a "Grantor") pledged to CapCo substantially all of their assets (including equity interests in subsidiaries) (collectively, the "Collateral") to secure their obligations under, in the case of Opco, the CapCo Lease, and, in the case of the other Grantors, the Lease Guarantee.

CapCo did not make the interest payment that was due on October 1, 2010 under the Notes.

### c. Intercreditor Agreement

The priority of lien rights as to the Collateral between the Prepetition Lender and CapCo was established pursuant to an Amended and Restated Intercreditor Agreement, dated December 18, 2009, as amended from time to time (the "Intercreditor Agreement").

Pursuant to the Intercreditor Agreement, (i) CapCo has a first priority security interest on the Collateral except the "Revolving Facility Collateral" (as defined in the Intercreditor Agreement), as to which it has (a) a second priority security interest, to the extent that the Revolving Facility Obligations (as defined in the Intercreditor Agreement) do not exceed the "Priority Lien Cap" (as defined in the Intercreditor Agreement) and (b) a first priority security interest to the extent that the Revolving Facility Obligations exceed the Priority Lien Cap, to secure the Grantors' obligations under the Lease Documents and (ii) the Prepetition Lender has (a) a first priority security interest on the Revolving Facility Collateral securing Revolving Facility Obligations in an amount up to the Priority Lien Cap, (b) a second priority security interest in the Revolving Facility Collateral securing Revolving Facility Obligations in amounts in excess of the Priority Lien Cap, and (c) a second priority security interest on all other Collateral to secure the Grantors' obligations under the Prepetition Credit Agreement. The Revolving Facility Collateral includes, *inter alia*, all of the Grantors' interests in accounts (including receivables from credit card processors with respect to credit card sales), inventory and deposit accounts. The Revolving Facility Collateral also includes all general intangibles (including intellectual property) to the extent evidencing or governing any of the other Revolving Facility Collateral.

2.    **Unsecured Creditor Claims**

As an operator of a chain of specialty stores, the Debtors purchases inventory from approximately 750 vendors.  The Debtors have historically purchased merchandise under normal purchase commitments in the ordinary course of business. Loehmann's does not enter into any long-term vendor contracts, which gives the flexibility to buy merchandise opportunistically during the selling season, typically at an attractive price.  This buying strategy also gives Loehmann's less exposure to fashion risk than full-priced retailers, which generally make their purchasing decisions several seasons in advance.

As of the Petition Date, there were approximately $27.6 million in unpaid accounts payable due Loehmann's merchandising and service provider vendors. However, there was approximately $12.4 million in letters of credit issued under the Prepetition Credit Agreement for the benefit of these vendors, or their factors (to the extent a vendor may have financed or assigned the right to collections its Loehmann's receivables), which may reduce the pool of unsecured claims associated with such unpaid accounts payable.

Additionally, in connection with a motion Loehmann's filed pursuant to Bankruptcy Code section 365 authorizing Loehmann's to reject certain unexpired leases for under performing stores that had been recently been closed prior to the Petition Date, the Debtors anticipate that there will be approximately $11 million in unsecured claims for damages arising out of the rejection of such leases, subject to section 502(b)(6) of the Bankruptcy Code.  The Debtors continue to evaluate the performance of their stores and have reserved the right under the Plan and Bankruptcy Code section 365 to seek authorization to reject unexpired leases for under performing stores up until the Confirmation Hearing.  To the extent that the Debtors seek such authorization, the amount of unsecured claims for damages arising out of the rejection of such leases, subject to section 502(b)(6) of the Bankruptcy Code, would increase.

3.    **Debtor-in-Possession Financing and Exit Facility**

Loehmann's ability to secure debtor-in-possession financing prior to commencing these Chapter 11 cases serves as crucial signal to their customers, employees and trade vendors that Loehmann's will maintain viable and competitive business operations going forward.

a.    **DIP Facility**

On November 17, 2010, the Debtors other than CapCo (the "DIP Credit Parties") entered into a $45 million revolving credit facility with Crystal Financial LLC, the Prepetition Lender for postpetition financing (the "Original DIP Facility"), which was approved by the Bankruptcy Court on an interim basis on November 16, 2010 pursuant to the Interim DIP Order, which authorized the Debtors to borrow up to $6 million under the Original DIP Facility and to use cash collateral on an interim basis until entry of the DIP Order as a Final Order.

Subsequent to entry of the Interim DIP Order, the Debtors concluded that the Original DIP Facility did not provide sufficient liquidity for the Debtors to obtain the most desirable inventory at the right times to adequately stock their stores for the spring, summer and fall selling seasons. After reviewing the Debtors' post-petition cash flow projections and determining that the Debtors' prospects for a successful exit from chapter 11 would be materially enhanced if they had access to incremental liquidity, Whippoorwill offered to provide the Debtors with a $7 million junior DIP facility (the "Tranche B Revolving Facility") on a "first in, last out" basis. The Debtors would have immediate access to the proceeds of the Tranche B Revolving Facility, which would be repaid after Crystal's DIP loan is repaid. The Debtors' use of the proceeds of the Tranche B Revolving Facility is limited to inventory purchases.

In connection with the Tranche B Revolving Facility, the parties amended and restated the Original DIP Facility (as amended and restated, the "DIP Facility") to: (i) reduce the $45 million Crystal facility to a $33 million Tranche A revolving loan, and (ii) provide for the Tranche B Revolving Facility.

The DIP Facility is secured by liens and security interests pursuant to Bankruptcy Code §§361, 362, 364(c)(2), 364(c)(3) and 364(d) on the DIP Credit Parties' existing and after-acquired property and assets, but excluding Avoidance Actions and the proceeds thereof (the "DIP Collateral"). The liens on the DIP Collateral are subject to all other valid and enforceable senior liens of record, and a carve-out for professional fees and expenses. The DIP Facility increases the Debtors' availability from 85% to 90% of eligible inventory and accounts receivable, subject to a borrowing base similar to the borrowing base in the Prepetition Credit Agreement.

The Court entered a Final DIP Order on December 14, 2010 that approved the DIP Facility. Pursuant to the Final DIP Order, the Prepetition Credit Agreement Secured Claims were rolled up into the DIP Facility and paid in full at closing.

(1)     **Milestones**

A predicate to Crystal providing the DIP Facility was that the Debtors agree to proceed on simultaneous tracks to (i) seek confirmation of a chapter 11 plan of reorganization based upon the Restructuring Support Agreement and the Commitment Letter, and (ii) seek approval to conduct either a going concern or "GOB" sales pursuant to section 363 of the Bankruptcy Code. Thus, the DIP Facility contains important milestones (the "Milestones") that the Debtors must meet as conditions to borrow, and the failure to meet any Milestone is an event of default under the DIP Facility. The Milestones are:

(a)     December 15, 2010 (30 days after the Petition Date) – Entry of the DIP Order as a Final Order.

(b)     December 30, 2010 (45 days after the Petition Date) – Entry of an order extending the Debtors' time to assume or reject real property leases until 210 days after the Petition Date, or June 13, 2011.

(c)        December 1, 2010 – The Debtors must file the Plan and Disclosure Statement.

(d)        January 7, 2011 – Entry of the Disclosure Statement Order.

(e)        January 14, 2011 – The Debtors must file a motion pursuant to section 363 of the Bankruptcy Code for authorization to conduct a sale of all or substantially all of their assets, as either a going concern business or through "going out of business sales,"(such motion, the "Required Sale Motion").

(f)        February 7, 2011 – Entry of the Confirmation Order

(g)        February 18, 2011 – The occurrence of the Effective Date.

(h)        February 23, 2011 – Entry of an order authorizing the sale of all or substantially all of the Debtors' assets within 60 days (Note that this milestone will only be relevant if the Plan is not confirmed on a timely basis).

Crystal, as DIP Lender, required the inclusion of the Required Sale Motion as a milestone under the DIP Facility as an alternative to the Plan in the event that the Plan process is not proceeding on an expedited basis. The Debtors intend to request an extension or waiver of this milestone in the event that the Court approves the Disclosure Statement prior to January 7, 2011. The Debtors believe that the Plan will provide the greatest value to their creditors and therefore intend to seek confirmation of the Plan on an expedited basis and proceed with the sale transaction contemplated by the Required Sale Motion only in the event that the Plan is not confirmed on a timely basis.

(2)      **Exit Facility**

Upon emergence from Chapter 11 and consistent with Restructuring Support Agreement, Reorganized Loehmann's will enter into a senior secured credit facility in the amount of ~~up to~~ at least $40 million (or a higher amount acceptable to the Debtors and each Backstop Party, in each Backstop Party's sole discretion) (the "Exit Facility") to be negotiated and to be satisfactory to Loehmann's, and each Backstop Party in its sole discretion.

Crystal has provided a commitment for exit financing in the form of a $45 million revolving credit facility. A term sheet describing the salient terms offered by Crystal was filed as an exhibit to the Debtor's motion, filed on the Petition Date, to approve the DIP Facility. The Debtors have no obligation to accept this commitment or to pay any fees in connection therewith. The Debtors will seek approval of exit financing that affords the Debtors the most favorable terms that they are able to obtain in connection with Confirmation.

### III. PREPETITION NEGOTIATIONS REGARDING DEBT RESTRUCTURING

In June 2010, Loehmann's began exploring possible financial restructuring alternatives in addition to its ongoing strategic and operational initiatives to reduce costs and provide additional liquidity for its operations and retained business consultants Clear Thinking Group, LLC and investment bank Perella Weinberg Partners to consider financial restructuring alternatives, including finding new financial or strategic investor(s), a replacement working capital lender and reviewing Loehmann's business processes for cost-savings. Ultimately, Loehmann's, in consultation with its advisors, determined that a balance sheet restructuring was in the best long-term interests of the Debtors and their creditors.

Beginning in August 2010, Loehmann's entered into discussions with Istithmar, and the two largest holders of the Secured Notes, Whippoorwill Associates, Inc., as agent for its discretionary accounts held by legal and/or beneficial owners of the Notes ("Whippoorwill"), and Plainfield to address liquidity issues and a potential restructuring of Loehmann's prior to the October semi-annual interest payment becoming due on the Secured Notes.

In the summer of 2010, Loehmann's requested an amendment from its then-existing lender, General Electric Capital Corporation ("GECC") of certain terms of Loehmann's revolving credit facility in order to enhance liquidity and facilitate its operational and financial initiatives. In pertinent part, this amendment would have provided, among other things, an elimination of the borrowing base reserve and a reduction in the borrowing base for eligible in transit inventory and eligible letter of credit inventory.

The proposed amendment was predicated on an additional capital commitment from Istithmar, of which approximately $3 million was provided to Loehmann's contemporaneously with the amendment proposal.

Notwithstanding Istithmar's additional capital contribution, the proposed amendment was denied by GECC, at which point Loehmann's sought to replace GECC with a lender more supportive of Loehmann's' restructuring efforts.

As noted above, in September 2010, Loehmann's entered into the Prepetition Credit Agreement with Crystal to replace its $35 million credit facility with GECC that had been otherwise scheduled to mature on December 11, 2012 to facilitate its financial restructuring initiatives.

With the Crystal Prepetition Credit Agreement in place, on September 24, 2010, Loehmann's reached an agreement in principle with Istithmar and Whippoorwill to pursue a financial restructuring through either (i) an out-of-court, private Note exchange offer (the "Exchange Offer") and consent solicitation (the "Consent Solicitation"), whereby, *inter alia*, the outstanding Notes would be exchanged for newly-issued notes on substantially the same terms as the current Notes, except that the maturity date would be extended by three years (such notes, the "Exchanged Notes") or

(ii) a Chapter 11 plan based upon a Plan Support Agreement, dated September 24, 2010 between Loehmann's, Istithmar and Whippoorwill (the "Original Support Agreement").

The Exchange Offer was commenced on September 27, 2010, and provided that holders of Notes could opt to exchange their Notes in full for Exchange Notes through October 13, 2010, and at 97% of their face value if exchanged by October 27, 2010 (the "Expiration Date"). The Offering Memorandum for the Exchange Offer was supplemented (i) on October 14, 2010 to extend the period for tendering holders of the Notes to exchange their Notes for Exchanged Notes at 100% of their face value through October 22, 2010; (ii) on October 25, 2010 to extend such period until the Expiration Date; and (iii) on October 28, 2010 to extend the Expiration Date until October 28, 2010.

The Consent Solicitation was launched contemporaneously with the Exchange Offer and was deemed successful on October 14, 2010 after holders of the Notes representing more than fifty percent in aggregate outstanding principal amount of the Notes tendered consents, which allowed for the incurrence of $10 million in additional debt under the Prepetition Credit Agreement, and the closing of up to 15 stores in the next 12 months.

Despite Loehmann's best efforts to successfully consummate the Exchange Offer, it did not achieve the requisite 97% acceptance for the exchange of the Notes. Furthermore, revisions to the Original Support Agreement were required to accommodate, *inter alia*, changes in the amount and nature of capital necessary to effectively restructure and emerge from Chapter 11.

Upon expiration of the Exchange Offer, Loehmann's, Istithmar and Whippoorwill moved forward with negotiations with respect to the material terms of a pre-negotiated plan of reorganization that culminated in execution of that certain Restructuring Support Agreement, dated November 14, 2010. The Debtors believe that the successful reorganization of Loehmann's likely depends upon the ability of the Debtors to demonstrate to both their creditors and customers a clear path to emergence from Chapter 11.

Ultimately, it was determined that a restructuring of Loehmann's balance sheet was in the best long-term interests of the Debtors and their creditors. On November 4, 2010, the Board of Directors of Loehmann's Holdings created a special committee (the "Special Committee") to review, along with the entire Boards of Directors of Loehmann's Holdings and its subsidiaries, the then available restructuring alternatives for them and to present recommendations to the respective full Boards of Directors. The Special Committee is comprised of Jerald Politzer, Robert Friedman and Joseph Melvin, none of whom are associated with Istithmar. The Special Committee recommended, and the full Boards of Directors determined, that the financial restructuring under the Plan, as contemplated by the Restructuring Support Agreement and the Commitment Letter, each as of November 14, 2010, was in the best interests of the Debtors (other than CapCo) and their stakeholders and would provide the Debtors (other than CapCo) with the best opportunity to maximize value for their stakeholders. Additionally, the Board of Directors and sole stockholder of CapCo separately determined that the financial restructuring under the Plan, as contemplated by the

November 14, 2010 Restructuring Support Agreement and Commitment Letter, was in the best interests of CapCo and would provide CapCo with the best opportunity to maximize value for its stakeholders. Consequently, the Debtors have commenced these Chapter 11 Cases to implement its financial restructuring under the Plan, as contemplated by such Restructuring Support Agreement and Commitment Letter.

## IV.  ADMINISTRATION OF THE CHAPTER 11 CASES

### A.  FIRST DAY MOTIONS AND CERTAIN RELATED RELIEF

Immediately following the Petition Date, the Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with vendors, customers, employees, landlords and utility providers that had been impacted by the commencement of these Chapter 11 Cases. As a result of these initial efforts, the Debtors minimized the negative impacts resulting from the commencement of these Chapter 11 Cases.

On the Petition Date, in addition to the voluntary petitions for relief Filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also Filed a number of first day motions and applications (collectively, the "First Day Motions") with the Bankruptcy Court. Within a few days, the Bankruptcy Court entered several orders to, among other things: (1) prevent interruptions to the Debtors' businesses; (2) ease the strain on the Debtors' relationships with certain essential constituents; (3) provide access to much needed working capital; and (4) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases (each, a "First Day Order").

### 1.  Administrative Motions

To facilitate a smooth and efficient administration of these Chapter 11 Cases and to reduce the administrative burden associated therewith, the Bankruptcy Court entered the following procedural Orders: (a) approving the notice, case management and administrative procedures to govern these Chapter 11 cases [Docket No. 57]; (b) authorizing the joint administration of the Debtors' Chapter 11 cases [Docket No. 27]; (c) allowing the Debtors to prepare a list of creditors and File a consolidated list of the Debtors' 30 largest unsecured creditors [Docket No. 28]; and (d) granting the Debtors an extension of time to File their Schedules [Docket No. 34]]. On December 16, 2010, the Debtors filed their Schedules with the Bankruptcy Court.

### 2.  Motion to Approve Debtor-in-Possession Financing [Docket No. 20]

Realizing that an infusion of new money into the Debtors would protect the Debtors' liquidity during the Chapter 11 cases, the Debtors Filed a First Day Motion to approve the Original DIP Facility and to ensure the availability of debtor-in-possession financing, a total commitment of $45 million, from the Crystal. This First Day Motion also included a request for entry of an interim order authorizing the Debtors to use the Prepetition Credit Agreement Lenders' cash collateral and granting adequate protection to the Prepetition Credit Agreement Lenders, and for entry of a

final order authorizing and approving the DIP Facility. The Debtors also sought approval to pay the Prepetition Secured Credit Claims in full upon entry of the Final DIP Order.

Thereafter, the Bankruptcy Court entered the Interim DIP Order, which permitted the Debtors to borrow up to $6 million under the Original DIP Facility. Additionally, the interim approval permitted the Debtors to use cash collateral and provide adequate protection to the Prepetition Credit Agreement Lenders. Also on November 17, 2010, the closing of the Original DIP Facility occurred.

On December 8, 2010 the Debtors filed a supplement to the Motion to approve the DIP Facility, to amend and restate the DIP Facility to reflect the reduction of the Crystal facility to $33 million and the new $7 million Tranche B Revolving Facility. On December 14, 2010, the Court entered a final order approving the DIP Facility and granting the Debtors the authority to, among other things, use cash collateral, roll up the prepetition secured debt, modify the automatic stay, obtain postpetition financing, and grant liens. The Debtors believe that the committed amount of the DIP Facility will meet their financing needs during the brief duration of the Chapter 11 Cases.

### 3. Employment and Compensation of Advisors

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered Final Orders, authorizing the Debtors to retain and employ the following advisors: (a) Kurtzman Carson Consultants LLC, as claims and noticing agent to the Debtors [Docket No. 36]; (b) Clear Thinking Group, LLC, as financial advisors to the Debtors [Docket No. 136]; (c) Perella Weinberg LLP, as investment banker to the Debtors [Docket No. 188]; (d) Togut, Segal & Segal LLP, as counsel to the Debtors [Docket No. 138]; (e) DJM as lease disposition consultant, to the Debtors [Docket No. [__]];] and (f) Troutman Sanders, as special corporate counsel to the Debtors [Docket No. 137]. In addition, the Bankruptcy Court approved the Debtors' motion to retain and compensate certain professionals utilized in the ordinary course of the Debtors' business [Docket No. 140]. On December 6, 2010, the Bankruptcy Court entered an order approving certain procedures for the interim compensation and reimbursement of Retained Professionals in the Chapter 11 Cases [Docket No. 139].

### 4. Stabilizing Operations

Recognizing that any interruption of the Debtors' business, even for a brief period, would negatively impact customer and supplier relationships, revenue and profits, the Debtors Filed a number of First Day Motions to ensure the stabilization of the Debtors' operations while in Chapter 11. Thereafter, the Bankruptcy Court entered a number of First Day Orders granting the Debtors the authority to, among other things, pay certain prepetition claims and obligations and continue certain existing programs. Indeed, the relief granted by the First Day Orders helped facilitate the Debtors' smooth transition into Chapter 11, allowed the Debtors to continue their operations without interruption and prevented a decrease in confidence among suppliers, customers and creditors as to the likelihood of the Debtors' successful emergence from the Chapter 11 Cases.

### a.    Essential Trade Vendors [Docket No. 10]

The Debtors rely on certain essential vendors to supply their stores with the specialty designer fashion merchandise that is essential to maintaining the Debtors' operations as a going concern.  Therefore, the Bankruptcy Court entered a First Day Order on November 18, 2010 authorizing the Debtors to pay prepetition claims of certain essential vendors and to pay administrative claims of certain essential vendors in an aggregate amount of no more than $3,250,000 [Docket No. 64].  The Debtors obtained a Final Order authorizing them to pay their essential vendors on December 16, 2010.  [Docket No. 192].  The Debtors believe that their ability to pay essential vendors has limited disruption to the supply of merchandise by such vendors, thus avoiding potential serious disruption in the Debtors' business in the critical holiday shopping period.

### b.    Motion to Pay Shippers, Warehousemen and Other Lien Claimants [Docket No. 8]

In the period immediately prior to the Petition Date, certain of the Debtors' merchandise was in transit.  The Debtors believed that, unless they were authorized to pay certain shippers and warehousemen, it would have been highly unlikely the Debtors would have received possession of these goods.  The Debtors were concerned that the warehousemen and the other lien claimants possessed lien rights or the ability to exercise "self-help" remedies to secure payment of their claims, and, as such, any failure of the Debtors to satisfy outstanding shipping charges and the miscellaneous lien claims could have had a material adverse impact on the Debtors' business.  The Bankruptcy Court entered a First Day Order [Docket No. 32] and then, on December 6, 2010, a Final Order [Docket No. 135] authorizing, among other things, the Debtors to pay certain prepetition claims of shippers, warehousemen and other lien claimants.

### c.    Employee Compensation Motion [Docket No. 5]

The Debtors rely on their employees for their day-to-day business operations.  The Debtors believed that absent the ability to (i) pay prepetition claims for compensation, benefits, and reimbursement of expenses and (ii) continue employee programs in the ordinary course of business and consistent with past practices, their employees might have sought alternative employment opportunities, perhaps with the Debtors' competitors, thereby depleting the Debtors' workforce, hindering the Debtors' ability to meet their customer obligations and likely diminishing customer confidence in the Debtors.  The loss of valuable employees would have been distracting and destabilizing at a critical time when the Debtors were focused on stabilizing their operations.  The Bankruptcy Court entered a First Day Order [Docket No. 29] and then, on December 6, 2010, a Final Order [Docket No.  129] authorizing the Debtors to pay, among other amounts, prepetition claims and to pay and continue obligations for (1) compensation and reimbursable employee expenses, (2) deductions and payroll taxes and (3) employee medical and similar benefits.  Such First Day Order and Final Order also directed banks and financial institutions to honor all checks and electronic payment requests made by the Debtors related to such prepetition compensation.

### d. Motion to Pay Prepetition Taxes [Docket No. 22]

The Debtors believed that, in some cases, certain authorities had the ability to exercise rights that would be detrimental to the Debtors' restructuring if the Debtors failed to meet the obligations imposed upon them to remit certain taxes. Accordingly, the Debtors sought an order authorizing the Debtors to pay any fees and taxes to avoid harm to the Debtors' business operations. The Bankruptcy Court entered a First Day Order [Docket No. [30]] and then, on December 6, 2010, a Final Order authorizing the Debtors to pay prepetition taxes [Docket No. 134].

