TOGUT, SEGAL & SEGAL LLP                                    Hearing Date: 2/7/2011 at 9:45 a.m.
One Penn Plaza
Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald
Howard P. Magaliff
Jonathan Ibsen

Counsel to the
 Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
In re:                                                      :     Chapter 11
                                                            :
LOEHMANN'S HOLDINGS INC., *et al.*,                         :     Case No. 10-16077
                                                            :
                           Debtors.                         :     Jointly Administered
                                                            :
------------------------------------------------------------X

### DECLARATION OF LEE DIERCKS IN SUPPORT OF CONFIRMATION OF DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION

I, Lee Diercks, pursuant to 28 U.S.C. § 1746, declare that the following is true to the best of my knowledge, information and belief:

1.  I am a Partner and Managing Director of Clear Thinking Group LLC ("Clear Thinking"), a consulting firm that specializes in corporate restructuring, operations improvements, litigation analytics, liquidation and asset sales and case management services. Pursuant to an Order of the Bankruptcy Court dated December 6, 2010, Clear Thinking was retained in the above-captioned Debtors' case as financial advisor to the Debtors. Among the services that Clear Thinking was engaged to provide were to (i) assist in the development of the Debtors' Chapter 11 plan, (ii) assist in the development of financial data and presentations to the Debtors' Board of Directors, secured lender, landlords, various creditors, the Court and other third parties, (iii) ana-

lyze various liquidation scenarios and potential impact of these scenarios on the recoveries of those stakeholders impacted by the Debtors' partial or full liquidation, and (iv) provide expert witness testimony concerning the subjects encompassed by these services.

2. I prepared the Liquidation Analysis that was attached as <u>Exhibit E</u> to the Debtors' Disclosure Statement.

3. I submit this Declaration in connection with the proposed confirmation of the Debtors' Second Amended Joint Plan of Reorganization dated January 3, 2011 (the "Plan").

**<u>Professional Background and Qualifications</u>**

4. I have considerable expertise with Chapter 11 restructuring, asset liquidation, sale of distressed assets, and other distressed company circumstances, advising both debtors and creditors. Examples of Debtor Retail Advisory assignments in which Clear Thinking and I have been actively involved include, among others: Crabtree & Evelyn, Inc., The Walking Company, Inc., Bacharach, Inc., Swoozies, Inc., The Parent Company, Inc., Barbecues Galore, Inc., Boot Town Western Warehouse, Inc., One Price Clothing, Inc., Market Antiques & Home Furnishing, Inc., Prints Plus, Inc., Bag'n Baggage, Inc., Copeland Sports, Inc., Lillian Vernon, Inc., and Rag Shops, Inc.

5. I have prepared liquidation analyses for many companies, both in and out of bankruptcy. These analyses have been utilized in a variety of situations and for different reasons, including for chapter 11 plan confirmation. It is standard practice in the financial advisory industry to perform a liquidation analysis for distressed companies, to enable the company and its professionals to evaluate all of the various options for resolving the distressed situation. I have testified at depositions and/or at

trial as an expert witness more than 12 times, including specifically with respect to liquidation analyses.

6. I hold a BA degree in Business/Marketing from St. Thomas University, and an MBA from Impac University. I have over 30 years of direct management and leadership experience, and for the last 13 years, I have worked in the corporate renewal/turnaround industry with companies in manufacturing, distribution, consumer products, and retail. I am a member in good standing of the Association for Corporate Growth and the Turnaround Management Association.

7. I believe that my knowledge, skill, experience, training and education qualify me as an expert in the matters for which I am providing this Declaration.

8. Unless otherwise stated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant available data and information, and documents and information provided to me by the Debtors or their professionals. I have formed my opinions based upon these facts and data, utilizing standard industry principles and methods. If called upon to testify, I can and would competently state the following.

**Purpose of the Liquidation Analysis**

9. The Debtors will rely upon the Liquidation Analysis to demonstrate that the Plan complies with section 1129(a)(7)(A)(ii) of the Bankruptcy Code, which requires that each holder of a claim in an impaired class either votes to accept the Plan, or will receive or retain under the Plan property having a value, as of the effective date of the Plan, that is not less than the amount that the holder would receive on account of its claim if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

10. The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs that would be realized if the Debtors were liquidated in ac-

cordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is based on a number of estimates and assumptions that, although considered reasonable by management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the Debtors' controls, and which could be subject to material change.