### e. Motion to Maintain Insurance Coverage [Docket No. 9]

The Debtors felt that the maintenance of and entry into future insurance policies was critical to the preservation of the value of the Debtors' estates, and that payment of certain unpaid prepetition amounts relating to their insurance policies was necessary to allow the Debtors to keep their insurance policies in effect and ensure that there were no inadvertent lapses in coverage. Accordingly, the Debtors filed a First Day Motion seeking authority to continue insurance and pay prepetition premiums and brokers' fees necessary to maintain insurance coverage. On the Petition Date, the Bankruptcy Court entered a First Day Order [Docket No. 33] and then, on [December __, 2010], a Final Order [Docket No. [__] authorizing the Debtors to continue insurance and pay prepetition premiums and brokers' fees necessary to maintain insurance coverage.

### f. Cash Management Motion [Docket No. 6]

To prevent disruption to the Debtors' business, the Debtors filed a First Day Motion to continue using Loehmann's existing cash management system, bank accounts and business forms. Additionally, the Debtors sought to open new bank accounts and continue intercompany transactions in the ordinary course of business with administrative expense priority. Further, the Debtors sought authority to maintain and continue using their existing bank accounts in the same manner as before the Petition Date without reference to their status as debtors-in-possession. On November 18, the Bankruptcy Court entered a First Day Order [Docket No. 40] and then, on December 6, 2010 a Final Order [Docket No. 141] granting the above relief.

### g. Motion to Continue Customer Programs [Docket No. 7]

Prior to the Petition Date, the Debtors engaged in customer programs to maintain customer loyalty, goodwill and support. The Debtors believed that these customer programs encourage customers to continue to purchase the Debtors' merchandise, helping to retain the customer base and reputations of the Debtors and, ultimately, increasing revenue. The continuation of these customer programs and retention of core customers is a critical element of the Debtors' successful reorganization. Accordingly, the Debtors filed a First Day Motion seeking authority to continue their customer programs and honor the prepetition commitments owed with respect thereto. On November 18, 2010, the Bankruptcy Court entered a Final Order granting such First Day Motion on the Petition Date [Docket No. 31].

h.     **Postpetition Delivery of Goods [Docket No. 13]**

In order to ensure a continuous flow of merchandise into the Debtors' stores, the Debtors' filed a First Day Motion to (1) confirm the grant of administrative expense status to obligations arising from the post-petition delivery of goods, and (2) establish authority to pay such obligations in the ordinary course of business. On November 18, 2010, the Bankruptcy Court entered a Final Order [Docket No. 35] granting such relief.

In addition to the First Day Motions, the Debtors also filed additional motions early in the Chapter 11 cases to stabilize the operations of the Debtors:

i.     **Utilities Motion [Docket No. 47]**

Section 366 of the Bankruptcy Code protects debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services.  The Debtors believed that the financing provided by the DIP Facility, along with the Debtors' incentive to maintain their utility services, provided their utility providers with the adequate assurance required by the Bankruptcy Code.  Consequently, the Debtors filed a Motion approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court.  On December 6, 2010, the Bankruptcy Court entered a Final Order [Docket No. 132] granting such relief.

j.     **Procedures for Reclamation Demands [Docket No. 47]**

The Debtors filed a motion establishing procedures for addressing reclamation demands.  On December 6, 2010, the Bankruptcy Court entered a Final Order [Docket No. 133] granting such relief.

k.     **Motion to Assume Commitment Letter [Docket No. 77] and Supplement Thereto [Docket No. 124]**

As noted, as part of the prepetition negotiations that led to the Restructuring Support Agreement, the Debtors entered into the Commitment Letter, dated as November 14, 2010, pursuant to which the Backstop Parties committed to invest an aggregate of $25 million (the "New Investment") in the Reorganized Debtors in the form of the New Convertible Preferred Stock to be issued on the Plan Effective Date.  The Commitment Letter required the Debtors, within five (5) days of the Petition Date, to seek Bankruptcy Court approval of its terms and conditions, including:  (i) the payment of a commitment fee equal to 4% of the New Investment (the "Commitment Fee") payable in the form of new convertible preferred shares of Reorganized Loehmann's Holdings, Inc., or cash, as applicable, in accordance with and subject to the terms of the Commitment Letter;  (ii) reimbursement of reasonable professional fees and expenses incurred by each of the Backstop Parties, in each case as an administrative expense and in accordance with and subject to the terms of the Commitment Letter; and (iii) certain indemnification obligations set forth in the Commitment Letter as an administrative expense and in accordance with and subject to the terms of the

Commitment Letter.[4]  Accordingly, on November 19, 2010, the Debtors filed a Motion pursuant to sections 105(a), 363(b), 365(a) and 503(b) of the Bankruptcy Code seeking authority to assume the Commitment Letter and to pay the Commitment Fee and expense reimbursement;  and perform certain indemnification obligations, pursuant to the terms and conditions set forth in the Commitment Letter.  Subsequent to filing the Motion, on December 1, 2010, the Debtors, Whippoorwill and Istithmar amended and restated the Restructuring Support Agreement (which amends and restates the Restructuring Support Agreement entered into on November 14, 2010) and the Commitment Letter, (which amends and restates the Commitment Letter entered into on November 14, 2010) to reflect the inclusion of the Rights Offering provided for in the Plan.  Based upon such amendments, the Debtors filed a Supplement to the Motion on December 3, 2010.

Additionally, the Backstop Parties' obligation to fulfill the Backstop Commitment is subject to a number of conditions set forth in the Commitment Letter, including, without limitation, that:  (a) the Plan shall be in form and substance satisfactory to each Backstop Party in its sole discretion, which shall provide for, among other things, the plan treatment and other terms set forth in the Plan Term Sheet;  (b) definitive documentation, including without limitation the Plan, the documents to be included in the Plan Supplement, documentation related to the Exit Facility, the Disclosure Statement and documentation in connection with the Backstop Commitment, including without limitation, a shareholders agreement, shall have been executed and delivered by the Debtors and each Backstop Party, in form and substance reasonably satisfactory to the Debtors and satisfactory to each Backstop Party (including as to shareholder protections) in its sole discretion, and the conditions precedent contained therein shall have been satisfied or waived in accordance therewith; (c) no Termination Event (as defined in the Commitment Letter) shall have occurred (excluding a Termination Event that has been waived as provided for in the  Commitment Letter); (d) the Debtors shall have entered into definitive documentation with respect to the Exit Facility in form and substance satisfactory to each Backstop Party, in its sole discretion, and the transactions contemplated by such agreement shall be consummated concurrently with the New Investment;  (e) the transactions contemplated by the Forward Purchase Agreement shall have been consummated, and (f) the Exit Facility shall not require any credit support of any of the Backstop Parties.  Additionally, the Commitment Letter provides that the obligation of Istithmar to make the New Investment shall be subject to the satisfaction by the Company or waiver of the conditions that: (a) no draw shall have been made on the Prepetition Letter of Credit (as such term is defined in the Commitment Letter), (b) no draw shall have been made on the DIP Letter of Credit (as such term is defined in the Commitment Letter) and the DIP Letter of Credit shall have been returned to the issuing bank for cancellation undrawn and the Prepetition Letter of Credit shall have been returned to the issuing bank for

---

[4]    In the case of Istithmar, (1) Istithmar's portion of the Commitment Fee shall only be payable to Istithmar in the form of convertible preferred shares on the Effective Date and (2) the expense reimbursement shall be reimbursed only in the event that the transactions contemplated by the Restructuring Plan are consummated or the Commitment Letter is terminated upon (a) the Debtors' uncured material breach;  or (b) (i) the Debtors' submission or support of a competing transaction or (ii) the Bankruptcy Court's entry of an order approving a competing transaction.

cancellation undrawn, and (c) entry into an agreement between Whippoorwill and Istithmar by which Whippoorwill will agree to sell, and Istithmar will agree to purchase, such amount of shares of the New Preferred Stock acquired by Whippoorwill under the Backstop Commitment or on account of the Commitment Fee as is necessary for Istithmar to become the largest shareholder of Reorganized Loehmann's Holdings on a fully diluted basis as of the Effective Date for a purchase price equal to the exercise price under the Rights Offering. Likewise, Whippoorwill's obligations are conditioned upon various conditions precedent, including without limitation, that Class 4 (Class B Notes Claims) has accepted the Plan.

The Commitment Letter requires, among other things, that the order approving it include a provision modifying, to the extent necessary, the automatic stay set forth in section 362 of the Bankruptcy Code to permit the delivery of notice and termination of the Investment Agreement in accordance with its terms. Significantly, the Commitment Letter provides for certain termination events upon notice to the Debtors, including without limitation, termination after breach by the Debtors of any material provisions of the Commitment Letter or Restructuring Support Agreement (provided the Debtors fail to cure such breach within two business days of receipt of notice of such breach) and termination by Istithmar upon written notice to the Debtors and Whippoorwill if Crystal makes any draw on the certain letters of credit. Additionally, there are a number of automatic termination events, including, without limitation, (a) if the Restructuring Support Agreement is terminated in accordance with its terms; (b) if the Bankruptcy Court has not entered the Approval Order on or before thirty (30) days after the Petition Date; (c) if the Plan is modified in a manner that is adverse in any material respect to any Backstop Party or inconsistent in any material respect with the terms set forth in the Commitment Letter or the Restructuring Support Agreement; (d) if the Debtors submit or support a plan of reorganization or liquidation that is adverse in any material respect to any Backstop Party or inconsistent in any material respect with the terms set forth in the Commitment Letter or the Restructuring Support Agreement, including without limitation any plan that contemplates a restructuring, sale or recapitalization that is inconsistent with the Commitment Letter; (e) the Debtors fail to satisfy certain milestones relating to the consummation of the Plan; (f) a Material Adverse Change (as defined in the Commitment Letter) occurs; (g) if the Debtors submit or support a competing transaction ; (h) an event of default occurs under the DIP Facility or (i) the Bankruptcy Court shall have entered an order approving a competing transaction, including, without limitation, any sale of substantially all of the Debtors' assets required by the DIP Facility.

The Restructuring Support Agreement[5] requires, among other things, that the Debtors restructure pursuant to the terms and conditions of a term sheet annexed to the Restructuring Support Agreement, which sets forth the essential terms for the Plan. Additionally, pursuant to the Restructuring Support Agreement, the Supporting Secured Noteholders have agreed, among other things, to vote in favor of the Plan and to exchange their Notes for New Common Stock. The Restructuring Support Agreement includes certain conditions to each party's obligations, including, without

---

[5] A true and correct copy of the Restructuring Support Agreement is annexed to this Disclosure Statement as Exhibit D.

limitation, that the Forward Purchase Agreement summarized above in Article I.C.3 be in full force in effect (unless and until consummated). The Restructuring Support Agreement also provides for certain termination events, including, without limitation, the Debtors' breach of any of their material obligations under the Restructuring Supporting Agreement, failure to diligently prosecute confirmation of the Plan or announcement that they intend to pursue a chapter 11 plan or other financial restructuring that differs in any material respect from the Restructuring Support Agreement and Commitment Letter[6] (not including the filing of a motion in form and substance acceptable to the Backstop Parties for the sale of substantially all of the Debtors' assets, as required by the DIP Facility); a breach by any Supporting Secured Noteholder or Istithmar of their material obligations under the Restructuring Support Agreement or Commitment Letter; termination of the Commitment Letter; dismissal or conversion to chapter 7 of the Chapter 11 Cases or the appointment of a chapter 11 trustee, responsible officer or examiner in the Chapter 11 Cases; a declaration by any court that the Restructuring Agreement is unenforceable; entry of an order by the Bankruptcy Court denying confirmation (which order has not been reversed or vacated within fourteen (14) days after entry); the Confirmation Order having been stayed, reversed, vacated or otherwise modified in a manner adverse to the Supporting Secured Noteholders or Istithmar; entry of an order by the Bankruptcy Court invalidating, equitably subordinating or limiting in any respect, the Secured Note Claims; the Effective Date having not occurred by March 15, 2010; and each party's agreement in writing to terminate the Restructuring Support Agreement.

The Bankruptcy Court entered a Final Order approving the Motion, as supplemented, on December 15, 2010 [Docket No. 187].

l. **Motion to Approve Rejection of Certain Nonresidential Real Property Leases** *Nunc Pro Tunc* **to Petition Date or Date of Surrender [Docket No. 88]**

On November 19, 2010, the debtors filed a motion pursuant to section 365 and Rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure authorizing the Debtors to reject certain unexpired leases for under performing stores that had been recently been closed so as not to incur any additional post-petition administrative expenses for the rents or other charges owed under certain leases. The Bankruptcy Court entered an Order approving this motion on December 6, 2010. [Docket No. 131].

B. **EXCLUSIVITY**

Under the Bankruptcy Code, a debtor has the exclusive right to file a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (which may be extended by the Court for a period of up

---

[6] Notably, the Restructuring Support Agreement permits the Debtors to pursue, propose, support or encourage an alternative chapter 11 plan or other financial restructuring to the extent that the Company believes in good faith and after consultation with outside legal counsel that the failure to do so would be inconsistent with its fiduciary duties under applicable law.

to 18 months from the petition date).  If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan (which may be extended by the Court for a period of up to 20 months from the petition date).  During the Debtors' exclusive periods, no other party in interest may file a competing plan of reorganization, however, a court may terminate the Debtors' exclusive periods upon request of a party in interest and "for cause."  The Debtors filed the Plan and Disclosure Statement within the initial exclusivity period.

## V.    SUMMARY OF THE ~~FIRST~~SECOND AMENDED JOINT PLAN

**This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).**

**The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.**

**The Plan itself and the documents therein control the actual treatment of Claims against, and Interests in, the Company under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Plan and other parties in interest.  In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.**

## A.    ADMINISTRATIVE, DIP FACILITY AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1.    Administrative Claims

Subject to the provisions of sections 327, 330(a) and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or

as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided that, Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in Cash in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided, further, that Allowed Administrative Claims do not include Claims filed after the Administrative Claims Bar Date, which shall be the date that is 30 calendar days after the Effective Date (except as otherwise provided by a separate order of the Bankruptcy Court). For the avoidance of doubt, any fees, costs and expenses of the Backstop Parties and the Backstop Party Professionals and any Backstop Indemnification Obligations shall be payable by the Debtors or Reorganized Debtors, as applicable, in accordance with the terms of the Commitment Letter and the Restructuring Support Agreement, in all cases without the need for any application to, or approval by, the Bankruptcy Court, whether pursuant to a professional fee application, an application for payment of an Administrative Expense Claim or otherwise. Notwithstanding the foregoing and in accordance with the Approval Order, any Backstop Party seeking reimbursement of attorneys' fees shall deliver copies of fee and expense invoices to the Office of the United States Trustee and the Committee at the same time such invoices are forwarded to the Debtors, and the Debtors shall promptly reimburse the applicable Backstop Party within ten (10) business days (if no written objection is received within such ten (10) business-day period) after such professional has delivered a summary invoice describing such fees and expenses. The Court shall have jurisdiction to determine any dispute concerning the reasonableness of such invoices, however, that the Debtors shall be required to timely pay the undisputed amount of the invoice.

**2.      DIP Facility Claims**

Notwithstanding anything to the contrary herein or in the Plan, and subject to the terms of the DIP Facility, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all DIP Facility Claims, on the Effective Date, the DIP Facility Claims shall be satisfied from the proceeds of the Exit Facility or otherwise be paid off in full and in Cash.

**3.      Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for release of each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive on account of such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, regular installment payments in Cash over a period ending not later than five years after the Petition Date of a total value, as of the Effective Date, equal to the Allowed amount of such Claim, which total value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable non-bankruptcy law pursuant to section 511 of the Bankruptcy Code.

On the Effective Date, the Liens securing any Allowed Secured Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

## B.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 1.  Classification of Claims

The Plan provides for the limited substantive consolidation of the Debtors' Estates solely for Plan purposes, including voting, Confirmation and distributions.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is classified in a particular Class only to the extent that any such Claim or Interest is an Allowed Claim in that Class and has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

**Summary of Classification and Treatment of Claims and Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Class A Note Claims | Impaired | Entitled to Vote |
| 4 | Class B Note Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Equity Interests in Loehmann's Holdings Inc. | Impaired | Deemed to Reject |
| 7 | Intercompany Claims | Unimpaired | Deemed to Accept |

### 2.  Treatment of Claims and Interests

#### a.  Class 1—Other Priority Claims

(1)  *Classification:*  Class 1 consists of all Other Priority Claims that may exist against the Debtors.

(2)  *Treatment*:  Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Priority Claim, *each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on the later of the Effective Date or the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or*

*as soon as reasonably practicable thereafter*; <u>provided</u>, <u>that</u>, subject to Bankruptcy Court approval, priority wage claims against the Debtors may be paid in full in the ordinary course of business.

(3) *Voting*:  Class 1 is Unimpaired, and Holders of Class 1 Other Priority Claims are conclusively presumed to have Accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

b.    **Class 2—Other Secured Claims**

(1) *Classification*:  Class 2 consists of all Other Secured Claims that may exist against the Debtors.

(2) *Treatment*:  Except to the extent that a Holder of an Other Secured Claim against the Debtors agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Secured Claim, *each Holder of an Allowed Other Secured Claim, at the option of the Debtors, with the consent of the Backstop Parties shall (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim, plus post-petition interest to the extent required under section 506(b) of the Bankruptcy Code, or (iii) receive other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code,* in each case on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter.

(3) *Voting*:  Class 2 is Unimpaired, and Holders of Class 2 Other Secured Claims are conclusively presumed to have Accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

c.    **Class 3—Class A Notes Claims**

(1) *Classification*:  Class 3 consists of Class A Notes Claims against the Debtors, which shall be Allowed in the aggregate amount of $75,000,000 plus accrued and unpaid interest as of the Petition Date.

(2) *Treatment*:  In exchange for full and final satisfaction, settlement, release and discharge of each Class A Notes Claim, on the Effective Date, *each Holder of a Class A Notes Claim shall receive its Pro Rata share of:  (a)  the Class A Notes*

*Claims Distribution; and (b) provided such Holder of a Class A Notes Claim is an Eligible Holder, the Class A Rights, <u>provided however</u>, that such Class A Rights shall only be exercisable by Eligible Holders that vote to accept the Plan. For the avoidance of doubt, the treatment <u>provided</u>, <u>herein</u>, shall also be in full satisfaction of: (i) any Claim, Lien, right or interest that a holder of a Class A Notes Claim may have arising under, related to, or in connection with, any of the Related Agreements; and (ii) any Claim, Lien, right or interest that the Indenture Trustee may have arising under, related to, or in connection with any of the Related Agreements for the benefit of any holder of a Class A Notes Claim <u>(but excluding the Indenture Trustee's charging lien under the Indenture upon holder distributions)</u>.*

(3)    *Voting*: Class 3 is Impaired and Holders of Class 3 Class A Notes Claims are entitled to vote to accept or reject the Plan.

### d.    Class 4—Class B Notes Claims

(1)    *Classification*: Class 4 consists of Class B Notes Claims against the Debtors, which shall be Allowed in the aggregate amount of $35,000,000 plus accrued and unpaid interest as of the Petition Date.

(2)    *Treatment*: If Class 4 votes to accept the Plan, each Holder of an Allowed Class B Notes Claim shall receive in full and final satisfaction, settlement, release and discharge of each Class B Notes Claim, on the Effective Date, *its Pro Rata share of the Class B Notes Claims Distribution. If Class 4 does not vote to Accept the Plan, Holders of Allowed Class B Notes Claims shall not receive any distributions under the Plan. For the avoidance of doubt, the treatment <u>provided</u>, <u>herein</u>, shall also be in full satisfaction of: (i) any Claim, Lien, right or interest that a holder of a Class B Notes Claim may have arising under, related to, or in connection with, any of the Related Agreements; and (ii) any Claim, Lien, right or interest that the Indenture Trustee may have arising under, related to, or in connection with* ~~*any of the Related Agreements; and (ii) any Claim, Lien, right or interest that the Indenture Trustee may have arising under, related to, or in connection with*~~ *any of the Related Agreements for the benefit of any holder of a Class B Notes Claim <u>(but excluding the Indenture Trustee's charging lien under the Indenture upon holder distributions)</u>. The distributions provided to Holders of Allowed Class B Notes Claims shall be funded solely from the distributions otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Allowed Class A Notes Claims.*

(3)    *Voting*: Class 4 is Impaired and Holders of Class 4 Class B Notes Claims are entitled to vote to accept or reject the Plan.

e. **Class 5—General Unsecured Claims**

(1) *Classification*:  Class 5 consists of General Unsecured Claims that may exist against the Debtors.

(2) *Treatment*:  If Class 5 votes to accept the Plan, each Holder of an Allowed General Unsecured Claim shall receive in exchange for full and final satisfaction, settlement, release and discharge of each General Unsecured Claim, on the Effective Date, its *Pro Rata* share of the General Unsecured Claims Distribution payable from the General Unsecured Claims Distribution Escrow Account.  Holder of Allowed General Unsecured Claims who received any payment from the Debtors during the Chapter 11 Cases pursuant to any order of the Bankruptcy Court shall not be excluded from receiving distributions under the Plan on account of such Claims unless such Claims were fully satisfied by any prior payments from the Debtors, provided however, that distributions on account of such Claims shall be made only to the extent such Claims were not previously satisfied.  The Debtors reserve all rights to challenge the legal basis and amount of any asserted General Unsecured Claim, and each such Holder reserves all rights and defenses with respect to any such challenge.  *If Class 5 does not vote to Accept the Plan, Holders of Allowed General Unsecured Claims shall not receive any distributions under the Plan.  The distributions provided to Holders of Allowed General Unsecured Claims shall be funded solely from the distributions otherwise payable, or otherwise directly or indirectly available, under the Plan to Holders of Allowed Class A Notes Claims.*

(3) *Voting*: Class 5 is Impaired, and Holders of Class 5 General Unsecured Claims are entitled to vote to accept or reject the Plan.

f. **Class 6—Equity Interests in Loehmann's Holdings Inc.**

(1) *Classification*:  Class 6 consists of all Equity Interests in Loehmann's Holdings Inc.