**Summary of Conclusions**

11. It is my opinion that the liquidation value of the Debtors' recoverable assets as of February 28, 2011 ranges from a low of $21,815,000 to a high of $35,123,000, with a mid range value of $28,469,000. This is the amount that would be available for distribution to creditors before the payment of the administrative fees and expenses of a chapter 7 trustee, including professionals that the trustee would retain.

12. It is my opinion that after paying chapter 7 administrative expenses, the amount available to pay secured creditors in their order of priority, beginning with repayment of amounts outstanding under the Amended and Restated Debtor in Possession Credit Agreement dated as of December 15, 2010, ranges from a low of $19,637,000 to a high of $32,546,000, with a mid point of $26,091,000.

13. The DIP loan is projected to be $24,821,000 as of February 28, 2011. It is my opinion that at the low end of the valuation analysis, the DIP lenders would receive payment of approximately 79.12% of the amount outstanding. Under the mid point and high valuation analyses, the DIP loan would be paid in full.

14. It is my opinion that the amount available to pay prepetition secured creditors in their order of priority, beginning with repayment of amounts outstanding under the secured A Series notes, ranges from a low of $0.00 to a high of $7,725,000, with a mid point of $1,271,000. At the high valuation, the holders of A notes

would receive approximately 10.3% of their claims, and at the mid point they would receive approximately 1.69%.

15.   In comparison, under the Debtor's proposed Plan, the holders of the secured A Series notes are projected to receive approximately 37.1% of the value of their claims.  Thus, it is my opinion that the holders of the A notes will receive more under the Plan than they would in a chapter 7 liquidation.

16.   It is my opinion that no creditors with a priority lower than the holders of secured A Series notes would receive any distribution at all in a chapter 7 liquidation.

17.   In comparison, under the Debtors' proposed Plan, the holders of the secured B Series notes are projected to receive approximately 13.8% of the value of their claims, and general unsecured creditors are projected to received approximately 7.6% of the value of their claims.  Thus, it is my opinion that these creditors will receive more under the Plan than they would in a chapter 7 liquidation

18.   It is my opinion that holders of allowed claims in every class of creditors under the Debtors' Plan are projected to recover more under the Plan than they would receive in a chapter 7 liquidation.

**General Assumptions Underlying the Analysis**

19.   To perform the Liquidation analysis, Clear Thinking made certain general assumptions, which I believe are reasonable and appropriate under the circumstances of this case.  These assumptions are:

- Liquidation would commence under the direction of a chapter 7 trustee and continue for a period of approximately six months, during which all of the Debtors' significant assets would either be sold or conveyed to the respective lien holders, and the cash proceeds, net of liquidation related costs, would then be distributed to creditors.

5

- The chapter 7 trustee would generally undertake: (i) the orderly collection of existing accounts receivable and future receivables during the wind down, (ii) the orderly sale of inventory, equipment, designation rights for the real estate leases and other fixed assets, and (iii) the orderly wind-down of the Debtors' estate.

- The chapter 7 trustee would be able to negotiate a charging lien against the assets that are subject to the claims of secured creditors. Under the DIP Order, liens were granted to the DIP Lenders against all of the Debtors' assets. Clear Thinking assumed that without an agreement as to a charging lien between the chapter 7 trustee and the DIP Lender that the chapter 7 trustee would likely abandon many of the assets in favor of the DIP Lender. In making this assumption, I am aware that the DIP Order provides for a $50,000 carve-out from the DIP Lender's collateral for chapter 7 burial expenses. Clear Thinking has assumed that the first $50,000 of chapter 7 administrative expenses associated with liquidating the DIP Lender's collateral would be charged to the liquidation proceeds of that collateral. Since the DIP Lender will be paid in full under mid-case and high case scenarios, Clear Thinking assumed that the balance of chapter 7 administrative expenses would be paid from the liquidation proceeds of the remaining assets.

- The chapter 7 trustee would reject substantially all of the Debtors' major executory contracts and unexpired leases, giving rise to additional rejection damage claims.

- Certain vendors will offset some of their outstanding unsecured claims against amounts that are owed to the Debtors (in the form of prepetition receivables).