(2) *Treatment*:  *Holders of Equity Interests in Loehmann's Holdings Inc. will not receive any distribution on account of such Interests*, and Equity Interests in Loehmann's Holdings Inc. shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(3) *Voting*:  Class 6 is Impaired, and Holders of Class 6 Equity Interests in Loehmann's Holdings Inc. are not entitled to receive or retain any property under the Plan on account of

Equity Interests in Loehmann's Holdings Inc.  Therefore, Holders of Class 6 Equity Interests in Loehmann's Holdings Inc. are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and Holders of Class 6 Equity Interests in Loehmann's Holdings Inc. are not entitled to vote to accept or reject the Plan.

g.      **Class 7—Intercompany Claims**

(1)      *Classification*:  Class 7 consists of all Intercompany Claims.

(2)      *Treatment*: Holders of Intercompany Claims will not receive any distribution on account of such Claims;  provided, that, the Debtors or, after the Effective Date, the Reorganized Debtors reserve the right to reinstate any or all Intercompany Claims (other than any Claims related to the CapCo Lease or related transactions) on or after the Effective Date.

(3)      *Voting*: Class 7 is Unimpaired, and Holders of Class 7 Intercompany Claims are conclusively presumed to have Accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 7 Intercompany Claims are not entitled to vote to accept or reject the Plan.

**3.      Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**4.      Acceptance or Rejection of the Plan**

a.      *Presumed Acceptance of Plan*:  Classes 1, 2, and 7 are Unimpaired under the Plan and are, therefore, presumed to have Accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Classes are not entitled to vote on the Plan and the vote of such Holders of Claims shall not be solicited.

b.      *Voting Classes:*  Each Holder of an Allowed Claim in each of Classes 3, 4 and 5 shall be entitled to vote to accept or reject the Plan.

c.      *Presumed Rejection of the Plan*:  Class 6 is Impaired and Holders of Class 6 Interests shall receive no distributions under the Plan on account of their Interests and are therefore, presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy

Code. Therefore, Holders of Class 6 Interests are not entitled to vote on the Plan and the vote of such Holders shall not be solicited.

d.    *Acceptance by Non-Voting Classes:*

(i)    Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

(ii)    If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated pursuant to Article III.D.4 (a)) of the Plan, such Class shall be deemed to have voted to Accept the Plan.

e.    *Controversy Concerning Impairment:* If a controversy arises as to whether any Claims, or any Class of Claims, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**5.    Nonconsensual Confirmation**

Except as otherwise specifically provided in the Plan, if any Impaired Class shall not Accept the Plan by the requisite statutory majority provided in section 1126 of the Bankruptcy Code, the Debtors reserve the right to amend the Plan (subject to the Restructuring Support Agreement, the Commitment Letter and conditions to the Effective Date set forth below) or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.

**C.    MEANS FOR IMPLEMENTATION OF THE PLAN**

**1.    Limited Substantive Consolidation**

Article IV.A of the Plan provides for the limited substantive consolidation of the Debtors' Estates, but solely for purposes of the Plan, including voting on the Plan by Holders of Claims, making distributions to Holders of Claims in such Class under the Plan and Confirmation. The Debtors and the Backstop Parties reserve all rights with respect to the substantive consolidation of the Debtors.

On the Effective Date, (i) all assets and liabilities of the Debtors will, solely for voting and distribution purposes, be treated as if they were merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (iii) any Claims Filed or to be Filed in the Chapter 11 Cases will be deemed

single Claims against all of the Debtors, (iv) all transfers, disbursements and distributions to Claims made by any Debtor under the Plan will be deemed to be made by all of the Debtors, and (v) any obligation of the Debtors as to Claims will be deemed to be one obligation of all of the Debtors. Holders of Allowed Claims shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim. Except as set forth in Article IV.A of the Plan, such limited substantive consolidation shall not (other than for purposes related to the Plan) (w) affect the legal and corporate structures of the Debtors or the Reorganized Debtors, subject to the right of the Debtors or Reorganized Entities to effect the Restructuring Transactions contemplated by the Plan, (x) cause any Debtor to be liable for any Claim or Equity Interest under the Plan for which it otherwise is not liable, and the liability of any Debtor for any such Claim or Equity Interest shall not be affected by such limited substantive consolidation, (y) except as otherwise stated in the Plan, affect Intercompany Claims of Debtors against Debtors and (z) affect Equity Interests in the Debtors' non-debtor Affiliates except as otherwise may be required in connection with the Restructuring Transactions contemplated by the Plan.

Unless the Bankruptcy Court has approved by a prior order the limited substantive consolidation of the Debtors solely for purposes of the Plan, the Plan shall serve as, and shall be deemed to be, a request for entry of an order substantively consolidating the Debtors' Estates, but solely for purposes of the Plan, including voting on the Plan, making distributions to Holders of Claims under the Plan and Confirmation. If no objection to the limited substantive consolidation of the Debtors' Estates is timely Filed and served by any Holder of an Impaired Claim affected by the Plan as provided herein on or before the Voting Deadline or such other date as may be established by the Bankruptcy Court, the Confirmation Order shall serve as the order approving the limited substantive consolidation of the Debtors' Estates, but solely for purposes of the Plan, including voting on the Plan, making distributions to Holders of Claims under the Plan and Confirmation. Any objections with respect to the limited substantive consolidation of the Debtors' Estates, solely for purposes of voting on the Plan and making distributions to Holders of Claims under the Plan, that are timely Filed and served shall be heard at the Confirmation Hearing.

### 2. The Rights Offering and Backstop Commitment

Pursuant to the Rights Offering, Loehmann's Holdings Inc. will offer and sell, for the Rights Offering Amount, the New Convertible Preferred Stock to the Eligible Holders that vote to accept the Plan subject to the terms and conditions of the Commitment Letter and the Rights Offering Procedures (or, to the extent the Rights Offering is not subscribed, to the Backstop Parties as described below). Eligible Holders that vote to accept the Plan will be entitled to exercise the Class A Rights in order to subscribe for and acquire their *Pro Rata* share of the New Convertible Preferred Stock, subject to the Commitment Letter and in accordance with the terms of the Rights Offering Procedures annexed hereto as Exhibit "H." In order to facilitate the Rights Offering and implementation of the Plan, the Backstop Parties have agreed to acquire any Unsubscribed Shares in accordance with and subject to the terms and conditions of the Commitment Letter. On the Effective Date: (i) the Reorganized Debtors will reimburse or pay any outstanding fees, costs and expenses that have not theretofor been paid of the Backstop Parties and the Backstop Party Professionals

relating to the Backstop Commitment and as provided for in the Commitment Letter, and (ii) the Backstop Parties will receive the Commitment Fee and be entitled to the Backstop Indemnification Obligations. For the avoidance of doubt, any fees, costs and expenses of the Backstop Parties and the Backstop Party Professionals and any Backstop Indemnification Obligations shall be payable by the Debtors or Reorganized Debtors, as applicable, in accordance with the terms of the Commitment Letter and Restructuring Support Agreement, in all cases without the need for any application to, or approval by, the Bankruptcy Court, whether pursuant to a professional fee application, an application for payment of an Administrative Expense Claim or otherwise. Notwithstanding the foregoing and in accordance with the Approval Order, any Backstop Party seeking reimbursement of attorneys' fees shall deliver copies of fee and expense invoices to the Office of the United States Trustee and the Committee at the same time such invoices are forwarded to the Debtors, and the Debtors shall promptly reimburse the applicable Backstop Party within ten (10) business days (if no written objection is received within such ten (10) business-day period) after such professional has delivered a summary invoice describing such fees and expenses. The Court shall have jurisdiction to determine any dispute concerning the reasonableness of such invoices, however, that the Debtors shall be required to timely pay the undisputed amount of the invoice.

The chart annexed to the Disclosure Statement as Exhibit "I" describes the anticipated equity ownership of Reorganized Loehmann's Holdings Inc. immediately upon the occurrence of the Effective Date of the Plan assuming that the Rights Offering is fully subscribed and, alternatively, assuming that the Rights Offering is fully unsubscribed.

### 3. Corporate Existence

Except as otherwise provided in the Plan, each Debtor other than CapCo and Holdings shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval. In addition, except as provided in the Plan, the Debtors' corporate structure in existence on the Petition Date shall continue in existence on and after the Effective Date. Pursuant to Article IV. C of the Plan, on the Effective Date, CapCo and Holdings shall be merged into Reorganized Loehmann's Operating Co. and all obligations between CapCo, Holdings and the other Debtors shall be extinguished, each without the need for any further corporate or shareholder action.

### 4. Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, the Confirmation Order or any agreement, instrument, or other document incorporated in the Plan, on the Effective

Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan and the Confirmation Order each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Debtor Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 5. Indemnification Provisions in Organizational Documents

As of the Effective Date, each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, directors, officers, employees or agents who were directors, officers, employees or agents of such Debtor, at any time prior to the Effective Date at least to the same extent as the bylaws of each of the respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors' or officers' rights, provided, however, that the Reorganized Debtors shall not indemnify claims resulting from gross negligence, willful misconduct or intentional fraud.

### 6. Cancellation of Agreements, Old Notes and Equity Interests

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates, and other documents evidencing the Notes and Equity Interests in Loehmann's Holdings Inc. shall be canceled and of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. On the Effective Date, except to the extent otherwise provided in the Plan, herein, any indenture relating to any of the foregoing shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be discharged; provided, that, the Notes and the Indenture shall continue in effect solely to (a) allow Holders of the Secured Note Claims to receive distributions provided for under hereunder (which shall be made through the Indenture Trustee or the Plan; Distribution Agent selected by the Debtors with the consent of the Indenture Trustee); (b) preserve the right of the Indenture Trustee to the reimbursement of the Indenture Trustee's Fees; and the Indenture Trustee's charging lien on distributions; and (c) preserve the Indenture Trustee's right to indemnification from the Debtors pursuant to the terms of the Indentures. Notwithstanding the foregoingFor the avoidance of doubt, the charging liens held by the Indenture Trustee against distributions to holders of Notes shall be deemed released only upon full payment of the Indenture Trustee's Fees.

Any unpaid Indenture Trustee's Fees, shall be paid in full in Cash on the Effective Date; provided, that the Indenture Trustee (or its professionals) shall deliver

copies of any fee and expense invoices to the Committee at the same time such invoices are forwarded to the Debtors, and the Debtors shall promptly pay such Indenture Trustee's Fees on the later of the Effective Date or within ten (10) business days (if no written objection is received within such ten (10) business-day period) after delivery of a summary invoice describing such Indenture Trustee's Fees. ~~The Court shall have jurisdiction to determine any dispute concerning the reasonableness of such invoices, however, that the Debtors shall be required to timely pay the undisputed amount of the invoice.~~

7.     **Reorganized Company Equity Interests**

Reorganized Loehmann's Holdings Inc.'s equity interests shall consist of New Common Stock and New Preferred Stock. On the Effective Date, the Reorganized Debtors shall issue the New Common Stock and New Preferred Stock pursuant to the terms of the Plan and the Amended and Restated Certificate of Incorporation, without need for any further corporate or shareholder action.

a.     <u>New Common Stock</u>. Shares of New Common Stock shall be issued to (a) Holders of Allowed Secured Note Claims, (b) the New Money Investors and/or the Backstop Parties, to the extent such parties elect to convert their shares of New Preferred Stock to New Common Stock, and (c) holders of any equity-based awards consisting of shares of new common stock in an amount of up to 10.0% of the fully diluted shares of New Common Stock issued under the Management Incentive Plan.

b.     <u>New Preferred Stock</u>. (i) the New Convertible Preferred Stock shall be issued to the New Money Investors and/or the Backstop Parties, as applicable, by Reorganized Loehmann's Holdings, Inc. pursuant to the Rights Offering, and (ii) the Commitment Fee Preferred Stock shall be issued to the Backstop Parties on account of the Commitment Fee. The New Preferred Stock shall: (i) pay cumulative Cash dividends at the rate of 2% per annum; and (ii) be convertible into 2,548,324 of the fully diluted shares of New Common Stock (excluding any shares of New Common Stock to be distributed under the Management Incentive Plan) in the aggregate.

c.     <u>Exemption from Securities Laws</u>. To the extent that the New Common Stock and New Preferred Stock constitute "securities," as defined in section 2(a)(1) of the Securities Act, the issuance of the New Common Stock and the New Preferred Stock shall be, and shall be deemed, to the maximum extent provided in section 1145 of the Bankruptcy Code, Section 4(2) of the Securities Act and under applicable nonbankruptcy law, to be exempt from registration under any applicable federal or state securities laws, including under the Securities Act, and all rules and regulations promulgated thereunder, and the Reorganized Debtors will not be subject to the reporting requirements of the Exchange Act. The

New Common Stock and New Preferred Stock issued pursuant to the Plan shall be fully paid and non-assessable.

## 8. Exit Financing

On the Effective Date, the Reorganized Debtors will consummate the Exit Facility. In accordance with the Exit Financing Agreement, the Reorganized Debtors will use proceeds of the Exit Financing Agreement to pay or refinance the DIP Facility Claims. From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

## 9. Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan (the "Restructuring Transactions"), including, without limitation: (1) merger of Holdings and CapCo into Reorganized Loehmann's Operating Co.; (2) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law in all respects, and are acceptable to the Backstop Parties; (3) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the Plan and acceptable the Backstop Parties; (4) the filing of appropriate certificates of incorporation, merger or consolidation with the appropriate governmental authorities pursuant to applicable law, which are, in all circumstances, acceptable to the Backstop Parties; and (5) all other actions that the Reorganized Debtors, with the consent of the Backstop Parties, determine are necessary or appropriate, including, without limitation, the Rights Offering.

## 10. Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate, financing or related actions to be taken by or required of the Reorganized Debtors (including the Restructuring Transactions) shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further corporate or shareholder action. Without limiting the foregoing, such actions will include the merger of Reorganized CapCo and Reorganized Holdings into Reorganized Loehmann's Operating Co.; the adoption and (as applicable) filing of the Amended and Restated Certificate of Incorporation, the Amended and Restated Bylaws; the adoption of the New Shareholders' Agreement; the appointment of officers and (as applicable) directors for the Reorganized Debtors; the issuance of the New Preferred Stock and, the New Common Stock, the execution and delivery of the Exit Facility (as applicable), and all related documents and instruments (as applicable).

11.    **Post-Effective Date Governance**

The Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.  Without limiting the generality of the foregoing, as of the Effective Date, Reorganized Loehmann's Holdings Inc. shall be governed by the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws.

12.    **Effectuating Documents; Further Transactions**

Pursuant to Article IV.L of the Plan, each of the Debtors and the Reorganized Debtors shall be authorized to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements and/or documents and take such acts and actions as may be reasonable, necessary or appropriate to effectuate, implement, consummate and/or further evidence the terms and conditions of the Plan, any notes or securities issued pursuant to the Plan, and any transactions described in or contemplated by the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

13.    **Authority to Act**

Prior to, on or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the stockholders, security holders, officers, directors, partners, managers, members or other owners of one or more of the Debtors or the Reorganized Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable law of the states or jurisdictions in which the Debtors or the members of the Reorganized Debtors are formed, without any requirement of further vote, consent, approval, authorization or other action by such stockholders, security holders, officers, directors, partners, managers, members or other owners of such entities or notice to, order of, or hearing before, the Bankruptcy Court.

14.    **Exemption from Certain Transfer Taxes and Recording Fees**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, Securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any

transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, applicable Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 15. Board Representation

The New Board shall consist of Reorganized Loehmann's Holdings Inc.'s Chief Executive Officer and six (6) other directors, comprised of (i) two (2) directors appointed by Istithmar; (ii) two directors appointed by Whippoorwill; and (iii) two (2) independent directors with management experience in the retail industry who shall be mutually acceptable to Istithmar and Whippoorwill, in consultation with the Committee, provided however, that the Committee shall not have veto rights or consent rights with respect to the appointment of such independent directors. One (1) of such independent directors, as shall be jointly approved by Istithmar and Whippoorwill, shall serve as Chairman of the New Board. The Plan Supplement will list the members of the New Board identified as of the date of the filing thereof; New Board members identified thereafter and prior to the start of the Confirmation Hearing will be identified at the Confirmation Hearing. Subject to the Amended and Restated Bylaws relating to the filling of vacancies, if any, on the New Board, the members of the New Board as constituted on the Effective Date will continue to serve at least until the first annual meeting of stockholders after the Effective Date. Starting at such first annual meeting of stockholders, the board of directors of Reorganized Loehmann's Holdings Inc. shall be elected pursuant to the terms of the Amended and Restated Bylaws and the New Shareholders' Agreement.

### 16. Senior Management

The senior management of the Reorganized Debtors shall be individuals acceptable to each Backstop Party, as designated in the Plan Supplement. The Reorganized Debtors' senior management shall serve in accordance with any employment agreement, policies or other arrangements as are acceptable to each Backstop Party and the Reorganized Debtors and applicable nonbankruptcy law.

### 17. New Shareholders' Agreement

Upon the Effective Date and as a condition to receiving their New Common Stock and New Preferred Stock, all holders of New Common Stock and New Preferred Stock shall be bound by and deemed to have entered into the New Shareholders' Agreement. The terms of the New Shareholders' Agreement are described below in Article VI "Governance of Reorganized Debtors."

### 18. Management Incentive Plan

Upon the Debtors' emergence from Chapter 11, certain of the Debtors' management shall be entitled to participate in a Management Incentive Plan to be approved by the New Board pursuant to which shares of new common stock in the amount of up to 10.0% of the fully diluted shares of the New Common Stock may be issued to the management of the Reorganized Debtors. Any Management Incentive Plan would be a post-bankruptcy incentive plan and would provide no awards for actions taken by any of the Debtors' employees during the Chapter 11 Cases. Awards under any Management Incentive Plan will vest over time and will not be fully earned upon the Effective Date. Further, granting of any future awards under any Management Incentive Plan will be at the discretion of the New Board. Subject to the approval of the New Board, Reorganized Loehmann's Holdings, Inc. shall adopt the Management Incentive Plan on or after the Effective Date.

### 19. Preservation of Rights of Action

Except for the actions released by the Debtors pursuant to Article IX.E of the Plan described below and Avoidance Actions arising solely under section 547 of the Bankruptcy Code, and in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Debtor Causes of Action, whether arising before or after the Petition Date, including, but not limited to, any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Debtor Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Debtor Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.** Unless any Debtor Causes of Action against a Person are expressly waived with the consent of the Backstop Parties, relinquished, exculpated, released, compromised or settled in the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Debtor Causes of Action (other than Avoidance Actions arising solely under section 547 of the Bankruptcy Code), for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Debtor Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

Further, except for the actions released by the Debtors pursuant to Article IX.E of the Plan and Avoidance Actions arising solely under section 547 of the Bankruptcy Code, the Reorganized Debtors reserve and shall retain the foregoing Debtor Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Debtor Causes of Action that a Debtor may hold against any Person shall vest in the applicable Reorganized Debtor (or in the case of Reorganized CapCo and Reorganized Holdings, in Reorganized

Loehmann's Operating Co.), as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Debtor Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Debtor Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party. Notwithstanding anything in the Plan or herein to the contrary, as additional consideration to Holders of Claims under the Plan, as of the Effective Date, the Debtors waive the right to pursue Avoidance Actions arising solely under section 547 of the Bankruptcy Code.

## D.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.      Assumption and Rejection of Executory Contracts and Unexpired Leases

**Subject to the provisions herein and in the Plan, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) is identified on the Rejected Executory Contracts and Unexpired Lease Schedule, which such list shall be included in the Plan Supplement; (3) is the subject of a separate motion or notice to reject filed by the Debtors on or before the filing of the Rejected Executory Contracts and Unexpired Lease Schedule; or (4) previously expired or terminated pursuant to its own terms.**

Except as expressly provided otherwise, the Plan shall give effect to any subordination rights as required by section 510(a) of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of such Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date. Each such Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party prior to the Effective Date, shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court. To the extent any provision in any Executory Contract and/or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the applicable Debtor or Reorganized Debtor's assumption or assignment of such assumed contract, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto. Further, any provisions in any Executory Contract or Unexpired Lease or under non-bankruptcy law providing for the termination or modification of any Executory Contract or Unexpired Lease by reason of the commencement of the Chapter 11 Cases,

the financial condition of any of the Debtors or the assignment of any Executory Contract or Unexpired Lease shall be unenforceable pursuant to Sections 365(e) and (f) and 541(c) of the Bankruptcy Code.  Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the Rejected Executory Contract and Unexpired Lease Schedule prior to the Confirmation Date with the consent of each Backstop Party.

**2.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any provisions or terms of the Debtors' Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure or by an agreed-upon waiver of Cure.  As part of the Plan Supplement, the Debtors shall File an Assumed Executory Contract and Unexpired Lease Schedule, which Schedule shall identify the Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan and shall include any amounts of Cure to be paid in connection therewith.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be Filed, served and actually received by the Debtors at least seven days before the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented to such assumption or Cure amount.  The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If any counterparty to an Executory Contract of Unexpired Lease objects to any Cure amount or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the applicable Debtor or Reorganized Debtor, and the counterparty to the Executory Contract or Unexpired Lease.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have assented to, and will forever be barred from contesting, such assumption or Cure amount. The Debtors or Reorganized Debtors, as applicable, reserve the right, either to reject or nullify the assumption of any Executory Contract or Unexpired Lease no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

3. **Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise must be Filed by Holders of such Claims with the Claims, Solicitation and Subscription Agent no later than thirty days after the earlier of (1) the Effective Date or (2) the effective date of rejection for such Holders to be entitled to receive distributions under the Plan on account of such Claims. Any Holder of Claims filing a Proof of Claim arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases that does not timely File such Proof of Claim shall not (a) be treated as a creditor with respect to such Claim, (b) be permitted to vote to accept or reject the Plan or (c) participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

4. **Assumption of Directors and Officers Insurance Policies**

As of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' unexpired directors' and officers' liability insurance policies and fiduciary policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired directors' and officers' liability insurance policies and fiduciary policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the unexpired directors' and officers' liability insurance policies and fiduciary policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies and fiduciary policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

5. **Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have

thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**6.      Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**7.      Compensation and Benefit Programs**

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

a.      all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Equity Interests in Loehmann's Holdings Inc.;

b.      Compensation and Benefits Programs listed in the Plan Supplement as Executory Contracts to be rejected;

c.      Compensation and Benefits Programs that have previously been rejected; and

d.      Compensation and Benefits Programs that, as of the entry of the Confirmation Order, are the subject of pending rejection procedures or a motion to reject, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

Any assumption of Compensation and Benefits Programs pursuant to Article V.G of the Plan shall be deemed by the Confirmation Order not to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein (unless a Compensation and Benefits Program counterparty timely objects to the assumption contemplated by Article V.G of the Plan, in which case any such Compensation and Benefits Program shall be deemed rejected as of immediately prior to the Petition Date). No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to Article V.G of the Plan other than those applicable immediately prior to such assumption.