20. The Liquidation Analysis assumes that proceeds would be distributed in accordance with the priorities required by sections 726 and 507 of the Bankruptcy Code. Specifically, net value from the liquidation of assets after the payment of fees associated with the liquidation generally would be distributed first to satisfy secured claims to the extent of the collateral value securing such claims, in order of priority. Next, value would flow to any unpaid chapter 11 administrative expense claims, then to prepetition priority claims and finally to general unsecured claims.

21. Clear Thinking did not include an estimate for other unsecured claims, such as claims of customers and other agreements arising from failure of the

Debtors to perform and render services. These types of claims are difficult to estimate but are presumed to occur in a liquidation context due to the cessation of the Debtors' business operations and the resulting rejection of contracts and lease agreements. These claims are likely substantial and, in the situation where it is projected that unsecured creditors would receive a distribution in a liquidation scenario, would further dilute that recovery. However, since the Liquidation Analysis in this case demonstrates that unsecured creditors would not receive a distribution in chapter 7, I did not think that it was necessary to estimate potential claims arising from the Debtors' failure to perform and render services under relevant agreements.

**Components of the Liquidation Analysis**

22. Clear Thinking looked at the Debtors' seven different categories of assets. These are: (i) cash; (ii) accounts receivable; (iii) inventory; (iv) prepaid expenses; (v) property, plant and equipment (PP&E) net of accumulated depreciation; (vi) intellectual property (IP); and (vii) real estate leases. Clear Thinking then undertook a 3-step process to arrive at the estimated value of the Debtors' assets in the Liquidation Analysis. First, Clear Thinking determined the estimated value of the assets as of February 28, 2011. Second, after determining the value for each category of asset, Clear Thinking subtracted the anticipated costs to recover and liquidate the PP&E, IP and leases. Third, Clear Thinking discounted the values to arrive at low, mid point and high values for each category of assets to reflect the nature of the sale process undertaken. For instance, the low value assumes forced-sale liquidation by a chapter 7 trustee in the shortest possible time frame, while the high end reflects an orderly liquidation by a trustee over a six-month period. Clear Thinking chose the recovery rate percentage for the low, mid and high ranges for each category of assets based upon the firm's experience in other cases and industry knowledge.

23.     After determining the low, mid and high values, Clear Thinking performed an analysis to demonstrate the projected distributions to creditors under each of the three scenarios. This analysis shows that under no scenario will distributions be made to the class of secured B Series note holders or below.

24.     Liquidation values were estimated for each asset or assessed for assets in similar categories by estimating the percentage recoveries that a chapter 7 trustee might obtain for that category of asset. Following is a discussion of some specific assumptions associated with each asset category (other than cash, which has a 100% recovery rate) in the Liquidation Analysis.

25.     <u>Accounts receivable</u>. The accounts receivable, with a stated value of $5,447,000, for the most part reflect credit card charges. Clear Thinking believes that the recovery rate for credit card charges is very high, ranging from 75% at the low end to 85% at the high end.

26.     <u>Inventory</u>. Inventory is stated at the net orderly liquidation value based upon the cost value of the inventory. In my experience, 80% cost recovery for the type of inventory the Debtors have is normal in an orderly chapter 11 liquidation. In the chapter 7 liquidation scenario, Clear Thinking's experience and knowledge suggests that 50% of the orderly liquidation value, or 40% of cost, can be achieved. The reduction in realizable value is based in part on the assumptions that upon conversion to chapter 7, the stores would close and all employees would be let go, resulting in a different type of liquidation process.

27.     <u>Prepaid Expenses</u>. These include such things as shipping supplies (*i.e.*, boxes and packing materials), prepaid utility deposits and insurance. Clear Thinking assumed that deposits would be offset against outstanding charges, with any bal-

ance refunded to the Debtors. The shipping supplies would have minimal value – 20% of the balance sheet amount at most.

28. <u>Property, Plant & Equipment</u>. The PP&E consists of equipment such as racks and point of sale systems in the stores and warehouse that are not leased from Capco. The PP&E is stated at balance sheet cost, net of accumulated depreciation. However, based upon my experience, PP&E of this kind and nature has very little resale value in the market, and Clear Thinking concluded that the recovery rate for the racks and POS systems would be between 5% and 15% of cost.

29. <u>Intellectual Property</u>. Clear Thinking considered the Debtors' IP assets, which consist of trademarks, Internet domain names, URLs and customer data. We reviewed the book value of these assets, and in forming an estimate of value, considered that Loehmann's is primarily a northeast and west coast regional retailer, not known nationally, and with no Internet business.