Notwithstanding anything to the contrary in Article V.G of the Plan or otherwise, the Reorganized Debtors' obligations, if any, to pay all "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) shall continue.

8.     **Workers' Compensation Programs**

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (1) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (2) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; <u>provided</u>, <u>further</u>, that nothing herein or in the Plan shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

E.     **PROVISIONS GOVERNING DISTRIBUTIONS**

1.     **Distributions on Account of Claims and Interests Allowed As of the Effective Date**

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of Allowed Claims and Interests on or before the Effective Date shall be made in accordance with Articles II, III.B, and IV of the Plan; <u>provided</u>, <u>however</u>, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice; <u>provided</u>, <u>further</u>, that the New Common Stock to be issued under the Plan shall be deemed issued as of the Effective Date regardless of the date on which the New Common Stock is actually dated, authenticated or distributed.

2.     **Distributions on Account of Claims and Interests Allowed After the Effective Date**

a.     <u>Payments and Distributions on Disputed Claims</u>.  Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as soon as reasonably practicable after the Disputed Claim becomes an Allowed Claim; <u>provided</u>, <u>however</u>, that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after

the Effective Date, unless otherwise agreed, shall be paid in accordance with Article II.C of the Plan.

b.　Special Rules for Distributions to Holders of Disputed Claims. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim (except to the extent such Allowed Claim is expressly Allowed pursuant to the Plan) unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claims have been Allowed.

**3.　Delivery of Distributions**

a.　Record Date for Distributions.  On the Effective Date, the Claims Register shall be closed and the Distribution Agent shall be authorized to recognize only those record Holders listed on the Claims Register as of the close of business on the Effective Date. Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded certificate, is transferred twenty or fewer days before the Effective Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

b.　Distribution Agent.  The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims and Interests governed by a separate agreement and administered by a Servicer will be deposited by the Reorganized Debtors with the appropriate Servicer or, with the consent of the Servicer, distributed by the Distribution Agent to Holders of Allowed Claims, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement;  provided, that, distributions to Holders of Secured Note Claims as provided under the Plan shall be made (a) through the Indenture Trustee, which shall in turn make distributions to holders of Allowed Class A Notes Claims and Allowed Class B Notes Claims in accordance with section 6.10 of the Indenture;  or (b) with consent of the Indenture Trustee, through the facilities of the DTC or, if applicable, a Third Party Distribution Agent, provided that DTC or any Third Party Distribution Agent shall make any distributions in accordance with clause (a) above.  Each Distribution Agent will serve without bond

and any Distribution Agent may employ or contract with other Entities to assist in or make the distributions required under the Plan; provided, however, that if any Cash distributions are to be made by any Third Party Distribution Agent, an escrow account or bond shall be established with respect to such Cash distributions. The duties of any Third Party Distribution Agent shall be set forth in the applicable agreement retaining such Third Party Distribution Agent. Distribution Agents, including the Indenture Trustee, shall have no liability for making distributions in accordance with the Plan.

c.  Delivery of Distributions in General.  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Interests shall be made to Holders of record as of the Effective Date by the Distribution Agent or a Servicer, as appropriate: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim or Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Interest is Filed or if the Debtors have been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim or Interest;  or (d) at the addresses reflected in the Schedules if no Proof of Claim or Interest has been Filed and the Distribution Agent has not received a written notice of a change of address.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

d.  Compliance Matters.  In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all

applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

e.   <u>Undeliverable Distributions</u>.  If any distribution to a Holder of an Allowed Claim or Interest is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder as soon as reasonably practicable thereafter.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors and shall not be supplemented with any interest, dividends or other accruals of any kind.

f.   <u>Reversion</u>.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six (6) months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors.  Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, made pursuant to any indenture or Certificate (but only with respect to the distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

g.   <u>Manner of Payment Pursuant to the Plan</u>.  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtors by check or by wire transfer.  Checks issued by the Distribution Agent or applicable Servicer on account of Allowed Claims and Interests shall be null and void if not negotiated within ninety (90) days after issuance, but may be requested to be reissued until the distribution revests in the Reorganized Debtors.

h.   <u>Surrender of Cancelled Instruments or Securities</u>.  On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant

Claim or Interest is governed by an agreement and administered by a Servicer). Such surrendered Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding anything to the contrary herein or in the Plan, this paragraph shall not apply to Certificates evidencing Claims that are rendered Unimpaired under the Plan.

i. <u>No Fractional Shares</u>. There shall be no distribution of fractional shares of New Common Stock or New Preferred Stock. Where a fractional share of New Common Stock or New Preferred Stock would otherwise be called for, the actual issuance shall reflect a rounding down of such fraction.

j. <u>No Postpetition Interest.</u> Postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of any such Claim against the Debtors shall be entitled to payment or distributions on account of interest accruing on or after the Petition Date.

## 4. Claims Paid or Payable by Third Parties

Claims paid by Third Parties. The Claims, Solicitation and Subscription Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the federal judgment rate in effect on the Petition Date on such amount owed for each Business Day after the two weeks grace period specified above until the amount is repaid.

## 5. Allocation Between Principal and Accrued Interest

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claim (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

6. **Minimum Distribution**

Any other provision of the Plan notwithstanding, the Distribution Agent will not be required to make distributions of Cash less than $50 in value or of New Common Stock less than $50 in value, and each such Claim to which this limitation applies shall be discharged pursuant to Article IX.B of the Plan, and its Holder forever barred pursuant to Article IX.I of the Plan from asserting that Claim against the Reorganized Debtors or their property.

7. **General Unsecured Claims Distribution Account**

On or as reasonably practicable after the Effective Date, the Debtors shall establish and fund the General Unsecured Claims Distribution Escrow Account, which shall be an escrow account separate and apart from the Debtors' general operating funds to be maintained in trust for the benefit of Holders of Allowed Class 5 General Unsecured Claims and funded in the amount of $2 million. Cash held in the General Unsecured Claims Escrow Account shall not constitute property of the Debtors or the Reorganized Debtors. Distributions from the General Unsecured Claims Distribution Escrow Account to Holders of Allowed Class 5 General Unsecured Claims shall be made in accordance with the provisions governing distributions set forth in Article VI of the Plan. The General Unsecured Claims Distribution Escrow Account may be an interest-bearing account.

F. **PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS**

1. **Allowance of Claims and Interests**

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim. Prior to and following the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

2. **Claims and Interests Administration Responsibilities**

Except as otherwise specifically provided in the Plan, the Debtors, prior to the Effective Date, and the Reorganized Debtors, after the Effective Date, shall have the sole authority: (1) to File, withdraw or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

### 3. Estimation of Claims and Interests

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

### 4. Disallowance of Claims or Interests

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550 (other than in the case of a transfer avoidance solely pursuant to section 547 of the Bankruptcy Code), or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or an order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims Filed on account of an Indemnification Obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan.

### 5. Preservation of Debtor's Rights and Defenses Pending Allowance of Claims

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim. Except as expressly provided in the Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors will have and shall retain after the Effective Date any and all rights and defenses that the Debtors had with respect to any Claim as of the Petition Date. All Claims of any

Entity subject to section 502(d) of the Bankruptcy Code shall be deemed disallowed as of the Effective Date unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as the case may be.

## G.  CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

### 1.  Conditions Precedent to Confirmation

The following conditions shall have been satisfied or waived pursuant to the provisions of Article VIII.C of the Plan:

a.  the Bankruptcy Court shall have entered an order by January 7, 2011 in form and substance satisfactory to the Backstop Parties approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code

b.  the Plan, the Plan Supplement and all of the schedules, documents, and exhibits contained therein (including, but not limited to, the Exit Financing) shall have been Filed in form and substance acceptable to the Backstop Parties;

c.  the proposed Confirmation Order shall be in form and substance acceptable to the Backstop Parties; and

d.  the Restructuring Support Agreement and the Commitment Letter and shall be in full force and effect and shall not have been terminated.

### 2.  Conditions Precedent to the Effective Date

The following are conditions precedent to the Effective Date that must be satisfied or waived in accordance with Article VIII. C of the Plan:

a.  the Confirmation Order, in form and substance satisfactory to each of the Debtors and the Backstop Parties in their sole discretion, shall have been entered on or before February 7, 2011 and shall be a Final Order;

b.  the Reorganized Debtors shall have entered into the Exit Financing Agreement, in form and substance satisfactory to the Backstop Parties, and such agreement shall be consummated on the Effective Date;  provided, that, in the event the Reorganized Debtors pursue an alternative exit financing facility the DIP Facility shall be repaid in Cash in full on the Effective Date;

c.  the Debtors shall have conducted the Rights Offering consistent with the Plan and the Rights Offering Procedures and shall have

received the proceeds of the Rights Offering and/or the Backstop Commitment, as applicable, on or prior to Effective Date;

d. the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement the Plan and required by law, regulation or order;

e. all actions, documents, certificates, and agreement necessary to implement the Plan shall have been effected and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

f. all fees and expenses of the Backstop Parties, including any outstanding fees and expenses of the Backstop Party Professionals, shall have been paid as required by the Approval Order, the Plan and the Commitment Letter;

g. the New Shareholders' Agreement shall be in full force and effect and binding on all persons receiving New Preferred Stock and/or New Common Stock and the Company pursuant to the Plan;

h. there shall have been no modification or stay of the Confirmation Order or entry of other court order prohibiting transactions contemplated by the Plan from being consummated; and

i. the Effective Date shall have occurred on or prior to February 18, 2011.

### 3. Waiver of Conditions

Unless otherwise specified in the Plan, the conditions set forth in Articles VIII.A and VIII.B of the Plan may be waived, in whole or in part, by the Debtors and each of the Backstop Parties, without notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

### 4. Non-Occurrence of Conditions

If the conditions precedent specified in Article VIII.B of the Plan have not been satisfied or waived, the Debtors may determine, upon notice to the Bankruptcy Court, that the Plan is null and void in all respects, and nothing contained in the Plan, the Confirmation Order or the Disclosure Statement shall: (1) constitute a waiver or release of any Cause of Action or Claim by any party; (2) constitute an admission, acknowledgment, offer or undertaking in any respect by any party, including the Debtors; or (3) otherwise prejudice in any manner the rights of any party, including the Debtors.

## H.    RELEASE, INJUNCTIVE AND RELATED PROVISIONS

**1.**     On the Effective Date, and effective as of the Effective Date, the Plan shall, and shall be deemed to, be binding upon the Debtors and all present and former Holders of Claim against and Equity Interests in any Debtor, and their respective Related Persons, regardless of whether any such Holder of a Claim or Equity Interest has voted or failed to vote to accept or reject the Plan.

### 2.    Discharge of Claims and Termination of Interests

To the fullest extent provided under section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, and Causes of Action (other than Debtor Causes of Action to the extent not released or waived pursuant to the Plan, which shall be preserved) of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action (other than Debtor Causes of Action to the extent not waived or released pursuant to the Plan, which shall be preserved) that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### 3.    Subordination

The classification and manner of satisfying all Claims and Equity Interests under the Plan take into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code or otherwise.  All subordination rights that a Holder of a Claim or Equity Interest may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated and all actions related to the enforcement of such subordination rights will be permanently enjoined.  Accordingly, distributions pursuant to the Plan to Holders of Allowed Claims will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights; provided, however, that nothing contained herein shall preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures and other agreements or documents

delivered under or in connection with the Plan. For the avoidance of doubt, Subordinated Claims shall be disallowed and shall not be entitled to any distribution under the Plan.

4. **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, including, but not limited to, distributions to holders of Allowed Class B Notes Claims and Allowed General Unsecured Claims, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. After the Effective Date, the Reorganized Debtors may and shall have the exclusive right to, compromise and settle any Claims against them and Causes of Action against other Person or Entity without Notice to or approval from the Bankruptcy Court, including, without limitation, any and all derivative actions pending or otherwise existing against the Debtors as of the Effective Date.

5. **Debtor Release**

**AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE DEBTORS AND ANY PERSON SEEKING TO EXERCISE THE RIGHTS OF THE DEBTORS' ESTATES, INCLUDING, WITHOUT LIMITATION, ANY SUCCESSOR TO THE DEBTORS OR ANY ESTATE REPRESENTATIVE APPOINTED OR SELECTED PURSUANT TO SECTION 1123(B)(3) OF THE BANKRUPTCY CODE, SHALL BE DEEMED TO UNCONDITIONALLY AND FOREVER RELEASE, WAIVE AND DISCHARGE ALL DEBTOR CAUSES OF ACTION AGAINST EACH OF THE RELEASED PARTIES IN CONNECTION WITH OR RELATED TO THE DEBTORS, THE REORGANIZED DEBTORS, THE CHAPTER 11 CASES, THE PLAN (OTHER THAN THE RIGHTS OF THE DEBTORS TO ENFORCE THE PLAN AND THE CONTRACTS, RELEASES, INDENTURES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER), THE EXCHANGE OFFER, THE COMMITMENT LETTER (OTHER THAN THE RIGHTS OF THE DEBTORS TO ENFORCE THE PLAN AND THE CONTRACTS, RELEASES, INDENTURES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER) OR THE RESTRUCTURING SUPPORT AGREEMENT (OTHER THAN THE RIGHTS OF THE DEBTORS TO ENFORCE THE PLAN AND THE CONTRACTS, RELEASES, INDENTURES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER) THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE REORGANIZED DEBTORS, THE CHAPTER 11 CASES, THE**

PLAN, THE COMMITMENT LETTER OR THE RESTRUCTURING SUPPORT AGREEMENT, AND THAT MAY BE ASSERTED BY THE DEBTORS IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF THE DEBTORS OR THEIR ESTATES, IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON; PROVIDED THAT THE FOREGOING SHALL NOT OPERATE AS A WAIVER OR RELEASE FROM ANY DEBTOR CAUSES OF ACTION ARISING OUT OF THE ACTS OR OMISSIONS CONSTITUTING ACTUAL OR INTENTIONAL FRAUD, GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR CRIMINAL CONDUCT AS DETERMINED BY A FINAL ORDER ENTERED BY A COURT OF COMPETENT JURISDICTION.

6.         **Release by Holders of Claims**

AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH HOLDER OF A CLAIM AGAINST THE DEBTORS (INCLUDING ANY HOLDER OF A SECURED NOTE CLAIM) THAT VOTES TO ACCEPT THE PLAN AND EACH HOLDER OF A CLAIM AGAINST THE DEBTORS (INCLUDING ANY HOLDER OF A SECURED NOTE CLAIM) THAT ABSTAINS FROM VOTING ON THE PLAN AND DOES NOT OPT OUT OF THIS RELEASE (EACH A "RELEASING CLAIMHOLDER") SHALL BE DEEMED TO UNCONDITIONALLY AND FOREVER RELEASE, WAIVE, AND DISCHARGE EACH OF THE RELEASED PARTIES FROM ANY CAUSES OF ACTION IN CONNECTION WITH OR RELATED TO THE DEBTORS, THE REORGANIZED DEBTORS, THE CHAPTER 11 CASES, THE PLAN (OTHER THAN THE RIGHTS OF SUCH RELEASING CLAIMHOLDER TO ENFORCE THE PLAN AND THE CONTRACTS, RELEASES, INDENTURES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER), THE EXCHANGE OFFER, THE COMMITMENT LETTER (OTHER THAN THE RIGHTS OF SUCH RELEASING CLAIMHOLDER TO ENFORCE THE PLAN AND THE CONTRACTS, RELEASES, INDENTURES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER) OR THE RESTRUCTURING SUPPORT AGREEMENT (OTHER THAN THE RIGHTS OF SUCH RELEASING CLAIMHOLDER TO ENFORCE THE PLAN AND THE CONTRACTS, RELEASES, INDENTURES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER) THAT ARE BASED IN WHOLE OR PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE WHICH COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS, IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON; PROVIDED, HOWEVER, THAT THE FOREGOING SHALL NOT OPERATE AS A WAIVER OR RELEASE FROM ANY CAUSES OF ACTION ARISING OUT OF THE ACTS OR OMISSIONS CONSTITUTING ACTUAL OR INTENTIONAL FRAUD, GROSS NEGLIGENCE,

**WILLFUL MISCONDUCT OR CRIMINAL CONDUCT AS DETERMINED BY A FINAL ORDER ENTERED BY A COURT OF COMPETENT JURISDICTION.**

7.     **Exculpation**

**THE RELEASED PARTIES AND THE COMMITTEE AND THE COMMITTEE'S RELATED PERSONS SHALL NOT HAVE OR INCUR ANY LIABILITY TO, OR BE SUBJECT TO ANY RIGHT OF ACTION BY, ANY HOLDER OF ANY CLAIM AGAINST OR AN EQUITY INTEREST IN THE DEBTORS, OR ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE RELATED PERSONS, FOR ANY ACT OR OMISSION IN CONNECTION WITH, OR ARISING OUT OF, THE CHAPTER 11 CASES, FORMULATING, NEGOTIATING, OR IMPLEMENTING THE EXCHANGE OFFER, THE RESTRUCTURING SUPPORT AGREEMENT, THE COMMITMENT LETTER, AND THE PLAN, THE SOLICITATION OF ACCEPTANCES OF THE PLAN, THE CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN OR THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, THE OFFER AND ISSUANCE OF ANY SECURITIES UNDER THE PLAN, EXCEPT FOR ACTS OR OMISSIONS CONSTITUTING ACTUAL OR INTENTIONAL FRAUD, GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR CRIMINAL CONDUCT AS DETERMINED BY A FINAL ORDER ENTERED BY A COURT OF COMPETENT JURISDICTION.  FOR THE AVOIDANCE OF DOUBT, TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, THE BACKSTOP PARTIES SHALL HAVE NO LIABILITY TO ANY PERSON IN CONNECTION WITH THE RIGHTS OFFERING OTHER THAN THOSE OBLIGATIONS EXPRESSLY SET FORTH IN THE COMMITMENT LETTER AND THE PLAN.**

8.     **Indemnification**

On and from the Effective Date, and except as prohibited by applicable law, the Reorganized Debtors shall assume all indemnification obligations currently in place, whether in the bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts or other agreements for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', managers', and employees' respective Affiliates (collectively, the "*Indemnified Parties*"), excluding any indemnification obligations related to claims resulting from gross negligence, willful misconduct or intentional fraud.  Without limiting the foregoing and except as prohibited by applicable law, the Debtors shall indemnify and hold harmless, except as provided in the Plan Supplement, each of the Indemnified Parties for all costs, expenses, loss, damage or liability incurred by any such Indemnified Party arising from or related in any way to any and all Causes of Action, excluding any indemnification obligations related to claims resulting from gross negligence, willful misconduct or intentional fraud, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, including any claims or causes of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those

arising from or related in any way to: (1) any action or omission of any such Indemnified Party with respect to any indebtedness of or any Equity Interest in the Debtors (including any action or omission of any such Indemnified Party with respect to the acquisition, holding, voting or disposition of any such investment); (2) any action or omission of any such Indemnified Party in such Indemnified Party's capacity as an officer, director, member, employee, partner or agent of, or advisor to any Debtor; (3) any disclosure made or not made by any Indemnified Party to any current or former Holder of any such indebtedness of or any such Equity Interest in the Debtors; (4) any consideration paid to any such Indemnified Party by any of the Debtors in respect of any services provided by any such Indemnified Party to any Debtor; and (5) any action taken or not taken in connection with the Chapter 11 Cases or the Plan. In the event that any such Indemnified Party becomes involved in any action, proceeding or investigation brought by or against any Indemnified Party, as a result of matters to which the foregoing "Indemnification" may relate, the Reorganized Debtors shall promptly reimburse any such Indemnified Party for its reasonable and documented legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof; provided, however, that, notwithstanding anything herein or in the Plan to the contrary, the Debtors shall not indemnify any of the Non- Released Parties, whether for any matter to which Article IX.H of the Plan pertains or otherwise.

**9.     Injunction**

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ANY DOCUMENT, INSTRUMENT, RELEASE OR OTHER AGREEMENT ENTERED INTO IN CONNECTION WITH THE PLAN OR APPROVED BY ORDER OF THE BANKRUPTCY COURT, THE CONFIRMATION ORDER SHALL PROVIDE, AMONG OTHER THINGS, THAT FROM AND AFTER THE EFFECTIVE DATE ALL PERSONS OR ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS ARE (I) PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE ESTATE(S), THE RELEASED PARTIES OR ANY OF THEIR RESPECTIVE PROPERTY ON ACCOUNT OF ANY SUCH CLAIMS OR EQUITY INTERESTS AND (II) PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES OR THEIR RESPECTIVE PROPERTY ON ACCOUNT OF SUCH CLAIMS OR EQUITY INTERESTS:  (A) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (D) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO THE DEBTORS; AND (E) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN; PROVIDED, HOWEVER, THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE SUCH PERSONS OR ENTITIES FROM EXERCISING THEIR RIGHTS PURSUANT TO**

**AND CONSISTENT WITH THE TERMS OF THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN.**

## 10. Setoffs

Except as otherwise provided in the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim (other than DIP Facility Claims or Prepetition Credit Agreement Secured Claims) or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Debtor Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Debtor Causes of Action against such Holder have not been otherwise compromised, waived or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.

## 11. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

## I. ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS

### 1. Professional Claims

    a.    <u>Final Fee Applications</u>. All final requests for Professional Compensation and Reimbursement Claims shall be filed no later than 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Compensation and Reimbursement Claims shall be determined by the Bankruptcy Court. For the avoidance of doubt, any fees, costs and expenses of the Backstop Parties and the Backstop Party Professionals and any Backstop Indemnification

Obligations shall be payable by the Debtors or Reorganized Debtors, as applicable, in accordance with the terms of the Commitment Letter and the Restructuring Support Agreement, in all cases without the need for any application to, or approval by, the Bankruptcy Court, whether pursuant to a professional fee application, an application for payment of an Administrative Expense Claim or otherwise.  Notwithstanding the foregoing and in accordance with the Approval Order, any Backstop Party seeking reimbursement of attorneys' fees shall deliver copies of fee and expense invoices to the Office of the United States Trustee and the Committee at the same time such invoices are forwarded to the Debtors, and the Debtors shall promptly reimburse the applicable Backstop Party within ten (10) business days (if no written objection is received within such ten (10) business-day period) after such professional has delivered a summary invoice describing such fees and expenses.  The Court shall have jurisdiction to determine any dispute concerning the reasonableness of such invoices, however, that the Debtors shall be required to timely pay the undisputed amount of the invoice.

b.  <u>Payment of Interim Amounts</u>.  Except as otherwise provided in the Plan, Retained Professionals shall be paid pursuant to the Interim Compensation Order.

c.  <u>Post-Effective Date Fees and Expenses</u>.  Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall pay in Cash the reasonable legal fees and expenses incurred by that Reorganized Debtor after the Effective Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  Upon the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

d.  <u>Substantial Contribution Compensation and Expenses</u>.  Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, by no later than the Administrative Claims Bar Date and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules.