30. Clear Thinking also consulted a leading intellectual property consultant, with extensive experience providing high-quality intellectual property valuation and related services to large and complex companies in bankruptcy proceedings and other distressed situations.

31. Based upon our analysis, Clear Thinking estimated the value of the IP to be a low of $500,000 in a forced sale to a high of $1,500,000 in an orderly chapter 7 liquidation.

32. <u>Lease Designations</u>. The Liquidation Analysis ascribes a value of $3,000,000 to designation rights for the Debtors' leases, which consist of 46 store leases, the warehouse/distribution center lease, and the corporate offices. Clear Thinking obtained this estimate of the value of the designation rights from DJM Asset Management, LLC ("DJM"), which has been retained by the Debtors to provide consulting and advi-

9

sory services with respect to the potential restructuring of certain of the Debtors' leasehold interests. Loehmann's previously retained DJM pre-petition. DJM assisted the Debtors with lease termination and modification negotiations, and marketing of certain leasehold interests for assignment or sublease. DJM's professionals, therefore, have developed relevant experience and expertise regarding the Debtors and have in-depth knowledge of the Debtors' leasehold interests.

33. The average remaining term of the Debtors' leases is approximately 5.4 years. DJM informed Clear Thinking that very few of the leases are below market, and it was DJM's view that there would be only limited interest in the market in acquiring the leases themselves. Clear Thinking concluded that for purposes of a chapter 7 liquidation analysis, it was more reasonable to assume that a sale of the designation rights for the Debtors' leases was a quicker, less expensive and more reliable means of realizing value than marketing each lease separately. The latter process would have entailed appraising each lease individually to determine its marketability, negotiating assumption agreements with third parties, fixing cure amounts, and determining the ability of a proposed assignee to provide adequate assurance of future performance with the landlords. During that time, administrative expenses for rent and related charges would accrue, because the trustee would not be able to reject the leases until the marketing process was concluded and no buyers found. There is also the possibility that disputes over cure or adequate assurance could result in litigation and delay.

34. Conversely, the sale of designation rights can result in more immediate realizable value for the estate. Sales of designation rights have become a common means in bankruptcy cases of disposing of leasehold interests in a more streamlined and expedited fashion. Thus, Clear Thinking believed that valuing the designation rights was superior to valuing each lease. Clear Thinking assumed for purposes of its

estimate that the designation rights would be sold by a chapter 7 trustee under a forced sale scenario, to minimize the administrative expenses that would accrue until the leases could be rejected.

35. After Clear Thinking prepared the Liquidation Analysis, the Debtors determined that, post confirmation, the Reorganized Debtors will move forward with 40 instead of 46 stores. I understand that they made the decision to close an additional six stores based, in part, upon their lack of performance in relation to the remaining stores.

36. It is my opinion that closing these six stores will have no material effect on the Liquidation Analysis. The stores were underperforming and did not significantly contribute to the Debtors' revenue. The amount of inventory that Clear Thinking expects the Debtors will have on hand at the end of February is approximately $2 million less than when we prepared the Liquidation Analysis, and will have no discernable effect on the overall analysis. In addition, while there will be fewer leases to include in the sale of designation rights, I think the impact will at most be marginal, because these are leases associated with unprofitable stores.

37. In addition, after Clear Thinking prepared the Liquidation Analysis, which was filed on December 1, 2010 with the Disclosure Statement, the Debtors entered into an amended and restated DIP credit agreement, pursuant to which Whippoorwill Associates, Inc. provided a $7 million junior loan. The Debtors are required to repay the Whippoorwill loan after payment of the senior Crystal facility.

38. The $7 million Whippoorwill loan was not included in the Liquidation Analysis. However, in a chapter 7 liquidation, the trustee would be required to pay Whippoorwill before making any distributions to the secured A series noteholders. If that payment is factored into the Liquidation Analysis, the result would be that under

11

the mid point scenario Whippoorwill would receive less than full payment of its loan, and under the high point Whippoorwill would be paid in full. Thereafter, the amount left to distribute to the secured A series noteholders in the high valuation scenario (approximately $725,000) would result in a distribution of approximately .0097%, or about one-tenth of the projected high distribution without the junior DIP loan. No other creditors in any scenario would receive a distribution.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on February 2, 2011 in New York, New York.

/s/ Lee Diercks
LEE DIERCKS