## 2. Other Administrative Claims

All requests for payment of an Administrative Claim must be Filed with the Claims, Solicitation and Subscription Agent and served upon counsel to the Debtors or Reorganized Debtors, as applicable, by the Administrative Claims Bar Date. The Reorganized Debtors may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. In the event that any party with standing objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

## J. RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising in, arising under and/or related to the Chapter 11 cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

    a. allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any objections to the allowance or priority of Claims or Equity Interests;

    b. resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

    c. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

    d. decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

    e. enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

    f. resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement

of the Plan, including, without limitation, any other contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

g.    modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

h.    hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code; provided, however, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtors, including counsel fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

i.    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

j.    hear and determine causes of action by or on behalf of the Debtors or the Reorganized Debtors;

k.    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

l.    hear and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

m.    determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order or any contract, instrument, release (including the releases in favor of the Released Parties) or other agreement or document created in connection with the Plan or the Confirmation Order;

n.       enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

o.       hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

p.       enter orders closing the Chapter 11 Cases.

## K.    MISCELLANEOUS PROVISIONS

### 1.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### 2.    Payment of Statutory Fees

~~All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.~~

All Debtors shall pay all United States Trustee quarterly fees under 28 U.S.C. section 1930(a), plus interest due and payable under 31 U.S.C. section 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business, until the entry of a Final Decree, dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to chapter 7. The Debtors estimate payment of such fees in the amounts of $30,000 in January 2011 and $20,000 in April 2011.

### 3.    Modification of Plan

Subject to the approval of each Backstop Party: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or

reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

4. **Revocation of Plan**

Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, except as otherwise provided by the Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtors or any other Person or Entity, (ii) prejudice in any manner the rights of such Debtors or any other Person or Entity or (iii) constitute an admission of any sort by the Debtors or any other Person or Entity.

5. **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

6. **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

7. **Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Debtors | Counsel to Debtors |
|---|---|
| Loehmann's Holdings Inc.<br>2500 Halsey Street<br>Bronx, New York 10461<br>Attn: Chief Executive Officer | Togut Segal & Segal LLP<br>One Penn Plaza, Suite 3335<br>New York, New York 10119<br>Fax (212) 967-4258<br>Attn: Frank A. Oswald, Esq. |
| With a copy to each Backstop Party and its counsel: | Counsel to Whippoorwill: |
| Whippoorwill Associates, Inc.<br>11 Martine Avenue, 11th Floor<br>White Plains, New York 10606<br>Attn: Steven Gendal<br>With a copy to its General Counsel<br>at the same address | Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, New York 10166<br>Fax: (212) 351-5208<br>Attn: Robert L. Cunningham, Esq.<br>      Matthew J. Williams, Esq. |
| Istithmar Retail Investments, The Galleries<br>Limitless Building No. 4, Level 6<br>Jebel Ali, Dubai<br>United Arab Emirates<br>Fax: +971 4 390 2100<br>Attn: Chief Executive Officer<br>    and General Counsel | Counsel to Istithmar:<br><br>Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Fax: (212) 225-3999<br>Attn: Sean A. O'Neal, Esq. |

### 8. Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 9. Entire Agreement

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 10. Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed

by, and construed and enforced in accordance with, the laws of New York, without giving effect to the principles of conflicts of law of such jurisdiction.

### 11. Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be Filed with the Bankruptcy Court on or before the Plan Supplement Filing Date. After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' private website at http://www.kccllc.net\loehmanns.comor the Bankruptcy Court's website at www.nysb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

### 12. Nonseverability of Plan Provisions upon Confirmation

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors and the Backstop Parties; and (3) nonseverable and mutually dependent.

### 13. Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

### 14. Conflicts

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control

### 15. Dissolution of Committee

On the Effective Date, the Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; provided, however, that after the entry of the Confirmation Order, the Committee's functions shall be restricted to, and the Committee shall not be heard on any issue except, obtaining a Final Order of the Bankruptcy Court authorizing or approving Accrued Professional Compensation of its Retained Professionals.

### 16. Section 1125(e) Good Faith Compliance

The Debtors, Reorganized Debtors, the Committee, and each of their respective Representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### 17. No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

## VI. GOVERNANCE OF REORGANIZED DEBTORS

The Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan. As of the Effective Date, Reorganized Loehmann's Holdings shall be governed by the Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws.

From and after the Effective Date, the New Board shall consist of Reorganized Loehmann's Holdings, Inc.'s Chief Executive Officer and six (6) other directors comprised of (i) two (2) directors appointed by Whippoorwill; (ii) two (2) directors appointed by Istithmar; and (iii) two (2) independent directors with management experience in the retail industry who shall be mutually acceptable to Istithmar and Whippoorwill in consultation with the Committee, provided however, that the Committee shall not have veto rights or consent rights with respect to the appointment of such independent directors. One (1) of such independent directors, as shall be jointly approved by Istithmar and Whippoorwill, shall serve as Chairman of the New Board.

Upon the Effective Date and as a condition to receiving distributions of New Common Stock and New Preferred Stock, all recipients of New Common Stock and New Preferred Stock shall be bound by and deemed to have entered into the New Shareholders' Agreement. Prior to termination of the New Shareholders' Agreement as to all holders of New Common Stock and New Preferred Stock, all transferees of New Common Stock or New Preferred Stock shall be required to execute a joinder to the New Shareholders' Agreement, as it may be amended from time to time. The New Shareholders' Agreement will include certain provisions, including, without limitation, (i) prohibitions on transfers that would, if effected, require Reorganized Loehmann's

Holdings, Inc. to register its New Common Stock or New Preferred Stock under the Exchange Act, unless, in any such case, at the time of such transfer, Reorganized Loehmann's Holdings, Inc. is already subject to the reporting obligations under Sections 13 and 15(d) of the Exchange Act with respect to its capital securities, (ii) prohibitions on transfers that would, if effected, result in Reorganized Loehmann's Holdings, Inc. having 490 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act and any relevant rules promulgated thereunder) of New Common Stock or New Preferred Stock, unless, in any such case, at the time of such transfer, Reorganized Loehmann's Holdings, Inc. is already subject to the reporting obligations under Sections 13 and 15(d) of the Exchange Act with respect to its capital securities, (iii) drag-along rights pursuant to which one or more holders of New Common Stock and New Preferred Stock representing at least 65% of the aggregate outstanding shares of New Common Stock (including shares of New Common Stock issuable upon conversion of all outstanding shares of New Preferred Stock) propose to sell all of the shares of New Common Stock and New Preferred Stock then owned by them to an unaffiliated third party (or a group of related parties) in a *bona fide* third party transaction or a series of related bona fide third party transactions may compel each other holder of New Common Stock and New Preferred Stock to sell all of the shares of New Common Stock and New Preferred Stock owned by such holder and (iv) tag-along rights pursuant to which a holder that (x) owns at least 35% of the aggregate outstanding shares of New Common Stock (including shares of New Common Stock issuable upon conversion of all outstanding shares of New Preferred Stock) and (y) proposes to sell shares of New Common Stock or New Preferred Stock representing at least 25% of the New Common Stock and New Preferred Stock then owned by such holder must offer each holder of at least 5% of the aggregate outstanding shares of New Common Stock (including shares of New Common Stock issuable upon conversion of all outstanding shares of New Preferred Stock) the right to sell certain of its shares of New Common Stock and New Preferred Stock . Each of these provisions may impact the liquidity of the New Preferred Stock and the New Common Stock. The above description of certain terms of the New Shareholders' Agreement is qualified in its entirety by the New Shareholders' Agreement. A copy of the New Shareholders' Agreement will be filed in the Plan Supplement not later than ten (10) calendar days prior to the Voting Deadline.

## VII.    VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

### A.    VALUATION OF THE REORGANIZED DEBTORS

#### 1.    OVERVIEW

The Debtors have been advised by Perella Weinberg Partners LP ("Perella Weinberg"), its financial advisor, with respect to the reorganization value of the Reorganized Debtors on a going concern basis. Perella Weinberg has determined the estimated range of reorganization enterprise value of the Reorganized Debtors, excluding cash on hand, to be approximately $89 million to $114 million (with a mid-point estimate of approximately $101 million) as of an assumed Effective Date of March 1, 2011. Assuming outstanding debt upon emergence of $40 million, the Reorganized

Debtors' equity value would be $49 million to $74 million (with a mid-point estimate of approximately $61 million).

**The estimated range of the reorganization value of the Reorganized Debtors, as of an assumed Effective Date of March 1, 2011, reflects work performed by Perella Weinberg on the basis of information in respect of the business and assets of the Debtors provided to Perella Weinberg as of December 1, 2010. Changes in facts and circumstances between such date and the Effective Date, including, without limitation, a delay in the Effective Date, may result in changes to the reorganization value of the Reorganized Debtors. Perella Weinberg will consider any such changes in facts and circumstances and may modify its estimate of the reorganization value prior to the Effective Date.**

The foregoing estimates of the reorganization value of the Reorganized Debtors is based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the Reorganized Debtors' Business Plan (the "Business Plan"), the achievement of the forecasts reflected in the Business Plan, access to adequate exit financing, continuity of a qualified management team, market conditions through the period covered by the Projections, and the Plan becoming effective in accordance with the estimates and other assumptions discussed below.

With respect to the Debtor's Projected Financial Information (the "Financial Projections"), which were prepared by the management of the Debtors, and are included as Exhibit F to this Disclosure Statement, Perella Weinberg has assumed that the Financial Projections have been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the management of the Debtors as to the future operating and financial performance of the Reorganized Debtors. Perella Weinberg's estimate of a range of reorganization values assumes that operating results projected by the Debtors will be achieved by the Reorganized Debtors in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow. We note that certain of the results forecast by the management of the Debtors are materially better than the recent historical results of operations of the Debtors. If the business performs at levels above or below those set forth in the Financial Projections, such performance may have a material impact on the Financial Projections and on the estimated range of values derived therefrom.

**In estimating the range of the reorganization value of the Reorganized Debtors, Perella Weinberg: (1) reviewed certain historical financial information of the Debtors for recent years and interim periods; (2) reviewed certain internal financial and operating data of the Debtors, including the Financial Projections (3) met with certain members of management of the Debtors to discuss the Financial Projections and the Debtors' operations and future prospects; (4) reviewed publicly available financial data and considered the market value of public companies that Perella Weinberg deemed generally comparable to the operating businesses of the Debtors; (5) considered relevant precedent transactions in industries most comparable to the Debtors' operating businesses; (6) considered certain economic and industry information relevant to the operating businesses; and (7) conducted such other studies, analyses, inquiries, and investigations as it deemed appropriate.**

Perella Weinberg assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors, as well as publicly available information.

In addition, Perella Weinberg did not independently verify management's Financial Projections in connection with such estimates of the reorganization value of the Reorganized Debtors, and no other valuations or appraisals of the Debtors were sought or obtained in connection herewith.

Estimates of the reorganization value of the Reorganized Debtors do not purport to be appraisals or necessarily reflect the values that may be realized if assets are sold as a going concern, in liquidation, or otherwise.

In the case of the Reorganized Debtors, the estimates of the reorganization value prepared by Perella Weinberg represent the hypothetical reorganization value of the Reorganized Debtors. Such estimates were developed for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to creditors thereunder. Such estimates reflect computations of the range of the estimated reorganization value of the Reorganized Debtors through the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the re-sale of any New Common Stock and New Convertible Preferred Stock issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.

The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimate of the ranges of the reorganization value of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, none of the Debtors, Perella Weinberg, the Debtors' other advisors or any other person assumes responsibility for their accuracy. In addition, the valuation of newly issued New Common Stock and New Convertible Preferred Stock is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such New Common Stock and New Convertible Preferred Stock at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, available liquidity, the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors which generally influence the prices of securities.

2.  VALUATION METHODOLOGY

Perella Weinberg performed a variety of analyses and considered a variety of factors in preparing the reorganization value of the Reorganized Debtors. Perella Weinberg primarily relied on three widely-recognized methodologies: comparable public company analysis, discounted cash flow analysis, and precedent transactions analysis. Perella Weinberg made judgments as to the relative significance of

each analysis in determining the Debtors' indicated reorganization value range. Perella Weinberg's valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the Reorganized Debtors' reorganization value.

The following summary does not purport to be a complete description of the analyses and factors undertaken to support Perella Weinberg's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is more complex than the summary provided below.

### a. Comparable Public Company Analysis

A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets through a standardized approach that uses a common variable such as revenues, earnings, and cash flows. The analysis includes a detailed financial comparison of each company's income statement, balance sheet, and cash flow statement. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, target market segments, growth prospects, maturity of businesses, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining reorganization value.

While calculating the current trading value for the comparable companies, Perella Weinberg analyzed the current reorganization value for the comparable companies as a multiple of projected fiscal year end 2010, 2011 and 2012 earnings before interest, taxes, depreciation and amortization ("EBITDA") and revenue as of the last twelve months of the previous fiscal quarter. These multiples were then applied to the Debtors' fiscal year end 2012 forecasted EBITDA and the Debtor's projected revenue as of the last twelve months ended March 1, 2011 to determine the range of reorganization values.

### b. Discounted Cash Flow Approach

The discounted cash flow ("DCF") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be

generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the Debtors. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Financial Projections).  Perella Weinberg's discounted cash flow valuation is based on projection of the Debtors' operating results from March 1, 2011 through January 31, 2014. Perella Weinberg discounted the projected cash flows using the Debtors' estimated weighted average cost of capital, and calculated the terminal value of the Debtors using trailing EBITDA multiples consistent with the comparable companies analysis.

The DCF approach relies on a company's ability to project future cash flows with some degree of accuracy. Because the Financial Projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the Financial Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized.  Perella Weinberg cannot and does not make any representations or warranties as to the accuracy or completeness of the Financial Projections.

### c.    Precedent Transactions Analysis

Precedent transactions analysis estimates value by examining public merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics reveals industry acquisition multiples for companies in similar lines of businesses to the Debtors.  These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Debtors. Perella Weinberg specifically focused on prices paid as a multiple of EBITDA in determining a range of values for the Debtors. These multiples are then applied to the Debtors' EBITDA, to determine the total reorganization value or value to a potential strategic buyer assuming the purchase of the Debtors in a single transaction.

Unlike the comparable public company analysis, the valuation in the precedent transactions methodology includes a "control" premium, representing the purchase of a majority or control position in a company's assets. Thus, the precedent transactions methodology generally produces higher valuations than the comparable public company analysis. Other factors that impact value in the precedent transactions analysis include the following:

(i)    The business, financial and market environment are not identical for transactions occurring at different periods of time.

(ii)    Circumstances surrounding a merger transaction, including the financial position of the Debtors and potential buyers, may significantly impact the valuation of the transaction. Perceived synergies and NOL benefits that buyers can obtain and their willingness to pay for or share such synergies and benefits with

the seller.

As with the comparable company analysis, because no acquisition used in any analysis is identical to any other transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions during a relevant timeframe for which public data is available also limits this analysis. Because the precedent transactions analysis of value is hypothetical and Perella Weinberg has not market tested the results, there are limitations as to its use in the Debtors' valuation.

The estimates of the reorganization value of the Reorganized Debtors determined by Perella Weinberg represent estimated reorganization values and do not reflect values that could be attainable in public or private markets. The estimate of the range of the reorganization value of the Reorganized Debtors ascribed in the analysis does not purport to be an estimate of the post-reorganized market trading value. Any such trading value may be materially different from the estimate of the reorganization value range for the Reorganized Debtors associated with Perella Weinberg's valuation analysis.

## B.    FINANCIAL PROJECTIONS

As further discussed in Article IX.B.2 of this Disclosure Statement, the Debtors believe the Plan meets the feasibility requirement for confirmation of a Chapter 11 plan set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors.  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has, through the development of financial projections for the years of 2010 through 2013 as attached hereto as Exhibit F (the "Financial Projections"), analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses.  In general, as illustrated by the Financial Projections, the Debtors believe that with a significantly de-leveraged capital structure, the Reorganized Debtors will be viable.  The Debtors believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value.  Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date.  Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and

financial performance of the Debtors including, but not limited to, an increased risk of inability to meet sales forecasts and higher reorganization expenses. Additionally, the estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies. They also are based on factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Financial Projections. Additionally, the Debtors continue to evaluate the performance of their stores and have reserved the right under the Plan and Bankruptcy Code section 365 to seek authorization to reject unexpired leases for under performing stores up until the Confirmation Hearing. To the extent that the Debtors seek and obtain authorization to close under performing stores, actual and projected results may differ and the actual results may be materially greater or less than those contained in the Financial Projections set forth on Exhibit F. The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, including in the event that additional leases for under performing stores are rejected, even in the event that assumptions underlying the Financial Projections are not borne out.

THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS.

## VIII.   CONFIRMATION PROCEDURES

## A.   CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for _____ at ____ a.m. before the Honorable Robert E. Gerber, United States Bankruptcy Court, One Bowling Green, New York, New York 10004 (the "Confirmation Hearing"). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.

Responses or objections, if any, to confirmation of the Plan including the assumption and/or assignment of certain executory contracts under the Plan, cure amounts related to any contracts to be assumed under the Plan and the consummation of the Financial Restructuring, (a) shall be in writing; (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules; (c) state the name and address of the objecting

Entity and the amount and nature of the Claim or Interest of such Entity; (d) state with particularity the basis an nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the notice parties identified in the notice of the Confirmation Hearing (the "Confirmation Hearing Notice") on or prior to the Plan Objection Deadline (defined below). Any response or objection to cure amounts must state with specificity the cure amount the objecting party believes is required and provide appropriate documentation in support thereof. Any such response or objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the Notice Parties (as defined below), and the other parties requesting notice in these cases, on or before _____ at 4:00 p.m., prevailing Eastern Time, (the "Plan Objection Deadline"). The Confirmation Hearing will commence on [_____]February 7, 2011 at [_____]9:45 a.m. prevailing Eastern Time.

The Debtors' proposed schedule will provide Entities sufficient notice of the Plan Objection Deadline. The Debtors believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Debtors and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

**THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

Following this Disclosure Statement Hearing, the Debtors will publish the Confirmation Hearing Notice, which will contain, among other things, the Plan Objection Deadline, the Voting Deadline, and the date that the Confirmation Hearing is first scheduled, in the *New York Times, National Edition* to provide notification to those Entities that may not receive notice by mail, on a date no fewer than 15 calendar days prior to the Voting Deadline.

**Plan Objections must be served on all of the following parties (the "Notice Parties"):**

| Counsel to Debtors | United States Trustee |
|---|---|
| Togut, Segal & Segal LLP | United States Trustee's Office |
| One Penn Plaza, Suite 3335 | 33 Whitehall Street, 21st Floor |
| New York, New York 10119 | New York, New York 10004 |
| Attn:  Frank A. Oswald, Esq. | Attn:  Brian S. Masumoto, Esq. |
| **Counsel to Whippoorwill** | **Counsel to Istithmar** |
| Gibson, Dunn & Crutcher LLP | Cleary Gottlieb Steen & Hamilton LLP |
| 200 Park Avenue, 47th Floor | One Liberty Plaza |
| New York, New York 10166 | New York, New York 10006 |
| Attn:  Matthew Williams, Esq. | Attn:  Sean A. O'Neal, Esq. |
| **Counsel to Committee** | **Counsel to DIP Lender** |

| Hahn & Hessen LLP | Proskauer Rose LLP |
| --- | --- |
| 488 Madison Avenue | 1585 Broadway |
| New York, New York  10022 | New York, New York  10036 |
| Attn:  Mark S. Indelicato, Esq. | Attn:  Jeffrey W. Levitan, Esq. |

## B.  STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith.  The Debtors believe that the Plan satisfies or will satisfy the applicable requirements for Confirmation.  Certain of the major requirements for Confirmation of a chapter 11 plan are discussed below.

### 1.  Best Interests of Creditors Test - Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class of claims and equity interests, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7;  and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral);  (b) holders of priority claims;  (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court;  and (e) holders of equity interests.

To demonstrate compliance with the "best interests" test, Clear Thinking Group, with the assistance of the Debtors, estimated a range of proceeds that would be generated from a hypothetical chapter 7 liquidation in the Liquidation Analysis attached hereto as Exhibit E (the "Liquidation Analysis") and summarized in the below chart.  In the Liquidation Analysis, Clear Thinking Group, with the assistance of the Debtors, determined a hypothetical liquidation value of the Debtors' businesses if a chapter 7 trustee were appointed and charged with reducing to cash any and all of the

Debtors' assets.  The Debtors compared this hypothetical liquidation value to the value and returns provided for under the Plan.  As reflected in more detail in the Liquidation Analysis and set forth in the below chart, the Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would not be greater than the value of distributions under the Plan.

| Class | Type of Claim or Equity Interest | Treatment of Claim/Interest | Estimated Aggregate Amount of Allowed Claims or Equity Interests under the Plan[7] | Estimated Percentage Recovery of Allowed Claims or Interests under the Plan[8] | Estimated Percentage Recovery of Class under Chapter 7 Liquidation |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | [_____]$1,500,000 | 100% | 100% |
| 2 | Other Secured Claims | Unimpaired | $0 | 100% | 100% |
| 3 | Class A Notes Claims | Impaired | $80,421,798 | 37.1% | 1.69% |
| 4 | Class B Notes Claims | Impaired | $37,954,754 | 13.8% | 0.0% |
| 5 | General Unsecured Claims | Impaired | $26,200,000 | 7.6% | 0.0% |
| 6 | Equity Interests in Loehmann's Holdings, Inc. | Impaired | N/A | 0.0% | 0.0% |
| 7 | Intercompany Claims | Unimpaired | N/A | 0.0% | 0.0% |

The Debtors believe that recoveries under a chapter 7 liquidation would be equal to or lower than under the Plan because, among other reasons, distributions in

---

[7] The estimated amount of Other Secured Claims assumes that the Prepetition Credit Agreement Secured Claims are satisfied pursuant to the DIP Order. The estimated amount of General Unsecured Claims is based on the Debtors' books and records and projections as of the date hereof. As noted in Article II.C.2 above, under the Plan, the Debtors have reserved the right under Bankruptcy Code section 365 to seek authorization to reject unexpired leases for under performing stores and any other unexpired leases or executory contracts up until the Confirmation Hearing. To the extent that the Debtors seek such authorization, the amount of unsecured claims for damages arising out of the rejection of such leases and contracts, subject to section 502(b)(6) of the Bankruptcy Code, would increase, and thus reduce the estimated percentage recoveries for Holders of Allowed General Unsecured Claims.

[8] Estimated recoveries for Classes 3 and 4 assume that Eligible Holder of Class A Notes Claims fully subscribe to the Rights Offering; that 100% of the New Preferred Stock is converted into New Common Stock; and that the Exit Facility is fully drawn. Additionally, recoveries for Classes 3 and 4 may vary depending upon whether New Common Stock is issued on account of any Management Incentive Plan.

chapter 7 cases may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors. In addition, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution.

Underlying the Debtors' Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Debtors' Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Debtors. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to be liquidated. All Holders of Allowed Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Debtors' Liquidation Analysis is based in connection with their evaluation of the Plan.

2. **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the reorganized debtors, unless the plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses and developed a business plan and prepared the Financial Projections.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The Plan contemplates a plan in which the Debtors' balance sheet will become materially deleveraged. In addition, the Debtors have already secured at least one commitment for exit financing, and therefore believe sufficient funds will exist to make all payments required by the Plan.

In general, as illustrated by the Financial Projections, the Debtors believe that with a significantly deleveraged capital structure, the Debtors' business will return to viability. The Debtors believe that Confirmation and Consummation is not likely to

be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

3. **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in Article IX.B.5 below, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Claims in Classes 1, 2 and 7 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to Accept the Plan.

4. **The Voting Classes are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan.**

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan in order for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both

standards are described herein.  As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 5.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it, provided, that, the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### a.      No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  Certain bankruptcy courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.  Accordingly, a plan could potentially treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### b.      Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting impaired class, the test sets different standards depending on the type of claims or equity interests in such class.

*Secured Claims*:  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in subclause (i) or (ii) of this subparagraph.

*Unsecured Claims*:  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims or equity interests of the non-accepting class will not receive or retain any property under the plan on account of such claims and equity interests.

*Equity Interests*:  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of its equity interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan on account of such equity interest.

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Class 6.  The Debtors believe that the Plan may be confirmed on a nonconsensual basis (<u>provided</u>, <u>that</u>, at least one impaired Class of Claims votes to accept the Plan).  To the extent that any of the Voting Classes vote to reject the Plan, the Debtors further reserve the right to seek (1) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (2) alter, amend, modify, revoke or withdraw the Plan or any exhibit or schedule to the Plan, subject in all respects to Article XII.C of the Plan, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

The votes of Holders of Class 6 Equity Interests in Loehmann's Holdings Inc. are not being solicited because, under Article III of the Plan, there will be no distribution to the Holders of these Interests.  The members of Class 6 have, therefore, conclusively been deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  All Class 6 Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding the deemed rejection by Class 6 or any Class that votes to reject the Plan, the Debtors believe that the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

## IX.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' capital structure will remain highly leveraged and the Debtors will remain unable to service their debt obligations or to cure defaults thereunder.  The Debtors believe that the most likely scenario in the event the Plan is not confirmed will be the liquidation of the Company.  Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

## A.  LIQUIDATION UNDER CHAPTER 7

If no plan is confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected

to liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth in the Liquidation Analysis. For the reasons articulated in Article IX.B.1 above, the Debtors believe that liquidation under chapter 7 would result in lower aggregate distributions being made to Holders of Allowed Claims than those provided in the Plan.

## B. ALTERNATIVE PLAN OF REORGANIZATION

The Debtors believe that failure to confirm the Plan will likely lead to expensive and protracted Chapter 11 Cases. In formulating and developing the Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process involving many different parties with widely disparate interests.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of Holders of Claims and enable the Holders of Allowed Claims to maximize their returns, but also that rejection of the Plan in favor of some alternative method of reconciling the Claims will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class. As a result, alternatives are limited.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS, AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES AND INCREASE RESTRUCTURING EXPENSES. THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

## C. DISMISSAL OF THE DEBTORS' CHAPTER 11 CASES

Dismissal of all of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the status quo ante. Upon dismissal of all of the Debtors' Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the creditors of the Debtors, and possibly resulting in costly and protracted litigation in various jurisdictions. Most significantly, dismissal of all of the Debtors' Chapter 11 Cases would permit the DIP Lenders and Holders of Secured Notes to foreclose upon the assets that are subject to their Liens that constitute a material portion of the Debtors' assets. Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtors. The Debtors believe that these actions would seriously undermine their ability to reorganize and could lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Debtors' Chapter 11 Cases is not a preferable alternative to the Plan.

## D.     CONTACT FOR MORE INFORMATION

Any interested party desiring further information about the Plan should contact legal counsel to the Debtors, by: (a) writing to Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York  10119, Attention:  Loehmann's Holdings Inc.;  or (b) calling Frank A. Oswald, Esq. at (212) 594-5000.

## X.     PLAN-RELATED RISK FACTORS

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

## A.     GENERAL

The following provides a summary of various important considerations and risk factors associated with the Plan.  However, it is not exhaustive.  In considering whether to vote for or against the Plan, Holders of Claims and Equity Interests that are Impaired should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement, including the various risks and other factors described in Loehmann's Annual Report on Form 10-K for the fiscal year ended January 30, 2010, and Quarterly Report on Form 10-Q for the fiscal quarterly period ended July 31, 2010, the entirety of which are annexed as Exhibit H.

## B.     CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.     Bankruptcy Matters

#### a.     General

While the Debtors believe that a bankruptcy filing solely for the purpose of implementing an agreed upon restructuring as contemplated by the Restructuring Support Agreement and Commitment Letter will be of short duration and will not be seriously disruptive to their businesses, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure that the Plan will be confirmed.

Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could have an adverse effect on the Reorganized Debtors' businesses.  Among other things, it is possible that a bankruptcy proceeding could adversely affect the Reorganized Debtors' relationships with their key trade vendors, customers, employees and independent contractors.  A bankruptcy proceeding will also involve significant

expenses and will divert the attention of the Reorganized Debtors' management from the operation of the businesses.

Further, the Plan provides for conditions that must be satisfied (or waived) prior to the Confirmation Date and for other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

The extent to which a bankruptcy proceeding disrupts the Reorganized Debtors' businesses will likely be directly related to the length of time it takes to complete the proceeding. If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, they may be forced to operate in bankruptcy for an extended period while they try to develop a different plan of reorganization that can be confirmed. That would increase both the probability and the magnitude of the adverse effects described above. Even assuming a successful emergence from Chapter 11, there can be no assurance as to the overall long-term viability of the Reorganized Debtors' business.

i      <u>Failure to Confirm the Plan</u>

Although the Debtors believe that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modification would not necessitate the resolicitation of votes to accept the Plan, as modified.

ii      <u>Termination of the Restructuring Support Agreement Commitment Letter/Conditions Precedent to the New Investment</u>

Upon the occurrence of certain conditions, the Restructuring Support Agreement and/or Commitment Letter could be terminated. See Article IV.A.4.K above for a summary of certain key termination events under the Commitment Letter. If the Restructuring Support Agreement were terminated, the parties thereto would not be obligated to vote in favor of or otherwise support the Plan. Further, termination of the Restructuring Support Agreement would result in the termination of the Commitment Letter, in which case the Backstop Parties would no longer be obligated to fulfill the Backstop Commitment. Likewise, a termination of the Commitment Letter would result in a termination of the Restructuring Support Agreement. Any termination of the Restructuring Support Agreement and/or the Commitment Letter could materially impair the Debtors' ability to obtain confirmation of the Plan.

Additionally, the Backstop Parties' obligation to fulfill the Backstop Commitment is subject to a number of conditions set forth in the Commitment Letter, including, without limitation, that: (a) the Plan shall be in form and substance satisfactory to each Backstop Party in its sole discretion, which shall provide for, among other things, the plan treatment and other terms set forth in the Plan Term Sheet; (b) definitive documentation, including without limitation the Plan, the documents to be

included in the Plan Supplement, documentation related to the Exit Facility, the Disclosure Statement and documentation in connection with the Backstop Commitment, including without limitation, a shareholders agreement, shall have been executed and delivered by the Debtors and each Backstop Party, in form and substance reasonably satisfactory to the Debtors and satisfactory to each Backstop Party (including as to shareholder protections) in its sole discretion, and the conditions precedent contained therein shall have been satisfied or waived in accordance therewith; (c) no Termination Event (as defined in the Commitment Letter) shall have occurred (excluding a Termination Event that has been waived as provided for in the Commitment Letter); (d) the Debtors shall have entered into definitive documentation with respect to the Exit Facility in form and substance satisfactory to each Backstop Party, in its sole discretion, and the transactions contemplated by such agreement shall be consummated concurrently with the New Investment; (e) the transactions contemplated by the Forward Purchase Agreement shall have been consummated, and (f) the Exit Facility shall not require any credit support of any of the Backstop Parties. Additionally, the Commitment Letter provides that the obligation of Istithmar to make the New Investment shall be subject to the satisfaction by the Company or waiver of the conditions that: (a) no draw shall have been made on the Prepetition Letter of Credit (as such term is defined in the Commitment Letter), (b) no draw shall have been made on the DIP Letter of Credit (as such term is defined in the Commitment Letter) and the DIP Letter of Credit shall have been returned to the issuing bank for cancellation undrawn and the Prepetition Letter of Credit shall have been returned to the issuing bank for cancellation undrawn, and (c) entry into an agreement between Whippoorwill and Istithmar by which Whippoorwill will agree to sell, and Istithmar will agree to purchase, such amount of shares of the New Preferred Stock acquired by Whippoorwill under the Backstop Commitment or on account of the Commitment Fee as is necessary for Istithmar to become the largest shareholder of Reorganized Loehmann's Holdings on a fully diluted basis as of the Effective Date for a purchase price equal to the exercise price under the Rights Offering. Likewise, Whippoorwill's obligations are conditioned upon various conditions precedent, including without limitation, that Class 4 (Class B Notes Claims) has accepted the Plan. The failure of any of the conditions precedent in the Commitment Letter, if not waived by each Backstop Party, as applicable, would mean that the Backstop Parties, as applicable, would not be required to fulfill the Backstop Commitment, which could adversely affect the Debtors' ability to confirm and consummate the Plan.

iii      <u>Non-Occurrence of the Effective Date</u>

Operating in bankruptcy imposes significant risks on the Debtors' operations. Although the Debtors believe that the Effective Date will occur on or before February 18, 2011, there can be no assurance as to such timing or that the conditions to the Effective Date will ever be satisfied, including without limitation: (i) entry of the Confirmation Order in form and substance satisfactory to each of the Debtors, the Backstop Parties in their sole discretion on or before February 7, 2011 as a Final Order; (ii) the Reorganized Debtors shall have entered into the Exit Financing Agreement, in form and substance satisfactory to the Backstop Parties, and such agreement shall be consummated on the Effective Date; provided, that, in the event the Reorganized Debtors pursue an alternative exit financing facility the DIP Facility shall be repaid in Cash in full on the Effective Date; (iii) the Debtors shall have conducted the Rights

Offering consistent with the Plan and the Rights Offering Procedures and shall have received the proceeds of the Rights Offering and/or the Backstop Commitment, as applicable, on or prior to Effective Date; (iv) the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement the Plan and required by law, regulation or order; (v) all actions, documents, certificates, and agreement necessary to implement the Plan shall have been effected and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; (vi) all fees and expenses of the Backstop Parties, including any outstanding fees and expenses of the Backstop Party Professionals, shall have been paid as required by the Approval Order, the Plan and the Commitment Letter; (vii) the New Shareholders' Agreement shall be in full force and effect and binding on all Persons receiving New Preferred Stock and/or New Common Stock and the Company pursuant to the Plan; (viii) there shall have been no modification or stay of the Confirmation Order or entry of other court order prohibiting transactions contemplated by the Plan from being consummated; and (ix)the Effective Date shall have occurred on or prior to February 18, 2011

If the Effective Date does not occur by February 18, 2011, the Debtors may determine, upon notice to the Bankruptcy Court, that the Plan is null and void in all respects, and nothing contained in the Plan, the Confirmation Order or the Disclosure Statement shall: (1) constitute a waiver or release of any Cause of Action or Claim; (2) constitute an admission, acknowledgment, offer or undertaking in any respect by any party, including the Debtors; or (3) otherwise prejudice in any manner the rights of any party, including the Debtors.

b.     **The Debtors' businesses could suffer from the loss of key personnel**

The Debtors may be unable to retain and motivate key executives and employees through the process of reorganization and the Debtors may have difficulty attracting new employees. The loss of key personnel could have a material adverse effect on the Debtors' business, financial condition, and results of operations. In addition, so long as the Chapter 11 Case continues, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.

c.     **The Debtors may not be able to grow their business during the Chapter 11 Case without Bankruptcy Court approval**

Transactions outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. In addition, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell or otherwise dispose of all or substantially all of the Debtors' assets or grant liens. These restrictions may place the Debtors at a competitive disadvantage. The Debtors may be unable to continue to grow the Debtors' business through acquisitions and restrictions on the Debtors' ability to pursue other business strategies, unless the Debtors obtain Bankruptcy Court approval

for those transactions.

        d.      **Pursuit of litigation by the parties in interest could disrupt the confirmation of the Plan and could have material adverse effects on the Debtors' businesses and financial condition**

There can be no assurance that any parties in interest will not pursue litigation strategies to enforce any Claims in respect of the Debtors. Litigation is by its nature uncertain and there can be no assurance of the ultimate resolution of such claims. The pursuit of litigation in connection with objections to this Disclosure Statement or the Plan could delay and disrupt confirmation of the Plan and the Debtors' emergence from bankruptcy. Any litigation may be expensive, lengthy and disruptive to the Debtors' normal business operations and the Plan confirmation process, and a resolution of any such strategies that is unfavorable to the Debtors could have a material adverse effect on the Plan confirmation process, emergence from bankruptcy or on the Debtors' businesses, results of operations, financial condition, liquidity and cash flow.

        e.      **Key Vendors may refuse to transact with the Debtors or attempt to modify trade terms as a result of these Chapter 11 Cases**

Loehmann's, as a retail supplier of clothing and other apparel, is heavily reliant on its trade vendors to timely supply merchandise, which serves as Loehmann's inventory. There is no assurance that certain of Loehmann's trade vendors will continue doing business with the Debtors during the course of the Chapter 11 Cases or will not attempt to modify existing trade terms with Loehmann's.

        f.      **Adverse publicity in connection with the Chapter 11 Cases, or otherwise, could negatively affect the Debtors' businesses**

Adverse publicity or news coverage relating to the Debtors, including but not limited to publicity or news coverage in connection with the Chapter 11 Cases, may negatively affect (i) the Debtors' businesses during the Chapter 11 proceeding and (ii) the Reorganized Debtors' efforts to establish and promote name recognition and a positive image after the Effective Date.

        g.      **Risk of Not Obtaining Exit Financing**

The Plan is predicated, among other things, on obtaining the Exit Facility. While the Debtors believe that they will be able to obtain the Exit Facility, there can be no assurance that the Exit Facility will be obtained.

**C.      RISK FACTORS THAT MAY AFFECT THE VALUE OF THE SECURITIES TO BE ISSUED UNDER THE PLAN**

      **1.      No public markets for the New Preferred Stock or New Common Stock are currently present, and lack of the development of a public market could result in the New Preferred Stock and/or New Common Stock**

**being difficult or impossible to trade.  Other uncontrollable market factors could also negatively affect the value of the New Preferred Stock and/or New Common Stock**.

The New Preferred Stock and New Common Stock to be issued pursuant to the Plan is a security for which there is currently no market, and there can be no assurance as to the development or liquidity of any market for the New Preferred Stock and/or New Common Stock.  If a trading market does not develop or is not maintained, holders of the New Preferred Stock and/or New Common Stock may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions and the performance of, and investor expectations for, the Reorganized Debtors.

Furthermore, Persons to whom the New Common Stock are issued pursuant to the Plan or who purchase New Convertible Preferred Stock in the Rights Offering may prefer to liquidate their investments rather than hold such securities on a long-term basis.  Accordingly, any market that does develop for such securities may be volatile.

Restrictions on resale of the New Common Stock by certain holders and of the New Convertible Preferred Stock, which are described under "U.S. Securities Law Matters" will further restrict trading in the New Common Stock and New convertible Preferred Stock and may limit any market for those securities that would otherwise exist.

**2.      Loehmann's Holdings will not be required to, nor does it intend to, file periodic reports with the SEC or any other regulator or stock exchange upon emergence**

Loehmann's Holdings will not be required to, nor does it intend to, file periodic reports with the SEC upon emergence.  As a result, holders of Loehmann's Holdings securities will have access to limited information (other than that provided pursuant to information covenants set forth in the Exit Facility and reporting requirements under applicable laws) about Loehmann's Holdings and the New Preferred Stock and New Common Stock following the Effective Date.

**3.      The New Shareholders' Agreement will Include Restrictions on Transfer, As Well as Drag Along and Tag Along Rights and Other Shareholder Protections**

Upon the Effective Date and as a condition to receiving distributions of New Common Stock and New Preferred Stock, all recipients of New Common Stock and New Preferred Stock shall be bound by and deemed to have entered into the New Shareholders' Agreement.  Prior to termination of the New Shareholders' Agreement as to all holders of New Common Stock and New Preferred Stock, all transferees of New Common Stock or New Preferred Stock shall be required to execute a joinder to the New Shareholders' Agreement, as it may be amended from time to time.  The New

Shareholders' Agreement will include certain provisions, including, without limitation, (i) prohibitions on transfers that would, if effected, require Reorganized Loehmann's Holdings, Inc. to register its New Common Stock or New Preferred Stock under the Exchange Act, unless, in any such case, at the time of such transfer, Reorganized Loehmann's Holdings, Inc. is already subject to the reporting obligations under Sections 13 and 15(d) of the Exchange Act with respect to its capital securities, (ii) drag-along rights pursuant to which one or more holders of New Common Stock and New Preferred Stock representing at least 65% of the aggregate outstanding shares of New Common Stock (including shares of New Common Stock issuable upon conversion of all outstanding shares of New Preferred Stock) propose to sell all of the shares of New Common Stock and New Preferred Stock then owned by them to an unaffiliated third party (or a group of related parties) in a *bona fide* third party transaction or a series of related bona fide third party transactions may compel each other holder of New Common Stock and New Preferred Stock to sell all of the shares of New Common Stock and New Preferred Stock owned by such holder and (iii) tag-along rights pursuant to which a holder that (x) owns at least 35% of the aggregate outstanding shares of New Common Stock (including shares of New Common Stock issuable upon conversion of all outstanding shares of New Preferred Stock) and (y) proposes to sell shares of New Common Stock or New Preferred Stock representing at least 25% of the New Common Stock and New Preferred Stock then owned by such holder must offer each holder of at least 5% of the aggregate outstanding shares of New Common Stock (including shares of New Common Stock issuable upon conversion of all outstanding shares of New Preferred Stock) the right to sell certain of its shares of New Common Stock and New Preferred Stock . Each of these provisions may impact the liquidity of the New Preferred Stock and the New Common Stock. The above description of certain terms of the New Shareholders' Agreement is qualified in its entirety by the New Shareholders' Agreement. A copy of the New Shareholders' Agreement will be filed in the Plan Supplement on the date that is ten (10) calendar days prior to the Voting Date.

4.    **The New Common Stock could be subject to future dilution and, as a result, could decline in value**

The Backstop Commitment will take the form of New Convertible Preferred Stock. The New Convertible Preferred Stock is convertible to 47.2% of the New Common Stock of Reorganized Loehmann's Holdings on a fully diluted basis, subject to dilution on account of any New Common Stock issued under a Management Incentive Plan.

Additionally, on the Effective Date, the Backstop Parties will receive the Commitment Fee Preferred Stock convertible into 1.9% of the New Common Stock of Reorganized Loehmann's Holdings. It is contemplated that all of the Commitment Fee Preferred Stock will be converted to New Common Stock, resulting in additional dilution of the New Common Stock. Further, on or after the Effective Date, additional New Common Stock may be issued on account of a Management Incentive Plan to management or employees of the Reorganized Debtors. If such issuance occurs, this would further dilute the ownership percentage of Holders of Allowed Secured Note Claims in New Common Stock.

Additionally, in the future, similar to all companies, additional equity financings or other share issuances of ordinary shares in Loehmann's Holdings by the Reorganized Debtors could adversely affect the market price of the New Common Stock. Sales by existing holders of a large number of New Common Stock in the public market, or the perception that additional sales could occur, could cause the market price of the New Common Stock to decline.

**5.     Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery**

The Claims estimates set forth in Article VI above, "Summary of the ~~First~~Second Amended Joint Plan," are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Further, estimated recoveries for General Unsecured Claims are not yet ascertained pending the filing of such Claims. Such differences may adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan. Additionally, the Debtors have made certain assumptions, as described in Article VII, **which should be read carefully**.

**6.     The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results or Meet Post- Reorganization Debt Obligations and Finance All Operating Expenses, Working Capital Needs and Capital Expenditures**

The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and cash flows that they have assumed in projecting future business prospects. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) enhancing their current customer offerings; (b) taking advantage of future opportunities; (c) growing their business; or (d) responding to competitive pressures. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required. Further, even if the Reorganized Debtors were able to obtain additional working capital, it may only be available on unreasonable terms. For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors. If any such required capital is obtained in the form of equity, the equity interests of the holders of the then-existing New Common Stock could be diluted. While the Debtors' Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized.

7.      **The Reorganized Debtors will be Subject to Significant
        Restrictive Debt Covenants, which will limit their Operating Flexibility**

Significant restrictive covenants, including financial covenants, in the instruments governing the Exit Facility may restrict the Reorganized Debtors' flexibility. Such covenants may place restrictions on its ability to: incur additional indebtedness; pay dividends and make other restricted payments or investments; sell assets; make capital expenditures; engage in certain mergers and acquisitions; and refinance existing indebtedness.

8.      **Estimated Valuation of the Reorganized Debtors
        and the New Common Stock and the Estimated
        Recoveries to Holders of Allowed Claims Are Not Intended
        to Represent the Private Sale Values of the New Common Stock**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities. The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of the Reorganized Debtors), including, without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

9.      **A Small Number of Holders or Voting Blocks
        Will Control the Reorganized Debtors**

Consummation of the Plan is likely to result in a small number of holders owning a significant percentage of the shares of outstanding New Common Stock. These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors and approve significant mergers, other material corporate transactions or the sale of all or substantially all of the assets of the Reorganized Debtors.

10.     **Certain Tax Implications of the Debtors'
        Bankruptcy and Reorganization May Increase
        the Tax Liability of the Reorganized Debtors**

Holders of Allowed Claims should carefully review Article XII herein, "Certain United States Federal Income Tax Consequences," to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors.

## D. RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTORS' BUSINESS

### 1. The Debtors' emergence from bankruptcy may potentially reduce or eliminate their tax attributes.

As of January 30, 2010, the Company had an aggregate amount of net operating loss, capital loss and tax credit carry forwards (collectively, the "Tax Attributes") in the United States of approximately $10.8 million, $0 and $106.1 million, respectively. In connection with the Debtors' emergence from Chapter 11, it is likely that the Tax Attributes will be significantly reduced due to the cancellation of indebtedness income, with any remaining Tax Attributes subject to limitation under Internal Revenue Code sections 382 and 383. A full valuation allowance has been recorded against the deferred tax assets related to these Tax Attributes in the condensed consolidated balance sheets for the quarterly period ended July 31, 2010.

### 2. Prolonged Chapter 11 Cases Could Reduce the Debtors' Sales and Harm the Debtors' Profitability

While the Debtors would hope that a chapter 11 filing solely for the purpose of implementing an agreed-upon restructuring would be of short duration and would not be seriously disruptive to their business, the Debtors cannot be certain that this would be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors might spend in chapter 11 or to assure that the Plan will be confirmed. Even if the Plan is confirmed on a timely basis, a prolonged chapter 11 proceeding could have an adverse effect on the Debtors' business. Among other things, it is possible that a protracted bankruptcy proceeding could adversely affect (i) the Debtors' relationships with their key suppliers, (ii) the Debtors' relationships with their customers, and (iii) the Debtors' relationships with their employees. A chapter 11 proceeding will also result in the Debtors' incurrence of substantial administrative expense claims and professional fee claims and will require the Debtors' management to devote substantial time and energy which could otherwise be directed at improving the operation of the Debtors' businesses and implementing a strategic business plan. The extent to which a chapter 11 proceeding disrupts the Debtors' business will likely be directly related to the length of time it takes to complete the proceeding. If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, they may be forced to operate in Chapter 11 for an extended period while they try to develop an alternative reorganization plan that can be confirmed. Such a circumstance would increase both the probability and the magnitude of the adverse effects described above.

### 3. Adverse Developments Affecting One or More of the Debtors' Major Vendors Could Harm the Debtors' Profitability

The Debtors obtain merchandise from numerous vendors throughout the world. It is possible that notwithstanding the Confirmation of the Plan, certain vendors may decide to cease doing business with Reorganized Debtors or may adversely modify terms on which they will do business with the Reorganized Debtors.

4. **Impairment Charges Relating to the Debtors'
Goodwill and Long-Lived Assets may have a Material
Adverse Effect on the Debtors' Earnings and Results of Operations**

The Debtors regularly monitor their goodwill and long-lived assets for impairment indicators. In conducting the goodwill impairment testing, the Debtors compare the fair value of each of their reporting units to the related net book value. In conducting the impairment analysis of long-lived assets, the Debtors compare the undiscounted cash flows expected to be generated from the long-lived assets to the related net book values. Changes in economic or operating conditions impacting the Debtors' estimates and assumptions could result in the impairment of the Debtors' goodwill or long-lived assets. In the event that the Debtors determine their goodwill or long-lived assets are impaired, the Debtors may be required to record a significant charge to earnings in their financial statements that would have a material adverse effect on the Debtors' results of operations.

5. **The Debtors' Failure to Execute Their Strategic
Objectives Would Negatively Impact the Debtors' Business**

The Debtors' financial performance and profitability depend in part on the Debtors' ability to successfully execute the Debtors' strategic objectives. Various factors, including the Debtors' financial leverage, adverse industry conditions and the other matters described in Loehmann's Annual Report on Form 10-K for the fiscal year ended January 30, 2010 under Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," including "— Forward-Looking Statements," and Quarterly Report on Form 10-Q for the quarterly period ended July 31, 2010 under Item 2, "Management's Discussion and Analysis of Financial Condition and Results of Operations," could adversely impact the Debtors' ability to execute their corporate strategy. There also can be no assurance that, even if implemented, the Debtors' strategic objectives will be successful.

6. **The Debtors are Involved from Time to Time
in Legal Proceedings and Commercial or Contractual
Disputes, which Could Have an Adverse Impact on the
Debtors' Profitability and Financial Position**

The Debtors are involved in legal proceedings and commercial or contractual disputes that, from time to time, are significant. These are typically claims that arise in the normal course of business including, without limitation, commercial or contractual disputes, including disputes with the Debtors' suppliers, competitors or customers, intellectual property matters, personal injury claims, environmental issues, tax matters and employment matters. No assurances can be given that such proceedings and claims will not have a material adverse impact on the Debtors' profitability and financial position.

**E. RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS**

    **1.    Financial Information Is Based on the Debtors'
    Books and Records and, Unless Otherwise Stated,
    No Audit Was Performed.**

        The financial information contained in this Disclosure Statement has not been audited.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

    **2.    Financial Projections and Other Forward Looking
    Statements Are Not Assured, Are Subject to Inherent
    Uncertainty Due to the Numerous Assumptions Upon Which
    They Are Based and, as a Result, Actual Results May Vary**

        This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections. The Financial Projections do not reflect emergence adjustments including the impact of generally accepted "fresh start" accounting.

        Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning:  (a) the potential adverse impacts of the filing of the Chapter 11 Cases on the Debtors' business, financial condition or results of operations, including the Debtors' ability to maintain contracts, trade credit and other customer and vendor relationships that are essential to their business and the actions and decisions of their creditors and other third parties with interests in the Chapter 11 proceedings; (b) the Debtors' ability to obtain approval of Bankruptcy Court with respect to motions in the Chapter 11 proceedings prosecuted from time to time and to develop, prosecute, confirm and consummate one or more plans of reorganization with respect to the Chapter 11 proceedings and to consummate all of the transactions contemplated by one or more such plans or upon which consummation of such plans may be conditioned; (c) the timing of confirmation and consummation of one or more plans of reorganization in accordance with its terms;  (d) the occurrence of any event, change or other circumstance that could give rise to the termination of the Restructuring Support Agreement and/or the Commitment Letter; (e) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Reorganized Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures;  (f) general economic conditions in

the markets in which the Debtors operate, including changes in interest rates or currency exchange rates; (g) the financial condition of the Debtors' vendors; (h) disruptions in the relationships with the Debtors' vendors; (i) labor disputes involving the Debtors or their significant customers or suppliers or that otherwise affect the Debtors; (j) the Debtors' ability to achieve cost reductions that offset or exceed customer mandated selling price reductions; (k) the costs, timing and success of restructuring actions; (l) competitive conditions impacting the Debtors' vendors; (m) the outcome of legal or regulatory proceedings to which the Debtors are or may become parties; (n) unanticipated changes in cash flow, including the Debtors' ability to negotiate and maintain vendor payment terms; ( o) further impairment charges initiated by adverse industry or market developments; and (p) other risks described from time to time in Loehmann's 10-K and 10-Q reports and the Debtors' success in implementing their operating strategy.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

## F.    Leverage

The Debtors believe that they will emerge from Chapter 11 with a level of debt that can be effectively serviced in accordance with their business plan. However, future circumstances could result in the increase of leverage of Reorganized Debtors being overleveraged. If such circumstances should occur, the Reorganized Debtors would face certain difficulties, including, but not limited to, difficulty in meeting their obligations, reduced flexibility and competitive disadvantages relative to competitors that have less debt.

Additionally, factors beyond the control of the Reorganized Debtors could affect their ability to meet debt service requirements. The ability of the Reorganized Debtors to meet debt service requirements will depend on their future performance, which, in turn, will depend in part on the ability of the Reorganized Debtors to sustain sales conditions in the markets which they will operate, the economy generally and other factors that are at least partially beyond the Reorganized Debtors' control. The Debtors can provide no assurance that the Reorganized Debtors' business will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Reorganized Debtors to pay their indebtedness or to fund its other liquidity needs.

Further, the Reorganized Debtors may need to borrow additional funds or refinance all or a portion of their indebtedness on or before maturity. There is no assurance that the Reorganized Debtors will be able to borrow additional funds or refinance any of their indebtedness on commercially reasonable terms or at all. If the Reorganized Debtors are not able to make scheduled debt payments or comply with the other provisions of their debt instruments, their lenders will be permitted under certain

circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

## G. DISCLOSURE STATEMENT DISCLAIMER

### 1. Information Contained Herein Is for Soliciting Votes

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

### 2. This Disclosure Statement Was Not Approved by the Securities and Exchange Commission

This Disclosure Statement was not filed with the Commission under the Securities Act or applicable state securities laws. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3. Reliance on Exemptions from Registration Under the Securities Act

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with federal or state securities laws or other similar laws. The offer of New Common Stock to Holders of certain Classes of Claims and the offer of New Convertible Preferred Stock in the Rights Offering have not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the issuance of the New Common Stock (including the shares reserved for issuance under the Management Incentive Plan), will be exempt from registration under the Securities Act by virtue of Section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act or Regulation D promulgated thereunder, Rule 701 of the Securities Act or a "no sale" under the Securities Act as described herein.

### 4. This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be

affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**5.      No Legal or Tax Advice Is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not legal advice to you**.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

**6.      No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interest or any other parties in interest.

**7.      Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, File and prosecute Claims and Equity Interest and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

**8.      No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors, the Reorganized Debtors or the Litigation Trust (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

**9.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

### 10. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 11. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Committee and the United States Trustee.

## XI. U.S. SECURITIES LAW MATTERS

### A. New Common Stock

The New Common Stock issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemption set forth in section 1145(a)(1) of the Bankruptcy Code and may be resold by holders thereof without registration unless the holder is an "underwriter" (as defined in section 1145(b)(1) of the Bankruptcy Code) with respect to such New Common Stock, subject to the terms thereof and applicable securities laws.

### B. Rights Offering

The New Convertible Preferred Stock issued in connection with the Rights Offering will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder. The New Convertible Preferred Stock issued in connection with the Rights Offering and the New Common Stock into which it is convertible will, in each case, be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereof.

## C.       Section 1145 of the Bankruptcy Code

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering. Therefore, the securities issued pursuant to the section 1145 exemption may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (1) purchases a claim with a view to distribution of any security to be received in exchange for such claim, or (2) offers to sell securities offered or sold under the plan for the holders of such securities, or (3) offers to buy securities issued under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (4) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities.

The term "issuer," as used in section 2(a)(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed "underwriters" receive securities under the Plan pursuant to the exemption from registration set forth in section 1145 of the Bankruptcy Code, resales of such securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of such securities may, however, be able, at a future time and under certain conditions described below, to sell such securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

**D.     Section 4(2) of the Securities Act/Regulation D**

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering will be exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act.

The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security. Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities." As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, under certain conditions described below, to sell such restricted securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

**E.     Resales of New Common Stock and New Convertible Preferred Stock under Rule 144 and Rule 144A**

To the extent that Holders of Claims who receive New Common Stock are deemed to be "underwriters" (collectively, the "Restricted Holders"), resales of such New Common Stock by Restricted Holders would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders would, however, be permitted to sell New Common Stock without registration if they are able to comply with the applicable provisions of Rule 144 under the Securities Act, as described further below, or if such securities are registered with the Securities and Exchange Commission. Any person who is an "underwriter" but not an "issuer" with respect to an issue of securities (other than a holder of restricted securities) is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

Persons who purchase New Convertible Preferred Stock in the Rights Offering and/or the Backstop Parties, with respect to any New Convertible Preferred Stock purchased as a result of the Backstop Commitment, will hold "restricted securities." Resales of such New Convertible Preferred Stock, or the New Common Stock into which it is convertible, would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell New Convertible Preferred Stock or New Common Stock into which it is converted without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act, as described further below, or if such sale is registered with the Securities and Exchange Commission.

Under certain circumstances, Restricted Holders and holders of restricted securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are

met (e.g., that the availability of current public information with respect to the issuer, volume limitations, and notice and manner of sale requirements), specified persons who resell restricted securities or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(a)(11) of the Securities Act. Rule 144 provides that: (1) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period if there is not current public information regarding the issuer at the time of the sale; and (2) an affiliate may sell restricted or other securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer, and also may sell restricted or other securities after a one-year holding period whether or not current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph (d)(4) of Rule 144A and certain notice provisions).

Any certificates evidencing New ~~Convertible~~ Preferred Stock issued ~~through~~in connection with the Rights Offering or the Backstop Commitment, or New Common Stock issued upon conversion thereof will bear a legend substantially in the form below:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT."

Any holder of a certificate evidencing shares of New ~~Convertible~~ Preferred Stock or New Common Stock bearing such legend may present such certificate to the transfer agent for such securities for exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such times as (a) such shares are sold pursuant to an effective registration statement under the Securities Act, (b) such holder delivers to Reorganized Loehmann's Holdings, Inc. an opinion of counsel reasonably satisfactory to Reorganized Loehmann's Holdings, Inc. to the effect that such shares are no longer restricted securities under the Securities Act and such shares may be sold without registration under the Securities Act, or (c)

when such shares have been transferred pursuant to Rule 144, provided that such holder delivers to Reorganized Loehmann's Holdings, Inc., unless Reorganized Loehmann's Holdings otherwise agrees, an opinion of counsel reasonably satisfactory to Reorganized Loehmann's Holdings, Inc., to the effect that such shares are no longer restricted securities under the Securities Act and such shares may be sold without registration under the Securities Act.

Until the termination of the New Shareholders' Agreement, any certificates evidencing New Common Stock issued under the Plan, New Preferred Stock issued in connection with the Rights Offering or the Backstop Commitment or New Common Stock issued upon conversion thereof ~~shall~~will bear ~~the following~~a legend~~:~~ substantially in the form below:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO A SHAREHOLDERS' AGREEMENT ~~DATED AS OF [_____,] 2011~~ (THE "AGREEMENT"), WHICH CONTAINS PROVISIONS REGARDING (I) CERTAIN RESTRICTIONS ON THE TRANSFER OF SUCH SECURITIES, (II) CERTAIN TAG-ALONG RIGHTS AND DRAG-ALONG OBLIGATIONS APPLICABLE TO THIS SECURITY AND (III) CERTAIN OTHER MATTERS.  A COPY OF SUCH AGREEMENT IS AVAILABLE FOR INSPECTION AT THE PRINCIPAL OFFICE OF THE COMPANY. ANY TRANSFER OF THE SECURITIES EVIDENCED BY THIS CERTIFICATE IN VIOLATION OF THE AGREEMENT IS NULL AND VOID."

WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF REORGANIZED LOEHMANN'S HOLDINGS, INC. WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTORS AND REORGANIZED LOEHMANN'S HOLDINGS, INC. EXPRESS NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF REORGANIZED LOEHMANN'S HOLDINGS, INC., THE DEBTORS AND REORGANIZED LOEHMANN'S HOLDINGS, INC. MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF REORGANIZED LOEHMANN'S HOLDINGS, INC. ACCORDINGLY, IT IS RECOMMENDED THAT POTENTIAL RECIPIENTS OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES."

## XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain United States federal income tax consequences of the Plan and related transactions to the Debtors and certain Holders of Claims and Shareholders (as defined below).  This summary is based on the Internal Revenue Code of 1986 (the "IRC"), Treasury Regulations (proposed, temporary and final) issued thereunder ("Treasury Regulations") and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and

all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below. There can be no assurance that the Internal Revenue Service ("IRS") will not challenge one or more of the tax consequences of the Plan described below.

The following summary is for general information only. The tax treatment of beneficial owners of Claims (each a "Holder" and collectively, the "Holders") may vary depending on such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in this Plan. This summary also does not address the U.S. federal income tax consequences to Holders that are not United States Persons (as such term is defined in the IRC) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, partnerships or other passthrough Entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies). The following discussion assumes that Claims are held by Holders as "capital assets" within the meaning of section 1221 of the IRC and that all claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes. Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtors and Holders based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE**

STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE SOLICITATIONS OF VOTES ON THE PLAN OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE REORGANIZED DEBTORS

### 1.    Cancellation of Debt and Reduction of Tax Attributes

As a result of the Plan, Loehmann's aggregate outstanding indebtedness will be substantially reduced.  In general, absent an exception, a debtor will recognize cancellation of debt income ("CODI") upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price.  The IRC provides that a debtor in a bankruptcy case generally may exclude from income, but must reduce certain of its tax attributes by, the amount of any CODI realized upon consummation of a plan of reorganization.  The amount of CODI is generally the excess of (a) the adjusted issue price of any indebtedness discharged (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), over (b) any consideration given in exchange therefore, subject to certain statutory or judicial exceptions that can apply to limit the amount of CODI (such as where the payment of the cancelled debt would have given rise to a tax deduction).

Loehmann's expects to realize substantial CODI.  The amount of such CODI realized by Loehmann's (and the resulting tax attribute reduction) will depend significantly on the value of the New Common Stock and New Convertible Preferred Stock distributed pursuant to the Plan.  This value cannot be known with certainty until after the Effective Date.  Thus, the exact amount of such tax attribute reduction cannot be predicted with certainty.  As a general rule, tax attributes must be reduced in the following order: (a) NOLs, (b) most tax credits, (c) capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), and (e) foreign tax credits.  A debtor with CODI may elect first to reduce the basis of its depreciable assets under Section 108(b)(5) of the IRC, with any remaining balance applied to the other tax attributes in the order stated above.  It has not been determined whether Loehmann's will make the election under Section 108(b)(5).  In the context of a consolidated group of corporations, the IRC provides for a complex ordering mechanism to determine how the tax attributes of one member can be reduced in respect of the CODI of another member.

### 2.    Limitation of NOL Carry Forwards and Other Tax Attributes

Following the implementation of the Plan, Loehmann's anticipates that any remaining NOL carryforwards and certain built-in losses allocable to periods prior to the Effective Date may be subject to limitation under Section 382 of the IRC as a result of an "ownership change" of the Reorganized Debtors attributable to the transactions contemplated by the Plan.  This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from CODI

realized by Loehmann's. Loehmann's also expects that the ability of the Reorganized Debtors to use any remaining capital loss carryforwards and tax credits will also be limited.

a.    **General Section 382 Annual Limitation**

Section 382 of the IRC generally imposes an annual limitation (the "Section 382 Limitation") on a corporation's use of its NOL carryforwards (and may limit a corporation's use of certain built-in losses if such built-in losses are recognized within a five-year period following an ownership change) (collectively, "Pre-Change Losses") if a corporation undergoes an "ownership change."

The annual Section 382 Limitation on the use of Pre-Change Losses to offset income in any "post change year" is generally equal to the product of (a) the fair market value of the loss corporation's outstanding stock immediately before the ownership change, and (b) the long term tax-exempt rate in effect for the month in which the ownership change occurs. The long-term tax-exempt rate is published monthly by the IRS and is intended to reflect current interest rates on long-term tax-exempt debt obligations. Section 383 of the IRC applies a similar limitation to capital loss carryforward and tax credits. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding. See "Special Bankruptcy Exceptions" below.

In general, an ownership change occurs when the percentage of the corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by those shareholders at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date and (b) the period of time since the most recent ownership change of the corporation). A "5 percent shareholder" for this purpose includes, generally, an individual or entity that directly or indirectly owns 5% or more of a corporation's stock at any time during the testing period and one or more groups of shareholders that individually own less than 5% of the corporation's stock. Under applicable Treasury Regulations, an ownership change with respect to an affiliated group of corporations filing a consolidated return that has consolidated NOLs is generally measured by changes in stock ownership of the parent corporation of the group.

The issuance under the Plan of the New Common Stock and the New Convertible Preferred Stock, along with the cancellation of existing Equity Interests, is expected to cause an ownership change with respect to Loehmann's. As a result, Loehmann's Pre-Change Losses will be subject to the Section 382 Limitation (as described above). Loehmann's Section 382 Limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change. If, in any year, the amount of Pre-Change Losses used by the Reorganized Debtors to offset income is less than the Section 382 Limitation, any unused limitation may be carried forward, thereby increasing the Section 382 Limitation (the amount of Pre-Change Losses which may offset income) in the subsequent taxable year of the Reorganized Debtors.

b. **Special Bankruptcy Exceptions**

The Section 382 Limitation described above is subject to a special exception applicable in the case of a bankruptcy reorganization (the "Section 382(l)(5) Rule"). If a corporation qualifies for the Section 382(l)(5) Rule, the annual Section 382 Limitation will not apply to the corporation's Pre-Change Losses. Instead, a corporation's Pre-Change Losses are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the Effective Date, and the portion of the current taxable year ending on the date of the ownership change, in respect of all debt converted into stock pursuant to the bankruptcy reorganization ("Disqualified Interest"). Additionally, if the Section 382(l)(5) Rule applies and the Reorganized Debtors undergo another ownership change within two years after consummation of the plan of reorganization, then the reorganized corporation's use of any Pre Change Losses would be eliminated.

A corporation will qualify for the Section 382(l)(5) Rule if (a) the corporation's pre-bankruptcy stockholders and holders of certain debt (the "Qualifying Debt") receive, in respect of their claims, at least 50% of the stock of the reorganized corporation (or of a controlling corporation if also in bankruptcy) pursuant to a confirmed plan of reorganization, and (b) the corporation does not elect to opt out of the application of the Section 382(l)(5) Rule. Qualifying Debt includes any claim constituted by debt instruments which (i) were held by the same creditor for at least 18 months prior to the bankruptcy filing or (ii) arose in the ordinary course of a corporation's trade or business and have been owned, at all times, by the same creditor. Indebtedness will be treated as arising in the ordinary course of a corporation's trade or business if such indebtedness is incurred by the corporation in connection with the normal, usual or customary conduct of the corporation's business. For the purpose of determining whether a claim constitutes Qualifying Debt, special rules may in some cases apply to treat a subsequent transferee as the transferor creditor.

Where the Section 382(l)(5) Rule is not applicable (either because the debtor corporation does not qualify for it or otherwise elects not to utilize it), the Section 382 Limitation will apply but may be calculated under a special rule (the "Section 382(l)(6) Rule"). Where the Section 382(l)(6) Rule applies, a corporation in bankruptcy that undergoes an ownership change pursuant to a plan of reorganization values its stock to be used in computing the Section 382 Limitation by taking into account any increase in value resulting from the discharge of creditors' claims in the reorganization (rather than the value without taking into account such increases, as is the case under the general rule for non-bankruptcy ownership changes). However, unlike the Section 382(l)(5) Rule, the Section 382(l)(6) rule does not require the corporation's Pre-Change Losses to be reduced by Disqualified Interest and the reorganized corporation may undergo a subsequent ownership change within two years without triggering an elimination of its use of Pre-Change Losses.

The determination of the application of the Section 382(l)(5) Rule is highly fact specific and dependent on circumstances that are difficult to assess accurately. Loehmann's has not decided whether it will utilize the Section 382(l)(5) Rule (assuming it otherwise satisfies the substantive criteria in order to qualify for the Section 382(l)(5) Rule). However, since the Holders of the Notes will receive in the

aggregate 51% of the New Common Stock (after giving effect to the Rights Offering and the issuance of New Convertible Preferred Stock), the acquisition of more than a de minimis amount of Notes by the Holders within the eighteen month period preceding the Petition Date will preclude the Reorganized Debtors' ability to qualify for the application of the Section 382(l)(5) Rule, if the Reorganized Debtors otherwise satisfy the substantive criteria to qualify for the Section 382(l)(5) Rule. In the event that the Reorganized Debtors' do not use the 382(l)(5) Rule, Loehmann's expects that the Reorganized Debtors' use of any of its Pre-Change Losses after the Effective Date will be subject to a Section 382 Limitation computed by taking into account the Section 382(l)(6) Rule. Even if the special bankruptcy exceptions under either the Section 382(l)(5) Rule or the Section 382(l)(6) Rule apply, instead of the general Section 382 Limitation, the use of a portion of the Pre-Change Losses nevertheless may be subject to existing limitations limited as a result of prior ownership changes.

The above discussion does not address transactions that may occur after the Effective Date, including the exercise by a holder of options to acquire stock in the Reorganized Debtors, any of which transactions may cause or increase the likelihood of an "ownership change" in Reorganized Loehmann's Holdings. Holders are urged to consult their own tax advisors with respect to the U.S. federal income tax consequences of any such transaction.

### 3. Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carry-forwards, only 90% of a corporation's taxable income from AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change, within the meaning of section 382 of the IRC and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be adjusted for certain AMT purposes to reflect the fair market value of such assets as of the ownership change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

**B.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS**

**1.   Consequences to Holders of Allowed Class 3 and Class 4 Secured Note Claims**

For Holders of the Notes that exchange their Notes for Subscription Rights (solely in the case of Holders of Allowed Class 3 Claims) in the Rights Offering and New Common Stock pursuant to the Plan, Loehmann's believes that the U.S. federal income tax treatment of the exchange is currently unclear.  Holders of Notes are urged to consult their own tax advisors with respect to the U.S. federal income tax treatment.

Pursuant to the Plan, CapCo and Holdings will be merged into Reorganized Loehmann's Operating Co. (the "Merger").  As a result of the Merger and Rights Offering, the Holders of the Notes, which were issued by CapCo, will exchange their Notes for New Common Stock of Reorganized Loehmann's Holding, the parent of Reorganized Loehmann's Operating Co., and in the case of Holders of Allowed Class 3 Claims, for New Common Stock and Subscription Rights.  The Merger and Rights Offering may be treated as a reorganization within the meaning of IRC Section 368(a)(1)(G) (a "G Reorganization").  The law regarding whether a transaction qualifies as a reorganization is uncertain and there can be no assurance that the IRS will respect the characterization of the Merger and Rights Offering as a G Reorganization.  If the IRS were to treat the Merger and Rights Offering as a G Reorganization, a Holder of a Note generally will not recognize loss with respect to the exchange and will not recognize gain except to the extent any of the New Common Stock or Subscription Rights are treated as received in satisfaction of accrued but unpaid interest with respect to the exchanged Notes (see "Accrued Interest" below).  If the Merger and Rights Offering is not treated as a G Reorganization, then a Holder of Notes should be considered to receive New Common Stock and Subscription Rights pursuant to a fully taxable exchange as described below.  Whether the Merger and Rights Offering would be treated as a G Reorganization will depend, in part, on whether the Notes are considered "securities" for federal income tax purposes. If the Notes are considered securities, the Merger and Rights Offering may qualify as a G Reorganization.

The term "security" is not defined in the IRC or applicable Treasury Regulations.  Judicial decisions have held that the determination whether a particular debt constitutes a "security" is based on an overall evaluation of the nature of the original debt.  One of the most significant factors is the term of the original debt.  In general, debt obligations issued with a weighted average maturity at issuance of five (5) years or less do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more do constitute securities.  The term of the Notes is seven (7) years.  Because the original term of the Notes is greater than five (5) years and less than ten (10) years, there is significant uncertainty as to whether the Notes would be treated as "securities."  Additional factors to be considered include whether the debt instruments were secured, subordinate to other creditors, exposed to the risks of the enterprise and the intent of the parties.

### a. Notes Treated as Securities.

If the Notes are classified treated as "securities" for U.S. federal income tax purposes, the receipt of the New Common Stock by a Holder of an Allowed Class 4 Notes Claim, and the receipt of New Common Stock and Subscription Rights by a Holder of an Allowed Class 3 Notes Claim, may be treated as a G Reorganization. In such case, the Holders of the Notes will not recognize loss, and generally will not recognize gain except to the extent any of the New Common Stock and Subscription Rights are treated as received in satisfaction of accrued but unpaid interest with respect to the exchanged Notes (see "Accrued Interest" below). In the case of a Holder of an Allowed Class 4 Notes Claim, such Holder's adjusted tax basis in the New Common Stock will be their adjusted tax basis in the Notes exchanged therefor. The Debtors expect that the Subscription Rights will not have any value. Therefore, in the case of a Holder of an Allowed Class 3 Notes Claim, such Holder's adjusted tax basis in the Notes will be allocated in full to the New Common Stock, and such Holder will have an adjusted tax basis of zero in the Subscription Rights received. A Holder of the Notes' holding period in the New Common Stock and Subscription Rights will include the holding period for the Notes exchanged therefor.

### b. Notes Not Treated as Securities.

If the Notes are not treated as "securities," the Note Exchange will constitute a taxable transaction and Holders of the Notes will recognize gain or loss on the exchange equal to the difference between their "amount realized" in the exchange and their adjusted tax basis in their Notes. In the case of an Allowed Class 4 Notes Claim Holder, the amount realized will be the sum of the fair market value of the New Common Stock received. The Debtors expect that the Subscription Rights will not have any value. Therefore, in the case of an Allowed Class 3 Notes Claim Holder, the amount realized will be the sum of the fair market value of the New Common Stock received. A Holder of the Notes' adjusted tax basis in the Notes (other than Claims for accrued but unpaid interest) would be the amount paid for such Notes, reduced by principal payments received by the Holder of the Notes. A Holder's gain or loss on the exchange would be capital gain (subject to the "Market Discount" rules discussed below), assuming the Notes were held as a capital asset, and would be long-term capital gain or loss if the Holder held the Notes for more than one (1) year on the date of the exchange. A Holder of the Notes' tax basis in the New Common Stock will be equal to its fair market value on the Effective Date. In the case of a Holder of an Allowed Class 3 Notes Claim, because the Debtors expect that the Subscription Rights will not have any value, such Holder's tax basis in the Subscription Rights will be zero. A Holder of the Notes holding period in the New Common Stock will begin on the day after the Effective Date, and a Class 3 Holder's holding period in the Subscription Rights will begin on the day after receipt.

### 2. Consequences to Holders of Allowed Class 1 and 2 Claims

Pursuant to the Plan, Allowed Class 1 and 2 Claims will be exchanged for Cash or, in the case of certain Secured Claims, the collateral securing such Claims. A Holder who receives Cash or collateral should recognize capital gain or loss equal to the difference between (1) the amount of Cash and/or the fair market value of any

collateral received that is not allocable to accrued interest and (2) the Holder's tax basis in the Allowed Claims surrendered therefor by the Holder. Such gain or loss should be (subject to the "market discount" rules described below) long-term capital gain or loss if the Holder has a holding period for Allowed Claims of more than one year. To the extent that a portion of the Cash and/or collateral received in exchange for the Allowed Claims is allocable to accrued but untaxed interest, the Holder may recognize ordinary income (as discussed in greater detail in "Accrued Interest" and "Market Discount" below).

3. **Consequences to Holders of Allowed Class 5 Claims**

The Debtors intend to create a General Unsecured Claims Distribution Escrow Account for Cash held for the benefit of Holders of Allowed Class 5 General Unsecured Claims. Under the IRC, interest and other income earned on such accounts are subject to current tax. However, the U.S. Treasury Department has not issued Treasury regulations to address the U.S. federal income tax treatment of such funds that specifically applies in a bankruptcy context. Accordingly, the proper tax treatment of such funds is uncertain. The Debtors intend to treat the General Unsecured Claims Distribution Escrow Account as a "disputed ownership fund" taxed as an entity separate from the Reorganized Debtors for U.S. federal income tax purposes.

Under such treatment, a designee of the Creditors' Committee shall file all income tax returns with the IRS with respect to any income attributable to the General Unsecured Claims Distribution Escrow Account, and shall pay the federal, state and local income taxes attributable to the General Unsecured Claims Distribution Escrow Account using Cash available in the General Unsecured Claims Distribution Escrow Account, based on the items of income, deduction, credit or loss allocable thereto.

Although not free from doubt, Holders should not recognize any gain or loss on the date that the Cash is transferred by the Debtors to the General Unsecured Claims Distribution Escrow Account, but should recognize gain or loss in an amount equal to: (i) the amount of Cash actually distributed to such Holder from the General Unsecured Claims Distribution Escrow Account, less (ii) the Holder's adjusted tax basis of its Claim. Such gain or loss should be (subject to the "market discount" rules described below) long-term capital gain or loss if the Holder has a holding period for Allowed Claims of more than one year. To the extent that a portion of the Cash received in exchange for the Allowed Claims is allocable to accrued but unpaid interest, the Holder may recognize ordinary income (as discussed in greater detail in "Accrued Interest" and "Market Discount" below).

Holders should note the tax treatment of the General Unsecured Claims Distribution Escrow Account is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on, and distributions from, the General Unsecured Claims Distribution Escrow Account.

4. **Consequences to Holders of ~~Class 6~~ Subordinated Claims**

Pursuant to the Plan, each ~~Class 6~~ Subordinated Claim shall be cancelled without any distribution. A Holder may be entitled in the year of cancellation (or in an

earlier year) to a bad debt deduction in some amount under section 166(a) of the IRC to the extent of such Holder's tax basis in the Claim. The rules governing the timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of ~~Class 6~~Subordinated Claims therefore are urged to consult their tax advisors with respect to their ability to take such a deduction.

5.      **Consequences to Holders of Class 6 ~~Claims~~Interests**

Pursuant to the Plan, a Holder of Equity Interests will receive no distribution and its Equity Interests will be discharged, cancelled, released and extinguished as of the Effective Date. Section 165(g) of the IRC permits a "worthless security deduction" for any security that is a capital asset that becomes worthless within the taxable year. Thus, a Holder of Equity Interests may be entitled to a worthless security deduction. The rules governing the timing and amount of worthless security deductions place considerable emphasis on the facts and circumstances of the Holder, the issuer, and the instrument with respect to which the deduction is claimed. Holders are therefore urged to consult their tax advisors with respect to their ability to take such a deduction.

6.      **Accrued Interest**

To the extent that any amount received by a Holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the Holder as ordinary interest income to the extent not already taken into income by the Holder. Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the Holder's gross income but was not paid in full by Loehmann's. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which an amount received by a Holder of a Claim will be attributable to accrued interest on the debt instrument constituting the Claim is unclear. Certain Treasury Regulations treat a payment under a debt instrument first as a payment of accrued and unpaid interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such claim, to the extent otherwise permitted and as determined for U.S. federal income tax purposes, and thereafter to the remaining portion of such Claim, if any.

7.      **Market Discount**

Under the "market discount" provisions of the IRC, some or all of any gain realized by a Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax

basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). However, special rules apply to the disposition of a market discount obligation in certain types of non-recognition transactions, such as reorganization and accrued, but previously untaxed, Market Discount may nevertheless be recognized on such exchange as ordinary income.

**C.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF SUBSCRIPTION RIGHTS, NEW COMMON STOCK AND NEW CONVERTIBLE PREFERRED STOCK**

The discussion in this section is addressed to a "Shareholder" who holds the Subscription Rights, New Convertible Preferred Stock or New Common Stock that is a "U.S. holder" for federal income tax purposes. A Shareholder is a U.S. holder if such Shareholder is a beneficial owner of the Subscription Rights, New Convertible Preferred Stock or New Common Stock that is for U.S. federal income tax purposes (i) a citizen or individual resident of the United States; (ii) a corporation (or other entity that is taxable as a corporation) created or organized in the United States or under the laws of the United States or of any State (or the District of Columbia); or (iii) any other person that is subject to U.S. federal income taxation on a net income basis in respect of its investment in the Subscription Rights, New Convertible Preferred Stock or New Common Stock.

**1.      Exercise of Subscription Rights**

A holder of Subscription Rights will not recognize gain or loss on exercise of a Subscription Right. The holder's tax basis in New Convertible Preferred Stock acquired through exercise of the Subscription Right will equal the sum of the exercise price for the Subscription Right and the holder's tax basis, if any, in the Subscription Right determined as described under "Consequences to Holders of Allowed Class 3 and Class 4 Note Claims" above. The holding period for the New Convertible Preferred Stock acquired through exercise of the Subscription Right will begin on the exercise date.

A holder that allows a Subscription Right to expire will recognize short-term capital loss equal to such holder's adjusted basis in the Subscription Rights. The deductibility of capital losses is subject to certain limitations. As described above under "Consequences to Holders of Allowed Class 3 and Class 4 Note Claims," the Debtors expect that a holder's adjusted basis in its Subscription Rights will be zero, and

therefore a holder that allows a Subscription Right to expire is not expected to recognize a capital loss.

### 2. Distributions on New Convertible Preferred Stock and New Common Stock

*In General*.  In general, distributions with respect to the New Convertible Preferred Stock or New Common Stock of Reorganized Loehmann's Holdings will constitute dividends, taxable upon receipt, to the extent made out of Reorganized Loehmann's Holdings' current or accumulated earnings and profits, as determined under U.S. federal income tax principles.  If a distribution exceeds Reorganized Loehmann's Holdings' current and accumulated earnings and profits, the excess will be treated as a non-taxable return of capital to the extent of a Shareholder's tax basis in the New Convertible Preferred Stock or New Common Stock (as applicable) and thereafter as capital gain from the sale or exchange of such New Convertible Preferred Stock or New Common Stock (as applicable). Dividends received by a corporate Shareholder will be eligible for the dividends-received deduction if certain holding period and other applicable requirements are met.

*Constructive Distributions*. Shareholders of New Convertible Preferred Stock may be treated as receiving a constructive dividend distribution from Reorganized Loehmann's Holdings if (1) the conversion rate is adjusted and as a result of such adjustment such Shareholder's proportionate interest in the assets or earnings and profits of Reorganized Loehmann's Holdings is increased and (2) the adjustment is not made pursuant to a bona fide, reasonable anti-dilution formula.  An adjustment in the conversion rate would not be considered made pursuant to such a formula if the adjustment were made to compensate the Shareholders of New Convertible Preferred Stock for certain taxable distributions with respect to the New Common Stock of Reorganized Loehmann's Holdings.  For example, an increase in the conversion ratio to reflect a taxable dividend to Shareholders of New Common Stock will generally give rise to a taxable constructive dividend to the Shareholders of New Convertible Preferred Stock to the extent made out of current and accumulated earnings and profits of Reorganized Loehmann's Holdings, even though such Shareholders of New Convertible Preferred Stock would not receive any cash related thereto.  In addition, in certain circumstances, the failure to make an adjustment of the conversion rate may result in a taxable distribution to a Shareholder of New Convertible Preferred Stock or New Common Stock, if as a result of such failure, the proportionate interests of the holders of the New Convertible Preferred Stock or New Common Stock or Reorganized Loehmann's Holdings, as applicable, in our assets or earnings and profits is increased.

Proposed regulations would require Reorganized Loehmann's Holdings to report to the IRS and to Shareholders the amount of constructive dividends with respect to the New Convertible Preferred Stock attributable to certain adjustments to the conversion rate taking place on or after January 1, 2011. It is anticipated that such constructive dividends would be reported to Shareholders in the same manner as actual dividends.

### 3. Sale or Other Taxable Disposition

A Shareholder of New Common Stock or New Convertible Preferred Stock will recognize gain or loss upon the sale or other taxable disposition of New Common Stock or New Convertible Preferred Stock equal to the difference between the amount realized upon the disposition of such stock and the Shareholder's adjusted tax basis in the New Common Stock or New Convertible Preferred Stock (as applicable). Any such gain or loss generally will be capital gain or loss if the New Common Stock or New Convertible Preferred Stock is held as a capital asset (within the meaning of the IRC), and will be long-term capital gain or loss if the Shareholder has held the New Common Stock or New Convertible Preferred Stock (as applicable) for more than one year as of the date of disposition. For a discussion of a Shareholder's tax basis and holding period in respect of New Common Stock received in the conversion of the New Convertible Preferred Stock, see below under "— Treatment of the Conversion." For a discussion of a Shareholder's tax basis and holding period in respect of New Common Stock received in exchange for Notes, see above under "Consequences to Holders of Allowed Class 3 and Class 4 Note Claims." Long-term capital gains recognized by individuals are generally subject to lower tax rates. The deductibility of capital losses by individuals and corporations is subject to limitation.

Notwithstanding the foregoing, under section 108(e)(7) of the IRC, a Shareholder of New Common Stock that acquired such New Common Stock in exchange for Notes may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if the Shareholder took a bad debt deduction with respect to their Notes or recognized an ordinary loss on the exchange of their Notes for New Common Stock.

### 4. Treatment of the Conversion of New Convertible Preferred Stock into New Common Stock

*In General*. A Shareholder will not recognize any income, gain or loss in respect of the receipt of New Common Stock upon the conversion of the New Convertible Preferred Stock of Reorganized Loehmann's Holdings, except that (1) the amount of cash, if any, received in respect of accrued and unpaid dividends will generally be taxable as described under "— Distributions on New Convertible Preferred Stock and New Common Stock" above; (2) although it is not free from doubt, we intend to treat New Common Stock received in respect of accrued and unpaid dividends as a taxable distribution as described under "— Distributions on New Convertible Preferred Stock and New Common Stock" above and (3) the receipt of cash in lieu of a fractional share of New Common Stock will generally be treated as if you received the fractional share and then received such cash in redemption of such fractional share. Such redemption will generally result in capital gain or loss equal to the difference between the amount of cash received and the Shareholder's tax basis in the New Common Stock that is allocable to the fractional share. Shareholders should consult their own tax advisors to determine the specific tax treatment of the receipt of cash or shares in respect of accrued and unpaid dividends or cash in lieu of a fractional share in their particular circumstances.

*Tax Basis.* A Shareholder's tax basis in the New Common Stock you receive upon a conversion of the New Convertible Preferred Stock of Reorganized Loehmann's Holdings (including any basis allocable to a fractional share) will generally equal the tax basis of the New Convertible Preferred Stock that was converted. A Shareholder's tax basis in a fractional share will be determined by allocating its tax basis in the New Common Stock between the New Common Stock received upon conversion and the fractional share, in accordance with their respective fair market values. A Shareholder's holding period for the New Common Stock it receives (other than New Common Stock received in respect of accrued and unpaid dividends) will include the holding period for the New Convertible Preferred Stock converted. The basis of New Common Stock received in respect of accrued and unpaid dividends that is treated as a taxable distribution will equal its fair market value at the time it is distributed and its holding period will begin on the day following the distribution.

## 5. Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan, including in connection with payments of dividends and the proceeds of a sale or other disposition of New Convertible Preferred Stock and New Common Stock to a Holder or Shareholder that is not an exempt recipient. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan, and a Shareholder may be subject to backup withholding with respect to the payment of dividends on the New Convertible Preferred Stock or New Common Stock, unless that Holder or Shareholder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder or Shareholder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided, however,* that the required information is timely provided to the Internal Revenue Service.

The Debtors and Reorganized Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors and Reorganized Debtors will comply with all applicable reporting requirements of the IRS.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.  CONCLUSION AND RECOMMENDATION

The Debtors, with the support of the Committee and holders of approximately 70% of the Secured Note Claims, believe the Plan is in the best interests of all Holders of Claims and urge all Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Debtors' Claims, Solicitation and Subscription Agent, no later than 512:00 p.m. prevailing Eastern Time on [————].February 2, 2011.

Dated:      December 22, 2010January 3, 2011

Respectfully submitted,

**LOEHMANN'S HOLDINGS, INC.**

By: /s/ Joseph Melvin
Title:   Chief Operating Officer/Chief
          Financial Officer

**LOEHMANN'S, INC.**

By: /s/ Joseph Melvin
Title:   Chief Operating Officer/Chief
          Financial Officer

**LOEHMANN'S REAL ESTATE HOLDINGS INC.**

By: /s/ Joseph Melvin
Title:   Chief Operating Officer/Chief
          Financial Officer

**LOEHMANN'S OPERATING CO.**

By: /s/ Joseph Melvin
Title:   Chief Operating Officer/Chief
          Financial Officer

**LOEHMANN'S CAPITAL CORP.**

By: /s/ Joseph Melvin
Title:   Chief Operating Officer/Chief
          Financial Officer

Exhibit A

~~First~~Second Amended Joint Plan of Reorganization

Exhibit B

Forms of Letters to Holders in each of the Voting Classes

[TO FOLLOW]

Exhibit C

Signed Disclosure Statement Order


[TO FOLLOW]

Exhibit D

Restructuring Support Agreement

Exhibit E

Liquidation Analysis

Exhibit F

Financial Projections

Exhibit G

Annual Report for Fiscal Year Ended January 30, 2010 and
Quarterly Report for Fiscal Quarter Ended July 31, 2010

Exhibit H

Rights Offering Procedures

Exhibit I

Pro Forma Equity Ownership Immediately Upon Effective Date